**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RECEIVED

MAY 2 6 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| IN RE SULFURIC ACID<br>ANTITRUST LITIGATION | : MDL Docket No. 1536<br>: Case No. 03 C 4576<br>: Honorable Judge David H. Coar<br>: Magistrate Judge Jeffrey Cole |
| This Document Relates To:<br><br>ALL RELATED ACTIONS | :<br>:<br>:<br>: |

## THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of a Class of all those similarly situated, bring this

action for damages and injunctive relief under the antitrust laws of the United States against De-

fendants NorFalco LLC, Noranda Inc., Falconbridge Ltd., E.I. du Pont de Nemours & Co., Pres-

sure Vessel Services, Inc., PVS Chemicals, Inc. (Ohio), PVS Chemical Solutions, Inc., PVS

Nolwood Chemicals, Inc., GAC Chemical Corporation, Marsulex, Inc., ChemTrade Logistics

(U.S.), Inc., Intertrade Holdings, Inc., Koch Sulfur Products Company, and Koch Sulfur Products

Company, LLC demanding a trial by jury, and complaining and alleging as follows:

### I.    NATURE OF THE CASE

1.    This is a class action lawsuit brought on behalf of direct purchasers of sulfuric

acid against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. §1.  As more

fully alleged below, Defendants contracted, combined or conspired to raise, fix, maintain or sta-

bilize the price of sulfuric acid sold in the United States.  As part of the conspiracy, Defendants

agreed to limit the supply of sulfuric acid in the United States, to fix prices, and to allocate mar-

kets and customers for the sale of sulfuric acid in the United States.  As a result of Defendants'

unlawful conduct, Plaintiffs and the Class, as hereinafter defined, paid prices for sulfuric acid that were artificially inflated and they have suffered injury to their business and property.

## II.   JURISDICTION AND VENUE

2.     Plaintiffs bring this action pursuant to Sections 4(a) and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violations of Section 1 of the Sherman Act.

3.     Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

4.     Personal jurisdiction over all Defendants comports with the United States Constitution.

5.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found or had agents in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out, in this District.

## III.   DEFINITIONS

6.     As used in the Complaint:

    a.     "Sulfuric acid" is a colorless, odorless, extremely corrosive, oily liquid used in making dyes, paints, explosives, fertilizers, other products, and in industrial processes.

    b.     The term "Class Period" refers to the time period from January 1, 1988 until January 16, 2003.

2

## IV.     PARTIES

7.     Plaintiff Ohio Chemical Services, Inc. is an Ohio corporation and a chemical distributor located in Columbus, Ohio. During the Class Period, Ohio Chemical Services, Inc. purchased sulfuric acid directly from one or more of the Defendants or their co-conspirators, and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

8.     Plaintiff Independent Chemical Corporation is a corporation and a chemical distributor with its principal place of business located in Glendale, New York. During the Class Period, Independent Chemical Corporation purchased sulfuric acid directly from one or more of the Defendants or their co-conspirators and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

9.     Plaintiff National Alum Corporation is a Texas corporation with its principal place of business located in Mesquite, Texas. During the Class Period, National Alum Corporation purchased sulfuric acid directly from one or more of the Defendants or their co-conspirators and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

10.     Plaintiff Producers Chemical Company is an Illinois corporation with its principal place of business located in Batavia, Illinois. During the Class Period Producers Chemical Company purchased sulfuric acid directly from one or more of the Defendants or their co-conspirators, and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

11.     Plaintiff Old Bridge Chemicals, Inc. is a New Jersey corporation with its principal place of business located in Old Bridge, New Jersey. During the Class Period, Old Bridge

Chemicals, Inc. purchased sulfuric acid directly from Defendants or their co-conspirators and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

12.     Plaintiff AG RX is a California corporation located in Oxnard, California. During the Class Period, AG RX purchased sulfuric acid directly from one or more of the Defendants or their co-conspirators and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

13.     Defendant NorFalco LLC ("NorFalco") is a Delaware limited liability company with its principal place of business located at 6050 Oak Tree Boulevard, Suite 190, Independence, Ohio 44131. Originally formed in 1998 as a joint venture between Noranda Inc. ("Noranda"), Falconbridge Ltd. ("Falconbridge") and E.I. du Pont de Nemours & Co. ("DuPont"), NorFalco at that time was named Noranda DuPont LLC. The company was renamed NorFalco on or around June 29, 2001, following Noranda's redemption of DuPont's interest in the joint venture. Currently, Noranda owns 65% of NorFalco's capital stock while Falconbridge owns 35%. NorFalco manufactured, marketed, sold or distributed sulfuric acid in the United States during the Class Period. NorFalco is responsible for Noranda DuPont LLC's illegal and collusive acts, as well as for NorFalco's own acts after Noranda Inc.'s redemption of DuPont's interest in the joint venture. In addition, as a result of their direct participation in NorFalco, Noranda and Falconbridge are each responsible for NorFalco's illegal and collusive acts.

14.     Noranda DuPont LLC ("Noranda DuPont") manufactured, marketed, sold or distributed sulfuric acid in the United States during the Class Period. Noranda DuPont was a joint venture among Noranda DuPont and Falconbridge. As a result of their direct participation in the joint venture, Noranda, DuPont and Falconbridge each are responsible for Noranda DuPont's il-

4

legal and collusive acts, as well as for their own acts prior to and after the existence of the joint venture.

15.     Defendant Noranda is a Canadian corporation with its principal place of business located at 181 Bay Street, Toronto, Canada. Noranda is a major producer of sulfuric acid. Noranda sold sulfuric acid to purchasers in the United States during the Class Period. Noranda currently sells sulfuric acid in the United States through NorFalco. Noranda is a 65% joint venture partner in NorFalco with Falconbridge.

16.     Noranda has systematic and continuous contacts with the United States in addition to its holdings in NorFalco. Noranda is listed on the New York Stock Exchange under the symbol NRD. Noranda also does business in the United States through numerous subsidiaries and affiliates (in addition to NorFalco) including, without limitation, the following entities wholly owned by Noranda: (1) Noranda Recycling Inc., headquartered in California, is one of the largest processors of precious metal-bearing electronic materials in the Western United States; (2) American Racing Equipment, Inc., one of the leading aluminum automotive wheel producers in the United States, produces aluminum wheels at three plants in the Los Angeles, California area and promotes its products through a network of more than 45,000 dealers in the United States; (3) Norandal USA, Inc. operates three aluminum rolling mills in the United States, employing some 774 people; (4) Noranda produces high purity aluminum and aluminum alloy products at its New Madrid reduction plant, located on the Mississippi River near New Madrid, Missouri. Molten aluminum production of the New Madrid plant was 220,000 tons in 2001.

