IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In Re SULFURIC ACID ANTITRUST
LITIGATION

)
)
)
)
)
)
)

MDL Docket No. 1536
Case No. 03 C 4576

Judge David Coar
Magistrate Judge Jeffrey Cole

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION AND FACTUAL BACKGROUND

This is the fourth opinion in connection with three multi-faceted discovery motions brought by the plaintiffs against various defendants.[1] The facts are these: Following the filing of the consolidated amended class action complaint on September 5, 2003, charging a violation of §1 of the Sherman Act, plaintiffs served sixty-six document requests and ten interrogatories on Noranda, Inc., Falconbridge, Ltd. and Norfalco, LLC ("the Noranda defendants"). The requests sought specified classes of documents created after January 1, 1988, the date the complaint charged as the commencement of the conspiracy, and earlier documents that related to the events within the period of the charged conspiracy.

The Noranda defendants resisted production on the theory that the statute of limitations under Section 4 of the Clayton Act was four years, while the request covered a fifteen-year period. There ensued negotiations in October, 2003, culminating in an exchange of letters purporting to document the discussions. (*Response of the Noranda Defendants in Opposition*, App. I, Ex. A). An arrangement of sorts grew

---

[1] *See generally, In re Sulfuric Acid Antitrust Litigation* 2005 WL 2143945 (N.D.Ill. September 6, 2005); 2005 WL 2059327 (N.D.Ill. August 26, 2005); *See also In re Sulfuric Acid Antitrust Litigation*, 2005 WL 2155219 (N.D.Ill. September 7, 2005). A fourth opinion, 2005 WL 1994105 (N.D.Ill. August 19, 2005), dealt with a motion by certain of the defendants to compel compliance with discovery..

out of all this: only post-January 1, 1988 documents would be produced (for now), and the plaintiffs reserved the right to make additional requests for earlier documents depending in what the initial production revealed. In a letter in late October, 2003, to plaintiffs' counsel, David Gustman, lead counsel for the Noranda defendants, expressed his understanding of what had occurred during these discussions. While it differed from the plaintiffs' perception of those meetings, at least somewhat, Mr. Gustman did promise, "[h]owever, [to] entertain additional narrow, specific requests to search for documents after our initial search and production." (October 29, 2003 letter, at 7). As will be seen, this was "a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." *Edwards v. California*, 314 U.S. 160, 186 (1941) (Jackson, J., concurring).

Thereafter, the Noranda defense team reviewed 350 boxes that had been kept since 1998 in a Noranda storage facility in Toronto, Canada. Ultimately, the Noranda defendants produced between 840,000 to 1,000,000 pages of documents–depending on whose estimate is to be credited. This was a "rolling," somewhat sporadic production, in which the documents were released in stages as they were reviewed. (*See Response of the Noranda Defendants in Opposition*, at 4-5)("Response"); *Plaintiffs' Reply Memorandum*, at 5 n.1. ("Reply").

The first 250,000 pages were produced as early as February of 2004 (Response at 4 and Ex. B, ¶ 15), although Bates numbers 591,997 through 593,239 were not produced until June 7, 2005. (*Response* at 4 n.7; Reply at 5 n.1).[2] The dates and numbers are significant: by February, 2004, the plaintiffs had been provided with a 1988 marketing report – the 1988 "Prime Report" – Bates numbers

----

[2] The first 132,000 pages of documents came from the Noranda defendants and were Bates stamped ND. The next 100,000 plus documents were Bates stamped NFD.

100,696 - 715 – which, according to plaintiffs is "one of the most important pieces of evidence produced by the Noranda Defendants in this case." (*Plaintiffs' Motion and Supporting Memorandum* at 2; Ex. C). The Report suggested that "the Noranda Defendants had hatched their scheme to convince voluntary sulfuric acid producers to stop producing sulfuric acid at least at as early as 1985." (*Plaintiffs' Motion and Supporting Memorandum*, at 2). It purportedly set forth Noranda's agreements and attempts to reach agreements with sulfuric acid producers to close down their plants and purchase sulfuric acid from Noranda.

Within "months" of its production by the defendants in February 2004, the 1988 Report was found by the plaintiffs during their "intensive document review." (*Reply* at 5). It is uncertain whether by the Spring or early Summer of 2004, the plaintiffs knew about the 1988 Report, which referenced and updated an earlier Prime Report dated August 18, 1987. (*Id.* at 1, 7-12).[3] What is certain is that by February 2005, the plaintiffs were aware of the existence of the 1987 Report, for they specifically asked for it in a letter to the defendants' counsel. That request was rebuffed in late February, 2005. In early May 2005, the plaintiffs served a second document request specifically requesting pre-January 1, 1988 Prime Reports and two mid-1980s contracts between Noranda and Delta, and Noranda and Essex.

On June 6, 2005, the Noranda defendants served their responses and objections to that documents request and to the second set of interrogatories, which was also served on May 6th. Plaintiffs served a third set of interrogatories on the Noranda defendants on May 31, 2005; responses came on June 30, 2005.

---

[3] The reference to the 1987 Report, according to the plaintiffs, "was contained in a single sentence of. . . [the] 1988 Prime Report." (Response at 5). The plaintiffs contend that the 1987 Prime Report is critical to the case and will shed light upon Noranda's purpose in seeking agreements with the sulfuric acid producers and upon Noranda's plan as to how it would carry out these discussions. The defendants have a very different view of the Report's value.

On July 1, 2005, without compliance with the certification requirements of at least Local Rule 37.2, plaintiffs moved to compel the Noranda defendants to produce several pre-1988 documents and to answer certain interrogatories.

According to the Noranda defendants, in October, 2003, they made an agreement with the plaintiffs that pre-January 1, 1988 documents would not have to be produced, and that the plaintiffs have welched on the deal. And, the Noranda defendants contend, even if there were no agreement, granting the plaintiffs' belated motion would require re-review of the 350 boxes of documents that, they say, is a monumental and costly task that could have easily been avoided had the plaintiffs acted with any reasonable dispatch rather than waiting until the day discovery closed to take action. Finally, the defendants claim, not only would the effort involved in the review be unduly burdensome, it is not worth the candle.

