# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In Re SULFURIC ACID ANTITRUST LITIGATION | ) **MDL Docket No. 1536** <br> ) **Case No. 03 C 4576** <br> ) <br> ) **Magistrate Judge Jeffrey Cole** <br> ) |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiffs have moved for a determination of whether the attorney-client privilege applies to certain documents that defendants, Noranda, Inc. and Falconbridge Limited (collectively, "Noranda defendants"), claim are protected from discovery, despite their prior inadvertent production. As to others, the privilege is said to have been waived by virtue of their having been shared with an affiliated company, the stock of which was owned in large part by Noranda or another company with which Noranda entered into a joint venture. Finally, there is the claim that the crime-fraud exception to the attorney-client privilege requires that a number of documents be produced.

## I.
## BACKGROUND

Given the complexity of the case, the volume of documents that have been produced in discovery, and the enormity of the stakes, it is not surprising that this is the sixth opinion involving discovery disputes between the parties.[1] That there have not been more is a testament to the fair way in which the parties have fulfilled the task of self-governance in discovery.

---

[1] *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351 (N.D.Ill. 2005); *Id.,* 230 F.R.D. 527; *Id.,* 231 F.R.D. 331; *Id.,*231 F.R.D. 320; *Id.,* 2005 WL 1994105.

· As explained in the earlier opinions, the case is a multi-district, antitrust suit involving allegations that the defendants conspired to raise, fix, maintain or stabilize the price of sulfuric acid in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Noranda defendants are Canadian mining companies, which sold sulfuric acid to companies in the United States. The plaintiffs claim that their activities in that market resulted in a restriction of output by their competitors and fixation of prices. The two companies offer quite a different characterization of their efforts in the market, contending that they were in a position to take advantage of certain business opportunities created not only by market conditions, but by environmental restrictions on their mining activities.

## A.
## Production of Sulfuric Acid

As a part of their mining operations, Noranda and Falconbridge smelt ores like copper, lead, zinc, or nickel – all of which are sulfides. Smelting removes the sulfur, releasing it as sulfur dioxide. Environmental laws prohibit the venting of this gas into the atmosphere and mandate its recapture. When it combines with water, sulfur dioxide becomes sulfuric acid; when this occurs in the atmosphere, it causes acid rain. If this done purposefully under controlled conditions, however, the sulfuric acid produced can be sold on the sulfuric acid market. The acid is used in a wide range of applications, from phosphate fertilizer materials, to ore processing, to batteries.

When companies like Noranda and Falconbridge produce sulfuric acid, it is done so as a by-product of their smelting activities. It is essentially a waste, and has no production cost. Yet, due to environmental restrictions, disposal is costly. One extremely practical – and lucrative – way it can be disposed of is through sale, and is often shipped in large quantities over considerable distances.

2

· Of course, there being such a market, all sulfuric acid is not produced as a mere by-product. Much is produced through the smelting of elemental sulfur. Solid sulfur is first melted and cleansed of impurities. It is then converted to sulfur dioxide, burned in a blast of dried air. The gas is then "cleaned and dried," and undergoes catalytic oxidation at high temperature and pressure to convert it to sulfur trioxide. The sulfur trioxide cannot yet be combined with water; the reaction is exothermic and generates a mist that is too difficult to work with. Instead, the sulfur trioxide is dissolved in concentrated sulfuric acid to form oleum before it is combined with water to form concentrated, liquid sulfuric acid.[2]

## B.
## The Effect Of Waste Acid On The Market

Obviously, this process involves costs, not the least of which being the elemental sulfur, which are not involved where the production of sulfuric acid is a by-product of other operations. Thus, the by-product acid can be priced below the smelter-produced acid in the marketplace. The economic realties of the situation are such that the smelters must decide whether to continue producing sulfuric acid in an environment that makes it difficult for them to compete.

These smelting producers, however, do have tangible and intangible assets that they can exploit, if they choose to remain in the market. They have the infrastructure for storing and transporting sulfuric acid already in place. They have a wealth of experience with the associated safety concerns and regulations. Perhaps most importantly, they already have relationships with the sulfuric acid customers, as well as insight into the market. Consequently, these companies can exploit these assets and remain in the sulfuric acid

---

[2] The very basic discussion of the processes employed in sulfuric acid production is drawn from http://www.uyseg.org/greener_industry; http://en.wikipedia.org/wiki/Sulfuric_acid; and http://www.answers.com/topic/sulfuric-acid.

3

market in a distribution capacity.

In the mid- to late-1980s, Noranda and Falconbridge were faced with the need to dispose of ever-increasing volumes of by-product sulfuric acid from their mining operations. According to them, they engaged certain of the smelting producers to distribute their by-product acid in the United States. The defendants point out that, at that time, they were not selling any sulfuric acid to end users – they had no sales force or distribution network. Instead, they made use of those already in existence by entering into agreements with the smelting producers. As the Noranda defendants describe it, these were essentially agency agreements; the Noranda defendants simply made use of the smelting producers as distributors. Given the economics of the situation, the smelting producers decided to participate in the market as distributors. To be sure, some of these smelting producers shut down certain operations or reduced capacity. But they replaced that capacity with cheaper sulfuric acid from Noranda and Falconbridge.

The plaintiffs characterize these agreements far less benevolently. According to the plaintiffs, Noranda and Falconbridge were horizontal competitors of the smelting producers. As such, the system they set up was not a vertical arrangement. The plaintiffs argue that Noranda and Falconbridge entered into a series of output restriction agreements with these competitors with the goal of shutting down sulfuric acid plants and limiting production. Later, the two defendants would, as plaintiffs put it, "reap[] the fruits of this and seek[] to join these same horizontal competitors into a scheme of territorial allocation and price-fixing, which are also *per se* violations [of the Sherman Act]." (*Memorandum in Support of Plaintiffs' Motion of Determination of Privilege*, at 6).

4

## C.
## The Present Discovery Dispute

The Noranda defendants' privilege log includes over 2,300 entries. All of the entries involve claims of attorney-client privilege relating to an equal number of documents; no claims of work-product are involved. The plaintiffs have challenged the claim of privilege as to approximately 150 entries/documents, spread over seven categories. The vast majority of these documents have not been produced and are identified solely through entries in the privilege log. A select few, however, have been produced inadvertently during discovery to an affiliated company owned in part by Noranda, and/or to the government pursuant to subpoena. As to these categories, the claim is that the privilege has been waived. Others are said to be outside the privilege because the Noranda defendants made use of an attorney's advice to commit violations of the Sherman Act, thereby triggering the crime-fraud exception to the attorney/client privilege.

## II.
## ANALYSIS

## A.
## The Attorney-Client Privilege

The attorney-client privilege is the oldest of the recognized privileges for confidential communications known to the common law. *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996); *Upjohn Co. v. United States* 449 U.S. 383, 389 (1981). Deeply rooted in public policy, *In re Ford Motor Co.*, 110 F.3d 954, 966 (3d Cir. 1997), and playing a "vital role" in the administration of justice, *American Nat. Bank and Trust Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 878, (7th Cir. 2005), it remains one of the most carefully guarded privileges and is not readily to be whittled down. *See*

*Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998).[3]  The privilege's central concern – and its ultimate justification – is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice. Without that frankness, sound legal advice is impossible, and without informed advice, the ultimate goal of the attorney-client privilege is unattainable. *Upjohn v. United States*, 449 U.S. 383, 389 (1981).  But the privilege – like all testimonial privileges and all exclusionary rules – comes at a price.  Since it makes the search for truth more difficult by preventing disclosure of what is often exceedingly relevant information, it is strictly construed and is limited to those instances where it is necessary to achieve its purposes. *University of Pennsylvania v. EEOC*, 493 U.S. 182, 185 (1990); *Fisher v. United States*, 425 U.S. 391, 403 (1976).

The protection of the privilege extends to confidential communications made by a client to his lawyer "[w]here legal advice of any kind is sought . . . from a professional legal advisor in his capacity as such." *Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000); *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir.1997) (*quoting* 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (John T. McNaughton rev.1961).  The privilege is limited to situations in which the attorney is acting as a legal advisor.  Business advice does not count and is not protected. *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003).  Although the  privilege is deemed generally to apply only to communications by the client, statements made by the lawyer to the client will be protected where those

---

[3] *Compare United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)(the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism."). Bentham was perhaps the most acerbic and unrelenting critic of the privilege. *See* VIII Wigmore, Evidence, §2291 at 549 (McNaughton rev. 1961).

communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client. *Rehling*, 207 F.3d at 1019.

## B.
## The Documents Actually Produced In Discovery

## 1.
## The Sulphuric Acid Prime 1994 Report

The Sulphuric Acid Prime 1994 report is an in-house Noranda document, although it addresses both Noranda and Falconbridge metallurgical operations. The Noranda defendants produced in unredacted form, the 68-page report in January, 2004. (*Appendix to Plaintiff's Motion*, Ex. 4 (NFD 102168-102244). During the massive discovery in this case – the Noranda defendants alone produced over 800,000 documents – the Noranda defendants had produced four other copies of the report with the section they considered privileged redacted. (*Appendix to Plaintiff's Motion*, Ex. 5). Upon receipt of the unredacted report, the plaintiffs, with commendable candor, notified the Noranda defendants, who immediately invoked the provisions of the agreed protective order regarding inadvertent production and claimed privilege for pages 9-11 of the report.

Page 10 of the report is captioned "LEGAL ISSUES (PRIVILEGED)*". The accompanying footnote states that "[t]his Section has been prepared by Al Gourley and John Whyte of the Noranda Minerals Inc. Legal Department and is privileged information having been prepared by solicitors in respect to a request for legal advice by the Sulphuric Acid Business Team."[4] There are five legal issues discussed

---

[4] The table of contents to the report likewise lists as a heading "Legal Issues (Privileged)*".

on pages 9-11, one of which relates to antitrust matters.[5] Plaintiffs do not dispute that the material qualifies as privileged under the attorney-client privilege, but argue that the privilege is inapplicable because: 1) the privilege was waived when Noranda disclosed it to a Falconbridge employee; 2) the Noranda defendants inadvertently produced it in discovery; and 3) the crime-fraud exception applies because the Noranda defendants sought to use their counsel to effectuate an illicit scheme. The Noranda defendants' rejoinder is that the common interest doctrine allowed them to disclose the documents to Falconbridge, and that by adhering to the stipulated protective order regarding inadvertent production, the privilege remains inviolate.

