## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In Re SULFURIC ACID ANTITRUST LITIGATION | ) ) ) ) | MDL Docket No. 1536 Master File No. 03 C 45764 |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS | ) ) ) | JURY TRIAL DEMANDED |

## DEFENDANT PVS'S ANSWER TO THIRD
## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Defendants Pressure Vessel Services, Inc. d/b/a PVS Chemicals, Inc., PVS Chemical, Inx. (Ohio), PVS Chemical Solutions, Inc., and PVS Nolwood, Inc., (collectively "PVS") hereby answer as follows the Third Consolidated Amended Class Action Complaint:

## I.   NATURE OF THE CASE

1.      This is a class action lawsuit brought on behalf of direct purchasers of sulfuric acid against Defendants for violations of Section I of the Sherman Act, 15 U.S.C. § 1. As more fully alleged below, Defendants contracted, combined or conspired to raise, fix, maintain or stabilize the price of sulfuric acid sold in the United States.  As part of the conspiracy, Defendants agreed to limit the supply of sulfuric acid in the United States, to fix prices, and to allocate markets and customers for the sale of sulfuric acid in the United States.  As a result of Defendants' unlawful conduct, Plaintiffs and the Class, as hereinafter

defined, paid prices for sulfuric acid that were artificially inflated and they have suffered injury to their business and property.

**ANSWER:**   PVS denies that it violated Section 1 of the Sherman Act, 15 U.S.C. § 1, or that it has engaged in any other illegal conduct.

## II.    JURISDICTION AND VENUE

2.      Plaintiffs bring this action pursuant to Sections 4(a) and 16 of the Clayton Act (15 U.S.C. § § 15 and 26) to recover damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violations of Section I of the Sherman Act.

**ANSWER:**   PVS denies that it violated Section 1 of the Sherman.  PVS neither admits nor denies any remaining allegation of Paragraph 2 on the ground that it characterizes Plaintiff's claim and that no answer is required.

3.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

**ANSWER:**   PVS neither admits nor denies the allegation of Paragraph 3 on the ground that it alleges matters of jurisdiction to which no answer is required.

4.      Personal jurisdiction over all Defendants comports with the United States Constitution.

**ANSWER:**   PVS neither admits nor denies the allegation of Paragraph 4 on the ground that it alleges matters of jurisdiction to which no answer is required.

5.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 .S.C. §§ 15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found or had

agents in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out, in this District.

**ANSWER:**   PVS admits that it was found or had agents in this district between January 1, 1988 and January 16, 2003.  PVS neither admits nor denies any remaining allegation of Paragraph 5 on the ground that it alleges a legal conclusion to which no answer is required.

### III.   DEFINITIONS

6.    As used in the Complaint:

    a.    "Sulfuric acid" is a colorless, odorless, extremely corrosive, oily liquid used in making dyes, paints, explosives, fertilizers, other products, and in industrial processes.

    b.    The term "Class Period" refers to the time period from  January 1, 1988 until January 16, 2003.

**ANSWER:**   PVS neither admits nor denies the allegation of Paragraph 6 on the ground that it alleges conclusions of law and characterization of Plaintiff's Complaint to which no answer is required.

### IV.   PARTIES

7.    Plaintiff Ohio Chemical Services, Inc. is an Ohio corporation and a chemical distributor located in Columbus, Ohio.  During the Class Period, Ohio Chemical Services, Inc. purchased sulfuric acid directly from one or more of the  Defendants or their co-conspirators, and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

**ANSWER:**   PVS neither admits nor denies the allegation of Paragraph 7 on the ground that it is without sufficient information upon which to form a belief.

3

8.     Plaintiff Independent Chemical Corporation is a corporation and a chemical distributor with its principal place of business located in Glendale, New York.  During the Class Period, Independent Chemical Corporation purchased sulfuric acid directly from one or more of the Defendants or their co-conspirators and has been injured in its business and property, by reason of the antitrust violations alleged in this Complaint.

**ANSWER:**     PVS neither admits nor denies the allegation of Paragraph 7 on the ground that it is without sufficient information upon which to form a belief.

9.     Plaintiff National Alum Corporation is a Texas corporation with its principal place of business located in Mesquite, Texas.  During the Class Period, National Alum Corporation purchased sulfuric acid directly from one or more of the Defendants or their coconspirators and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

**ANSWER:**     PVS neither admits nor denies the allegation of Paragraph 7 on the ground that it is without sufficient information upon which to form a belief.

10.     Plaintiff Producers Chemical Company is an Illinois corporation with its principal place of business located in Batavia, Illinois.  During the Class Period Producers Chemical Company purchased sulfuric acid directly from one or more of the Defendants or their coconspirators, and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

**ANSWER:**     PVS admits that Producers Chemical Company made certain purchases of sulfuric acid from PVS in the period from January 1, 1988 to January 16, 2003.  PVS denies any remaining allegation of Paragraph 10.