17.     Noranda presents itself to the public as a unified corporate entity, referring to itself and its wholly-owned subsidiaries "individually or collectively" as the "company," "we," "us" or "ours" in its financial statements. Noranda's financial statements are consolidated with

5

all of its subsidiaries and joint ventures. Of the 13 "principal subsidiaries" that Noranda listed in its 2003 Annual Information Form filed with the United States Securities and Exchange Commission, eight listed under "jurisdiction" are incorporated in Delaware. Noranda stated in its 2000 Annual Report that 46% of its sales were made in the United States.

18.     Defendant Falconbridge is a Canadian corporation with its principal place of business located at 95 Wellington Street, Toronto, Canada. During the Class Period, Falconbridge manufactured, marketed, sold or distributed sulfuric acid in the United States. As of year-end 2002, Noranda owned 59.5% of Falconbridge. Falconbridge is a 35% joint venture partner with Noranda in NorFalco. Falconbridge has systematic and continuous contacts with the United States through its affiliate, Falconbridge U.S., Inc., whose offices are located in Pittsburgh, Pennsylvania. Of Falconbridge's total revenues in 2000, 32% were generated from sales in the United States.

19.     Defendant DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. During the Class Period, DuPont manufactured, marketed, sold or distributed sulfuric acid in the United States.

20.     Defendant Pressure Vessel Services, Inc., d/b/a PVS Chemicals, Inc. ("PVS"), is a Michigan corporation with its principal place of business in Detroit, Michigan. PVS is one of the largest manufacturers and marketers of sulfuric acid and other corrosive chemicals in the United States and worldwide. During the Class Period, PVS manufactured, marketed, sold or distributed sulfuric acid in the United States.

21.     PVS Chemicals, Inc., (Ohio) is a subsidiary of Pressure Vessel Services, Inc. PVS Chemicals, Inc., (Ohio) changed its name to PVS Chemical Solutions, Inc. PVS Chemical Solutions, Inc. has offices in Chicago, Illinois, Copley, Ohio and Buffalo, New York. During the

6

Class Period PVS Chemicals, Inc. (Ohio) and PVS Chemical Solutions, Inc., manufactured, marketed, sold or distributed sulfuric acid in the United States.

22.     PVS Nolwood Chemicals, Inc. is a corporation with its principal place of business in Detroit, Michigan. PVS Nolwood Chemicals, Inc. is a subsidiary of Pressure Vessel Services, Inc. During the Class Period PVS Nolwood Chemicals, Inc., manufactured, marketed, sold or distributed sulfuric acid in the United States.

23.     Pressure Vessel Services, Inc. d/b/a/ PVS Chemicals, Inc., PVS Chemicals, Inc. (Ohio), PVS Chemicals Solutions, Inc. and PVS Nolwood Chemicals, Inc. are collectively referred to herein as "PVS".

24.     Defendant GAC Chemical Corporation ("GAC") is an Indiana corporation with its principal place of business in Searsport, Maine. Defendant GAC was formerly known as General Alum & Chemical Corporation. On March 9, 1994, GAC acquired Delta Chemicals, Inc. of Searsport, Maine ("Delta"), a manufacturer of sulfuric acid and other chemicals, and was assigned Delta's sulfuric acid purchase contract with Noranda Sales Corporation, Limited. As a result of this merger and of the assignment of Delta's contract with Noranda, GAC is responsible for Delta's conspiratorial acts alleged in this Complaint, as well as for GAC's own conspiratorial acts prior to and/or subsequent to the merger. During the Class Period, Delta Chemicals and GAC manufactured, marketed, sold or distributed sulfuric acid in the United States.

25.     Defendant Intertrade Holdings, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia. Sulfuric acid producer and trader Boliden Intertrade, Inc. merged into Intertrade Holdings, Inc. on December 31, 1995. Intertrade Holdings, Inc. assumed Boliden Intertrade, Inc.'s responsibilities under its contract with Noranda. As a result of the merger and of the assignment of the contract, Intertrade Holdings, Inc. is responsible for Boliden

7

Intertrade, Inc.'s conspiratorial acts alleged in this Complaint, as well as its own conspiratorial acts prior to and/or subsequent to the merger. During the Class Period, Boliden Intertrade, Inc. and Intertrade Holdings, Inc. (hereinafter, collectively, "Boliden") manufactured, marketed, sold or distributed sulfuric acid in the United States.

26.      Defendant Marsulex, Inc. ("Marsulex") is a Canadian corporation with its principal place of business in Toronto, Canada. Marsulex was formed in June 1989 when an investor group acquired certain sulfur businesses and assets from CIL Inc. ("CIL"), a major United States producer and marketer of sulfuric acid and other sulfur products. During the Class Period, Marsulex and CIL manufactured, marketed, sold or distributed sulfuric acid in the United States. As a result of this merger, Marsulex is responsible for CIL's conspiratorial acts alleged in this Complaint, as well as for Marsulex's own conspiratorial acts subsequent to the merger.

27.      In May 1998, Marsulex purchased from Swedish-based Trelleborg AB ("Trelleborg") its wholly-owned subsidiaries IT Holding, Inc. and BCT ChemTrade Corporation, for the purpose of producing and marketing sulfuric acid from the sulfur-burning facility at Copperhill, Tennessee that was previously operated by Boliden.

28.      Marsulex has systematic and continuous contacts with and does business in the United States. According to Marsulex's web site, Marsulex owns and operates plants in Long Beach, California; Whiting, Indiana; Toledo, Ohio; and Lebanon, Pennsylvania. Marsulex also maintains offices in Toledo, Ohio and Lebanon, Pennsylvania.

29.      Defendant ChemTrade Logistics (U.S.), Inc. ("ChemTrade") is a Delaware corporation with its principal place of business in Cairo, Ohio. ChemTrade also owns and operates ocean terminals for sulfuric acid at Savannah, Georgia and Tampa, Florida. ChemTrade and its parent company, ChemTrade Logistics Income Fund, were formed in July 2001 to purchase Mar-

8

sulex's sulfur removal services businesses. ChemTrade is a continuation of the sulfuric acid operations of Marsulex, and is responsible for Marsulex's conspiratorial acts alleged in this Complaint, as well as for its own conspiratorial acts subsequent to the spin-off. During the Class Period, ChemTrade manufactured, marketed, sold or distributed sulfuric acid in the United States.

30.     Defendant Koch Sulfur Products Company, now known as Koch Sulfur Products Company, LLC, has its principal place of business in Wichita, Kansas, and is a subsidiary of Koch Mineral Services LLC, which is a subsidiary of Koch Industries, Inc. During the Class Period, Koch Sulfur Products Company, and/or Koch Sulfur Products Company LLC (hereinafter, collectively "Koch") manufactured, marketed, sold or distributed sulfuric acid in the United States.

## V.     CO-CONSPIRATORS

31.     Various other persons, firms or corporations not named as Defendants in this lawsuit have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance thereof. Evidence of the identity of co-conspirators is in the possession of the Defendants.