The plaintiffs deny the existence of any agreement to limit their discovery requests to the class period, and they submit that the Noranda defendants have failed to comply with Rule 34(b), Federal Rules of Civil Procedure, which requires that "a party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." The plaintiffs contend that this noncompliance mandates that the Noranda defendants and not the plaintiffs bear the burden of review of the documents. Finally, the motion contends that the Noranda defendants' responses to the third set of interrogatories are inadequate in that they refer plaintiffs generally to the entire document production in the case, in violation of Rule 33(d), Federal Rules of Civil Procedure.

# ANALYSIS

## I.

## THE NORANDA DEFENDANTS' MOTION TO STRIKE THE MOTION TO COMPEL
### A.

The motion to strike is based on the plaintiffs' claimed noncompliance with Rule 37(a)(2)(A), Federal Rules of Civil Procedure and Local Rule 37.2. The former provides that a motion to compel "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action." Local Rule 37.2 makes clear that the court *shall* refuse to hear discovery motions under Rules 26 - 37:

> unless the motion includes a statement (1) that after consultation in person or by telephone and good faith attempts to resolve differences they are unable to reach an accord, or (2) counsel's attempts to engage in such consultation were unsuccessful due to no fault of counsel's. Where the consultation occurred, this statement shall recite, in addition, the date, time and place of such conference, and the names of all parties participating therein. Where counsel was unsuccessful in engaging in such consultation, the statement shall recite the efforts made by counsel to engage in consultation.

> Paragraph 31 of the plaintiffs' motion to compel has the following certification.

> Plaintiffs counsel herein certifies that there were numerous consultations with various defense counsel at meetings, depositions and by written correspondence pursuant to Local Rule 37.2 and Fed.R.Civ.P. 37(d) in a good faith effort to secure the discovery responses, documents, and depositions at issue. During these consultations, counsel for the defendants maintained their objections to complying with the discovery obligations discussed in this motion.

(*Plaintiffs' Motion and Supporting Memorandum to Compel*, at 11). Thus, the argument that the motion does not "contain[] a certification or any other statement that Plaintiffs have attempted in good faith to confer with the Noranda Defendants regarding the issues set forth in these motions" is mistaken. (*Motion to Strike Plaintiffs' Motions to Compel*, at 4). Whether the certificate is sufficient is a different question.

5

The motion to compel plainly does not comply with the requirements of Local Rule 37.2. However, the motion to strike does not question the sufficiency of the certification, only its existence. Therefore, the issue of sufficiency is forfeited. *United States v. Johnson*, 415 F.3d 728, 730 (7th Cir. 2005). But even if it were not, the motion to strike would be denied.

The Seventh Circuit has recently stressed the importance of compliance with Local Rules. *See FTC v. Bay Area Business Council, Inc.*, _F.3d_, 2005 WL 2036251 (7th Cir. Aug. 25, 2005). But Local Rules have their limitations, and like all rules, they must have sufficient flexibility and must be applied to accomplish the ends of justice and "not bury it beneath the pressure of their own weight." Joseph Story, Miscellaneous Writings, 210 (1852). For that reason, courts have broad discretion to determine how and when to enforce local rules, *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir.1994), and they have the inherent authority to decide when a departure from their Local Rules should be excused. *Somlyo v. J. Lu-Rob Enterprises*, 932 F.2d 1043, 1048 (2nd Cir. 1991). *Cf. Brengettcy v. Horton*, _F.3d_, 2005 WL 2155656 (7th Cir. 2005)("noncompliance with a court's local rules does not create a jurisdictional bar for the district court or for us."). An appropriate circumstance for excusing noncompliance with rules is when compliance would have been an exercise in otiosity.

The doctrine of futility[4] is as applicable in the context of Rule 37 and Local Rule 37.2 as it is in any other. *See Armstrong v. Amstead Industries, Inc.*, No. 01 C 2963, 2004 WL 1497779, *3 (N.D.Ill. July 2, 2004)(Moran, J.)(accepting plaintiffs' contention that a meeting between the parties would

---

[4] "The law never requires an idle thing to be done." *Brooklyn Life Insurance Co. v. Dutcher*, 95 U.S. 269, 272 (1877). *See also Telemark Development Group v. Mengelt*, 313 F.3d 972, 978 (7th Cir. 2002)(tender excused if it would be a vain, idle or useless act); *Hence v. Hargett*, 71 F.3d 1169, 1174 (5th Cir. 1996)("no one should be required to do a useless act"); *McGraw v. Prudential Insurance Co.*, 137 F.3d 1253, 1263 (10th Cir. 1998).

have been fruitless); *Royal Maccabees Life Insurance. Co. v. Malachinski*, No. 96 C 6135, 2001 WL 290308, *18 (N.D.Ill. Mar. 20, 2001)(Guzman, J.)("Taking into account defendant's prior conduct we find that plaintiff adequately complied with Rule 37's certification requirement and Local Rule 37.2."); *Fidelity Nat. Title Insurance. Co. of New York*, 2002 WL 1433584, *3 (N.D.Ill. 2002)(Conlon, J.)(noting failure to explain the manner in which further discussions between the parties would have promoted Local Rule 37.2's purpose).

The following events demonstrate the appropriateness of the doctrine's application in this case. On February 8, 2005, Mary Jane Edelson Fait, counsel for the plaintiffs, wrote to Mr. Gustman requesting certain specifically identified documents including the 1987 Prime Report (and earlier Reports) and the contracts between Noranda and Delta and Noranda and Essex. ((*Plaintiffs' Motion and Supporting Memorandum to Compel*, Ex. H, Letter of February 8, 2005, at1-2, ¶¶ 1, 5-6). Ms. Fait indicated that the plaintiffs hoped to obtain the documents "in the most expedient manner possible." (*Id.* at 4).

Notwithstanding his promise to "entertain additional narrow, specific requests to search for documents after our initial search and production," on February 28, 2005, Mr. Gustman responded by letter and refused to produce the pre-1988 documents since, in his view, they went "far beyond our mutual agreement in Fall 2003 about what we [sic] documents we were going to search for and produce." His letter went on to day that Ms. Fait had "confirmed this agreement in [her] letter dated November 14, 2003." (*Plaintiffs' Motion and Supporting Memorandum to Compel*, Ex. H at 1). According to Mr. Gustman, the requests for pre-1988 documents "would require [the Noranda defendants] to go back through more than *five hundred* boxes of documents and tens of thousands of emails. . . ." (*Id.*).