### a.
### The Common Interest Doctrine

It is undisputed that, from 1989 through 2001, Noranda was the largest single shareholder of Falconbridge, never owning less than 46% of the common shares. Noranda maintained effective control of Falconbridge under Canadian law by being able to appoint a controlling bloc of the Falconbridge board of directors. From 1994 through 2001, the Chairman of Falconbridge's Board, Alex Balogh, was also the Deputy Chairman of Noranda's Board of Directors. In April, 1991, Noranda was appointed by Falconbridge to act as its sales agent for the sale of sulfuric acid. By July 1, 1994, Falconbridge's balance sheet was fully integrated with Noranda's and, in 2000, the two companies began to integrate a number of departments. (*Noranda Defendants' Response*, at 4; Ex. 10). The Sulphuric Acid Prime 1994 Report itself was clearly prepared with this relationship in mind, as it specifically addresses the concerns of both Noranda and Falconbridge. (*Appendix to Plaintiff's Motion*, Ex. 4 (NFD 102169-71, 102185-88,

---

[5] The parties' briefs relating to pages 9-11 do not discuss explicitly the contents of those pages, which were filed under seal pursuant to Local Rule 26.2. I have reviewed pages 9-11 *in camera*. I am mindful of the Seventh Circuit's decision in *Hicklin Engineering L.C. v. R.J. Bartell*, 439 F.3d 346, 351 (7th Cir 2006).

8

102203-07, 102213-16, 1022221-102222).

The plaintiffs argue that the "common interest" doctrine, which they submit is just another name for the "joint defense" doctrine, requires that the common interest must be in *litigation* and not just as a related business enterprise. (*Memorandum in Support of Plaintiff's Motion*, at 4-5). Properly read, *United States v. Evans*, 113 F.3d 1457 (7th Cir. 1997), on which the plaintiffs rely, does not support this contention. *Evans* merely held that the doctrine was "generally invoked" in a litigation context, not that litigation was the indispensable precondition for its application. Such a cramped reading is not only inconsistent with the text of the opinion, but with the salient purposes of the privilege which are to promote "the broader public interests in the observation of law and administration of justice." *United States v. Zolin* 491 U.S. 554, 562 (1989).

Achieving the former goal manifestly does not require that there be actual or contemplated litigation. Indeed, in response to the explosion of regulations from federal and state agencies, business entities routinely seek the advice of lawyers precisely so that they may avoid litigation by planning for the future. *In re Bankamerica Corp. Securities Litigation*, 270 F.3d 639, 644 (8th Cir. 2001). It would be idle to suggest that these requests for non-litigation legal advice – and the privilege covers "legal advice of *any* kind," not just litigation advice, *Rehling*, 207 F.3d at 1019; *Evans*, 113 F.3d at 1463 – are outside the scope of the privilege.

*Evans* drew its explanation of the common interest doctrine from *United States v. Schwimmer*, 892 F.2d 237 (2nd Cir. 1989), from which it quoted the following:

> The joint defense privilege, more properly identified as the "common interest rule," has been described as "an extension of the attorney client privilege." It serves to protect the confidentiality of communications passing from one party to the attorney for another party

9

where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected.

*Evans*, 113 F.3d at 1467 (*quoting Schwimmer*, 892 F.2d at 243-44)(citations omitted). Immediately following this, the Second Circuit went on to say:

The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share *a common interest about a legal matter*, and it is therefore *unnecessary that there be actual litigation in progress* for the common interest rule of the attorney-client privilege to apply. Neither is it necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney.

*Schwimmer*, 892 F.2d at 243-44 (Emphasis supplied).

*Schwimmer's* conclusion that the required common interest must be in a "legal matter," not necessarily a litigation matter, mirrors that of the courts of appeals. *See, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001)(because the privilege sometimes may apply outside the context of actual litigation, what the parties call a "joint defense" privilege is more aptly termed the "common interest" rule); *Cavallaro v. United States*, 284 F.3d 236, 249 (1st Cir. 2002)(applies to "matters of common interest"); *Hanson v. U.S. Agency for Intern. Development*, 372 F.3d 286, 292 (4th Cir. 2004)(attorney-client privilege may apply to multiple parties concerning a legal matter in which they share a common interest; unnecessary that there be actual litigation in progress). *See also* Kayle, *The Tax Advisor's Privilege in Transaction Matters: A Synopsis and a Suggestion*, 54 Tax Law 509, 521 (2001); Muriel Goode-Trufant, *Privileges in Federal Court*, 738 PLI/Lit. 77 (2006); Restatement (Third) Of The Law Governing Lawyers §126(1)(Proposed Final Draft 1996)(Common interest may be in "a litigated or non-

litigated matter").[6]

In short, the undifferentiated use of the label "joint defense" rather than the more accurate term, "common interest" to describe the doctrine, suggests inaccurately that joint litigation is a necessary, rather than merely a sufficient condition for the doctrine's application. And while it is true that knowing disclosure of communications reflecting that advice "almost invariably surrenders the privilege," *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003), the common interest doctrine is an exception to that rule. It is not, however, a separate privilege. It is rather an "extension" of the attorney-client privilege. *Evans*, 113 F.3d at 1467; *Hanson*, 372 F.3d at 292; *Schwimmer*, 892 F.2d at 243. Because the attorney-client privilege is not limited to litigation, neither should be its "extension."

Thus construed, there need be no fear that the "common interest" doctrine will prevent business documents and information from being discoverable. (*Memorandum in Support of Plaintiffs' Motion*, at 4-5; *Plaintiffs' Reply Memorandum*, at 7-8). The attorney-client privilege, itself, excludes from its ambit even confidential communications with a lawyer about business or other non-legal matters. *Simon v. G. D. Searle & Co.*, 816 F.2d 397, 402 (8th Cir. 1987); *Burden-Meeks*, 319 F.3d at 899; *Rehling*, 207 F.3d at 1019; *Evans*, 113 F.3d at 1463.

While Noranda and Falconbridge shared a common business interest, they also shared a common legal interest regarding compliance with antitrust and other laws affecting the sale of sulfuric acid. A review of the relevant portion of the 1994 report makes clear that it involves confidential communications between

---

[6] The indiscriminate use of the phrase "joint defense doctrine" is a perfect example of the analytical difficulty that results from the uncritical repetition of labels and catch words. *Cf.* Holmes, *Law In Science And Science In Law*, 12 Harv. L.Rev. 443, 455 (1899); *Meridian Security Insurance Co. v. Sadowski*, _F.3d_, 2006 WL 708681 (7th Cir. 2006)("the phrase [reasonable probability] acquired a life of its own."; "the turn of the phrase was infelicitous.").

11

lawyer and his common clients relating to requests for legal advice regarding antitrust and other laws. Accordingly, the attorney-client privilege as to the pages at issue is not waived because the advice was revealed to Noranda and Falconbridge.[7]

## b.
## Inadvertent Disclosure

Generally, the burden of proving inadvertent disclosure is on the party asserting the privilege. *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 116 (N.D.Ill. 1996). That burden has been sustained by the Noranda defendants through the declaration of one of their attorneys regarding the precautions that were taken during the review of the 422 boxes containing approximately 800,000 documents. The 1994 report was produced on four previous occasions, with pages 9-11 redacted. Obviously, the production of the single unredacted copy was inadvertent. *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126-27 (7th Cir. 1997). Where discovery is extensive, mistakes are inevitable and claims of inadvertence are properly honored so long as appropriate precautions are taken. *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 132 F.R.D. 204, 207 (N.D.Ind. 1990)(14,000 documents). This alone might be enough to sustain the defendants' burden. But there is more.

Recognizing the inevitability of mistakes in a case like this, the parties entered into an agreement that defined what was to be done in the event of inadvertent production in discovery:

> The inadvertent production of any document, thing or information in the Litigation shall be without prejudice to any claim that such material is privileged under the attorney-client

---

[7] Where clients share a common lawyer, there is little question that otherwise privileged communications from or to one client may be shared with the other without a waiver of the privilege, *inter se*. Indeed, the common lawyer has an equal fiduciary obligation to both clients.

privilege, or protected from discovery as work product. No party or entity shall be held to have waived any rights by such inadvertent production so long as the Recipient Party is notified within 30 days of the discovery of such inadvertent production.

(*Appendix to Plaintiffs' Motion*, Ex. 9, Agreed Protective Order, § 2).

The parties agree that the joint protective order was essentially a contract, and rules of contract interpretation govern. Judges have no way of crawling into peoples' minds; they must act on the basis of external signs. Posner, Overcoming Law, 276 (1995). Thus, the search here, as with other contracts, is for the parties' intent based on the language of the contract, which is usually enforced in accordance with the ordinary meaning of the language selected. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 859 (7th Cir. 2002)(Posner, J.); *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 878 (7th Cir. 2005). The plaintiffs insist that the word "discovery" was intended to mean "constructive knowledge," while the Noranda defendants contend that it means obtaining knowledge for the first time, in accordance with the ordinary meaning of the term.

Constructive knowledge is a concept often employed in determining when a statute of limitations begins to run, and it is cases involving statutes of limitations on which the plaintiffs rely. *See Barry Aviation Inc. v. Land O'Lakes Municipal Airport Com'n*, 377 F.3d 682, 688 (7th Cir. 2004)(a cause of action does not necessarily accrue when the injury occurs but when it is discovered or should have been discovered). Resort to the "discovery rule" is said by the plaintiffs to be dictated by the fact that "[c]onstructive knowledge permeates the field of contract law in many facets." (*Plaintiffs' Reply Memorandum*, at 15). But this overly facile generalization tacitly begs the question, and is more a statement of the obvious than an informative argument. *Cf.*, *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting)("[G]eneral propositions do not decide concrete cases.").