4

11. Plaintiff Old Bridge Chemicals. Inc. is a New Jersey corporation with its principal place of business located in Old Bridge, New Jersey. During the Class Period, Old Bridge Chemicals, Inc. purchased sulfuric acid directly, from Defendants or their co-conspirators and has been injured in its business and property by reason of the antitrust violations alleged in this Complaint.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 11 on the ground that it is without sufficient information upon which to form a belief.

12. Plaintiff AG RX is a California corporation located in Oxnard, California. During the Class Period, AG RX purchased sulfuric acid directly from one or more of the Defendants or their co-conspirators and has been injured in its business and property by reason of 'the antitrust violations alleged in this Complaint.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 7 on the ground that it is without sufficient information upon which to form a belief.

13. Defendant NorFalco LLC ("NorFalco") is a Delaware limited liability corporation with its principal place of business located at 6050 Oak Tree Boulevard, Suite 190 Independence, Ohio 44131. Originally formed in 1998 as a joint venture between Noranda Inc. ("Noranda"), Falconbridge Ltd. ("Falconbridge") and E.I. Du Pont de Nemours & Co. ("DuPont"), NorFalco at that time was named Noranda DuPont LLC. The company was renamed NorFalco on or around June 29, 2001, following Noranda's redemption of DuPont's interest in the joint venture. Currently, Noranda owns 65% of Norfalco's capital stock while Falconbridge owns 35%. Norfalco manufactured, marketed, sold or distributed sulfuric acid in the United States during the Class Period. NorFalco is responsible for Noranda DuPont LLC's illegal and collusive acts, as well as for NorFalco's

own acts after Noranda Inc.'s redemption of DuPont's interest in the joint venture. In addition, as a result of their direct participation in NorFalco, Noranda and Falconbridge are each responsible for NorFalco's illegal and collusive acts.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 13 on the ground that it is without sufficient information upon which to form a belief.

14. Noranda DuPont LLC manufactured, marketed, sold or distributed sulfuric acid in the United States during the Class Period. Noranda DuPont was a joint venture among Noranda DuPont and Falconbridge. As a result of their direct participation in the joint venture, Noranda, Falconbridge and DuPont each are responsible for Noranda DuPont's illegal and collusive acts, as well as for their own acts prior to and after the existence of the joint venture.

**ANSWER:** PVS admits that Noranda manufactured, marketed, sold or distributed sulfuric acid in the United States at certain during the Class Period. PVS neither admits nor denies any remaining allegation of Paragraph 14 on the ground that it alleges a conclusion of law to which no answer is required.

15. Defendant Noranda is a Canadian corporation with its principal place of business located at 181 Bay Street, Toronto, Canada. Noranda is a major producer of sulfuric acid. Noranda sold sulfuric acid to purchasers in the United States during the Class Period. Noranda currently sells sulfuric acid in the United States through Norfalco. Noranda is a 65% joint venture partner in Norfalco with Falconbridge.

**ANSWER:** PVS neither admits nor denies the allegations of Paragraph 15 on the ground that it is without sufficient information upon which to form a belief.

6

16.     Noranda has systematic and continuous contacts with the United States in addition to its holdings in Norfalco.  Noranda is listed on the New York Stock Exchange under the symbol NRD.  Noranda also does business in the United States through numerous subsidiaries and affiliates (in addition to Norfalco) including, without limitation, the following entities wholly owned by Noranda: (1) Noranda Recycling Inc., headquartered in California, is one of the largest processors of precious metal-bearing electronic materials in the Western United States; (2) American Racing Equipment, Inc., one of the leading aluminum automotive wheel producers in the United States, produces aluminum wheels at three plants in the Los Angeles, California area and promotes its products through a network of more than 45,000 dealers in the United States; (3) Norandal USA, Inc. operates three aluminum rolling mills in the United States, employing some 774 people; (4) Noranda produces high purity aluminum and aluminum alloy products at its New Madrid reduction plant, located on the Mississippi River near New Madrid, Missouri.  Molten aluminum production of the New Madrid plant was 220,000 tons in 2001.

**ANSWER:**  PVS neither admits nor denies the allegations of Paragraph 16 on the ground that it is without sufficient information upon which to form a belief.

17.     Noranda presents itself to the public as a unified corporate entity, referring to itself and its wholly-owned subsidiaries "individually or collectively" as the "company," "we," "us" or "ours" in its financial statements.  Noranda's financial statements are consolidated with all of its subsidiaries and joint ventures.  Of the 13 "principal subsidiaries" that Noranda listed in its 2003 Annual Information Form filed with the United States Securities and Exchange Commission, eight listed under "jurisdiction" are incorporated in Delaware.