## VI.     INTERSTATE TRADE AND COMMERCE

32.     During the Class Period, Defendants sold sulfuric acid in a continuous and uninterrupted flow of interstate and foreign commerce to customers located throughout the United States and in states or countries other than the states or countries in which the Defendants produced sulfuric acid. The business activities of Defendants were within the flow of, and substantially affected, interstate and foreign trade and commerce.

9

## VII.   STATEMENT OF FACTS

33.   Sulfuric acid is the largest volume inorganic chemical produced and sold in the United States.  Sulfuric acid plays some part in the production of many industrial processes. Sulfuric acid is produced in either of two ways:  voluntarily, in a process of burning sulfur ore, or involuntarily, as a by-product from the smelting of various metals, primarily copper and zinc. "Voluntary" acid is sometimes referred to as "discretionary" or "on-purpose" sulfuric acid.  In contrast, sulfuric acid that is the by-product of smelting ores is referred to as "involuntary", "non-discretionary", "fatal" or "smelter" sulfuric acid.

34.   Smelter sulfuric acid is made from sulfur dioxide, which is a by-product of metal smelting that, when released into the environment, has been at least partly responsible for the phenomenon known as acid rain.  Environmental regulations require sulfuric dioxide to be recaptured and converted into sulfuric acid.  Sulfuric acid, once produced, must be disposed of so that the smelters may continue operating.  There are virtually no commercially viable alternatives to disposing of sulfuric acid other than selling it on the open market.

35.   Producers of sulfuric acid prefer to sell it through the U.S. merchant market for various chemical uses. Sulfuric acid that cannot be sold through the merchant market is typically sold at a significantly lower price for use in the production of agricultural fertilizers.

36.   During the 1980s, Defendants Noranda and Falconbridge, competitors as Canada's leading metal smelters, found themselves with an oversupply of involuntary smelter acid. Involuntary sulfuric acid producers such as Noranda and Falconbridge cannot reduce their sulfuric acid production without also reducing their smelting operations.  In order to alleviate this problem, Noranda and Falconbridge increased their exports of sulfuric acid into the United States, which had the initial effect of driving down sulfuric acid prices in the United States.

10

37.    Moreover, Noranda was planning to bring its new Horne Plant on-line in late 1989, and anticipated that an additional more than 400,000 metric tons annually of Noranda acid soon would flood the United States market. Fearful of the effect this impending influx of sulfuric acid would have on sulfuric acid prices in the United States, Noranda approached various voluntary producers of sulfuric acid in the United States, including DuPont, PVS, Boliden, Koch and GAC/Delta, and obtained illegal agreements from them to cut back their voluntary production in order to limit sulfuric acid supply, and raise sulfuric acid prices, in the United States. As a result of these agreements, sulfuric acid supply in the United States was artificially reduced through production cutbacks and plant closures and sulfuric acid prices were artificially raised, maintained, and/or stabilized.

38.    In order to limit the supply of sulfuric acid, and to fix, maintain or stabilize the price of sulfuric acid, PVS and Noranda in March 1988 signed an illegal agreement in which PVS agreed to discontinue production of sulfuric acid at its sulfuric acid plant at Copley, Ohio, removing 60,000 metric tons of annual capacity from the sulfuric acid market. PVS further agreed to purchase its total sulfuric acid requirement from Noranda's CEZ and Horne sulfuric acid plants in Canada and to share with Noranda its revenues from sulfuric acid sales. PVS did in fact stop producing acid at its Copley sulfuric acid plant in or around August 1988.

39.    Also in 1988, CIL and Noranda agreed that CIL would shut down its sulfuric acid plant in Sayreville, New Jersey. CIL did in fact stop production of sulfuric acid at that plant in 1989, removing supply from the sulfuric acid market.

40.    In 1988 Delta and Noranda reached an agreement that Delta would shut down its sulfuric acid plant at Searsport, Maine, removing approximately 60,000 to 70,000 tons of annual capacity from the sulfuric acid market. Delta did in fact close down its Searsport, Maine plant

11

that year. In October 1989, Noranda and Delta signed an agreement for Delta to purchase its total requirements for sulfuric acid from Noranda and to share with Noranda its revenues from Delta's sales of the Noranda sulfuric acid. Delta and Noranda each expressly agreed not to make sulfuric acid sales to existing customers of the other party.

41. In or around 1988, Koch and Noranda agreed that Koch would close or scale back production at one or more of its sulfuric acid plants. Subsequently, Koch closed down a sulfuric acid plant and/or scaled back production of sulfuric acid, removing supply from the sulfuric acid market.

42. Shortly after the aforementioned sulfuric acid plants closed or scaled back production, PVS, CIL, Delta, DuPont and other voluntary sulfuric acid producers raised their sulfuric acid prices in concert by $5/ton.

43. Between 1988 and 1992, Noranda, DuPont and other producers and sellers of sulfuric acid entered into discussions and agreements regarding the restricting of sulfuric acid output, customer allocation, revenue sharing, and price fixing.

44. In August 1990, PVS and Noranda signed an agreement that PVS would discontinue production of sulfuric acid at its Bay City, Michigan sulfuric acid plant, thereby removing approximately 40,000 metric tons of capacity from the sulfuric acid market. PVS did in fact close down its Bay City plant in 1991.

45. In April 1992, Noranda and DuPont entered into a written agreement that DuPont would cease production of sulfuric acid at its Linden, New Jersey "Grasselli" plant and instead purchase sulfuric acid from Noranda to sell to its customers in replacement of such production. DuPont did in fact stop producing sulfuric acid at the Grasselli plant later that year, removing tens of thousands of tons of sulfuric acid supply from the sulfuric acid market.

46.     Noranda, still concerned about the ever-growing flood of smelter acid into the sulfuric acid market, determined that significant further cuts in sulfur-based acid production were necessary to stabilize sulfuric acid prices. In or around the early to mid 1990s, Noranda held discussions with still more United States producers of sulfur-burned acid, leading to additional agreements that sulfur-burned acid producers would curtail production in favor of purchasing acid from Noranda. Among others, Defendants GAC (following in the legacy of its predecessor-in-interest, Delta), Marsulex, Boliden and Koch engaged in collusive meetings and discussions with Noranda regarding sulfuric acid prices and capacity, and agreed to curtail sulfuric acid production.

47.     With their patterns and practices of collaboration firmly entrenched, Defendants continued to regularly meet and communicate throughout the remainder of the Class Period, to fix, stabilize or maintain sulfuric acid prices in the United States. Noranda coordinated the sharing of pricing information, capacity and production data and forecasts, and sensitive competitive information. Defendants agreed to supply each other with sulfuric acid, swapping acid back and forth as they deemed necessary in order to control capacity expansion and thus the supply of sulfuric acid. Defendants also allocated customers among themselves and entered into various agreements to share their revenues and not to compete regarding the sale and distribution of sulfuric acid.

48.     During the Class Period, Defendants regularly increased prices for sulfuric acid in a coordinated manner; close in time and in like amounts.