An exchange between counsel at the deposition in April, 2005, of Steve Skurnac further reveals

the polarity and intractability of the parties' positions on the dispute over the production of the pre-1988 documents. When counsel for the plaintiff requested a copy of the 1984 contract between Noranda and Delta – one of the documents sought by the present motion–this exchange occurred:

Ms. Fait: . . . didn't we ask you for that contract in a letter? It was a letter that –

Mr. Gustman: I don't know whether you asked us for the contract.

Ms. Fait: Okay. I believe we have. I'm almost certain that it was -- one of the items that we asked you for was –

Mr. Gustman: We have given you what we have.

Ms. Fait: -- a mid '80s contract between Noranda and Delta. Now you are making objections to my questions based on the fact that this is referring to another contract, a contract which I have asked for and haven't received yet.

Mr. Gustman: I disagree with your characterizations. I disagree with everything you said, and I don't know what the nature of the question is. So if you want to put a question, go ahead and put a question out.

Ms. Fait: Okay. Well, on the record, we need to have this previous contract between Noranda and Delta and –

Mr. Gustman: And on the record, we agreed to produce documents beginning January 1, 1988, and this case relates to the time period January 1988, and I think you are wasting our time going back to contracts from '84. And, frankly, I wish you would just move on because you're running out of time.

\*       \*       \*

Ms. Fait: And that's my point, none of us will know how the revenue-sharing provisions were different until we see a copy of that contract.

Mr. Gustman : Let me just state for the record, you didn't ask for a copy. We have written agreements with you that say we only had to look for documents beginning January 1, 1988, and that's what we provided to you.

(*Plaintiffs' Motion and Supporting Memorandum*, Ex. F, Skurnac Deposition. at 207-08, 209).

8

Under the circumstances, the absence of perfect compliance with the Rules' certification requirements is not a bar to consideration of the motion as it relates to the pre-January 1, 1988 documents. The question then is whether the same considerations make it appropriate to consider the motion to compel as it relates to the interrogatories.

## B.

While the parties' submissions regarding the noncompliance with Rule 37 and Local Rule 37.2 focus on the document requests far more than on the interrogatories, the February exchange of letters and the exchange at the Skurnac deposition show that a meet and confer session regarding the interrogatories would have been as unavailing as one would have been with regard to the pre-January 1, 1988 documents.

## II.
## THE PLAINTIFFS' ENTITLEMENT TO
## DOCUMENTS PREPARED PRIOR TO JANUARY 1, 1988

### A.
### The Plaintiffs' Demands For Pre-January 1, 1988
### Documents And The Noranda Defendants' Responses

In response to the plaintiffs' original document request the Noranda defendants objected that the statute of limitations under Section 4 of the Clayton Act was four years, while the request covered a fifteen-year period. The parties met to discuss Noranda's objections and thereafter exchanged lengthy letters. (*Response*, App. I, Ex. A).[5] On October 29, 2003, Mr. Gustman, wrote a 28-page single spaced letter

---

[5] The Noranda defendants' objection to production is no longer based on the statute of limitations. While in certain instances it might be proper to deny discovery of documents on the ground that they would only be relevant to events occurring before an applicable limitations period, where the information is otherwise relevant, the statute of limitations is not a basis for barring discovery. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978); *Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807 (7th Cir. 1985)(Posner, J.); *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. (continued...)

to Ms. Fait. The letter had five topical headings under which were discussed specific document requests or interrogatories. The opening paragraph under the third heading, "Discussions Regarding Noranda Defendants' Objections To Instructions," adverted to instruction no. 1 of the documents request, which defined the relevant time period for production as January 1, 1988, through the date of the request. The request also sought all documents "created or generated outside this period, but which contain information concerning this period." The second paragraph said:

> We indicated [at the meeting on October 16th] that we will produce documents within the time period alleged in the complaint, January 1988, through January 16, 2003, which latter date is the outside date for the class as alleged in the Consolidated Amended Complaint.

(October 29, 2003 letter, at 5).

Mr. Gustman acknowledged that plaintiffs had expressed the view that, while they might agree to limit certain requests, that "should not prejudice [plaintiffs'] right to ask for more documents once the first production has been reviewed." He reiterated the Noranda defendants' position that they "do not agree with plaintiffs' position regarding document requests for which we have agreed to undertake a search as outlined by these negotiations." The letter went on to state that at the October 16th meeting, the Noranda defendants had "reiterated our position that we generally want to only make one pass through the Noranda Defendants' documents." He did agree, "[h]owever, [to] entertain additional narrow, specific requests to search for documents after our initial search and production." (October 29, 2003 letter, at 7).

Ms. Fait responded on November 14, 2003, with a 10-page single spaced letter, which topically

---

[5](...continued)
1984). *Compare Geldon v. South Milwaukee School District,* 414 F.3d 817 (7th Cir. 2005) (granting of summary judgment on certain counts did not preclude evidence on those counts from being admissible on count on which summary judgment was denied).

mirrored Mr. Gustman's letter. The first sentence under the heading, "Discussions Regarding Noranda Defendants' Responses To The Document Request," said that the "description of our discussion [in the October 23rd letter] is incomplete." (November 14, 2003 letter, at 3). While acknowledging the Noranda defendants' "desire" to make only one pass-through of Noranda's documents, Ms. Fait explicitly "reserve[d] [plaintiffs'] right to request additional documents once we have reviewed Noranda's initial production if further investigation becomes necessary." (*Id.*, at 3).