· The presumption that terms be accorded their ordinary meaning, among other things, simplifies the litigation of contract disputes. *Beanstalk Group*, 283 F.3d at 859. Yet, the interpretation of "discovery" contended for by the plaintiffs would complicate the inquiry by requiring a determination of when the Noranda defendants *ought to have* discovered their inadvertent production, with the further, unavoidable dispute about what criteria should be used to decide that question. In the statute of limitations context, the inquiry is fact-intensive and almost always a question for the jury. *Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002). There is nothing to suggest that in crafting the agreed protective order the parties intended to infuse into that agreement such complexity and uncertainty regarding questions of inadvertent production. Quite the contrary. There would have been no need for the inadvertent production clause if that was their design.[8]

The obvious purpose of the protective order was to avoid the uncertainty that would have existed without it. *See, e.g., Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, No. 96-1718, 2001 WL 699850, *1 (S.D.Ind. May 29, 2001)(production of 25,000 documents under the mistaken assumption that they had been reviewed and redacted would ordinarily constitute waiver, but protective order foreclosed application of inadvertent production case law); *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96-7590, 1997 WL 736726, *4 (S.D.N.Y. Nov. 26, 1997)(parties drafted this provision to provide for the out-of-court resolution of inadvertent production issues and to avoid litigating these issues). *See generally*, Douglas R. Richmond, *Key Issues In The Inadvertent Release And Receipt Of Confidential Information*, 72 Def.Couns.J. 110, 117 (April 2005)(recommending use of "claw back"

---

[8]Absent the clarity provided by a protective order, questions of inadvertent disclosure become complicated. *See, e.g., Urban Outfitters, Inc. v. DPIC Co.*, 203 F.R.D. 376, 380 (N.D.Ill. 2001)(employing five-part balancing test).

agreements–to be incorporated in judicial orders-- where there are large numbers of documents involved).

In *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, No. 96-1718, 2001 WL 699850, *1 (S.D.Ind. May 29, 2001), the language of the provision in the protective order was identical to the one at issue here: "No party or entity shall be held to have waived any rights by such inadvertent production so long as the Recipient Party is notified within 30 days of the discovery of such inadvertent production." 2001 WL 699850, *1. Although the plaintiff produced the documents in December of 2000, and did not notify defendants of its mistake until March 21, 2001, the court found that the plaintiffs could maintain the privilege as to the documents because the plaintiffs did not learn of the inadvertent production until the defendants employed one of the documents in a deposition on March 8, 2001. By informing defendants 13 days later on March 21st, plaintiffs met the 30-day deadline. 2001 WL 699850, *1-2.

"Discovery," then, in the ordinary sense and in the context of protective orders such as that in this case, means "obtaining knowledge for the first time." Often the discovery stems from notification from the other side that a mistake has been made.[9] It is in this context, not in the dissimilar and irrelevant context of statute of limitations cases, that the word "discovery" must be construed. Constructive knowledge may permeate the field of contract law in many facets, but protective orders dealing with inadvertent disclosure is not one of them.

There is a long tradition of reading contracts sensibly. *Beanstalk, supra.* Employing the commonly understood definition of discovery makes sense and is consistent with the cases that have dealt with

---

[9] *See VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8, 10 (D.Mass. 2000)(party held to have "learned " or "discovered" inadvertent production when opponent used document in a brief); *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96-7590, 1997 WL 736726, *2 (S.D.N.Y. Nov. 26, 1997)(party held to have "learned" of inadvertent production when opponent notified it that the document had been produced).

disclosure in the context of a protective order. Acceptance of the construction of the protective order championed by the plaintiffs would be faithless to that tradition and would yield the absurd result that the parties did not seek a simple and predictable mechanism to undo mistakes, but rather intended to employ the complicated and unpredictable calculus required where there was no protective order, thereby defeating the purpose of the inadvertent production clause and rendering it surplusage. What Judge Easterbrook said in *Metro East Center for Conditioning and Health v. Qwest Communications Internat'l, Inc.*, 294 F.3d 924 (7th Cir. 2002) applies here *pari passu*:

> [I]t is almost never right to read legal language as self-defeating. . . . People draft documents to achieve *some* objective, and although the meaning of words can be elusive even after taking into account both linguistic and economic contexts, and some words may turn out to be redundant or otherwise carry no weight. It is not sensible to construe a substantial passage of a legal text as pointless.

*Cf., Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 64 (1995).

Perhaps when they agreed to the language of the protective order the plaintiffs' counsel had in mind a definition of discovery that differed from the commonly understood definition; it matters not at all:

> A signatory to a contract is bound by its ordinary meaning even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared. [Citations omitted]. You can't escape contractual obligation by signing with your fingers crossed behind your back, even if that clearly shows your intent not to be bound. The parties are free to sign hortatory as well as binding documents; "intent" is important in the sense that if the parties agree on a hortatory instrument the court may not convert it into a different kind. This sense of "intent" denotes agreement between the parties and is not a license to allow undisclosed intent to dominate. Even statutes, widely said to follow the "intent of the legislature", draw meaning only from visible indicators such as their structure, the nature of the problem at hand, public statements (as in committee reports), Private intent is irrelevant. [Citation omitted]. So it is here. Lynch may have had a private intent, but the signs visible to the union all pointed to Lynch's acceptance of the collective bargaining agreement. Lynch is bound by its terms.

*Robbins v. Lynch*, 836 F.2d 330 (7th Cir. 1988). *See also ConFold Pacific, Inc. v. Polaris Ind.*, 433

F.3d 952 (7th Cir. 2006); Holmes, *The Path Of The Law*, 10 Harv. L. Rev. 457 (1896)("the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs, – not on the parties having *meant* the same thing but on their having *said* the same thing.") (Emphasis in original).

In sum, the plaintiffs' interpretation of the term "discovery" has little to commend it: it needlessly complicates the resolution of the dispute and runs counter to the well-establish presumption that words in a contract are accorded their ordinary meaning. It renders the clause in the protective order meaningless, and incorporates a definition that is used only in the absence of the very clause to which the plaintiffs agreed. And finally, it assumes that the parties chose as the appropriate gloss for the word "discovery" not cases involving clauses in protective orders dealing with inadvertent disclosure but with cases involving statutes of limitations.

**c.**
**The Crime-Fraud Exception**

Neither the Sixth Amendment nor the attorney-client privilege give a person the right to carry out through counsel an unlawful course of conduct. *Georgia v. McCollum*, 505 U.S. 42, 57 (1992). Thus, the attorney-client privilege "does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989); *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 769 (7th Cir. 2006); *In re Richard Roe*, 68 F.3d 38, 40 (2nd Cir. 1995). The exception is not new, *Clark v. United States*, 289 U.S. 1, 16 (1933)(Cardozo, J.), and its underlying rationale is so basic and important that it extends to privileges other than the attorney-client privilege. *See In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71 (1st Cir.

17

1999)(psychotherapist privilege).

In *Zolin*, the Supreme Court clarified the procedure that district courts are to follow in deciding motions to compel production of documents claimed to run afoul of the crime-fraud exception. First the Court resolved a conflict among the circuits by holding that the district court has discretion to conduct an *in camera* review of the allegedly privileged documents to determine the applicability of the exception. Second, evincing a concern that routine *in camera* review would encourage opponents of the privilege to engage in groundless fishing expeditions, the Court held that district courts should not exercise the discretion to review *in camera* unless the party urging disclosure had made a threshold showing "of a factual basis adequate to support a good faith belief by a reasonable person" that the crime-fraud exception applies. That showing is not a "stringent" one. 491 U.S. at 572. If the party seeking discovery makes that threshold showing, the discretionary decision whether to conduct *in camera* review should be made "in light of the facts and circumstances of the particular case," including the volume of materials in question, their relative importance to the case, and the likelihood that the crime-fraud exception will be found to apply. *Id*.

In light of the narrow question presented in *Zolin* – what type of evidence may be used by a court in determining whether the communication is in furtherance of a crime or a fraud – the Court chose not to address the question of what quantum of proof *ultimately* was necessary to establish the application of the exception. *Id* at 536. *Zolin*, however, did make clear that the party advocating its application must make a two-part showing: first, that there is some reason to believe that a crime or fraud has been committed, and second that the communications were in furtherance thereof. *Mattenson*, 438 F.3d at 769.

Courts have variously described the quantum of proof ultimately required to satisfy the crime-fraud

exception. Sometimes the phrase, "prima facie case," is used. *Clark v. United* States, 289 U.S. 1 (1933); *In the Matter of Feldberg*, 862 F.2d 622, 625-26 (7th Cir. 1988). However, the phrase is "among the most rubbery of all legal phrases." *In re Grand Jury Proceedings*, 417 F.3d 18, 22-23 (1st Cir. 2005). Indeed, in *Zolin*, the Court noted the confusion *Clark's* use of the phrase had caused. 491 U.S. at 563 n. 7.[10] After *Zolin*, the courts of appeals have used different formulations to describe the quantum of proof ultimately required to dispel the privilege. *See Mattenson* (probable cause to believe a crime or fraud has been attempted or committed);[11] *United States v. Doe*, 429 F.3d 450, 454 (3rd Cir. 2005)("A prima facie showing requires evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met."); *In re Grand Jury Proceedings*, 417 F.3d at 22-23 ("a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud. . . . something less than a mathematical (more likely than not) probability that the client intended to use the attorney in furtherance of a crime or fraud."); *In re Grand Jury Proceedings #5 Empanelled January 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005)(proof "must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact

---

[10] In *United States v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993), the Seventh Circuit refused to overrule its earlier decision in *Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988), which had held that a party has established a *prima facie* case to dispel the privilege whenever it presents evidence sufficient to require the adverse party, the one with superior access to the evidence, to come forward with an explanation.