Noranda stated in its 2000 Annual Report that 46% of its sales were made in the United States.

**ANSWER**: PVS neither admits nor denies the allegations of Paragraph 17 on the ground that it is without sufficient information upon which to form a belief.

18. Defendant Falconbridge is a Canadian corporation with its principal place of business located at 95 Wellington Street, Toronto, Canada. During the Class Period, Falconbridge manufactured, marketed, sold or distributed sulfuric acid in the United States. As of year-end 2002, Noranda owned 59.5% of Falconbridge. Falconbridge is a 35% joint venture partner with Noranda in NorFalco. Falconbridge has systematic and continuous contacts with the United States through its affiliate, Falconbridge U.S., Inc., whose offices are located in Pittsburgh, Pennsylvania. Of Falconbridge's total revenues in 2000, 32% were generated from sales in the United States.

**ANSWER**: PVS neither admits nor denies the allegations of Paragraph 18 on the ground that it is without sufficient information upon which to form a belief.

19. Defendant DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. During the Class Period, DuPont manufactured, marketed, sold or distributed sulfuric acid in the United States.

**ANSWER**: Upon information and belief, admitted.

20. Defendant Pressure Vessel Services, Inc., d/b/a PVS Chemicals, Inc. ("PVS"), is a Michigan corporation with its principal place of business in Detroit, Michigan. PVS is one of the largest manufacturers and marketers of sulfuric acid and other corrosive chemicals in the United States and worldwide. During the Class Period, PVS manufactured, marketed, sold or distributed sulfuric acid in the United States.

**ANSWER:** PVS admits that it is a Michigan corporation with its principal place of business in Detroit, Michigan and that it manufactured, marketed, sold, or distributed sulfuric acid in the United States at certain times during the Class Period. PVS denies any remaining allegation of Paragraph 20.

21. PVS Chemicals, Inc. (Ohio) is a subsidiary of Pressure Vessel Services, Inc., PVS Chemicals, Inc. (Ohio) changed its name to PVS Chemical Solutions, Inc. PVS Chemical Solutions, Inc. has offices in Chicago, Illinois, Copley, Ohio and Buffalo, New York. During the Class Period PVS Chemicals, Inc. (Ohio) and PVS Chemical Solutions, Inc., manufactured, marketed, sold or distributed sulfuric acid in the United States.

**ANSWER:** Admitted.

22. PVS Nolwood Chemicals, Inc., is a corporation with its principal place of business in Detroit, Michigan. PVS Nolwood Chemicals is a subsidiary of Pressure Vessel Services, Inc. During the Class Period PVS Nolwood Chemicals, Inc., manufactured, marketed, sold or distributed sulfuric acid in the Unite States.

**ANSWER:** Admitted.

23. Pressure Vessel Services, Inc., d/b/a PVS Chemicals, Inc., PVS Chemicals, Inc. (Ohio), PVS Chemicals Solutions, Inc., and PVS Nolwood Chemicals, Inc. are collectively referred to herewith as "PVS."

**ANSWER:** Admitted.

24. Defendant GAC Chemical Corporation ("GAC") is an Indiana corporation with its principal place of business in Searsport, Maine. Defendant GAC was formerly known as General Alum & Chemical Corporation. On March 9, 1994, GAC acquired Delta Chemicals, Inc. of Searsport, Maine ("Delta"), a manufacturer of sulfuric acid and other

chemicals, and was assigned Delta's sulfuric acid purchase contract with Noranda Sales Corporation, Limited. As a result of this merger and of the assignment of Delta's contract with Noranda, GAC is responsible for Delta's conspiratorial acts alleged in this Complaint, as well as for GAC's own conspiratorial acts prior to and/or subsequent to the merger. During the Class Period, Delta Chemicals and GAC manufactured, marketed, sold or distributed sulfuric acid in the United States.

**ANSWER:** PVS neither admits nor denies the allegations of Paragraph 24 on the ground that it is without sufficient information upon which to form a belief.

25. Defendant Intertrade Holdings, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia. Sulfuric acid producer and trader Boliden Inter-trade, Inc. merged into Intertrade Holdings, Inc. on December 31, 1995. Intertrade Holdings, Inc. assumed Boliden Intertrade, Inc.'s responsibilities under its contract with Noranda. As a result of the merger and of the assignment of the contract, Intertrade Holdings, Inc. is responsible for Boliden Intertrade, Inc.'s conspiratorial acts alleged in this Complaint, as well as its own conspiratorial acts prior to and/or subsequent to the merger. During the Class Period, Boliden Intertrade, Inc. and Intertrade Holdings, Inc. (hereinafter, collectively, "Boliden") manufactured, marketed, sold or distributed sulfuric acid in the United States.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 25 on the ground that it is without sufficient information upon which to form a belief.