49.     In 1997, Noranda, DuPont and Falconbridge continued these illegal practices by deciding to form a joint venture, to control approximately 3 million tons of sulfuric acid per year. Noranda and Falconbridge were the dominant Canadian smelters, competing with each other in

13

the production of base metals and together controlling most of the smelter acid being sold in the U.S. merchant market. DuPont was the dominant firm producing voluntary sulfuric acid in the merchant market. Through this joint venture, Noranda, Falconbridge and DuPont controlled the merchant market supply of sulfuric acid.

50. Through the joint venture, these defendants jointly decided the prices at which the Noranda, Falconbridge and DuPont sulfuric acid would be purchased from their respective sulfuric plants. They jointly decided the prices at which all of this "pooled" acid would be sold to customers in the merchant market, class members herein. They jointly directed DuPont to cut back production at its own sulfuric acid plants, to artificially restrict supply, and thus keep the price of sulfuric acid artificially raised and stabilized.

51. The joint venture itself owned no capital assets of any kind. It had no actual staff (employees continued to be paid and receive benefits from the respective companies Noranda, Falconbridge and DuPont). The "joint venture" was in essence a sham organization through which three horizontal competitors were able to fix prices and limit supply of sulfuric acid in the merchant market.

52. On May 18, 2001, Noranda DuPont was dissolved. DuPont's interest in Noranda DuPont was redeemed on June 21, 2001.

## VIII. CLASS ACTION ALLEGATIONS

53. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of, and seeking certification of, the following class (the "Class"):

> All persons (excluding federal, state and local governmental
> entities and political subdivisions, the Defendants, and their re-

14

spective parents, subsidiaries and affiliates) who purchased sulfuric acid in the United States directly from one or more of the Defendants or their parents, subsidiaries, affiliates, or joint ventures during the period January 1, 1988 through January 16, 2003.

54.     The Class is so numerous that joinder of all class members is impracticable. The Plaintiffs do not know the exact size of the Class, since such information is in the exclusive control of Defendants. However, based on the nature of the trade and commerce involved, Plaintiffs believe that there are at least thousands of class members and that the members of the Class are geographically dispersed throughout the United States. Joinder of all members of the Class would be impracticable.

55.     There are questions of law or fact common to the Class, and such common questions predominate over any questions affecting only individual members of the Class. Such common questions include, but are not limited to, the following:

a.      Whether Defendants contracted, combined or conspired to fix, raise, maintain or stabilize the prices of sulfuric acid sold in the United States;

b.      Whether Defendants agreed to reduce the supply of sulfuric acid in order to fix, raise, maintain or stabilize the prices of sulfuric acid sold in the United States;

c.      Whether Defendants agreed not to compete with one another for each other's customers or market share;

d.      Whether Defendants agreed to fix prices for sulfuric acid sold in the United States;

e.      Whether sulfuric acid was sold in the United States to Plaintiffs and members of the Class at prices affected by Defendants' antitrust violations;

f.      The duration and extent of the antitrust violations alleged in this Complaint;

g.      Whether Defendants' conduct violated the Sherman Act;

15

      h.     Whether Defendants' antitrust violations caused injury to the business or property of Plaintiffs and the class members; and

      i.     Whether the statute of limitations is tolled.

56.     The claims of Plaintiffs are typical of the claims of the Class in that Plaintiffs are direct purchasers of sulfuric acid in the United States from one or more of the Defendants.

57.     Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs are typical purchasers of sulfuric acid that have no conflicts with any other member of the Class and are represented by experienced and able antitrust class action counsel. Further, the interests of Plaintiffs are coincident with, and not antagonistic to, those of the class members.

58.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein. A class action will permit a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence and effort. Class treatment will also permit the adjudication of claims by smaller class members who could not afford to individually litigate an antitrust claim against large corporate defendants.

## IX.   **VIOLATIONS ALLEGED**

59.     Beginning at least as early as January 1, 1988 and continuing to at least January 16, 2003, the exact dates being unknown at this time, Defendants and their co-conspirators entered into and participated in a contract, combination or conspiracy to suppress and eliminate competition by fixing, raising, maintaining or stabilizing the price of sulfuric acid sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. For the purpose of forming and effectuating this contract, combination or conspiracy, Defendants did those things that they combined and conspired to do, including among others, the following:

a.  Participated in meetings and conversations to discuss the prices and volume of sulfuric acid sold in the United States;

b.  Agreed to charge prices at certain levels and to otherwise raise, fix, maintain or stabilize the prices of sulfuric acid sold in the United States;

c.  Agreed to reduce the supply of sulfuric acid in order to raise, fix, maintain or stabilize the prices of sulfuric acid sold in the United States;

d.  Agreed to supply each other with sulfuric acid in order to control capacity expansion and thus the supply of sulfuric acid;

e.  Agreed not to compete with one another for each other's customers or market share;

f.  Sold sulfuric acid at agreed upon prices and in accordance with agreed upon plans;

g.  Reduced sulfuric acid supply; and

h.  Agreed to conceal and keep secret their illegal agreement.

60.  Defendants and their co-conspirators engaged in the activities described in the foregoing paragraphs in furtherance of their antitrust violations and for the purpose of effectuating the unlawful contract, combination or conspiracy described herein.

## X.     <u>EFFECTS</u>

61.  The aforesaid contract, combination or conspiracy had the following effects, among others:

a.  The supply of sulfuric acid in the United States was reduced by Defendants and their co-conspirators;

b.  Defendants and their co-conspirators sold sulfuric acid in the United States at artificial and non-competitive price levels;

c.  Direct purchasers of sulfuric acid were deprived of the benefit of free and open competition in the market for of sulfuric acid; and

17

    d.     Price competition in the sale of sulfuric acid was restrained, suppressed and/or eliminated.

62.    As a proximate result of Defendants' antitrust violations, Plaintiffs and the members of the class were injured and financially damaged in their businesses and property, in that they paid more for sulfuric acid than they would have paid in the absence of Defendants' unlawful conduct.

## XI.    TOLLING

63.    Until shortly before the filing of the first class action complaint on February 21, 2003, neither Plaintiffs nor the Class members had knowledge of any of the violations alleged herein.

64.    Neither Plaintiffs nor the Class members, until that time, could have discovered, by the exercise of reasonable diligence, that Defendants had engaged in the violations alleged herein, since Defendants' illegal antitrust conspiracy was inherently self-concealing, thereby preventing Plaintiffs and the Class members from suing within the normal period of limitations.

65.    Plaintiffs and the Class members could not have discovered the alleged combination and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques secretly employed by Defendants and their co-conspirators to avoid detection of, and to conceal, their combination and conspiracy.

66.    Defendants and their co-conspirators actively concealed the combination and conspiracy herein alleged by various means and methods, including, but not limited to, secret meetings and surreptitious communications.