Thereafter, 350 boxes of documents were shipped to Noranda defendants' Chicago counsel from Noranda's storage facility in Toronto, where the documents had been stored for seven years, following the 1998 formation of a joint venture between Noranda and DuPont to market sulfuric acid. In addition, hundreds of thousands of pages of emails that seemed relevant to sulfuric acid sales in the United States in the period January 1, 1988 - January 16, 2003 were reviewed. (*Response*, App. I, Ex. B, Declaration of Wanda Vasquez, ¶ 5). [6]

### B.
### There Was No Agreement Between the Plaintiffs and the Noranda Defendants That Production Would Be Limited To Post-January 1, 1988 Documents

Mr. Gustman's recitation in his October, 2003 letter of the Noranda defendants' position regarding production of pre-1988 documents did not create an agreement that production was excused, for "[a] man cannot make evidence for himself by writing a letter containing the statements that he wishes to prove" and thereafter, "sending it to the party against whom he wishes to prove the facts." *A.B. Leach & Co. v.*

---

[6] The motion to compel originally also targeted monthly and quarterly billing and reconciliation statements from 1988 through 2003. As part of a stipulation between the parties, however, the Noranda defendants have agreed to assist the plaintiffs in locating these documents. Accordingly, the plaintiffs concede that that portion of their motion to compel is moot. (*Reply* at 7 n.2).

11

*Peirson*, 275 U.S. 120, 128 (1927) (Holmes, J.). In any event, that recitation was found to be "incomplete" by Ms. Fait. While acknowledging that the initial run-through was to be only for the post-January 1, 1988 period, she reiterated her position that the plaintiffs could insist on production of documents from an earlier period depending on what turned up– a concept to which Mr. Gustman was hostile and which did not fit with the Noranda defendants' "desire" not to have to go through the task a second time. Ms. Fait's response, while polite, was emphatic that she did not much care, and she reserved the right to demand the very thing Mr. Gustman "desire[d]" not to do.

The "reservation of rights" provision in the plaintiffs' October 2003 letter is said not to count because it was "buried" in a paragraph dealing with the production of documents from smelters and thus, "arguably deals only with that topic." (*Response*, at 3 n. 4). The argument is apparently not so much that the Noranda defendants' lawyer missed the provision in reading the letter, but either that Ms. Fait intended that the reservation only apply to smelter documents or he was somehow gulled by its placement into thinking that it did – an apparent application to letters of *ejusdem generis*, the principle of statutory construction used to resolve ambiguity and uncertainty. Under the principle, where general words follow an enumeration of specific terms, the general words are read to apply only to other items like those specifically enumerated. While the argument does not employ the term, if it did not have that principle in mind, it has no meaning.

Even in its proper context, the principle does not apply in the absence of an enumeration or when the whole context dictates a different conclusion than that the general term should be understood as a reference to subjects akin to those specifically enumerated. *See Norfolk and Western Ry. Co. v. American Train Dispatchers Association*, 499 U.S. 117, 128 (1991); *Garcia v. United States*, 469

12

U.S. 70, 74 (1984). Here, we are not concerned with the construction of a statute, but with words in an exchange of letters; not with a specific enumeration of items in a list, but with two topics contained in two sentences responsive to the identical topics mentioned in the defendants' October 2003 letter; and finally, not with inherent ambiguity, but with undeniable clarity. Whatever else might be said about the letters, it cannot be said that there was an agreement between the parties that the Noranda defendants' production obligations would be fully satisfied by production of post-January 1, 1988 documents. The letters reveal not a meeting of the minds, *Baker O'Neal Holdings v. Massey*, 403 F.3d 485 (7th Cir. 2005), but an expression of irreconcilable positions and a clash of wills.[7]

## C.
## The Relevance and Claimed Importance of the Pre-January 1, 1988 Documents

In addition to the pre-1988 Prime Reports, which plaintiffs contend will illumine Noranda's purpose in seeking agreements with the sulfuric acid producers and will provide an interpretive gloss to the factual statements in the 1988 Prime Report, plaintiffs also seek two mid-1980s contracts between Noranda and Delta, and Noranda and Essex, which were in effect until at least 1996. Three deposition witnesses have testified about the Delta contract. That testimony is not exactly as plaintiffs characterize it, but generally, two of the witnesses to whom plaintiffs refer testified that the contracts in effect at the time of the negotiation of the October 1989 contained a profit-sharing or revenue-sharing provision. (*Id.* at Ex. D, Dullea Deposition. at 62:16-63:24; Ex. F, Skurnac Deposition at 204:10-215:11). They also testified that they had difficulty recalling the documents without being able to review the 1984 contract to refresh their

---

[7] Only literary perversity or jaundiced partisanship could suggest that there were "thoroughly documented agreements on the scope and breadth of discovery" and that the "agreement [was] that the period would be essentially the same originally sought in instruction No. 1. . . ." (Response at 1-2).

13

memory.

One of the witnesses testified that under the mid-1980s contract Noranda and Delta were required to agree upon the delivered price of the sulfuric acid to the end customer. (*Id.*, Ex. D, Dullea Deposition., at 64-67; 77-79) He also testified that either the 1989 contract was missing an attachment or rider that explained how the revenue sharing and pricing formula worked or that the 1989 contract incorporated by reference the 1984 contract. (*Id.*, Ex. D, Dullea Deposition., at 145). The Noranda defendants' counsel referred to this 1984 contract during at least one of the depositions. (*Id.*, Ex. F at 207-09). Plaintiffs argue that the deposition testimony demonstrates that the terms of the mid-1980s contract were either in effect during, or had some relevance to, the period from 1988 through 2003. Plaintiffs also contend that they were prejudiced during these depositions by not having a copy of the contract to show to the witnesses to refresh their memory.

The Essex-Noranda contract, the plaintiffs argue, relates to what the evidence indicates was the first of a series of shut-down agreements that Noranda entered into with sulfuric acid producers in the United States. Plaintiffs contend that a review of this first contract and the correspondence and memos surrounding the negotiations is relevant to the interpretation of the terms, provisions and intent of the later shut-down agreements that are part of the complaint. In light of the broad definition of relevance under the Federal Rules of Civil Procedure, the documents sought are discoverable. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978). The question then is what is the extent of the burden of production, whether that burden outweighs the likely benefit of the documents to plaintiffs' case, and who is to bear the costs of production. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002); Rule 26(b)(2)(iii).

14

## D.

### The Defendants Have Failed To Sustain Their Burden of Showing That Production Of The Few Pre-January 1, 1988 Documents Sought By The Plaintiffs Would Be Unduly Burdensome

The defendants claim that in order to produce the handful of pre-1988 documents, they will have to re-review the 350 boxes of documents that they reviewed for the initial production, a task they say involved "Herculean effort" and one they insist they should not have to repeat.[8] While essentially characterizing the Noranda defendants' argument as meritless, it is clear that the plaintiffs do not want to conduct the review either. Of course, the effort required to produce the documents the plaintiffs seek is not burden-free. But, that is not the test, or else there could be no discovery in any case.