[11] *Mattenson* did not refer either to the Seventh Circuit's *Davis* decision (which came after *Zolin*) or to the *Feldberg* decision (which preceded *Zolin*). It did not discuss whether its adoption of the Second Circuit's probable cause standard in *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2nd Cir.1995) marked a sea change in the Seventh Circuit's crime-fraud jurisprudence. Under its "probable cause" standard, the Second Circuit requires the party wishing to invoke the crime-fraud exception to demonstrate "that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *Id.* at 87.

is left unrebutted.").

A "probable cause" or "reasonable" cause standard is used in the Second and Ninth Circuits. *United States v. Jacobs*, 117 F.3d 82, 87 (2nd Cir. 1997); *Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir.), *cert. denied* 519 U.S. 945 (1996). In the Fifth Circuit, the test is whether there is evidence that will suffice until contradicted and overcome by other evidence. *In re International System & Controls Corp. Security Litigation*, 693 F.2d 1235, 1242 (5th Cir. 1982). The Sixth Circuit's test for a *prima facie* cases is whether there are sufficient facts for a prudent person to have a reasonable basis to suspect the perpetration of a crime or fraud.[12] *In re Antitrust Grand Jury*, 805 F.2d 155, 165-66 (6th Cir.1986). The D.C. Circuit employs the formulation, evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed when the document was prepared. The Third circuit employs a similar test. *In re Grand Jury Subpoena*, 419 F.3d 329, 336 (5th Cir. 2005)(requiring evidence "such as will suffice until contradicted and overcome by other evidence ... a case which has proceeded upon sufficient proof to that stage where it will support [a] finding if evidence to the contrary is disregarded.").[13]

The plaintiffs crime-fraud argument consists of a conclusory, unamplified, one-paragraph argument:

---

[12] This formulation, at least in terms, is similar to the definition of probable cause to support an issuance of an administrative warrant in OSHA cases. *See In the matter of establishment inspection of Midwest Instruments Co.*, 900 F.2d 1150, 1153 (7th Cir. 1990)("'probable cause' will be found to support an OSHA warrant if the warrant application supports a reasonable belief or leads to a reasonable suspicion that the OSH Act or its regulations have been violated.").

[13] The standards by circuit are collected in *In re Bankamerica Corp. Securities Litigation*, 270 F.3d 639, 643 (8th Cir. 2001); *Triple Five of Minnesota, Inc. v. Simon*, 213 F.R.D. 324, 327 (D.Minn. 2002), *aff.d*, 2002 WL 1303025 (N.D.Minn. 2002). Despite the semantic variations, there are probably not practical differences between the standards. *In re Antitrust Grand Jury*, 805 F.2d at 165-66.

marketing documents from 1988 and 1989 establish that Noranda had illegally entered into output restriction agreements with its United States competitors in order to shut down sulfuric acid plants. "Noranda was engaged in on-going violations of the U.S. antitrust law as of 1993-1994," and that by that time "Noranda was reaping the fruits of this, and seeking to join these same horizontal competitors into a scheme of territorial allocation and retail price fixing, which are also *per se* violations." (*Memorandum in Support of Plaintiffs' Motion*, at 6).

The marketing documents upon which the plaintiffs' argument is based detail "sales efforts during 1989." One issue addressed was the marketing of "400,000 [metric tons] of Horne sulphuric acid consistent with [a] policy of non-disruption in the marketplace and displacement of sulphur-burned acid." (*Memorandum in Support of Plaintiffs' Motion*, Ex. 6, at NFD591353). The 1988 Prime Report catalogued negotiations between Noranda and several smelting producers (i.e. acid producers). In one instance, an agreement was reached whereby the producer would shut down one of its plants and receive all its acid requirements from Noranda. In another instance, negotiations were ongoing, but the producer indicated it would purchase as much sulphuric acid as Noranda could supply, and there was an agreement in principle to close the smelting facility in the future. Another smelting producer expressed an interest in scaling down production, and still another indicated its plant was extremely expensive to operate and was looking for a satisfactory supply agreement. (*Memorandum in Support of Plaintiffs' Motion*, Ex. 6, at NFD100706-710).

The plaintiffs characterize each of these instances as evidence of illegal agreements between Noranda and its potential competitors. Beyond the conclusion, there is only the unamplified reference to *Otter Tail Power v. United States*, 410 U.S. 366, 379 (1973), where the Supreme Court held that a

21

utility that supplied retail power to numerous Midwestern towns had violated the Sherman Act by pursuing practices intended to keep the towns from adopting their own municipal utility systems. These practices included a refusal to "wheel power" (transfer by direct transmission or displacement electric power from one utility to another over the facilities of an intermediate utility) that the federal government wished to sell to the towns and the inclusion in Otter Tail's contracts with the government restrictive provisions that prevented it from selling power to certain potential competitors of Otter Tail. The Court condemned the refusal to wheel power as monopolization, and the restrictive contract provisions as a territorial market division. 410 U.S. at 378.

But, as Judge Posner has explained:

Selling your competitor's products, or supplying inputs to your competitor, sometimes creates problems under antitrust or regulatory law--but only when the supplier or distributor has monopoly or market power and uses it to restrict a competitor's access to an essential input or to the market for the competitor's output, as in *Otter Tail*. . . or *FTC v. Brown Shoe*. . . or *United Airlines v. CAB*. . . .

*Sally Beauty Co., Inc. v. Nexxus Products Co., Inc.*, 801 F.2d 1001, 1010 (7th Cir. 1986)(Posner, J., dissenting).

The restrictive contracts in *Otter Tail* were agreed to by the government only at monopolist, Otter Tail's, insistence. 410 U.S. at 379. Here, plaintiffs do not argue, much less demonstrate, that Noranda enjoyed monopoly power. The marketing documents' references to various agreements and negotiations regarding Noranda supplying sulfuric acid to various smelting producers reflects that some agreed to buy their acid from Noranda at a cost cheaper than they could produce it; some were interested in purchasing a portion of their output from Noranda, while still others indicated potential future interest.

Do the agreements and negotiations mentioned in the marketing documents amount to territorial

22

restrictions among competitors? That is what the case is ultimately about. Pointing to the description of the market conditions and the environmental restrictions that brought the agreements into existence, the Noranda defendants submit that the agreements were not forced upon the smelting producers through monopoly or market power, but were the product of unilateral, volitional, economically motivated decisions. These are all fact-intensive questions, which are not sufficiently informed by the plaintiffs' presentation.

The Noranda defendants explain that their actions and those of the producers were a legitimate reflex to the then existing economic realities of the market and the ramifications of environmental laws. In their view, there was no antecedent illegality, merely a voluntary decision by smelters to replace their own "production" acid with cheaper "waste" acid. (*See Noranda Defendants' Response Exhibits*, Ex. 7 (PVS memo referencing "market conditions in Ohio"); Ex. 4 (Dep. of Michael Harmon of Delta testifying to the effect that Delta "either had to produce sulfuric acid" or make a "deal with somebody" "to buy it or some combination thereof" "or else the alternative was to go out of business."); Ex. 5 (Dep. of Kevin Cannon of Copperhill testifying that Copperhill used its sulfuric acid production capacity as a "selling point" in its negotiations with Noranda; while it agreed to take a set amount of sulfuric acid from Noranda, Noranda "never had any control over [Copperhill's] operating rates"); Ex. 8 (Dep. of Karen Anderson testifying that shutdown of Grasselli sulfuric acid plant was due to shut down of a "strong nitric acid plant" that Grasselli supplied with oleum, and declining market conditions in New Jersey)).

There is no meaningful response to this evidence. Instead, the plaintiffs reiterate their position that discussions between the acid producers and Noranda resulted in the shutdown of many smelting production plants. (*Plaintiffs' Reply Memorandum*, at 2-3). But this circular mode of reasoning does not even tend to prove that the shutdowns were occasioned by Norandas' strong-arming rather than market exigencies.

23

For the time being, and given the limited analysis of these complex issues that can be performed in the context of a discovery dispute, with its necessarily constricted evidentiary record, it must be concluded that the plaintiffs have failed to make a showing sufficient to trigger the crime-fraud exception to the privilege.

An *in camera* review of the relevant portions of the 1994 Report does not support the plaintiff's claim that Noranda sought to perpetrate a crime or fraud through its lawyers or that the information provided by counsel was in furtherance of such an endeavor.[14] Plaintiff summarizes the Report as revealing a response from counsel that was "a blueprint for violating U.S. antitrust laws," namely "a scheme" whereby all of the U.S. horizontal competitors would be declared 'agents' of Noranda, and therefore could supposedly fix prices in the U.S." (*Memorandum in Support of Plaintiffs' Motion*, at 6).

Of course, it is illegal to attempt to circumvent the antitrust laws by creating a sham agency to conceal what was in reality, a sale. *See Simpson v. Union Oil Co.*, 377 U.S. 13 (1964). But not all agency agreements violate *Simpson* as Judge Posner's decisions in *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168, 172 (7th Cir. 1988) and *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1436 (7th Cir. 1986) make clear. Indeed, the Court in *Simpson* recognized that price maintenance was lawful in the case of a bonafide consignment or agency, 377 U.S. at 21. To determine whether a price restraint falls within the exception recognized by *Simpson*, courts look, *inter alia*, to the supplier's purpose in creating the agency, brokerage or consignment relationship, the extent to which the supplier retains control over the goods in question, and whether the supplier assumes the risk of loss. Whether a challenged pricing scheme

---

[14] Ordinarily, the plaintiffs would have had to have been successful in the first portion of their crime-fraud argument before there would have been discretion to review the document *in camera*. Here, the document was inadvertently produced – or more accurately, the portion in question was inadvertently not redacted – so it is already part of the record in this dispute, and I have reviewed it.

is legal is usually a question of fact for the jury. *See* ABA Section of Antitrust Law, Antitrust Law Developments 135-36 (5th ed. 2002)(collecting cases).