26. Defendant Marsulex, Inc. ("Marsulex") is a Canadian corporation with its principal place of business in Toronto, Canada. Marsulex was formed in June 1989 when an investor group acquired certain sulfur businesses and assets from CIL Inc. ("CIL"), a

major United States producer and marketer of sulfuric acid and other sulfur products. During the Class Period, Marsulex and CIL manufactured, marketed, sold or distributed sulfuric acid in the United States. As a result of this merger, Marsulex is responsible for CIL's conspiratorial acts alleged In this Complaint, as well as for Marsulex's own conspiratorial acts subsequent to the merger.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 26 on the ground that it is without sufficient information upon which to form a belief.

27.    In May 1998, Marsulex purchased from Swedish-based Trelleborg AB ("Trelleborg") its wholly-owned subsidiaries IT Holding, Inc. and BCT ChemTrade Corporation, for the purpose of producing and marketing sulfuric acid from the sulfur-burning facility at Copperhill, Tennessee that was previously operated by Boliden.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 27 on the ground that it is without sufficient information upon which to form a belief.

28.    Marsulex has systematic and continuous contacts with and does business in the United States. According to Marsulex's web site, Marsulex owns and operates plants in Long Beach, California; Whiting, Indiana; Toledo, Ohio; and Lebanon, Pennsylvania. Marsulex also maintains offices In Toledo, Ohio and Lebanon, Pennsylvania.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 28 on the ground that it is without sufficient information upon which to form a belief.

29.    Defendant ChemTrade Logistics (U.S.), Inc. ("ChemTrade") is a Delaware corporation, with its principal place of business in Cairo, Ohio. ChemTrade also owns and operates ocean terminals for sulfuric acid at Savannah, Georgia and Tampa, Florida. ChemTrade and its parent company, ChemTrade Logistics Income Fund, were formed in

11

July 2001 to purchase Marsulex's sulfur removal services businesses. ChemTrade is a continuation of the sulfuric acid operations of Marsulex, and is responsible for Marsulex's conspiratorial acts alleged in this Complaint, as well as for its own conspiratorial acts subsequent to the spin-off. During the Class Period, ChemTrade manufactured, marketed, sold or distributed sulfuric acid in the United States.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 29 on the ground that it is without sufficient information upon which to form a belief.

30. Defendant Koch Sulfur Products Company, now known as Koch Sulfur Products Company, LLC, has its principal place of business in Wichita, Kansas and is a subsidiary of Koch Minereral Services LLC, which is a subsidiary of Koch Industries, Inc. During the Class Period, Koch Sulfur Products Company, and/or Koch Sulfur Products Company LLC (hereinafter, collectively "Koch") manufactured, marketed, sold or distributed sulfuric acid in the United States.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 30 on the ground that it is without sufficient information upon which to form a belief.

## V.     CO-CONSPIRATORS

31. Various other persons, firms or corporations not named as Defendants in this lawsuit have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance thereof. Evidence of the identity of co-conspirators is in the possession of the Defendants.

**ANSWER:** Denied.

## VI.     INTERSTATE TRADE AND COMMERCE

32.     During the Class Period, Defendants sold sulfuric acid in a continuous and uninterrupted flow of interstate and foreign commerce to customers located throughout the United States and in states or countries other than the states or countries in which the Defendants produced sulfuric acid.  The business activities of Defendants were within the flow of, and substantially affected, interstate and foreign trade and commerce.

**ANSWER:**   PVS admits that it sold sulfuric acid to customers in states other than the state in which PVS is incorporated and has its principal place of business.  PVS neither admits nor denies any remaining allegation of Paragraph 32 on the ground that it is without sufficient information upon which to form a belief and on the ground that the allegations assert conclusions of law to which no answer is required.

## VII.     STATEMENT OF FACTS

33.     Sulfuric acid is the largest volume inorganic chemical produced and sold in the United States.  Sulfuric acid plays some part in the production of  many industrial processes.  Sulfuric acid is produced in either of two ways: voluntarily, in a process of burning sulfur ore, or involuntarily, as a by-product from the smelting of various metals, primarily copper and zinc.  "Voluntary" acid is sometimes referred to as "discretionary" or "on-purpose" sulfuric acid.  In contrast, sulfuric acid that is the by-product of smelting ores is referred to as "involuntary", "non-discretionary", "fatal" or "smelter" sulfuric acid.