67.     By reason of the foregoing, the running of any statute of limitations has been tolled and suspended with respect to the claims that Plaintiffs and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## XII.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     That the aforesaid contract, combination or conspiracy and the acts done in furtherance thereof by Defendants, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.     That Plaintiffs and the Class recover damages, as provided by law, that Defendants jointly and severally be held liable for the damages suffered by Plaintiff and the Class, and that judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled as provided by law;

D.     That Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

E.     That Plaintiffs and the Class receive such other and further relief as the Court may deem just and proper under the circumstances.

## XIII.   **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all the issues triable of right by jury.

Dated: May 25, 2005

_(signature)_

Mary Jane Edelstein Fait
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001

Steven O. Sidener
Joseph M. Barton
Karen D. Fineran
**GOLD BENNETT CERA**
  **& SIDENER LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Joseph C. Kohn
Robert J. LaRocca
William E. Hoese
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Steven A. Asher
David H. Weinstein
Mindee J. Reuben
**WEINSTEIN KITCHENOFF &**
  **ASHER LLC**
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: (215) 545-7200
Facsimile: (215) 545-6535

*Plaintiffs' Co-Lead Counsel*

Gregory P. Hansel
**PRETI FLAHERTY, BELIVEAU**
**& PACHIOS, LLC**
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000

Howard Sedran
**LEVIN, FISHBEIN, SEDRAN & BER-**
**MAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500

H. Laddie Montague, Jr.
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103-6365
Telephone: (215) 875-3000

John R. Malkinson
**MALKINSON & HALPERN, P.C.**
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606
Telephone: (312) 427-9600

Richard L. Creighton, Jr.
Joseph M. Callow, Jr.
**KEATING, MUETHING**
**& KLEKAMP, L.L.P.**
1400 Provident Tower
One East Fourth Street
Cincinnati, OH 45202
Telephone: (513) 579-6400

Leonard Barrack
**BARRACK RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

21

Steven J. Greenfogel
**MEREDITH COHEN GREENFOGEL**
 **& SKIRNICK, P.C.**
Architects Building
117 South 17th Street, 22nd Floor
Philadelphia, PA 19103
Telephone: (215) 564-5182

Anthony J. Bolognese
**BOLOGNESE & ASSOCIATES, LLC**
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, PA 19103
Telephone: (215) 814-6750

Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
**SAVERI & SAVERI, INC.**
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 217-6810

Susan G. Kupfer
**GLANCY BINKOW &**
**GOLDBERG LLP**
455 Market Street, Suite 1810
San Francisco, CA 94105
Telephone: (415) 972-8160

Warren Rubin
**LAW OFFICES OF BERNARD M.**
**GROSS, P.C.**
1515 Locust Street, 2nd Floor
Philadelphia, PA 19102
Telephone: (215) 561-3600

Ann D. White
**MAGER WHITE & GOLDSTEIN, LLP**
One Pitcairn Place
165 Township Line Road, Suite 2400
Jenkintown, PA 19046
Telephone: (215) 481-0273

Randy R. Renick
**LAW OFFICES OF RANDY R. RENICK**
128 N. Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
Telephone: (626) 585-9600

Michael G. Bruton
Christopher Ellis
**ROSS, DIXON & BELL, L.L.P.**
Three First National Plaza
70 West Madison, Suite 525
Chicago, IL 60602
Telephone: (312) 759-1920

Robert K. Whitt
**LAW OFFICES OF ROBERT K. WHITT**
3300 North A
Building 2, Suite 101
Midland, TX 79705
Telephone: (915) 686-2000

Thomas D. Lambros
Steven G. Janik
Andrew J. Dorman
Michael J. Callow
**JANIK & DORMAN, L.L.P.**
9200 South Hills Boulevard, Suite 300
Cleveland, OH 44147-3521
Telephone: (444) 838-7600

***Plaintiffs' Counsel***

# EXHIBIT B

# Westlaw.

Not Reported in F.Supp.

1996 WL 543312 (N.D.Ill.)

**(Cite as: 1996 WL 543312 (N.D.Ill.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.
VIDEOJET SYSTEMS INTERNATIONAL, INC., Plaintiff,
v.
INKJET, INC., and Chemsong, Inc., Defendants.
No. 91 C 6284.

Sept. 23, 1996.

*MEMORANDUM OPINION AND ORDER*

COAR, District Judge.

**\*1** Before the court is plaintiff's, Videojet Systems International, Incorporated's ("Videojet"), Motion for Leave to File a Second Amended Complaint to Join Il "Mike" Song, president and co-owner of the defendant, Chemsong, Incorporated ("Chemsong") as a Co-Defendant pursuant to Federal Rules of Civil Procedure 15(a) and 21. In addition, Videojet seeks leave to file a second amended complaint to delete obsolete counts. For the reasons stated in this memorandum opinion, the Court grants Videojet's motion.

## Background

This case arises out of the production and distribution of various products for ink jet printers. (Am. Complaint ¶ 9). Videojet sells inks for ink jet printers under several designations. Videojet obtained patent protection for several of these inks, including patents 4,024,096 (the " '096 patent"), 4,070,322 (the " '322 patent"), and 4,260,531 (the " '531 patent"). Videojet also sells "make-up" solution for each of these inks. Make-up solution is

sold by a number of different manufacturers, including Videojet, Inkjet, Incorporated ("Inkjet"), a Michigan corporation and former party to this action, [FN1] and, in the past, Chemsong.

Videojet initiated this action on October 3, 1991, seeking to protect several patented formulas for these printer fluids. On June 30, 1992, Videojet amended its complaint to join Chemsong as a defendant. Videojet's amended complaint contains four counts, alleging the following violations: (1) patent infringement as to certain patents relating to inks manufactured by Videojet; (2) violations of the Illinois Trade Secrets Act; (3) tortious interference with contractual relations between Videojet and its employees or former employees; and (4) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. Videojet seeks injunctive relief and compensatory and exemplary damages of, at least, one million dollars ($ 1,000,000).

On August 10, 1992, Chemsong filed a counterclaim seeking injunctive relief and declaratory judgment regarding the validity and infringement of a certain patents.

During a deposition taken on December 2, 1993, an attorney for Videojet told Mr. Song of Videojet's intention to join him as a party. (Videojet's Memorandum in Support of Its Motion for Leave to File a Second Amended Complaint to Join Mike Song as a Co-Defendant and to Delete Obsolete Counts ("VM"), Exhibit D, p. 869 lines 3-9). In addition, Videojet noted on the record Chemsong's apparent inability to satisfy the judgment Videojet seeks in this action. (VM, Exhibit B, p.4 lines 14-22).

On October 27, 1995, Videojet filed a motion for leave to amend to join Mike Song as a defendant and to delete obsolete counts.