The question is whether the burden is an undue one. As the objectors, the Noranda defendants must demonstrate that it is. *See Trading Technologies Intern., Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2005 WL 1300778, *1 (N.D.Ill. April 28, 2005)(Moran, J.); *Semien v. Life Insurance. Co. of North America*, No. 03 C 4795, 2004 WL 1151608, *1 (N.D.Ill. April 21, 2004)(Kocoras, J.). The defendants have failed to provide sufficiently convincing evidence to support their claim, and whatever that burden is, it pales by comparison to that in other cases. *See, e.g., United States v. IBM Corp.*, 83 F.R.D. 97 (S.D.N.Y.1979) (ordering civil antitrust defendant to comply with a subpoena that defendant estimated required production of over five billion document pages); *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 614 (7th Cir.1997) (discovery involved more than 1,000 depositions and over fifty million pages of documents); *In re Linerboard Antitrust Litigation*, 296 F.Supp.2d 568,

---

[8] Calling the effort involved "Herculean" is not conclusive. Discovered parties often use that adjective in vain. *Kozlowski v. Sears Roebuck & Co.*, 73 F.R.D. 73, 76 (D.Mass. 1976).

577 (E.D.Pa.2003) (discovery required production of millions of pages of documents); *In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 818 (3rd Cir.1982) (court permitted taking of 270 depositions and production of nearly two million documents in complex, nationwide antitrust claim).

In order to demonstrate undue burden, the plaintiffs must provide affirmative proof in the form of affidavits or record evidence. *Wagner v. Dryvit Systems, Inc.*, 208 F.R.D. 606, 610 (D.Neb. 2001); *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 529 (D.Nev. 1997); *Zapata v. IBP, Inc.*, 1994 WL 649322 at *3 (D.Kan. 1994).[9] Nothing of the sort has been offered by the Noranda defendants. There is only the *ipse dixit* of counsel, and that is not sufficient. Whether or not it is a fair inference that the defendants already have in their possession some of the specific documents requested – as a result of prior requests, depositions, and the Department of Justice investigation – it is certainly reasonable to assume that the prior review of the 350 boxes was not done in a haphazard and disorganized way. After all, the Noranda defendants' attorneys are no strangers to antitrust litigation and the kind of complicated and massive discovery involved in this case. Their two lead counsel, Mr. Gustman and Mr. Cross, have almost 60 years of experience between them. They have authored numerous publications involving antitrust, have lectured on antitrust law, and each has been selected as a Leading Lawyer in the field of antitrust by the American Research Corporation or the Leading Lawyers Network. Their firm has more than 120 lawyers. *See* www.freebornpeters.com

Thus, it is unlikely that the team of lawyers who were tasked to review the initial production did not

---

[9] *See also Athridge v. Aetna Casualty and Surety Co.*, 184 F.R.D. 181, 190- 91 (D.D.C.1998); *American Rock Salt Co., LLC v. Norfolk Southern Corp.*, 228 F.R.D. 426, 432 (W.D.N.Y. 2005); *Lineen v. Metcalf & Eddy, Inc.*, No. 96 Civ.2718, 1997 WL 73763, *7 (S.D.N.Y. Feb. 21, 1997); *Kozlowski v. Sears Roebuck & Co.*, 73 F.R.D. 73, 76 (D.Mass. 1976).

16

follow protocols and procedures that involved some method of document identification. But there are more than inferences from excellence and experience that suggest that the burden is not so severe as is claimed. That there was some sort of cataloging of the 350 boxes is evidenced by the Declaration of Wanda Vasquez, the paralegal involved in the production of the documents after their receipt in Chicago. In her declaration she said that her "records indicate that [the 1988 Prime Report] was produced to the plaintiffs in February, 2004," and bears the "Bates number of NFD 100,696 -715." (Vasquez Declaration, ¶15). Similarly, the defendants' response was able to pinpoint the Bates numbers that were produced on June 7th, and it would seem either that some method of indexing was already in place by October, 2003 or was anticipated, for how else could Mr. Gustman say in his October 29, 2003 letter that the defense would "entertain" "additional narrow, specific requests to search for documents after our initial search and production." (*Id.* at 7). Without some method of document inventorying and indexing, it is difficult to see how that promise could ever be fulfilled, short of reviewing all 350 boxes. Given Mr. Gustman's aversion to that task, it seems likely that he had something else in mind.

Given the experience of the Noranda defendants' lawyers, it seems unlikely that the documents that *were* turned over would have been returned to the 350 boxes and indiscriminately commingled with those that were *not* – and the latter would have included the pre-January 1, 1988 documents. The defendants have offered no proof that the documents that were not turned over were not separately maintained or were otherwise not identifiable in some fashion. The unadorned conclusion that the few pre-1988 documents being sought by the plaintiffs "would now require another complete search of all 350 boxes at an enormous burden and expense" is not decisive. (Response at 4)

While Ms. Vasquez was able to pinpoint the exact date on which the 1988 Prime Report was

17

produced to the plaintiffs and the exact Bates numbers of the approximately 20 pages comprising the document, the remainder of her sketchy declaration is curiously silent on the question of whether the 350 boxes of documents were indexed or catalogued and on the questions of how many documents were *not produced* and whether they were segregated or identified and thus are accessible without undue burden. Whether these omissions were inadvertent or purposeful need not be determined. Any uncertainties go against the defendants, not the plaintiffs, since the former have the responsibility to demonstrate undue burden. Without appropriate and supported explanation, the defendants cannot persuasively argue that they will have to start from scratch and review 350 boxes containing a million indiscriminately kept documents. In any event, having reviewed the universe of documents once, a second review would be far less burdensome. *Cf. U.S. S.E.C. v. Elfindepan, S.A.*, 206 F.R.D. 574, 577 (M.D.N.C. 2002) (Plaintiffs did not meet the threshold for using Rule 33(d) where it already culled the documents for answers to some or all of the interrogatories, meaning it was not equally or less burdensome for defendants to obtain the information).