The problem with the plaintiffs' argument is that it does not seek to illumine these critical areas, but merely begs the question to be decided. Thus, it cannot be concluded with any sense of assurance that the relationship between the defendants and the smelting producers was intended to be an empty form. *Cf.*, *Day v. Taylor*, 400 F.3d 1272, 1277 (11th Cir. 2005)(whether an agency relationship is a sham is determined by the substance of the relationship, not its form). If this assumption were compelled or supported by the text of the Report, the crime-fraud exception would apply, and disclosure would be mandatory. But, the relevant portion of the Report is not so pellucid, and the question of whether there was a sham agency is fact-intensive and cannot be decided on an unadorned, conclusory argument that occupies all of a single paragraph in the brief. Indeed, the Seventh Circuit has taken a dim view of critical arguments that are set forth in so skeletal a fashion. *Huck Store Fixture Co. v. NLRB,* 327 F.3d 528, 537 (7th Cir. 2003)(criticizing argument that comprised less than a page in the main brief).

The attorney-client privilege is strongest when a client seeks advice to determine the legality of conduct before taking action. *In Re: Bankamerica Corp. Securities Litigation,* 270 F.3d 639, 643 (8th Cir. 2001). Businesses entities, like the defendants, which operating in today's labyrinthine legal and regulatory environments, routinely seek legal advice about how to deal with all sorts of matters, especially those having antitrust consequences. There nothing inherently suspicious about the officers of a corporation seeking such advice, *In re Sealed Case*, 107 F.3d 46, 50 (D.C.Cir. 1997)(Randolph, J.), and the attorney-client privilege exists to promote and protect those kinds of endeavors. *Upjohn Co. v. United States* phrased it this way:

- In light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, "constantly go to lawyers to find out how to obey the law,"... particularly since compliance with the law in this area is hardly an instinctive matter, *see, e. g., United States v. United States Gypsum Co.*, 438 U.S. 422, 440-441 (1978) ("the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct").

449 U.S. at 392-393 (parenthesis in original).

In the twenty five years since *Upjohn,* the need for what Professors Hart and Sachs called safe-side counseling has not diminished; it has increased. *See* Henry M. Hart & Albert M. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 205-06 (Tent. ed. 1958). The "thickets of complex government requirements" in which complex businesses function today, *United States v. Chen*, 99 F.3d 1495, 1499 (9th Cir. 1996), have become thicker and thornier. It is essential that corporate officers be able to consult candidly with counsel without fear of compelled disclosure. Quoting at length from Hart and Sacks, the Ninth Circuit in *Chen* explained:

> Lawyers are constantly called upon to tell people, in advance of action or developed controversy, what their duties are to other people and to the government, and what the duties of others are to them. In the case of tightly defined requirements, such as the return and payment of taxes, this may call for close, meticulous guidance. For the most part, however, what are involved are prohibitions. Safe-side counseling is commonly the lawyer's task. When a continuing course of conduct is in question, this may require not only an informed appraisal of risk but the preparation of a plan of action to minimize it . . . .

99 F.3d at 1500.

Thus, it is not a decisive answer to say that the Noranda defendants appear to have been trying to fashion a mechanism to deal with market realities and the antitrust laws. To a not wholly dissimilar objection in *Louisville & Nashville R.R..v. United States* 242 U.S. 60, 74 (1916) that "upon this view, a way is opened to get beyond the reach of the statute and the Commission," Justice Holmes said, "[b]ut the very

26

meaning of a line in the law is that right and wrong touch each other, and that anyone may get as close to the line as he can if he keeps on the right side." *Cf., Helvering v. Gregory*, 69 F.2d 809, 811 (2d Cir. 1934)(L. Hand, J.). More recently in *Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 90 F.R.D. 21 (N.D.Ill. 1980)(Aspen, J.), the plaintiffs invoked the crime-fraud exception where the defendants' conduct evinced a continuous effort to "get around" a Supreme Court antitrust ruling "and retain their system of territorial allocation." The plaintiff supported their argument by pointing "to the restrictive characteristics of the . . . license agreement" that had been found illegal under antitrust laws. The district court rejected the argument, finding that the attempt "to maintain the 'perceived benefit of its former system (to the maximum extent) the Department of Justice and the courts would allow in light of the Supreme Court decision' is not in and of itself illegal. To the contrary, it reflects an attempt to 'get around' the Supreme Court opinion while remaining in accordance with its legal mandate." *Id.* at 30 (Parenthesis in original).

The portion of the 1994 Prime report at issue here reveals a similar effort. It suggests that the Noranda defendants sought advice regarding what could be done to respond to a situation resulting from market and environmental factors, while at the same time not running afoul of the antitrust laws. The plaintiffs have not shown – at least not at this point in the litigation and for the purposes of this discovery dispute – that there is probable cause to believe that the communications reflected under the heading Antitrust, were in furtherance of a crime or fraud.

Accordingly, the crime-fraud exception does not apply to that portion of the report.

The information in the report under the headings, Tort Liability, Environmental Liability, Antidumping, and Jurisdictional Concerns, are privileged, and the plaintiffs do not appear to argue otherwise. The information under the heading, General, is not privileged, as it does not remotely involve the giving of legal

27

advice, but is merely a terse explanation of Norandas' overall business and the interrelationship between sulfuric acid production and increasingly stringent environmental standards.

This does not mean that the report is forever out of bounds. At trial, where the factual record will be infinitely more complete than it is now, there may come a point where Judge Coar is convinced that the showing required by *Mattenson* has been made. At that point, there would appear to be no reason why the privilege should not "take flight," *Clark*, 298 U.S. at 15, and the section of the 1994 Report turned over. *Cf. United States v. AT & T*, 86 F.R.D. 603, 625 (D.D.C. 1980).

**2.**
**The May 1997 Kim Ross Memorandum and Attachments**

Kim Ross, the operating head of Noranda's sulfuric acid department during the relevant period, wrote a memorandum to his colleagues on May 8, 1997, outlining a proposed joint venture with DuPont. (*Appendix to Plaintiff's Motion*, Ex. 10 (NFD 291796-802)). The memo has a five page attachment, which was prepared by the Canadian law firm of Macleod Dixon. The Noranda defendants produced the complete document in discovery in July, 2004, with the exception of, the second half of page two and the top of page three, which were redacted. In November of 2004, plaintiffs showed this document to a witness at a deposition, and Noranda claimed that pages 3 through 7 were privileged and would not permit those pages of the document to be used at the deposition. (*Appendix to Plaintiff's Motion*, Ex. 11).

Plaintiffs challenge the claim that pages 3-7 are privileged, arguing that those pages reflect business, as opposed to legal advice and do not disclose client confidences. They also argue that the crime-fraud exception applies, and that the privilege was waived through inadvertent disclosure. Plaintiffs also request an *in camera* inspection of the redacted material on pages 2 and 3 to determine if it is privileged.

· The five pages at issue were prepared by attorneys and address Noranda's proposed acquisition of a company that produced sulfuric acid, oleum, and alum. The document covers several legal ramifications of the proposal and those sections are privileged and properly redacted. But commercial concerns are also discussed, and those portions may not be redacted, despite attorney participation. *Burden-Meeks*, 319 F.3d at 898. Only the following portions are privileged: first page, down to heading "Commercial Significance;" second page, beginning with "Such output will . . ." on line 6, up to "*2. Through the acquisition . . .*" on line 14; second page, beginning with "*4. Noranda could . . .*" through page 3 up to page 4. Pages 4 and 5 reflect legal advice and are privileged.

Because the privileged materials were produced inadvertently, the protective order applies. Since Noranda defendants informed the plaintiffs of their mistake immediately upon discovering, at the November 2004 deposition, that they had inadvertently produced the material in question,[15] they may maintain the privilege under the terms of the parties' agreement. Beyond having failed to make the requisite showing for application of the crime-fraud exception, the materials reveal that attorneys were consulted, not to further a fraud, but for advice on how to structure a proposed business acquisition with the strictures of the antitrust laws. *See Doe*, 429 F.3d at 454; *Chen*, 99 F.3d at 1499; *Sealed Case*, 107 F.3d at 50; *Ohio-Sealy*, 90 F.R.D. at 30. Finally, judging from the remainder of the materials, there is nothing to suggest that the portions of pages 2 and 3 were improperly redacted. Given the surrounding context, they most likely

---

[15] In *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 116-17 (N.D.Ill. 1996), on which the plaintiffs rely, there was no protective order, and two weeks elapsed between the discovery and the notification. *Chinnici v. Central DuPage Hosp. Ass'n*, 136 F.R.D. 464 (N.D.Ill. 1991) does not support the plaintiff's waiver argument. A waiver occurs when the substance of a communication is revealed, not when the fact that legal advice on a topic was sought.

discuss legal advice concerning the model for the proposed acquisition.

### 3.
### The October 1996 Strategy Framework

In early February of 2004 a 62-page document from Noranda's sulphuric acid marketing group was produced with no redactions or claim of privilege. (*Appendix to Plaintiff's Motion*, Ex. 12 (NFD 139970140034)). In a letter dated July 26, 2004 defendants sought redaction of a paragraph of page 4 and all of pages 32 and 33. (*Memorandum in Support of Plaintiffs' Motion*, at 9). The paragraph, entitled "Legal Considerations," briefly summarized legal topics and reflected legal advice and communications directed at obtaining that advice. The two pages are a more thorough discussion of that legal advice, not unlike the privileged portion of the 1994 Prime report. The report as a whole was prepared by a team that included legal counsel. But, regardless of whether the pages in question were authored by attorneys, the pages reflect legal advice and client revelations made to obtain legal advice and are privileged. *Evans v. City of Chicago*, 231 F.R.D. 302, 312 (N.D.Ill. 2005).