**ANSWER:**   PVS generally admits the allegations of Paragraph 33, but denies that they are a complete or fully accurate description of the use or definitions of sulfuric acid.

34.     Smelter sulfuric acid is made from sulfur dioxide, which is a by-product of metal smelting that, when released into the environment, has been at least partly responsible for the phenomenon known as acid rain.  Environmental regulations require

13

sulfuric dioxide to be recaptured and converted into sulfuric acid. Sulfuric acid, once produced, must be disposed of so that the smelters may continue operating. There are virtually no commercially viable alternatives to disposing of sulfuric acid other than selling it on the open market.

**ANSWER:** PVS admits that (1) sulfur dioxide is a byproduct of smelting certain metals; (2) release of sulfur dioxide has been associated with acid rain; (3) environmental regulations in various parts of the world, including the United States and Canada, require that sulfur dioxide be recaptured and converted into sulfuric acid; (4) metal smelters that produce sulfur dioxide must dispose of the sulfuric acid to continue operating; and (5) the only commercially viable means for metal smelters to dispose of sulfuric acid is to sell the acid. PVS neither admits nor denies any remaining allegation of Paragraph 34 on the ground that it is without sufficient information upon which to form a belief.

35. Producers of sulfuric acid prefer to sell it thought the U.S. merchant market for various chemical uses. Sulfuric acid that cannot be sold the merchant market is typically sold at a significantly lower price for us in the production of agricultural fertilizers.

**ANSWER:** PVS neither admits nor denies the allegations of Paragraph 35 on the ground that it is without sufficient information to form a belief.

36. During the 1980s, Defendants Noranda and Falconbridge, competitors as Canada's leading metal smelters, found themselves with an oversupply of involuntary smelter acid. Involuntary sulfuric acid producers such as Noranda and Falconbridge cannot reduce their sulfuric acid production without also reducing their smelting operations. In order to alleviate this problem, Noranda and Falconbridge increased their exports of

sulfuric acid into the United States, which had the initial effect of driving down sulfuric acid prices in the United States.

**ANSWER**:   PVS neither admits nor denies the allegation of Paragraph 32 on the ground that it is without sufficient information upon which to form a belief.

37.   Moreover, Noranda was planning to bring its new Horne Plant on-line in late 1989, and anticipated that an additional 400,000 metric tons annually of Noranda acid soon would flood the United States market.   Fearful of the effect this impending influx of sulfuric acid would have on sulfuric acid prices in the United States, Noranda approached various voluntary producers of sulfuric acid in the United States, including DuPont, PVS, Boliden, Koch and GAC/Delta, and obtained illegal agreements from them to cut back their voluntary production in order to limit sulfuric acid supply, and raise sulfuric acid prices, in the United States.   As a result of these agreements, sulfuric acid supply in the United States was artificially reduced through production cutbacks and plant closures and sulfuric acid prices were artificially raised, maintained and/or stabilized.

**ANSWER**:   Denied.

38.   In order to limit the supply of sulfuric acid, and to fix, maintain or stabilize the price of sulfuric acid, PVS and Noranda in March 1988 signed an illegal agreement in which PVS agreed to discontinue production of sulfuric acid at its sulfuric acid plant at Copley, Ohio, removing 60,000 metric tons of annual capacity from the sulfuric acid market.   PVS further agreed to purchase its total sulfuric acid requirement from Noranda's CEZ and Horne sulfuric acid plants in Canada and to share with Noranda its revenues from sulfuric acid sales.   PVS did in fact stop producing acid at its Copley sulfuric acid plant in or around August 1988.

**ANSWER:** PVS admits that PVS Chemicals, Inc. (Ohio) entered into a certain agreement with Noranda Sales Corporation Ltd. in approximately March 1988 concerning sulfuric acid produced in Copley, Ohio, the contents of which agreement are clear, unambiguous, and speak for themselves. PVS further answers that it made the independent decision to close the Copley plant based upon its own economic review and analysis, and not as part of any conspiratorial agreement or scheme. PVS denies any remaining allegation of Paragraph 38 that is not consistent with this answer.

39. Also in 1988, CIL and Noranda agreed that CIL would shut down its sulfuric acid plant in Sayreville, New Jersey. CIL did in fact stop production of sulfuric acid at that plant in 1989, removing supply from the sulfuric acid market.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 39 on the ground that it is without sufficient information upon which to form a belief.

40. In 1988 Delta and Noranda reached an agreement that Delta would shut down its sulfuric acid plant at Searsport, Maine, removing approximately 60,000 to 70,000 tons of annual capacity from the sulfuric acid market. Delta did in fact close down its Searsport, Maine plant that year. In October 1989, Noranda and Delta signed an agreement for Delta to purchase its total requirements for sulfuric acid from Noranda and to share with Noranda its revenues from Delta's sales of the Noranda sulfuric acid. Delta and Noranda each expressly agreed not to make sulfuric acid sales to existing customers of the other party.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 40 on the ground that it is without sufficient information upon which to form a belief.