## Discussion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 2

1996 WL 543312 (N.D.Ill.)

**(Cite as: 1996 WL 543312 (N.D.Ill.))**

Videojet seeks to join Mike Song as a defendant in this case pursuant to Fed. R. Civ. P. 15(a) and 21. Videojet asserts that, because of Chemsong's potential insolvency, Videojet may not receive full relief if Mr. Song is not joined as a defendant. In addition, Videojet moves to delete Counts II through V under Fed. R. Civ. Pro. 15(a) on the ground that they are obsolete. Chemsong contends that, for the reasons discussed below, the joinder of Mr. Song would cause undue prejudice to both Chemsong and Mr. Song. Chemsong further argues that there is no need to delete the obsolete counts from the first amended complaint.

**I. Motion for Leave to Amend to Join an Additional Party Pursuant to Federal Rules of Civil Procedure 15(a) and 21**

*2 Federal Rules of Civil Procedure 15(a) and 21 govern the amendment of pleadings. Federal Rule of Civil Procedure 15(a) states, in relevant part, that a party may amend its pleading "by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Id.* Federal Rule of Civil Procedure 21 provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." *Id.* The standards for granting motions for leave to amend are the same under both rules. *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1479 (Fed. Cir. 1990), *aff'd*, 988 F.2d 129 (1993) (citing 3A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice ¶ 21.05[1] 2d. ed. 1989).

The decision to grant a motion to amend is within the discretion of the district court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802 (1971) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct 227, 230 (1962); *Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir. 1992)). When balancing the respective interests of the parties, the court should consider the hardship to the moving party if the request to amend is denied, the reasons for the moving party's failure to include the information in the initial pleading, and the harm to the opposing party if the motion is granted. *Will v.United Chambers Administrators, Inc.*, 1987 WL

17153 * 2 (N.D. Ill. Sept. 11, 1987); *McCann v. Frank B. Hall & Co, Inc.*, 109 F.R.D. 363, 365 (N.D. Ill. Jan. 30, 1986).

Rules 15(a) and 21 are interpreted liberally to allow amendment of pleadings. The Supreme Court has stated that, "in the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--" motions for leave to amend should be "freely" granted. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct 227, 230 (1962); *see also Villa v. City of Chicago*, 924 F.2d 629, 632 (7th Cir. 1991) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). Furthermore, because every amendment results in some prejudice to the opposing party, the test is whether the prejudice is undue. *Alberto-Culver Co. v. Gillette Co.*, 408 F. Supp. 1160, 1161-62 (N.D. Ill. 1976).

Chemsong argues that this Court should deny Videojet's motion for leave to amend on the ground that the joinder of Mr. Song would result in undue prejudice to both Chemsong and Mr. Song. Specifically, Chemsong maintains that undue prejudice would result for the following reasons: (1) Mr. Song would need separate counsel and securing such counsel would unduly delay the proceedings; (2) Mr. Song would want to reopen discovery which would further delay the proceedings; (3) Videojet's motion is untimely and in bad faith; (4) new issues regarding "alter ego" and "piercing the corporate veil" would be introduced; and (5) allowing the amendment would be contrary to public policy. The Court addresses these arguments in its discussion below and concludes that the Defendant has failed to demonstrate that it would suffer prejudice as a result of Mr. Song's joinder.

*A. Undue Delay*

*3 The defendant's first two arguments are based upon a theory of undue delay. Specifically, Chemsong argues that if Mr. Song is joined he would need to secure separate counsel and perform

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 3

1996 WL 543312 (N.D.Ill.)

**(Cite as: 1996 WL 543312 (N.D.Ill.))**

additional discovery [FN2] which would delay the proceedings.

The Seventh Circuit has stated that "[d]elay in presenting the amendment will be a sufficient basis for denial of leave *only when the delay has caused the opposing party undue prejudice.*" *Textor v. Board of Regents of N. Ill. Univ.,* 711 F.2d 1387, 1391 (7th Cir. 1983) (emphasis added); *see also Tragarz v. Keene Corp.,* 980 F.2d 411, 432 (7th Cir. 1992) (only where there is prejudice to the opposing party in addition to delay of the proceedings should the court deny a motion to amend); *Clark v. Universal Builders, Inc. et al.,* 501 F.2d 324 (7th Cir. 1973) (mere delay should not preclude amendment); *Pitts v. National Railroad Passenger, Corp.,* 603 F. Supp. 1509, 1519 (N.D. Ill. 1985) ("delay without prejudice is not a reason to deny amendment" *); Davis v. Coler,* 601 F. Supp. 444, 447 (N.D. Ill. 1984), *aff'd, Watkins v. Blingzinger,* 789 F.2d 474 (7th Cir. 1986) (delay, without more, will not prevent amendment).

In *Clark v. Universal Builders, Inc. et al.,* the Seventh Circuit held that a district court erred when it denied a plaintiff's motion for leave to amend based on facts similar to this case. *Id.* at 340. The plaintiffs in that case sought to join as defendants under Rule 15(a) certain directors, officers, and shareholders of the defendant corporations. *Id.* at 339. The plaintiffs made their motion one month prior to the scheduled commencement of trial. *Id.* The district court denied the motion on the ground that it was not timely. *Id.* However, the court of appeals held that the district court erred in denying plaintiff's motion for leave to amend, stating that "mere delay" in the commencement of the action is insufficient to preclude amendment absent a showing of prejudice. *Id.* The court reasoned that the proposed joinder would not have prejudiced the opposing parties because "as officers, directors, and shareholders of the closely-held defendant corporations[, they] were on constructive notice of the action and were indeed active participants since the inception." *Id.* at 339-40.

Similarly, Videojet seeks to join Mr. Sung, who is the president, director of technical marketing, and one of two shareholders of Chemsong. [FN3] (VM, Exhibit B, p.4 lines 14-22; Videojet's Reply in Support of its Motion for Leave to File a Second Amended Complaint to Join Mike Song as a Co-Defendant and to Delete Obsolete Counts ("VR"), Exhibit G, p.33 lines 14-23). Mr. Song's wife is the other shareholder of Chemsong. (VR, Exhibit G, p. lines 14-23). Outside of an independent contractor who worked approximately one day a week from 1989 to 1991 (VM, Exhibit B, p. 239 lines 22-24, p. 240 lines 1-22) and Mr. Song's son who worked during some summers while in college (VM, Exhibit B, p. 238 lines 16-20), Mr. Song and his wife were Chemsong's only employees.

*4 Moreover, Mr. Song was an active participant in the discovery proceedings of this case. (*See generally* VM, Exhibits B, C, D; VR, Exhibit G). Indeed, it was during a deposition given by Mr. Sung that Videojet first informed Mr. Sung of its intention to join him as a defendant because of Chemsong's apparent inability to satisfy the judgment Videojet seeks against Chemsong. (VM, Exhibit D, p. 870 lines 3-9). In light of the foregoing facts, this Court finds that Mr. Sung was on constructive, if not, actual notice of the proceedings in this action and the allegations contained in the complaint, and thus any prejudice resulting from the amendment is not undue.