If the defendants failed to establish and follow a protocol for production, they are, to some degree, the cause of whatever increased burdens may be incurred in producing the pre-1988 documents. It was not as though the problem surfaced suddenly in May, 2005. The parties had been disputing the discoverability of the documents since before October, 2003, and by the Fall of 2003, the plaintiffs had left no doubt that they might well demand production of pre-1988 documents. By early February, 2005, the plaintiffs had actually demanded the pre-1988 documents. If the defendants chose to produce documents in a fashion that either ignored the unresolved controversy or unreasonably assumed that the plaintiffs had agreed to make no further demands, they did so at their peril. *Cf. In re Brand Name*

18

*Prescription Drugs Antitrust Litigation*, 1995 WL 360526 at *1 (N.D.Ill. 1995)(Kocoras, J.)(The plaintiffs should not have to bear the burden of production "where, as here, 'the costliness of the discovery procedure involved... is a product of the defendant's record-keeping scheme over which the [plaintiffs have] no control.'")(ellipsis and brackets in original); *Wagner v. Dryvit Systems, Inc.*, 208 F.R.D. 606, 610 (D.Neb. 2001); *Kozlowski v. Sears Roebuck & Co.*, 73 F.R.D. 73, 76 (D.Mass. 1976)("To allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filling system [here, by not creating an adequate indexing system], and then claiming undue burden, would defeat the purposes of the discovery rules.").

## E.

### Producing 350 Boxes of Documents For the Plaintiffs' Inspection Does Not Comply With Rule 34(b)

The Noranda defendants contend that *they* should not have to re-review the documents and that production of the 350 boxes, as they were kept in storage, complies (or will comply) with Rule 34(b)'s requirement that documents be produced "as they are kept in the usual course of business...." [10] Consequently, they say, any re-review of the documents is solely the responsibility of the plaintiffs. The facts tell a very different story. In 1998, Noranda and DuPont entered into a joint venture to market sulfuric acid. Thereafter, Noranda no longer had a separate acid sales force, and the files that had been

---

[10] Rule 34(b) provides, in pertinent part:

> A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.
> they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

used in the usual course of that business and which continued to be necessary to the business were transferred to the joint venture. Those not transferred were "packed up from [Noranda's] offices and file drawers" – where presumably they were kept in an organized fashion – "and transferred to storage," where they were no longer kept in any particular order, and where they remained until this litigation. (Response at 4; Vasquez Declaration).

The Federal Rules of Civil Procedure, which have the force of statutes, *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 392 (7th Cir. 2002), *cert. denied*, 540 U.S. 1068 (2003), are to be accorded "their plain meaning. . . and generally with them, as with a statute, '[w]hen we find the terms. . . unambiguous, judicial inquiry is complete. . . .'" *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 123 (1989).[11] The plain meaning of the 1980 amendment to Rule 34 compels rejection of the argument that production of 350 boxes of records of a business whose relevant activities had ceased in 1998 and which had been stored since then in no particular order *is* production of documents "as they are kept in the usual course of business." Storing documents may be a part of the usual course of business, but stored documents are not kept in the usual course of business within the meaning of the Rule.

Rule 34 was amended in 1980 because of a concern that litigants were deliberately mixing critical documents with masses of other documents to hide their existence or obscure their significance. *See Board of Education of Evanston Township High School Dist. No. 202 v. Admiral Heating &3, Inc.*, 104 F.R.D. 22, 36 (N.D.Ill. 1984)(Shadur, J.); 8A C.Wright, A.Miller & R.Marcus, Federal Practice and

---

[11] Courts frequently look to dictionaries to determine the plain meaning of words. *Cler v. Illinois Educational Association*, __F3d__, 2005 WL 2174427 (7th Cir. Sept. 9,2005). *See also, Mississippi v. Louisiana*, 506 U.S. 73, 78 (1992).

Procedure, § 2213, at 431 (2nd ed. 1994). Requiring documents to be produced "as they *are* kept in the *usual course of business*" (emphasis supplied), precludes artificial shifting of documents (assuming that the rule is adhered to). A businesses has an obvious incentive to keep needed documents in a way that maximizes their usefulness in the day-to-day operations of the business. That incentive, which is inconsistent with document tampering, vanishes once documents not used with regularity are sent to a storage facility, for then it is no longer essential that they be kept with any degree of organization–as this case vividly illustrates. As to the documents in storage, they are no longer kept in the "usual course"of *business*," they are kept in the usual course of"*storage*,"and the option granted by the first clause of Rule 34(b) no longer exists. That leaves the producing party with the obligation to "organize and label" the documents to correspond to the document requests. *City of Wichita, Kansas. v. Aero Holdings, Inc.*, 2000WL 1480499 at *1 (D.Kan. May 23, 2000). The Noranda defendants have not availed themselves of this option.

This is not to say that production of documents as they are kept in storage is never proper under Rule 34 (b). The discovered party must, however, show that the way in which the documents are kept has not changed from how they were kept in the usual course of business. That burden is not difficult. All that is needed is the testimony of a person with knowledge of how the records were originally kept and how they were maintained in storage. *See, e.g., Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.*, 222 F.R.D. 594, 598 (W.D.Wis. 2004)(compliance with Rule 34(b) shown by the declaration of defendants' CEO, who was familiar with the storage facility and the organization of the documents kept there); *Fidelity Nat. Title Insurance. Co. v. Intercounty Nat. Title Insurance. Co.*, 2002 WL 193385, *3 (N.D.Ill. Feb. 7, 2002).

21

The Noranda defendants have made no meaningful attempt to satisfy this evidentiary burden. Ms. Vasquez's declaration proves nothing other than that there was no impropriety in the handling of the Noranda documents after they were received at Freeborn & Peters in Chicago. Ms. Vasquez is testimonially incompetent under Rule 602, Federal Rules of Evidence, to say: a) what happened to those documents between the date they were removed from Noranda's files and sent to the storage facility; and b) what happened to the documents from the date they were received at the storage facility to the date they were shipped to Chicago to Freeborn & Peters. *See generally,* 3 Weinstein's Federal Evidence §602.02 et seq. (2nd ed. 2005).