The plaintiffs again argue that waiver by inadvertent disclosure and the crime-fraud exception require disclosure. But, the Noranda defendants appear to have complied with the terms of the protective order's requirement of timely notice of the discovery of the inadvertent production. Plaintiffs do not even attempt to suggest when the Noranda defendants ought to have discovered their mistake, which is the standard the plaintiffs (incorrectly) seek to apply. As for the crime-fraud exception, the pages at issue reflect impliedly client conversations regarding requests for legal advice on how to comply with antitrust laws. Accordingly, even if plaintiffs had made out the required *prima facie* case – and they did not, as discussed earlier – the crime-fraud exception would not apply.

30

## 4.
## Sulphuric Acid Product Knowledge Review

This document is a portion of a PowerPoint presentation prepared by the Noranda Metallurgy Inc. Sulphuric Acid Marketing Group. The Noranda defendants claim privilege as to one "slide," which is captioned "Business environment - legal considerations." (*Appendix to Plaintiff's Motion*, Ex. 13). The plaintiffs argue that the page is not privileged for the same reasons they advanced as to the previous document. (*Memorandum in Support of Plaintiffs' Motion*, at 10). As such, those arguments are again rejected.

## 5.
## Documents Produced to the Government

The Noranda defendants produced a raft of documents to the Department of Justice pursuant to subpoena in 1998 thereby waiving any claim of privilege.[16] Rather they argue that the production was inadvertent, as they informed the plaintiffs by letter on February 2, 2005. (*Appendix to Plaintiff's Motion*, Ex. 14). Since the protective order offers no protection to the unobjected-to response to the government's subpoena and with little in the way of argument from the Noranda defendants on the circumstances of the claimed inadvertancy of the turnover to the Department of Justice, the privilege is waived, and the documents must be produced to the plaintiffs.

## 6.
## Other Inadvertently Produced Documents

Plaintiffs challenge on two grounds the Noranda defendants' claims of privilege as to a number of

---

[16] The plaintiffs have cited cases from the First, Second, Third, Fourth, Fifth, Sixth, D.C. and Federal Circuits in support of their waiver argument. The defendants do not dispute these cases, but instead, point to a single case that seems to hold the opposite.

other documents or redacted portions thereof the Noranda defendants produced in discovery and then sought to claim were privileged in whole or in part as "inadvertently produced." They argue, first, that these materials are not privileged in that they do not reveal legal advice or client confidences; and second, that too much time elapsed between the Noranda defendants' production of the materials and their claim of inadvertence. As already discussed, the plaintiffs' stance on inadvertent production is incorrect and need not be revisited as to every document at issue. The question of application of the privilege to these documents, however, does require some discussion.

### a.
### The September 13, 2000 Memorandum From Kim Ross To Two Other Non-attorney Noranda Employees (*Appendix to Plaintiff's Motion*, Ex. 15).

Noranda claims the attorney-client privilege for Mr. Ross' statement that "if we bust-up now, with all the antitrust muddle that will arise . . . ." This phrase does not reveal any confidences or legal advice; it is merely a layman's speculation to other laymen as to future complications that might arise. It may well be that Mr. Ross spoke with attorneys regarding this topic, but neither his discussions nor attorneys' advice are revealed in this comment. The statement may not be redacted.

### b.
### The June 10, 1998 Memorandum From Kim Ross To Two Non-Attorney Noranda Employees.

This is a memorandum from Kim Ross to in-house lawyer, John Whyte, Esq., and Mr. Ross's superiors regarding a meeting with Marsulex and including a request for legal advice regarding the legal implications of certain facts. *Appendix to Plaintiff's Motion*, Ex. 16). At issue is the Noranda defendants claim of the privilege for a few sentences on the second page beginning "I believe Marsulex may be . . . ." This portion of the document does not reveal any confidences or legal advice. While the Noranda

defendants call it a request for legal advice, it much more closely resembles Mr. Ross's comment on a Marsulex business strategy, and is not privileged and cannot be redacted.

### c.
### The September 13, 1999 Email From John Hammond

This email is from one employee of DuPont to another. (*Appendix to Plaintiff's Motion*, Ex. 17) Although the Noranda defendants argue that they may claim the privilege as to the document because they were involved in a joint venture with DuPont and the document pertains to that topic, this is an unsupported, conclusory assertion, and one not supported by an examination of the document. (*Noranda Defendants' Response*, at 35). It cannot be ascertained whether the communication between two DuPont employees concerns DuPont business or the joint venture. Clearly, the Noranda defendants have not demonstrated they have standing to assert the privilege as to the document. *Matter of Walsh*, 623 F.2d 489, 493 (7th Cir 1980); *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 276-77 (N.D.Ill. 2004)(discussing to whom the privilege belongs in a corporate context).

But beyond that, and more importantly, the email does not reflect client confidences or legal advice. It is Mr. Hammond's recollection of one formula for determining market share. He calls it a "simple, incomplete view." As such, the material is not privileged and cannot be redacted.

### d.
### Operating Guidelines for Noranda's Toronto
### Acid Marketing Group (Appendix to Plaintiff's Motion, Ex. 18)

This is a memorandum from Ian Holden, a Noranda employee, to Al Gourley, an attorney representing Noranda. It sets forth proposed marketing strategies and requests comment from the attorney as to legal implications. It is clearly a request for legal advice reflecting client confidences. The document

is appropriately withheld as privileged.

### e.
### The October 3, 1997 George Jones Memorandum (*Appendix to Plaintiff's Motion*, Ex. 19)

This is a memo in which a non-lawyer employee, George Jones, writes to eleven non-lawyer colleagues (with a "cc" to in-house lawyer John Whyte)[17]. At issue is a sentence regarding market share and relating the advice on that issue received from outside counsel in New York. The sentence reveals not merely the advice but the information provided to counsel in order to have obtained that advice. It is privileged and an appropriate subject for redaction.

### f.
### The February 2002 Kim Ross Email (*Appendix to Plaintiff's Motion*, Ex. 20)

This is an email from Mr. Ross to another non-attorney which relays legal advice regarding the ramifications of a potential marketing strategy. The portion at issue indicates that legal advice was sought and obtained and indirectly reveals the inquiry that was made. The material is, therefore, privileged and subject to redaction.

### g.
### The Kim Ross Notes From A November 1997
### Meeting with DuPont (*Appendix to Plaintiff's Motion*, Ex. 21)

During a meeting between Noranda and DuPont regarding the formation of a joint venture, Mr. Ross took seven pages of hand-written notes. The portions the Noranda defendants seek to redact are several sentences commencing with a "JW" notation, ostensibly referring to attorney John Whyte. It is impossible to tell from the often illegible document but, according to the Noranda defendants, Mr. Whyte

---

[17] The copy to counsel does not make the document privileged. *In re Brand Name Prescription Drugs Antitrust Litigation*, 1996 WL 5180 at * 5 (N.D. Ill. 1996)( Kocoras, J.).

was providing legal advice during the meeting, and these portions reflect that advice. They argue that the common interest doctrine applies because Noranda and DuPont had common legal interests while negotiating their joint venture.

It is undisputed that Noranda and DuPont were formerly involved in a joint venture, which they entered in April of 1998, for the marketing and distribution of sulfuric acid. Each committed their entire acid production to the joint venture otherwise available to be sold in the market. Each committed employees to work full-time on joint venture business and also contributed real tangible assets to the joint venture, such as rail cars, barges, trucks and storage tanks. The two companies also contributed their contracts with customers to the enterprise. Each contributed capital and each shared in the risks and rewards. (*Noranda Defendants' Response*, at 4; Ex. 9). But the plaintiffs argue that, in November of 1997, the two companies had not reached a point in their relationship where the common interest doctrine protected their sharing legal confidences.

As already discussed in connection with the relationship between Noranda and Falconbridge, the plaintiffs' view of the common interest doctrine is too narrow. It is not limited to litigation situations, but covers situations where the parties share a common interest in a legal matter. Its application becomes questionable, however, when, as here, the two parties are *negotiating* a joint venture. They are still competitors, perhaps more so than partners, and do not share an interest sufficiently common to extend the attorney-client privilege to their discussions. *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 513 (D.Conn. 1976)(antitrust analysis offered during joint venture negotiations not privileged as parties were not commonly interested, but adverse, negotiating at arm's length a business transaction between themselves). Indeed, they might actually be at odds, jockeying for the better position should the joint venture come to

35

fruition. The very brief explanation of the materials the Noranda defendants offer does not suggest otherwise. (*Noranda Defendants' Response*, at 37). Accordingly, the common interest doctrine is inapplicable, and the privilege is waived for the redacted materials in these notes.

## h.
### The September 30, 1997 Letter from Noranda's General Counsel to Outside Lawyers (*Appendix to Plaintiff's Motion*, Ex. 22)

This document was inadvertently produced, and the plaintiffs claim that the Noranda defendants waited too long to inform the plaintiffs of their mistake. This argument is based on the plaintiffs' mistaken interpretation of the parties' protective order. The letter forwards certain sales and market information for the purposes of gaining legal advice. As such, it may be protected from discovery as privileged.

## i.
### The September 7, 1999 Email From Joe Skurla Of DuPont To DuPont And Noranda Employees (*Appendix to Plaintiff's Motion*, Ex. 23)

Unlike the September 13, 1999 email from John Hammond (*Appendix to Plaintiff's Motion*, Ex. 17), this email clearly concerns the Noranda-DuPont joint venture, and concerns a legal matter in which the two companies share a common interest. It reflects legal advice from a DuPont attorney, Jim Higgins, regarding the legal consequences of a proposed course of conduct. The material is appropriately redacted.

## j.

### The September 9, 1999 Email From Kim Ross To John Hammond And Joe Skurla Of DuPont (*Appendix to Plaintiff's Motion*, Ex. 24)

The material at issue here is properly redacted for the same reasons as the foregoing document, the September 7, 1999 Email from Joe Skurla.