41.     In or around 1988, Koch and Noranda agreed that Koch would close or scale back production at one or more of its sulfuric acid plants.  Subsequently, Koch closed down a sulfuric acid plant and/or scaled back production of sulfuric acid, removing supply from the sulfuric acid market.

**ANSWER:**    PVS neither admits nor denies the allegation of Paragraph 41 on the ground that it is without sufficient information upon which to form a belief.

42.     Shortly after the aforementioned sulfuric plants closed or scaled back production, PVS, CIL, Delta, DuPont and other voluntary  sulfuric acid producers raised their sulfuric acid prices in concert by $5/ton.

**ANSWER:**    Denied.

43.     Between 1988 and 1992, Noranda, DuPont and other producers and sellers of sulfuric acid entered into discussions and agreements regarding the restricting of sulfuric acid output, customer allocation, revenue sharing, and price fixing.

**ANSWER:**    PVS denies that it entered into any discussions or agreements regarding the restricting of sulfuric acid output, customer allocation, revenue sharing, or price fixing.

44.     In August 1990, PVS and Noranda signed an agreement that PVS would discontinue production of sulfuric acid at its Bay City, Michigan sulfuric acid plant, thereby removing approximately 40,000 metric tons of capacity from the sulfuric acid market.  PVS did in fact close down its Bay City plant in 1991.

**ANSWER:**    PVS admits that PVS-Nolwood Chemicals, Inc. entered into a certain agreement with Noranda Sales Corporation Ltd. in approximately August 1990 concerning sulfuric acid produced in Bay City, Michigan, the contents of which agreement are clear, unambiguous, and speak for themselves.   PVS further answers that it made the

independent decision to close the Bay City Plant upon its own economic review and analysis, and not as part of any conspiratorial agreement or scheme. PVS denies any remaining allegation of Paragraph 44 not consistent with this answer.

45. In April 1992, Noranda and DuPont entered into a written agreement that DuPont would cease production of sulfuric acid at its Linden, New Jersey "Grasselli" plant and instead purchase sulfuric acid from Noranda to sell to its customers in replacement of such production. DuPont did in fact stop producing sulfuric acid at the Grasselli plant later that year, removing tens of thousands of tons of sulfuric acid supply from the sulfuric acid market.

**ANSWER**: PVS neither admits nor denies the allegation of Paragraph 45 on the ground that it is without sufficient information upon which to form a belief.

46. Noranda, still concerned about the ever-growing flood of smelter acid into the sulfuric acid market, determined that significant further cuts in sulfur-based acid production were necessary to stabilize sulfuric acid prices. In or around the early to mid 1990s, Noranda held discussions with still more United States producers of sulfur-burned acid, leading to additional agreements that sulfur-burned acid producers would curtail production in favor of purchasing acid from Noranda. Among others, Defendants GAC (following in the legacy of its predecessor-in-interest, Delta), Marsulex, Boliden and Koch engaged in collusive meetings and discussions with Noranda regarding sulfuric acid prices and capacity, and agreed to curtail sulfuric acid production.

**ANSWER**: PVS neither admits nor denies the allegation of Paragraph 46 on the ground that it is without sufficient information upon which to form a belief.

18

47.    With their patterns and practices of collaboration firmly entrenched, Defendants continued to regularly meet and communicate throughout the remainder of the Class Period, to fix, stabilize or maintain sulfuric acid prices in the United States.  Noranda coordinated the sharing of pricing information, capacity, and production date and forecasts, and sensitive competitive information.  Defendants agreed to supply each other with sulfuric acid, swapping acid back as forth as they deemed necessary in order to control capacity expansion and thus the supply of sulfuric acid.  Defendants also allocated customers among themselves and entered into various agreements to share their revenues and not to compete regarding the sale and distribution of sulfuric acid.

**ANSWER**:    Denied.

48.    During the Class Period, Defendants regularly increased prices for sulfuric acid in a coordinated manner; close in time and in like amounts.

**ANSWER**:    Denied.

49.    In 1997, Noranda, DuPont and Falconbridge continued these illegal practices by deciding to form a joint venture, to control 3 million tons of sulfuric acid per year.  Noranda and Falconridge were the dominant Canadian smelters, competing with each other in the production of base metals and together controlling most of the smelter acid being sold in the U.S. merchant market.  DuPont was the dominant firm producing voluntary sulfuric acid in the merchant market.  Through this joint venture, Noranda, Falconridge and DuPont controlled the merchant marker supply of sulfuric acid.