*B. Bad Faith and Untimeliness*

Chemsong contends that Videojet's acknowledgment of Chemsong's inability to fully satisfy the judgment sought by Videojet and its statement that it would join Mr. Song as a defendant approximately two years before it made its motion for leave to amend, (*see* VM, Exhibit D, p. 869 lines 16-18, p. 860 lines 1-9), is evidence that Videojet is acting in bad faith and employing dilatory tactics. While this is a plausible theory, there is not sufficient evidence to support it.

In addition, Chemsong suggests that Videojet's motion should be denied based on untimeliness because it was filed on the same date that the parties were scheduled to submit final pretrial orders. However, absent a showing of prejudice, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1996 WL 543312 (N.D.Ill.)

(Cite as: 1996 WL 543312 (N.D.Ill.))

Page 4

untimeliness of a motion cannot preclude amendment. *See Clark,* 501 F.2d at 339 (motion made one month before trial should be granted); *Video Views, Inc. v. Studio 21, Ltd.,* 1987 WL 13971 *5 (N.D. Ill. July 16, 1987) (motion filed three years after commencement of proceedings, after the close of discovery, and one week before submission of final pretrial order granted). This Court has disallowed amendments that would require the reopening of discovery where the moving party sought to introduce new counterclaims and defenses based on information available to them at the commencement of the proceedings. *Continental Bank, N.A. v. Meyer,* 10 F.3d 1293, 1298 (7th Cir. 1993).

In the instant case, Videojet does not seek to introduce additional claims or defenses. Rather, due to Chemsong's apparent inability to satisfy the judgment sought by Videojet, Videojet's second amended complaint joins Mr. Song, who is already familiar with and has participated in this action. Furthermore, Chemsong fails to argue how the untimeliness of Videojet's motion, in particular, or the joinder of Mr. Song, in general, would result in prejudice to it or Mr. Song. This court concludes that neither Mr. Song nor Chemsong would suffer prejudice as a result of the proposed amendment that would outweigh Videojet's countervailing interest to join Mr. Song.

C. *Introduction of New Issues*

Chemsong argues that the joinder of Mr. Song would require the introduction of new issues into the litigation. Specifically, Chemsong asserts that Mr. Song's presence as a defendant in this suit raises the issues of "piercing the corporate veil" and "alter ego."

*5 It is unclear whether either of these issues would be made relevant as a result of Mr. Sung's joinder. *See Clark* (citing *Ohio v. Tank Car Co. v. Keith Ry. Equipment Co.,* 148 F.2d 4,6 (7th Cir.), cert. denied, 326 U.S. 730, 66 S.Ct. 38(1945)) ("The general rule that a corporation and its stockholders are deemed separate entities is subject to the qualification that the separate entity may be discarded in exceptional situations where it otherwise would present an obstacle to the enforcement of public or private rights."). Nonetheless, in balancing the interests of both parties, this Court has determined that Videojet's interest in joining Mr. Song as a defendant due to Chemsong's potential insolvency outweighs the prejudice, if any, that would occur as a result of the introduction of these issues.

D. *Public Policy*

In support of its proposition that Mr. Song's joinder would frustrate public policy, Chemsong cites *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct 1434 (1971), cert. denied, 409 U.S. 1061, 93 S.Ct. 559 (1972). Noting, in dicta, that there is a public interest in monitoring patent monopolies, the Supreme Court stated that it "has condemned attempts to broaden the physical or temporal scope of the patent monopoly." *Id.* at 343; 1450. This Court opines, however, that no matter how liberal the interpretation of this statement, granting leave to amend in patent actions would not constitute such an attempt. Indeed, granting leave to amend in this situation only poses a threat to public policy where the amendment would result in undue prejudice to the opposing party that is not outweighed by the countervailing interest of the moving party. For reasons discussed above, this Court concludes that such a result would not occur here and thus granting Videojet's motion would not violate public policy.

In view of the foregoing, the policy of the Federal Rules to "freely" allow the amendment of pleadings, *see Hess v. Gray,* 85 F.R.D. 15 (N.D. Ill. 1979), and the Seventh Circuit's liberal construction of Rule 15(a), *see Wakeen v. Hoffman House, Inc.,* 724 F.2d 1238, 1244 (7th Cir. 1983); *Guse v. J.C. Penney Co.,* 570 F.2d 679, 680 (7th Cir. 1978); *Fuhrer v. Fuhrer,* 292 F.2d 140, 142 (7th Cir. 1961) , plaintiff's motion will be granted.

II. Motion to Delete Obsolete Counts

In addition to joining Mr. Song as a defendant, Videojet seeks leave to amend its complaint to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1996 WL 543312 (N.D.Ill.)

**(Cite as: 1996 WL 543312 (N.D.Ill.))**

delete Counts II through V on the ground that they are obsolete. Count II alleges that Inkjet and Chemsong violated the Illinois Trade Secrets Act. Counts III, IV, and V pertain to violations solely against Inkjet, which is no longer a party to this action. Chemsong objects to the proposed amendment on the basis that there is no need to delete obsolete counts.

Upon motion by a party or on its initiative, a district court can grant leave to delete portions of the pleadings "when justice so requires." *See* Fed. R. Civ. Pro. 15(a); *McAtee v. Ramos, et al.* 1994 WL 630824 at * 2 (N.D. Ill. Nov. 8, 1994).

*6 Chemsong's argument as to why Videojet's motion for leave to amend to delete obsolete counts should be denied is as follows: "No amendment is needed to delete obsolete counts." [FN4] (Memorandum in Opposition to Videojet's Motion for Leave to Amend, p. 1). This is a true, but incomplete statement. The fact that no amendment is necessary does not require that no amendment be allowed. This court can think of no reason how Chemsong would be prejudiced by the deletion of the Count II since it sets forth allegations of patent infringement against Chemsong or by the deletion of Counts III through V, which are directed solely at Inkjet, a former party to this action. Accordingly, Plaintiff's motion for leave to amend to delete obsolete counts is granted.

### CONCLUSION

For reasons stated in this memorandum opinion, IT IS HEREBY ORDERED THAT Videojet's motion for leave to file a second amended complaint to join Mike Song as a defendant and to delete obsolete counts is hereby GRANTED.

FN1. Videojet initially sued Inkjet, which was the sole defendant in this action. On March 24, 1993, Inkjet and Videojet entered a settlement agreement and stipulation to dismiss. (Docket Documents 50 and 51).

FN2. It is unclear whether additional discovery would in fact be needed.

However, granting additional time for discovery is within the discretion of the district court upon motion by a party.

FN3. In addition, Ms. Song serves as the Vice President, Treasurer, and Secretary of Chemsong. (VM, Exhibit B, p.235 lines 1-9).

FN4. The balance of Chemsong's memorandum is devoted to arguing against the joinder of Mr. Song.