The Noranda defendants are not at liberty under federal discovery rules to dump massive amounts of documents, which the defendants concede have "no logical order to them," (Response at 9), on their adversaries and demand that they try to find what they are looking for. *See Rothman v. Emory University,* 123 F.3d 446, 455 (7th Cir. 1997)(production of three large storage boxes papers and numerous other unrelated, non-responsive materials in response to court-ordered production was sanctionable); *Transportes Aereos De Angola v. Ronair, Inc.,* 104 F.R.D. 482, 499 (D.Del. 1985)("The court will not permit defendants to shift the burden of discovery by telling 'plaintiff that, if he wishes, he may hunt through all the documents and find the information for himself.'"); *Wagner v. Dryvit Systems, Inc.,* 208 F.R.D. 606, 610 (D.Neb. 2001). If the plaintiffs are correct, the documents relating to sulfuric acid were not only taken from the file drawers and offices at Noranda and placed into boxes in no particular order, they "were mixed in the same box[es] with files from unrelated aspects of Noranda's business,

22

relating to zinc, copper or other materials." (Reply at 9).[12] Whether intended or not, the result is the proverbial "needle in a haystack," *Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.*, 222 F.R.D. at 598, the very situation that the 1980 amendment to Rule 34 was intended to prevent.

**F.**

### The Plaintiffs' Claimed Responsibility For The Costs To Be Incurred In The Production Of The Pre-January 1, 1988 Documents

The Noranda defendants argue that if the motion to compel is granted, any expense to be incurred in obtaining the pre-1988 documents ought to be borne by the plaintiffs since, they are the cause of any increased costs. The Noranda defendants contend that in February, 2004, when the 1988 Prime Report was produced, only 90 of the 350 boxes had been reviewed by the Noranda defense team, and had the plaintiffs acted promptly in seeking the 1987 Prime Report rather than waiting until the close of discovery, the burden and expense of searching for that and related documents would have been, if not non-existent, infinitely less than it may now be. (Response, at 4-5).[13]

The plaintiffs contend that the 1988 Prime Report, which led them to the 1987 Report, was "buried in the bowels of Noranda's massive production," which, by February, totaled approximately 250,000 pages, and which took the plaintiffs months to find. (*Reply* at 5). Exactly how long it took is not clear. But months are not years, and thus perhaps by May or June, 2004, the plaintiffs might have known about the 1988 Report, or perhaps should have. But that is a question that cannot be decided on the present record. Obviously by February 8, 2005, when Ms. Fait wrote to Mr. Gustman asking that the 1987

---

[12] This representation is premised on "discussions with Noranda's counsel. . . ." (*Id.*).

[13] This representation contrasts somewhat with Mr. Gustman's February 28, 2005 letter to Ms. Fait in which he said that a search would require re-review of "more than 500 boxes. . . ."

23

Report be produced, the plaintiffs were aware of its existence.

In light of Mr. Gustman's statement in his October, 2003 letter to "entertain additional narrow, specific requests to search for documents *after our initial search and production*" (emphasis supplied), a literalist might have thought that it would have been permissible to wait until document production was complete before asking for the pre-January 1, 1988 documents. But, the plaintiffs did not wait. In early February 2005, almost five months before documents Bates stamped 591,997 - 593,239 were produced, the plaintiffs attempted unsuccessfully to get the 1987 Report and "additional, narrow, specific" documents. It is not possible, on the strength of the present record, to determine whether the plaintiffs could have acted with greater dispatch and whether, notwithstanding Mr. Gustman's claim, there really would have been a necessity in February, 2005 to have reviewed "500" boxes of documents, or whether the documents she requested could have been produced at that time without undue burden. Nor is it possible to determine the how much additional costs will result as a consequence of the Noranda defendants' February 28, 2005 refusal to produce the 1987 Report and the contracts that were requested. These are questions for another day and a better developed record.

The Essex-Noranda and Delta-Noranda agreements present a slightly different circumstance. Those agreements were well-known in the marketplace at least as early as 1989. The January 27, 1989 issue of Fertecon Sulphuric Acid Telefax, a widely-distributed trade publication, noted:

> Noranda is believed to have concluded an agreement with DuPont which will involve closing of the latter's 195,000 t/yr. plant at Grasselli, NJ which will then receive Noranda material. *This arrangement is similar to that negotiated by Noranda with Essex, and more recently with Delta.*

(*Response* at 5, App. 1, Ex. C, at 3) (Emphasis supplied). Even if the plaintiffs were unfamiliar with this

24

newsletter, the Noranda defendants produced a collection of excerpts from the Fertecon faxes and newsletters in mid-December of 2003 as part of the files of Dr. Lauren Stiroh, the class expert economist retained by the defendants. The plaintiffs deposed Dr. Stiroh on February 15, 2004 and made the collection of Fertecon faxes an exhibit at the deposition. (*Response* at 5, App. I, Ex. D, at 3). Yet, they did nothing for a year to try and obtain the contracts.

Whether an earlier request could have been made and whether it would have been flatly rejected in the way that Mr. Gustman rejected the request in February 2005 – thereby rendering any earlier request an exercise in futility – cannot be determined given the state of the present record. Thus, before there can be any allocation of costs, a number of things must be known including: whether there was some kind of indexing system in place pursuant to which the Noranda defendants conducted their initial review of the 350 boxes of documents; whether location of the handful of documents presently being sought actually requires a re-review of the 350 boxes of documents; when the plaintiffs actually discovered the 1988 Prime Report; whether they could have acted more quickly in making the requests for documents than they did; whether the costs of production would have been different had the requests been made at an earlier time, and other related matters, which bear upon an appropriate allocation of the costs involved in compliance with the motion to compel. *See* Rule 26(c)(2), Federal Rules of Civil Procedure; *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978) ; *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 468 (9th Cir. 1987); 8 Wright & Miller, Federal Practice & Procedure, §2008.1(2005 Pocket part at 32).

The time for resolving these questions is not yet at hand.

## III.

## THE NORANDA DEFENDANTS' RESPONSE TO
## THE PLAINTIFFS' INTERROGATORIES IS NOT COMPLIANT WITH RULE 33(d)

On May 31, 2005, the plaintiffs served a third set of interrogatories on Noranda and Falconbridge.