### k.
### Attorney John Whyte's Marginalia On
### January 15, 1992 Memo *(Appendix to Plaintiff's Motion, Ex. 25)*

Plaintiff originally objected to the inclusion of this material as privileged as a result of confusion over

its authorship. While the memo itself is not privileged, the notes in the margin by attorney Whyte, reflecting

client confidences and legal advice regarding certain transactions, are. *See In re Brand Name*

*Prescription Drugs Antitrust Litigation, supra.*

### l.
### The March 2, 1998 Email String *(Appendix to Plaintiff's Motion, Ex. 28)*

The Noranda defendants apparently produced this document to the Department of Justice

*(Memorandum in Support of Plaintiffs' Motion*, at 15), thereby waiving the privilege.

### m.
### The Competition Law Compliance Manuals

The final category of inadvertently produced documents are antitrust compliance manuals which

were distributed from the Presidents and CEOs of Noranda to "every employee whose duties involve

marketing, sales or production management responsibilities." The manuals were drafted to assist employees

in complying with United States and Canadian competition laws. Noranda's brief argues that the manuals

are privileged because they were prepared by its counsel in response to ongoing requests for legal advice.

*(Defendants' Surreply*, at 1). Not surprisingly, the plaintiffs have a different perspective. They contend

that the manuals are outside the privilege because they "do not respond to *specific* factual requests for legal

advice. . . ." *(Reply Memorandum*, at 27)(Emphasis supplied).[18]

---

[18] The plaintiffs argue for the first time in their Rebuttal Memorandum – which came after the
(continued...)

The Noranda defendants have submitted under seal a representative example of one of these manuals, which was compiled in the Fall of 1996. It is organized under categorical headings including Agreements With Competitors, Pricing Policies, Supply/Distribution Policies, Advertising And Marketing Practices, and Abuse Of Dominant Market Positions. Under each category, the pamphlet briefly sets forth a statement of the applicable Canadian, United States, and European law, and illustrates the application and ramifications of the law with 34 hypothetical "[e]xample[s]." (*Defendants' Surreply*, Ex. A).[19] At the end of each category is a statement of Norandas' Policy regarding each category.

The discoverability in antitrust cases of internal compliance manuals has not been the subject of much judicial attention. One reason may be that they are often merely a compendium of policies and rules, which by definition neither reveal client confidences nor constitute the giving of legal advice and thus are outside the scope of the attorney-client privilege, whether viewed broadly or narrowly.[20] The manuals in

---

[18](...continued)
Noranda defendants' Surreply – that the extent of the distribution waived the privilege. Arguments raised for the first time in a reply brief are waived, including waiver arguments, themselves. *Help At Home, Inc. v. Medical Capital, LLC*, 260 F.3d 748, 753 n. 2 (7th Cir. 2001). Arguments raised for the first time after a surreply are indefensible.

[19] The hypotheticals also appear in an Index of Examples, which succinctly describes the specific topic covered by each hypothetical. For example, Example 2 is "Discussions About Negotiation Strategies."

[20] The question of whether the privilege excludes legal advice from counsel that does not reveal client confidences has been a source of debate. Some courts have held that any legal advice is privileged. *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1370 (10th Cir. 1997). Others have held that to be privileged, the communication must be related to or must reveal explicitly or implicitly, client confidences. *See Sprague*, (collecting cases); *Brinton v. Dept. of State*, 636 F.2d 600, 604 (D.C. Cir. 1980); *United States v. IBM*, 66 F.R.D. 206, 211 (S.D.N.Y. 1974); *Ohio-Sealy Mattress Mfg. Co.*, 90 F.R.D. at 21; Epstein, The Attorney-Client Privilege and the Work-Product Doctrine, *supra at* 52 *et seq.*, (and Supplement at 11)(collecting cases). *See also* Paul R. Rice, *Attorney-Client Privilege: Continuing Confusion About Attorney Communications, Drafts, Pre-Existing Documents, and the Source of the Facts Communicated*, 48 Am.U.L.Rev. 967, 974 (1999).

*Miller v. Smith Barney, Harris Upham & Co., Inc.*, No. 84-4307, 1986 WL 2762, *6 (S.D.N.Y. Feb. 27, 1986), on which the plaintiffs rely, fall within this category. There, the plaintiff charged that the defendant and her former husband – one of its employees – conspired to defraud her of money held in the then-couple's joint trading account. Smith Barney's internal compliance manuals set forth rules and regulations for employee conduct with respect to all trading activity and the handling of customer accounts.

The court rejected Smith Barney's claim of attorney-client privilege in response to a discovery request since the manuals had been previously disclosed in other litigation, were required to be maintained by the National Association of Securities Dealers and NYSE – and thus could not be deemed confidential – and did "not constitute legal opinions." 1986 WL 2762, *6. They were a compendium of and internal operating procedures and rules governing the activity of brokers. *See Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 819 (6th Cir. 1981). That the manuals may have been authored by an attorney was not the test of the privilege's applicability.

Certain portions of the Noranda manuals are within *Smith Barney's* general analytical framework and are not privileged. They include, the Presidents' Message To Employees, the Table Of Contents, and the statements under the categorical headings, Purpose Of The Manual, Foreign Competition Laws, Compliance Obligations And The Designated Compliance Officer, Attempts By Others, Grey Area Conduct, and Policy. They do not reveal client confidences and are no more than an articulation of Norandas' policies. The adumbrations of Canadian, United States and European competition laws that appear under each heading on pages 3-24 are not privileged. The Schedule Of Penalties on page 26 is manifestly not privileged nor is the Index Of Examples on page 30, which briefly states the topic of each of the 34 hypotheticals. No advice is reflected, no confidential confidences are revealed, and the contents

of the hypotheticals are not disclosed.

In *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854 (D.C.Cir. 1980), memoranda from the defendant's regional counsel to field auditors, which had been issued in response to a request for interpretations of regulations, were held not privileged because they were "neutral, objective analyses of agency regulations. They resemble, in fact, question and answer guidelines which might be found in an agency manual." *Id.* at 863. Much of the information in the Noranda manual is a "neutral, objective analysis" of the law, and the defendants themselves concede that the manual was designed as an "overview . . . of competition laws. . . ." (*Noranda Defendants' Surreply*, at 1).

Judge Kocoras' opinion in *In re Brand Name Prescription Drugs Antitrust Litigation*, on which the defendants exclusively rely, is not to the contrary. There, after an *in camera* review, he found that an attorney's presentation on the application of the antitrust laws to specific aspects of one of the defendants' business was privileged:

> This is a 1991 presentation describing the application of the antitrust laws to specific aspects of Schering's business. The presentation was prepared by a Schering attorney and was given to seven Schering executives. The presentation is privileged as it provides legal advice and reveals client confidences regarding certain of Schering's business practices.

1996 WL 5180, *2. *See also In re Ford Motor Company*, 110 F.3d at 966. Judge Kocoras' opinion is a straightforward application of basic attorney-client privilege principles to an obvious and uncomplicated situation. The 34 hypotheticals and the Quick Reference Guidelines on pages 27 and 28 of the 1996 manual are not as clear, and the answer to the question of whether these communications are privileged is to be found in the informing principles of the privilege itself, rather than in the precise holdings in the cases cited by the parties.

The privilege is designed to protect client confidences, not as an end in itself – for that in many instances would merely insulate from disclosure compelling evidence of wrongdoing – but as the means to secure future conformity with law. *Upjohn Co.*, 449 U.S. at 389; *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999). The achievement of that goal obviously is not a function of the form either the client's communications or the lawyer's responses may take. As the Supreme Court has said in another context, "[i]t is the substance of what they do, and not the form in which they clothe their transactions, which must afford the test." *Electric Bond and Security Company v. SEC*, 303 U.S. 419, 440 (1938). Thus, the fact that a communication may take the form of a hypothetical does not mean that it is automatically outside the scope of the privilege, as *O'Brien v. Board of Ed. of City School Dist. of City of New York*, 86 F.R.D. 548 (S.D.N.Y. 1980) teaches.

There, a committee for the Board of Education posited hypothetical questions regarding penalties for striking teachers to the Board's legal offices. The questions posed various fact situations, and the answers gave the lawyer's explanation of the legal ramifications of the facts proposed. The plaintiff argued, *inter alia*, that the document was not privileged because it did not reveal confidential factual communications but merely hypothetical questions. The court rejected this argument, explaining that the questions were suggestive of alternative strategies and tactics actually under consideration by the defendant in anticipation of imposing fines and penalties against the plaintiffs. *Id.* Despite the fact that the questions were put in terms of hypothetical situations, they "reveal[ed] the mental processes of the clients, its strategies, tactics and the facts and distinctions which it considered potentially important. Such a communication is entitled to protection." *Id.* at 549.

The plaintiffs contend that the 34 hypotheticals in the Noranda manual are merely hypothetical

41

situations, and there is no evidence that the factual bases for any of them were actually communicated in confidence by Noranda to its counsel. Although the Noranda defendants contend that the hypotheticals were "lawyer-crafted," they have not provided any competent factual evidence regarding their genesis. There is only the statement in the Surreply that they were responsive to "ongoing requests of the corporation for legal advice regarding complex antitrust issues as related to specific aspects of Noranda's business." But that is not enough. Unsupported statements, whether in oral argument, *In re: Payne*, 431 F.3d 1055, 1066 (7th Cir. 2005), or in briefs do not count. *See United States ex rel. Feingold v. AdminiStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003); *IFC Credit Corp v. Aliano Brothers General Contractors, Inc.*,437 F.3d 606, 610-611 (7th Cir. 2006). *Compare, Trading Technologies Intern., Inc. v. eSpeed, Inc.*, 2005 WL 1300778, *1 (N.D.Ill. April 28, 2005).[21]

On the present state of the record, one cannot tell when the requests were made, the nature of the requests, to whom the requests were made, by whom they were made, or any other circumstance from which it could be ascertained whether the hypotheticals "implicitly" reveal client confidences, *In re Brand Name Prescription Drugs Antitrust Litigation*, 1996 WL 5180 at * 3; *Rehling*, 207 F.3d at 1019, mental processes, strategies, or tactics. Were they compiled with specific situations in mind and crafted to deal with the ramifications of various courses of conduct? Or were they the unsolicited, creative efforts of enterprising lawyers, drawing on their own knowledge of the industry derived from other engagements with other clients. For example, Example 8 appearing under the heading, Agreements With Competitors, refers to "an actual case before the European Commission. . . ." This would not seem to be privileged.