**ANSWER**:    PVS neither admits nor denies the allegations of Paragraph 49 on the ground that it is without sufficient information to form a belief.

50.     Through the joint venture, these defendants jointly decided the prices at which the Noranda, Falconbridge and DuPont sulfuric acid would be purchased from the respective sulfuric plants.  They jointly decided the prices at which all of this "pooled" acid would be sold to customers in the merchant marker, class members herein.  They jointly directed DuPont to cut back production at its own sulfuric acid plants, to artificially restrict supply, and thus keep the price of sulfuric acid artificially raised and stabilized.

**ANSWER:**     PVS neither admits nor denies the allegations of Paragraph 49 on the ground that it is without sufficient information to form a belief.

51.     The joint venture itself owned no capital assets of any kind.  It had no actual staff (employees continued to be paid and receive benefits from the respective companies Noranda, Falconbridge and DuPont).   The "joint venture" was in essence a sham organization through which three horizontal competitors were able to fix prices and limit supply of sulfuric acid in the merchant market.

**ANSWER:**     PVS neither admits nor denies the allegations of Paragraph 49 on the ground that it is without sufficient information to form a belief.

52.     On May 18, 2001, Noranda DuPont was dissolved.  DuPont's interest in Noranda DuPont was redeemed on June 21, 2001.

**ANSWER:**     PVS neither admits nor denies the allegations of Paragraph 49 on the ground that it is without sufficient information to form a belief.

### VIII.     CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of, and seeking certification of, the following class (the "Class"):

> All persons (excluding federal, state and local governmental entities and political subdivisions, the Defendants, and their respective parents, subsidiaries and affiliates) who purchased sulfuric acid in the United States directly from one or more of the Defendants or their parents, subsidiaries or affiliates, during the period January 1, 1988 through January 16, 2003.

**ANSWER:** PVS neither admits nor denies the allegation of Paragraph 53 on the ground that it characterizes the nature of Plaintiff's Complaint and that no answer is required.

54. The Class is so numerous that Joinder of all class members is impracticable. The Plaintiffs do not know the exact size of the Class, since such information is in the exclusive control of Defendants. However, based on the nature of the trade and commerce involved, Plaintiffs believe that there are at least thousands of class members and that the members of the Class are geographically dispersed throughout the United States. Joinder of all members of the Class would be impracticable.

**ANSWER:** Denied.

55. There are questions of law or fact common to the Class, and such common questions predominate over any questions affecting only individual members of the Class. Such common questions include, but are not limited to, the following:

> a. Whether Defendants contracted, combined or conspired to fix, raise, maintain or stabilize the prices of sulfuric acid sold in the United States;
>
> b. Whether Defendants agreed to reduce the supply of sulfuric acid in order to fix, raise, maintain or stabilize the prices of sulfuric acid sold in the United States;
>
> c. Whether Defendants agreed not to compete with one another for each other's customers or market share;
>
> d. Whether Defendants agreed to fix prices for sulfuric acid sold in the United States;

e.   Whether sulfuric acid was sold in the United States to Plaintiffs and members of the Class at prices affected by Defendants' antitrust violations;

f.   The duration and extent of the antitrust violations alleged in this Complaint;

g.   Whether Defendants' conduct violated the Sherman Act;

h.   Whether Defendants' antitrust violations caused injury to the business or property of Plaintiffs and the class members; and

i.   Whether the statute of limitations is tolled.

**ANSWER:**   Denied.

56.   The claims of Plaintiffs are typical of the claims of the Class in that Plaintiffs are direct purchasers of sulfuric acid in the United States from one or more of the Defendants.

**ANSWER:**   Denied.

57.   Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs are typical purchasers of sulfuric acid that have no conflicts with any other member of the Class and are represented by experienced and able antitrust class action counsel.   Further, the interests of Plaintiffs are coincident with, and not antagonistic to, those of the class members.

**ANSWER:**   PVS neither admits nor denies the allegations of Paragraph 57 on the ground that it is without sufficient information upon which to form a belief.

58.   Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein.   A class action will permit a large number of injured persons to prosecute their common claims in a single forum

simultaneously, efficiently and without unnecessary duplication of evidence and effort. Class treatment will also permit the adjudication of claims by smaller class members who could not afford to individually litigate an antitrust claim against large corporate defendants.