1996 WL 543312 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:91CV06284 (Docket)

(Oct. 03, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE SULFURIC ACID | : | MDL Docket No. 1536 |
| ANTITRUST LITIGATION | : | Case No. 03 C 4576 |
| | : | |
| | : | |
| | : | Honorable Judge David H. Coar |
| This Document Relates To: | : | Magistrate Judge Jeffrey Cole |
| | : | |
| ALL RELATED ACTIONS | : | |
| | : | |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of May 2005, copies of the *Plaintiffs'*

*Renewed Motion for Leave to File Their Third Consolidated Amended Complaint Instanter*

and *Plaintiffs' Third Consolidated Amended Complaint Instanter* were served by causing true

and correct copies of same to be delivered via hand delivery, Federal Express, or first class mail

to the attached Service List.

Dated: May 25, 2005

Mary Jane Edelstein Fait

7789

**In Re Sulfuric Acid Antitrust Litigation; MDL No. 1536, Master File No. 03 C 4576**

## VIA HAND DELIVERY

**FREEBORN & PETERS**
David C. Gustman
Jeffrey M. Cross
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 360-6000
**Counsel for Defendants Falconbridge, Ltd.,
Noranda, Inc., and Norfalco LLC**

**SANCHEZ & DANIELS**
Edward M. Ordonez
Hugo Chaviano
333 West Wacker Drive, Suite 500
Chicago, Illinois 60606
Telephone: (312) 641-1555
**Counsel for Defendants E.I. DuPont de
Nemours and Company, Inc. and Norfalco,
LLC**

**HOWREY SIMON ARNOLD &
WHITE, LLP**
Joel C. Chefitz
Todd L. McLawhorn
321 North Clark Street, Suite 3400
Chicago, Illinois 60610
Telephone: (312) 595-1239
**Counsel for Defendant Koch Industries, Inc.**

**WINSTON & STRAWN LLP**
R. Mark McCareins
35 West Wacker Drive, 41st Floor
Chicago, Illinois 60601
Telephone: (312) 558-5600
**Counsel for Defendants Marsulex, Inc. and
ChemTrade**

**CONNELLY, ROBERTS &
McGIVNEY, LLC**
Michael P. Connelly
William E. Snyder
Cory D. Anderson
One North Franklin, Suite 1200
Chicago, Illinois 60606
Telephone: (312) 251-9600
**Counsel for Defendant Intertrade
Holdings, Inc.**

**SACHNOFF & WEAVER, LTD.**
Michael H. Cramer
Michael D. Richman
Adam R. Chiss
30 South Wacker Drive, Suite 2900
Chicago, Illinois 60606
Telephone: (312) 207-6505
**Counsel for Defendant Pressure Vessel
Services, Inc.**

<u>**VIA FEDERAL EXPRESS**</u>

**BALLARD SPAHR ANDREWS &**
**INTERSOLL, LLP**
Stephen J. Kastenberg
Eric W. Sitarchuk
Carrie E. Watt
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599
Telephone: (215) 665-8500
**Counsel for Defendant E.I. DuPont de**
**Nemours and Company, Inc.**

**BOIES, SCHILLER & FLEXNER LLP**
James P. Denvir
5301 Wisconsin, Ave., NW
Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727
**Counsel for Defendant E.I. DuPont de**
**Nemours and Company, Inc.**

**VERILL & DANA, LLP**
James T. Kilbreth
One Portland Square
P.O. Box 586
Portland, Maine 04112-0586
Telephone: (207) 774-4000
**Counsel for Defendant**
**GAC Chemical Corporation**

**DICKINSON WRIGHT PLLC**
Edward H. Pappas
38525 Woodward Avenue
Suite 2000
Bloomfield Hills, Michigan 48304-2970
Telephone: (248) 433-7200
**Counsel for Defendant**
**PVS Chemicals, Inc.**

**DICKINSON WRIGHT PLLC**
K. Scott Hamilton
500 Woodward Avenue
Suite 4000
Detroit, MI 48226-3425
Telephone: (313) 223-3636
**Counsel for Defendant**
**PVS Chemicals, Inc.**

## VIA FIRST CLASS U.S. MAIL

**WEINSTEIN KITCHENOFF & ASHER, LLC**
Steven A. Asher
Mindee Reuben
1845 Walnut Street
Suite 1100
Philadelphia, Pennsylvania 19103
Telephone: (215) 545-7200

**KOHN, SWIFT & GRAF, P.C.**
Joseph C. Kohn
William E. Hoese
Diana Liberto
One South Broas Street, Suite 2100
Philadelphia, Pennsylvania 19107
Telephone: (215) 238-1700

**LEVIN, FISHBEIN, SEDRAN & BERMAN**
Howard Sedran
510 Walnut Street
Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592-1500

**LAW OFFICES OF RANDY R. RENICK**
Randy R. Renick
128 North Fair Oaks Avenue, Suite 204
Pasadena, California 91103
Telephone: (626) 585-9608

**GOLD BENNETT CERA & SIDENER LLP**
Steven O. Sidener
Joseph M. Barton
Karen D. Fineran
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 777-2230

**LAW OFFICES OF ROBERT K. WHITT**
Robert K. Whitt
330 North A
Building 2, Suite 101
Midland, Texas 79705
Telephone: (915) 686-2000

**SAVERI & SAVERI, INC.**
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
111 Pine Street, Suite 1700
San Francisco, California 94111
Telephone: (415) 217-6810

**MALKINSON & HALPERN**
John R. Malkinson
223 West Jackson Boulevard, Suite 1010
Chicago, Illinois 60606
Telephone: (312) 427-9600

**MAGER WHITE & GOLDSTEIN, LLP**
Ann D. White
One Pitcairn Place
165 Township Line Road, Suite 2400
Jenkintown, Pennsylvania 19046
Telephone: (215) 481-0273

**BOLOGNESE & ASSOCIATES, LLC**
Anthony J. Bolognese
One Penn Center
1617 JFK Boulevard, Suite 650
Philadelphia, Pennsylvania 19103
Telephone: (215) 814-6750

**BARRACK RODOS & BACINE**
Leonard Barrack
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600

**GLANCY & BINKOW, LLP**
Susan G. Kupfer
455 Market Street, Suite 1810
San Francisco, California 94105
Telephone: (415) 972-8160

**ROSS, DIXON & BELL, LLP**
Michael G. Bruton
Christopher Ellis
Three First National Plaza
70 West Madison, Suite 525
Chicago, Illinois 60602
Telephone: (312) 759-1920

**KEATING MUETHING & KLEKAMP, LLP**
Richard L. Creighton, Jr.
Joseph M. Callow, Jr.
1400 Provident Tower
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 579-6400

**PRETI FLAHERTY LLC**
Gregory P. Hansel
One City Center
P.O. Box 9546
Portland, Maine 04112-9546
Telephone: (207) 791-3000

**LAW OFFICES OF BERNARD M. GROSS, P.C.**
Warren Rubin
1515 Locust Street, 2nd Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 561-3600

**BERGER & MONTAGUE, P.C.**
H. Laddie Montague, Jr.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365
Telephone: (215) 875-3000