(*Plaintiffs' Motion and Supporting Memorandum to Compel*, Ex. I). On June 30, 2005, the Noranda

defendants objected to the interrogatories on the grounds that they were improperly served, exceeded the

numerical limit allowed by Rule 33(a), sought privileged information, and were vague, ambiguous, and

unduly burdensome, (*Id.*, Ex. J, at 3-6, 11-13), but went on to respond to interrogatories 1, 2, and 7 by:

> refer[ring] Plaintiffs to their document production in this case, from which the information
> responsive to this interrogatory can be derived or ascertained. The burden of searching
> the documents for such information is substantially the same for Plaintiffs as it is for
> Noranda and Falconbridge.

(*Id.*, Ex. J, at 4-5, 6, 13).

Plaintiffs complain that this response is inadequate because it refers plaintiffs generally to the entire

document production. (*Id.*, at 7-8).[14] In their response brief, the Noranda defendants object to

interrogatories 1, 2, and 7 as unreasonably cumulative and duplicative of not only information contained

in documents already produced, but information garnered through depositions as well. (*Response*, at 10-

13). Rule 33(b)(4) requires that "[a]ll grounds for an objection to an interrogatory shall be stated with

specificity." If they are not, the objection is deemed waived. Rule 33(b)(4); *Hobley v. Chicago Police*

*Commander Burge*, No. 03 C 3678, 2003 WL 22682362, *5 (N.D.Ill. Nov. 12, 2003); *Jones v. Syntex*

*Laboratories, Inc.*, No. 99 C 3113, 2001 WL 1338987, *1 (N.D.Ill. Oct. 30, 2001). The advisory

---

[14] These were the only interrogatories that drew a reference to documents produced from the
Noranda defendants. (Motion and Memorandum to Compel, Ex. J at 4-5, 6, 13; Response at 9 n.15).

committee's notes to the 1993 amendment to Rule 33 state that the added language was intended to make clear that objections must be specifically justified, and that unstated or untimely grounds for objection ordinarily are waived. Here, as plaintiffs point out in their reply brief, the Noranda defendants raise their "cumulative and duplicative" objection for the first time in their Response. The objection is thus waived.

That leaves the plaintiffs' concerns about the Noranda defendants' resort to Rule 33(d) to answer the interrogatories. Under this rule:

> Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served . . . and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived . . . A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

This same issue was considered at length in the earlier opinion involving defendant Koch Industries. *See In re Sulfuric Antitrust Litigation,* 2005 WL 2059327 (N.D.Ill. August 26, 2005). A party responding to an interrogatory may not take advantage of Rule 33(d) unless it can show that "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served....." *Magarl, LLC v. Crane Co.,* No. IP 02-0478-C-T/L, 1:03-CV-01255-JDT-TW, 2004 WL 2750252, *7 (S.D.Ind. Sept. 29, 2004); *Fresenius Medical Care Holding Inc. v. Baxter Intern., Inc.,* 224 F.R.D. 644, 650 (N.D.Cal. 2004). While another review of the documents that have been produced would be anything but effortless, the effort involved is not as great for the producing parties as it is for the plaintiffs, since the former are more familiar with the documents than the plaintiffs. Added to that familiarity is the familiarity of defense counsel, who have already undertaken at least one review of the documents. Consequently, the defense will be more easily able to locate the answers in the documents

27

than would plaintiffs. *U.S. S.E.C. v. Elfindepan, S.A.*, 206 F.R.D. 574, 577 (M.D.N.C. 2002) (Plaintiffs did not meet the threshold for using Rule 33(d) where it already culled the documents for answers to some or all of the interrogatories, meaning it was not equally or less burdensome for defendants to obtain the information); *Petroleum Insurance. Agency, Inc. v. Hartford Acc. and Indemnity. Co.*, 111 F.R.D. 318, 322 (D.Mass. 1984) (court did not allow defendants to use Rule 33(c) – predecessor to Rule 33(d) – where defendants had done considerable work to gather the information requested by the interrogatories because it followed that it was not equally burdensome for the parties to search the records to come up with answers).

Even if the Noranda defendants had satisfied the threshold showing required to employ the Rule 33(d) option, the reference to records must be sufficiently detailed to allow the interrogating party to locate and identify them. Instead of specifying "by category and location, the records from which the answers to the interrogatories can be derived," Rule 33(c) advisory committee's note (1980 amendment), *cited in In re G-I Holdings Inc.*, 218 F.R.D. 428, 438 (D.N.J. 2003), the Noranda defendants have produced perhaps a million pages of documents and merely referred plaintiffs, generally, to them for the answers to their interrogatory. This is "an abuse of the option." *See In re Sulfuric Antitrust Litigation*, 2005 WL 2059327 (N.D.Ill. August 26, 2005)(citing *Bonds v. District of Columbia*, 93 F.3d 801, 811 (D.C.Cir. 1996)). The Noranda defendants' reliance on two cases that antedated the 1980 amendment to Rule 33 by 31 and 21 years respectively is, to say the least, odd. *See Aktiebologet Vargos v. Clark*, 8 F.R.D. 635 (D.D.C. 1949); *Riss & Co. v. Association of American Railroads*, 23 F.R.D. 211 (D.D.C. 1959). (Response at 9). Those cases were decided when the law did not require a party opting to produce business records to specify, by category and location, the records from which answers to the interrogatories

28

can be derived.

Accordingly, plaintiffs' motion to compel is granted as to interrogatories 1, 2, and 7. The Noranda Defendants must either provide a specific response to each subsection of the interrogatory or, if it chooses to invoke Rule 33(d), must adequately specify the responsive documents.

### CONCLUSION

For the foregoing reasons, the plaintiffs' motion to compel the Noranda defendants to comply with certain outstanding discovery requests [#168] is GRANTED in part and DENIED in part. The motion of the Noranda defendants to strike plaintiffs' motion to compel [#171] is DENIED. Following compliance with the outstanding discovery requests, the Noranda defendants may apply, if they choose, for a determination of whether costs should be imposed on the plaintiffs, and if so, in what amounts. Any application must be supported by evidence that addresses the concerns expressed earlier in this opinion.

**ENTERED:** _____

**DATE:** 9-27-05

UNITED STATES MAGISTRATE JUDGE