_____

[21] This should not be construed as a reflection on Norandas' counsel. Lawyers only know what their clients tell them about historical facts, and thus, competent proof is required as to those facts.

The burden of demonstrating that the manuals are privileged is the defendants', and on the strength of the present record, I cannot find that that burden has been sustained.

Although judges who ask for additional briefs are often sorry, *Morris v. City of Pittsburgh*, 445 F.Supp. 981, 982-83 (W.D. Pa. 1978), the issue is sufficiently important that it should be decided on the merits and not by default. Thus the defendants are given 14 days to file whatever additional *factual* support they desire to satisfy their burden of proof on the question of the applicability of the privilege to the 34 hypotheticals. The plaintiffs shall have 10 days to respond. The briefs shall not exceed 7 pages, and there need be no reply. If sufficient, competent supporting proof is not filed, the 34 hypotheticals shall also be turned over to plaintiffs.

## 7.
## Privilege Log Descriptions

Finally, the plaintiffs argue that many of the descriptions in the Noranda defendants' privilege log are inadequate. When a party withholds information from discovery under a claim of attorney-client privilege, Federal Rule of Civil Procedure 26(b)(5) requires that:

> the party shall make the claim expressly and shall describe the nature of the documents, communications, or other things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

The Advisory Committee notes to the rule explain that "[t]o withhold materials without [providing notice as described in Rule 26(b)(5)] is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver of the privilege or protection." Here, the descriptions, although terse, allow for the determination of whether the documents described qualify as privileged. At bottom, the parties' disagreements are more over the proper scope of the privilege itself than over the adequacy of the

designations.[22]

## The Memoranda By Kim Ross To The File

There are forty entries relating to Kim Ross's notes to file. All are adequately described as either relating to legal advice regarding customer transactions and reflecting communications or conversations between attorney and client: (30, 45, 54, 74, 112, 114, 119, 120, 121, 122, 123, 217, 235, 243, 263, 473-474, 500, 1724); the legal ramifications of the formation of a potential joint venture LLC: (218, 222, 238, 244, 257, 258, 260, 274, 275, 313, 315, 324, 328, 329, 348, 349, 359, 473-474, 501), or proposed acquisition: (254, 259, 265). The plaintiffs seem to suggest that the lack of any participation by an attorney as author or recipient means these notes cannot be privileged (*Memorandum in Support of Plaintiffs' Motion*, at 14, 15). But the privilege issue is not settled by authorship or participation. The question is whether the communications rest on confidential information obtained from the client, or would reveal the substance of a confidential communication by the client. *Rehling*, 207 F.3d at 1019.

It is enough that the notes reveal, directly or indirectly, the substance of a confidential attorney-client communication. *SmithKline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 534

---

[22] In *American Nat. Bank and Trust Co. of Chicago*, the privilege logs were not only admittedly inadequate, certain documents that had been inadvertently produced revealed that the logs were spurious. 406 F.3d at 870-871. The court devised a sampling technique to determine whether the claim of privilege was legitimate. When review of the arbitrarily chosen samples went badly for the defendant, sanctions were imposed, all non-sampled documents were ordered disclosed, and the claim of privilege even as to these was deemed improper. The court of appeals reversed, finding that sanctions ought not to have been imposed and the privilege should not have been globally rejected without an full *in camera* review, which in that case was manageable. The question here is not whether the Noranda defendants ought to be sanctioned for bad faith assertions of the privilege, but merely whether they have demonstrated that the documents in the privilege log are adequately described as being privileged. In some instances, the entries demonstrate that the documents are privileged; in others, they indicate the privilege– or the extension of the privilege through the common interest doctrine – does not apply. As such, the log is similar to a pleading in which the party pleads itself out of court. *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005).

(N.D.Ill. 2000); *Weeks v. Samsung Heavy Industries Co., Ltd.*, No. 93-4899, 1996 WL 341537, *2

(N.D.Ill.June 20, 1996)(summary of legal advice sent from one non-attorney to another privileged); *Baxter*

*Travenol Laboratories, Inc. v. Abbott Laboratories*, No. 84-5103, 1987 WL 12919, *5 (N.D.Ill. June

19, 1987)(principal consideration is nature of document, not necessarily author or recipient).

## b.
## The Memos Between Kim Ross And Non-Attorneys

The plaintiffs also question thirty entries describing communications between Mr. Ross and other

non-attorneys. Plaintiffs' insistence that an attorney must be involved as a participant in the communication

before it can be found to reflect a client confidence or legal advice is misplaced. *Rehling*, 207 F.3d at

1019; *SmithKline Beecham*,193 F.R.D. at 534; *Ohio-Sealy Mattress*, 90 F.R.D. at 28. The entries in

this category are all adequately described as either relating to legal advice regarding customer transactions

and/or proposed contracts and reflecting communications or conversations between attorney and client:

105, 124, 137, 142, 184, 185, 444, 675, 1722; reflecting legal advice regarding potential acquisitions:

214; or the formation of an LLC: 242, 267, 269, 465; or reflecting ongoing LLC legal concerns once the

joint venture with DuPont had been formed in April of 1998: 661, 885, 889, 972, 1032, 1034, 1068,

1110, 1111, 1112, 1113, 1135, 1192.

One entry in this category, however – 1790 – reflects a communication between Mr. Hammond

of DuPont and Mr. Ross of Noranda about two months prior to the formation of the joint venture. As

indicated earlier, the Noranda defendants have presented nothing to demonstrate that, during the period

prior to the formation of the joint venture, Noranda and DuPont were not merely competitors or even

adversaries negotiating for better position in the proposed joint venture. *SCM Corp.*, 70 F.R.D. at 513.

The common interest doctrine does not apply in such a circumstance to extend the privilege, and so this document must be produced for *in camera* inspection.

**c.**
**Memoranda By John Hammond Of DuPont To File**

There are similar problems with entries 308, 309, 310, 327, which all predate the formation of the joint venture. It cannot be said that such documents do not merely refer to legal advice regarding negotiation positions that would not be protected under the common interest doctrine. Entry 804 does not even refer to the joint venture, but merely to a draft of a contract. The description does not indicate that the document refers to a communication that might come under the common interest doctrine as it applies in this case. These documents must be produced for *in camera* inspection. Conversely, entries 702, 980, and 1818, all post-date the formation of the joint venture, and are described as referring to legal matters that would be of common interest to DuPont and Noranda. These materials are privileged.

**d.**
**Memoranda By John Hammond Of DuPont To Noranda**
**Or DuPont Employees Before April 1998**

The privilege log also includes entries describing memos that Mr. Hammond sent to various Noranda employees prior to the formation of the joint venture in April of 1998: 311, 319, 331, and the aforementioned 1790. These documents must be produced for *in camera* inspection for the same reasons set forth in connection with Mr. Hammond's memos to file.

Entry 335 is described as a memo regarding the joint venture from Mr. Hammond to a fellow DuPont employee. As such, the document is similar to the September 13, 1999 email from John Hammond (*Appendix to Plaintiff's Motion*, Ex. 17). It is from one employee of DuPont to another, but unlike the

46

other email, it predates the joint venture. The Noranda defendants offer nothing to suggest that they have standing to assert the privilege as a communication between DuPont employees before the joint venture began. *Matter of Walsh*, 623 F.2d at 493; *Dexia Credit Local*, 231 F.R.D. at 276-77. DuPont itself has not claimed these materials are privileged. (*Memorandum in Support of Plaintiffs' Motion*, at 15; Ex. 27). These documents must be produced.

### e.
### Memoranda To Or From John Hammond With No Lawyer Involvement

The plaintiffs also question the entries for about thirty other communications involving Mr. Hammond as author or recipient, but listing no attorney involvement. Mr. Hammond's communications to Noranda employees after the joint venture began are privileged if they reflect attorney-client communications regarding legal matters of common interest: 346, 354, 443, 578, 588, 702, 796, 860, 1102, 1182, 1198, 1818. Those that he received of a similar nature are similarly protected: 345, 352, 661, 885, 886, 888, 889, 951, 963, 964, 1038, 1135, 1167 But this category also includes two entries for documents that, while shared among Mr. Hammond and Noranda employees are not described as referring to the joint venture: 625, 642, 704. Entry 804, while not described as shared, is also not described as referring to the joint venture. Accordingly, the common interest doctrine cannot be found to apply to these documents, and they must be produced for *in camera* inspection.

### f.
### Other Memoranda Between Non-lawyer Employees Of Noranda And DuPont

The plaintiffs find fault with a final category of entries which describe documents that do not involve attorneys as author or recipients and were shared among Noranda and DuPont employees. The entries describe documents as revealing confidences relating to legal advice. For example, entry 158, although

47

listed as the product of a marketing group, is described as being redacted to exclude portions reflecting legal advice concerning sales proposals. As such, the redaction is proper, much like the redaction of material in the 1994 Prime report. Other entries are described as reflecting legal advice or client confidences regarding the joint venture between Noranda and DuPont: 405, 634, 863, 951, 1128. Dated after the joint venture began, these are adequately described to warrant protection as privileged under the common interest doctrine. But the doctrine does not protect documents described as having been shared among Noranda and DuPont employees and that are not described as concerning joint venture legal matters: 626, 704, 706, 713. These documents must be produced for *in camera* inspection.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for determination of the privilege [#144] is GRANTED in part and DENIED in part.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

Date: 4/10/06