**ANSWER:**   Denied.

## IX.   VIOLATIONS ALLEGED

59.   Beginning at least as early as January 1, 1988 and continuing to at least January 16, 2003, the exact dates being unknown at this time, Defendants and their co-conspirators entered into and participated in a contract, combination or conspiracy to suppress and eliminate competition by fixing, raising, maintaining or stabilizing the price of sulfuric acid sold in the United States in violation of Section I of the Sherman Act, 15 U.S.C. § 1.  For the purpose of forming and effectuating this contract, combination or conspiracy, Defendants did those things that they combined and conspired to do, including among others, the following:

   a.   Participated in meetings and conversations to discuss the prices and volume of sulfuric acid sold in the United States;

   b.   Agreed to charge prices at certain levels and to otherwise raise, fix, maintain or stabilize the prices of sulfuric acid sold in the United States;

   c.   Agreed to reduce the supply of sulfuric acid in order to raise, fix, maintain or stabilize the prices of sulfuric acid sold in the United States;

   d.   Agreed to supply each other with sulfuric acid in order to control capacity expansion and thus the supply of sulfuric acid;

   e.   Agreed not to compete with one another for each other's customers or market share;

23

  f.  Sold sulfuric acid at agreed upon prices and in accordance with agreed upon plans;

  g.  Reduced sulfuric acid supply; and

  h.  Agreed to conceal and keep secret their illegal agreement.

**ANSWER:** Denied.

60. Defendants and their co-conspirators engaged in the activities described in the foregoing paragraphs in furtherance of their antitrust violations and for the purpose of effectuating the unlawful contract, combination or conspiracy described herein.

**ANSWER:** Denied.

## X. EFFECTS

61. The aforesaid contract, combination or conspiracy had the following effects, among others:

  a.  The supply of sulfuric acid in the United States was reduced by Defendants and their co-conspirators;

  b.  Defendants and their co-conspirators sold sulfuric acid in the United States at artificial and non-competitive price levels;

  b.  Direct purchasers of sulfuric acid were deprived of the benefit of free and open competition in the market for of sulfuric acid; and

  c.  Price competition ln the sale of sulfuric acid, was restrained, suppressed and/or eliminated.

**ANSWER:** Denied.

62. As a proximate result of Defendants' antitrust violations, Plaintiffs and the members of the class were injured and financially damaged in their businesses and

property, in that they paid more for sulfuric acid than they would have paid in the absence of Defendants' unlawful conduct.

**ANSWER**: Denied.

## XI. TOLLING

63. Until shortly before the filing- of the first class action complaint on February 21, 2003, neither Plaintiffs nor the class members had knowledge of any of the violations alleged herein.

**ANSWER**: Denied.

64. Neither Plaintiffs nor the class members, until that time, could have discovered, by the exercise of reasonable diligence, that Defendants had engaged in the violations alleged herein since Defendants illegal antitrust conspiracy was inherently self-concealing, thorough, preventing Plaintiffs and the Class members from suing them within the normal period of limitations.

**ANSWER**: Denied.

65. Plaintiffs and the Class members could not have discovered the alleged combination and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques secretly employed by Defendants and their co-conspirators to avoid detection of, and to conceal, their combination and conspiracy.

**ANSWER**: Denied.

66.    Defendants and their co-conspirators actively concealed the combination and conspiracy herein alleged by various means and methods, including, but not limited to, secret meetings and surreptitious communications.

**ANSWER:**   Denied.

67.    By reason of the foregoing, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

**ANSWER:**   Denied.

## XII.   PRAYER FOR RELIEF

WHEREFORE, the PVS Defendants request that this Court dismiss Plaintiffs' Complaint and award them any and all relief to which they may be deemed entitled.

/s/ K. Scott Hamilton_____
K. Scott Hamilton
Edward H. Pappas
Attorneys for the PVS Defendants
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3041

Dated: May 2, 2006

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Third Consolidated Amended Class Action Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiffs' claims, as well as the claims of each punitive class member are barred, in whole or in part, by the applicable statute of limitations.

### Third Affirmative Defense

The actions by PVS of which Plaintiff's complain were the result of independent investigation and action by PVS.

### Fourth Affirmative Defense

Plaintiffs were not injured in their business or property by any act of PVS.

### Fifth Affirmative Defense

Plaintiffs have not suffered any antitrust injury by any act, or failure to act, by PVS.

### Sixth Affirmative Defense

Plaintiffs have failed to allege fraudulent concealment with sufficient particularity.

### Seventh Affirmative Defense

PVS reserves the right to add any additiona Affirmative Defenses of which it may become aware during the course of discovery.

/s/ K. Scott Hamilton_____
K. Scott Hamilton
Edward H. Pappas
Attorneys for the PVS Defendants
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3041

Dated: May 2, 2006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 2, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system.

s/K. Scott Hamilton
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI  48226
Phone:  (313) 223-3041
E-mail:  Khamilton@dickinsonwright.com
P-44095

DETROIT 46831-1 934482v1

28