

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

)
**In Re SULFURIC ACID ANTITRUST** )    **MDL Docket No. 1536**
**LITIGATION** )    **Case No. 03 C 4576**
)
)    **Magistrate Judge**
)    **Jeffrey Cole**
)

## MEMORANDUM OPINION AND ORDER

As this is the seventh opinion in this case, the background of the litigation need not be revisited.[1]

The present controversy involves the testimony of plaintiffs' expert economic witnesses, Drs. James

McClave, a statistician, and Robert Tollison, an economist, whom the defendants contend should not be

allowed to testify because: 1) Dr. Tollison's identity and his opinions were not timely disclosed under Rules

26(a)(2)(B) and (C) in accordance with Judge Coar's scheduling order; 2) the plaintiffs failed to disclose

the identity and opinions of two individuals (Mr. Boyd and Ms. Erler), whom the defendants say provided

expert opinion on which Drs. McClave and Tollison relied; and 3) Drs. McClave and Tollison improperly

offered opinions that were not contained in the expert reports disclosed by plaintiffs during their depositions.

The sanction mandated by the Federal Rules of Civil Procedure is, say the defendants, that the reports of

Drs. McClave and Tollison must be stricken and that they be precluded them testifying at trial.

Alternatively, the defendants seek to bar any opinions that: (1) improperly rely upon information provided

by non-disclosed third-party experts; and/or (2) were not properly disclosed in the expert's report.

---

[1] *See In re Sulfuric Acid Antitrust Litigation*, 2006 WL 991039, April 10, 2006, (N.D.Ill. 2006); 231 F.R.D. 351 (N.D.Ill. 2005); 230 F.R.D. 527; 231 F.R.D. 331; 231 F.R.D. 320; 2005 WL 1994105 (N.D.Ill. 2005).

Under Judge Coar's July 21, 2004 scheduling order, fact discovery was to close by April 29,

2005, while expert discovery was to end by December 16, 2005. Plaintiffs were to disclose their expert

witnesses by June 30, 2005. Plaintiff sought an extension of all dates in that order by 90 days on March

15, 2005. On March 21, 2005, Judge Coar granted plaintiffs' motion "to the extent that discovery is

extended only to July 1, 2005 and only 40 days of depositions. Discovery extended and ordered closed

by July 1, 2005. No further extensions will be allowed."

On June 10, 2005, plaintiffs sought "a limited extension of 90 days to complete fact discovery, until

July 27, 2005 (together with a commensurate extension of the remaining deadlines in the schedule by the

same three month period). . . ." (*Memorandum in Support of Plaintffs' Motion for Extension of

Discovery*, at 1). Four days later, plaintiffs filed a motion that essentially reiterated their June 10th request,

but noted that in its order of March 21st, the court had not specifically extended all discovery deadlines.

(*Plaintiffs' Motion for Entry of Revised Scheduling Order*, at 2). On June 20th, Judge Coar granted

plaintiffs' motion, setting the following new schedule: "Plaintiffs' expert disclosure by 8/29/2005.

Defendants' expert disclosure by 11/1/2005. Expert Discovery ordered closed by 2/14/2006."

By the time fact discovery closed on July 1st, a raft of discovery motions had made their way to

court. Clearly, fact discovery had not been completed and, as a result, on August 18, 2005, plaintiffs filed

a motion for an order requiring the defendants to explain certain sales data they had produced and

permitting "Plaintiffs' expert thirty (30) days therefrom to furnish report." (*Plaintiffs' Motion . . . to

2

*permit Plaintiffs' Expert Thirty (30) Days Therefrom to Furnish Report*). Plaintiff proposed a schedule whereby "Plaintiffs' expert shall file his damage report on or before October 24, 2005." (*Id.*, Ex. A). In their supporting memorandum, plaintiffs explained that their expert, Dr. James McClave, had to have certain data and explanations thereof in order to prepare his export report. (*Memorandum of Law in Support of Motion*, at 1)("Defendant's Memorandum"). No other expert or expert report was mentioned in these submissions. In a declaration attached to the memorandum, Dr. McClave indicated he had been retained to provide an opinion regarding the issue of economic damages. (*Id.*, Ex. 1, ¶¶ 9, 23).

Ultimately, the parties reached an agreement regarding the production of the transaction data and attendant explanations, and the plaintiffs' motion to compel was denied as moot on August 25, 2005. Also, in "accordance with the agreement of the parties, all expert discovery [was] extended." The parties submitted an agreed order, which I signed on September 8th, that amended the schedule: "Plaintiffs' damages *experts* shall disclose *their* expert *opinions* by September 30, 2005." (Emphasis supplied).

On September 22nd plaintiffs moved for yet another modification of the discovery schedule occasioned by the difficulties plaintiffs and their named expert, Dr. McClave, were having understanding the transaction data in the format produced by the defendants. An extension was necessary, the plaintiffs said, in order for Dr. McClave to assimilate all of the transaction data into his damage model. The plaintiffs proposed the following new deadlines: "Plaintiffs' expert: October 28, 2005; Defense expert: January 10, 2006; Plaintiffs' rebuttal: February 15, 2006; Close expert discovery: March 3, 2006; Dispositive motions: April 3, 2006." (*Plaintiffs' Motion to Modify the Order Entered September 8, 2005*, at 8).

The parties subsequently agreed to the newly proposed schedule. Because it included an extension of the deadline for dispositive motions, on September 28, 2005, I granted the motion subject to Judge

3

Coar's ruling on an application to extend the final date for dispositive motions. Judge Coar then granted the parties' motion to approve the new schedule on October 4, 2005. On October 28, 2005, plaintiffs submitted the expert reports of both Dr. McClave and Dr. Tollison. Defendants deposed Dr. McClave on December 14-15, 2005, and Dr. Tollison on January 5-6, 2006. No claim regarding the timing of the disclosure or its effect on the ability to depose Dr. Tollison was made until the present motion.

# I.
# ANALYSIS

## A.
## The Plaintiffs Did Not Fail To Timely Disclose Dr. Tollison As An Expert Witness

Time and again lawyers are warned of the importance of adhering to deadlines. As Judge Easterbrook has warned, ignoring deadlines is the surest way to lose a case. *United States v. Golden Elevator, Inc.*, 27 F.3d 301, 302 (7th Cir. 1994). *See also Raymond v. Ameritech Corp.*, 442 F.3d 600, 604-05 (7th Cir. 2006); *Harris v. Owens-Corning Fiberglass Corp.*, 102 F.3d 1429, 1433 (7th Cir.1996); *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 332 (N.D. Ill. 2005). Adherence to deadlines for disclosure of expert witnesses and their reports is especially important under Rule 26, Federal Rules of Civil Procedure. The argument presently advanced by the defendants is that the plaintiffs failed to disclose Dr. Tollison as an expert and to provide his expert report by the August 29, 2005 deadline. The argument is based on a hyper-literal parsing of the discovery orders, which were phrased in the singular form – "expert" and "export report" – and only mentioned Dr. McClave. (*Defendants' Memorandum*, at 10-11).

In the evolution of the discovery deadlines, the parties used indiscriminately the plural and singular form in referring to their experts. The plaintiffs proposed a schedule that referred only to their expert and

4

to his damage report, although the agreed order that I signed on September 8th referred to the plaintiffs' and defendants' "damages experts" and "their expert opinions" which were to be disclosed by September 30, 2005 and December 5, 2005, respectively. Near the end of August 2005, the parties agreed that "all expert discovery" would be extended. On September 28, 2005, I entered an order conditionally extending the time for the plaintiffs' expert to file his expert report. On October 4, 2005, Judge Coar approved this order.

It is telling that the defendants do not feel constrained by the language of the orders that they contend hem in the defendants. Thus, abandoning any pretense at symmetrical application of the orders' language, the defendants refer to their "expert witnesses" and their expert "reports" and make perfectly clear that they have the right to call not one but multiple experts. (*Defendants' Memorandum,* at 2).

It is a basic principle of contract construction that the surest guide to the parties' intent is how they construed the language as evidenced by their conduct. The same basic principle can be employed here. Plaintiffs submitted Dr. Tollison's expert report on October 28, 2005, in accord with Judge Coar's order of October 4, 2005, the language of which was jointly crafted, or at least approved, by the defendants. Given the current argument, one would have expected that upon receipt of the Tollison report, the defendants' lawyers would have immediately objected. But the defendants did nothing for two-and-a-half months. If not an ineluctable conclusion, their prolonged silence permits an inference that the defendants understood that the reference to "expert" and "expert report" was not intended to be restrictive and permitted disclosure of more than one expert.

But there is yet more. Dr. Tollison was deposed on January 5-6, 2006. One purpose of the expert disclosure rule is to allow the opposing party o dispense with the expert's deposition. *S.E.C. v. Lipson,*

5

46 F.Supp.2d 758, 763 n.3 (N.D.Ill. 1999). Other purposes include the minimization of the expense of

deposing experts, the shortening of direct examination, and the prevention of ambush at trial. *Ortiz-Lopez*

*v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir.

2001)(cases cited). The Advisory Committee Notes, which are informative, *Williamson v. United States*,

512 U.S. 594, 614-615 (1994) (Kennedy, J., concurring), explain the design of Rule 26 this way:

> The information disclosed under the former rule in answering interrogatories about the
> "substance" of expert testimony was frequently so sketchy and vague that it rarely
> dispensed with the need to depose the expert and often was even of little help in preparing
> for a deposition of the witness.
>
> *       *       *
>
> Revised subdivision (b)(4)(A) authorizes the deposition of expert witnesses. Since
> depositions of experts required to prepare a written report may be taken only after the
> report has been served, the length of the deposition of such experts should be reduced,
> and in many cases the report may eliminate the need for a deposition.

Fed.R.Civ.P. 26(a)(2)(B)(advisory committee note to 1993 amendment).

The defendants do not so much as suggest that plaintiffs' disclosure of Dr. Tollison's expert opinion

on October 28th had any adverse effect on their deposition of Dr. Tollison. (*Defendants' Memorandum*,

at 10-11). Indeed, it went off without a hitch, and almost three months passed without a word of complaint

about the now claimed tardy disclosure. Of course, inferences from silence are often perilous. But not in

a context where some prompt outcry would be expected. *See Richman v. Sheahan*, 415 F.Supp.2d 929,

940 (N.D.Ill. 2006)(delay in challenging expert report and lack of effect on deposition belied any claim of

adverse effect). If the defendants felt they were prejudiced by the belated disclosure of Dr. Tollison's

report, it is doubtful that they would have gone ahead with the deposition instead of filing a motion to bar.

*In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 340 (N.D.Ill. 2005)(claim of severe prejudice

by lack of responses to discovery requests was undermined by party taking the depositions in any event).

*Cf. Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000) (7th Cir. 1998)(no indication opposing party had been harmed or unfairly surprised).

The final bit of "evidence" that makes unacceptable the defendants' current claim of prejudice is that it was not raised until the reply brief. Apart from the fact that an argument that is not developed or adequately supported until the reply brief is deemed waived,[2] the defendants' delay in raising the issue suggests that the prejudice argument is essentially an afterthought. *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776 (7th Cir. 2000), on which the defendants rely, is not particularly relevant. There, it was unquestioned that the defendant missed the deadline for filing its expert report, and the plaintiff immediately moved to bar the expert witness from testifying. *Id.*, at 782. In addition, the harm in *NutraSweet* was self-evident insofar as the trial was just six weeks away by the time the defendant submitted its expert report. *Id.*, at 786.

Literalism has its place. But not here. The evidence of intent in the choice of form used by the parties in applying for expert discovery extensions is inconclusive given the history of the parties' usage of the plural and singular form in the applications and in not disapproving at least one order that referred to "experts." Learned Hand has rightly observed that there is no more likely way to misapprehend the meaning of any language than to read the words literally, forgetting the object which the document as a whole was meant to secure. *Central Hanover Bank & Trust Co. v. CIR*, 159 F.2d 167 (2nd Cir.), *cert. denied*, 331 U.S. 836 (1947). Even words such as jurisdiction are notoriously plastic and thus cannot always be construed literally. *See Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998);

---

[2] *See United States v. Alhalabi*, 443 F.3d 605 (7th Cir. 2006); *Harper v. Vigilant Insurance. Co.*, 433 F.3d 521, 528 (7th Cir. 2005); *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 586 (7th Cir. 1999).

*United Phosphorus Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 948 (7th Cir. 2002)(*en banc*) and *id.* at 953 (Wood, J., dissenting), *cert. denied* 540 U.S. 1003 (2003). The same is true of "shall" and "may." Thus, controlling significance cannot be ascribed to the fact that the last order in the sequence used the singular rather than the plural form in referring to expert discovery.

## B.
## The Plaintiffs Did Not Improperly Fail To Disclose Dr. Boyd As An Expert Witness

The defendants' motion is, at least ostensibly, about the untimely disclosure of expert witnesses under Rule 26(a)(2)(A) and (C). In reality, the motion necessarily implicates Rules 703 and 803 (17) of the Federal Rules of Evidence, for if either of these rules allowed Dr. McClave to rely on the Fertecon materials, there could be no violation of Rule 26's disclosure requirements. The title of the defendants' motion and its exclusive reliance on Rule 26 neither determine what the motion is substantively, nor define or limit analysis to that Rule. *Compare Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992); *Shannon v. Shannon*, 965 F.2d 542, 552-52 (7th Cir. 1992); *United Airlines v. U.S. Bank, N.A.*, 406 F.3d 918, 923 (7th Cir. 2005)("Temporary restraining orders that extend past 20 days are reviewable as preliminary injunctions no matter what the rendering judge may call them.").

The defendants argue that in preparing his damage model and formulating his opinion Dr. McClave improperly relied upon data and information provided by an undisclosed expert, Robert Boyd. Beyond the characterization of Boyd as a "Dr." and as an expert whom the plaintiffs failed to identify, they provide essentially no other information. The facts regarding Boyd are these: Robert Boyd is the President of PentaSul, Inc. – formerly Fertecon – a company that (according to its website and information obtained in discovery in the case) provides information, data and consulting services on sulfur, sulfuric acid, sulphur

8

products, natural gas liquids and related markets. (http://www.pentasul.com/). The defendants refer to Boyd as "Dr.," the plaintiffs do not, and the PentaSul website makes no claim either way.

For almost two decades, Fertecon has published, among other things, *weekly,* current information newsletters that include ranges of sulfuric acid prices in certain regions of the world for the week. The prices are listed by United States dollars per ton.[3] Thus, for the week of November 21, 2005, the World Sulfuric Acid Weekly reported:

| Sulphuric Acid Price Indications | | | | |
|---|---|---|---|---|
| | Nov. 7 | Nov. 11 | Nov. 21 | Trend / Notes |
| US Gulf ex-terminal | 45-50 | 45-50 | 45-50 | |
| Tampa, /st cfr consumer | 40-45 | 40-45 | 40-45 | |
| South US /st cfr consumer | 64-68 | 64-68 | 64-68 | |
| NW Europe cfr consumer | €42-48 | €42-48 | €42-48 | H2-2005 |
| - above at current $ rate | 50-57 | 49-56 | 49-56 | |
| Hamburg - ARA fob export | 25-30 | 25-30 | 25-30 | |
| Mediterranean fob export | 25-30 | 25-30 | 25-30 | |
| Chile cfr northern terminal | 70-75 | 70-75 | 70-75 | 2005, 60-63 for 2006 |

(http://www.pentasul.com/sac11-29.pdf). The prices, according to the newsletter, are derived from the "most recent concluded contract or spot business or competitive offers."

---

[3] According to one of the defendants' experts, Dr. Lauren Stiroh, Mr. Boyd – she does not refer to him as Dr. – calls each participant in the market on a weekly basis and "elicits the price range, volume, and time period in which each agent has conducted recent sulfuric acid transactions. After having conversations with several of the market participants, Dr. Boyd has a good feel for the market conditions and a sense for which numbers are the most representative." (*Plaintiffs' Response to Marsulex's Summary Position*, Ex. 2, Stiroh Ex. 17 at 2).

In his expert report, Dr. McClave made no secret of his use of the PentaSul/Fertecon price figures. He explained that various economic forces combined to complicate the supply/demand relationship in the sulfuric acid market, and that this was captured in the Fertecon reports. According to Dr. McClave, the Fertecon newsletter had been published for nearly twenty years and is relied upon by consumers, buyers, traders, and even government agencies. (*Certain Defendants' Appendix of Exhibits*, Ex. H ("McClave Rep.") at 5). He indicated that the prices reported in the newsletter are derived from current information supplied by consumers, producers, and traders who regularly deal in the sulfuric acid market. Dr. McClave felt the "Tampa market price" as reported in the newsletters was a "particularly relevant benchmark" for his report. As it turns out, so too do the defendants and their experts.

The defendants contend that the use of these price reports is improper because Dr. McClave is relying on another expert's "information, studies and data." Relying on *Dura Automotive*, 285 F.3d 609 (7th Cir. 2002); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794 (N.D.Ill. 2005)(*Loeffel Steel II*) and *Grant v. Chemrex, Inc.*, No. 93-0350, 1997 WL 223071 (N.D.Ill. Apr. 28, 1997), the defendants argue that Rule 26(a)(2) required Boyd to have been disclosed as an expert, and since he was not, Dr. McClave cannot testify. In the words of *Dura Automotive*, without the PentaSul/Fertecon data Dr. McClave's opinion would "'rest [] on air.'" (*Defendants' Memorandum*, at 5-7).

These cases did not turn on Rule 26, but on the contours of Rule 703, Federal Rules of Evidence – a rule that is unmentioned in the defendants' submissions. Rule 703 provides that "the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular

10

field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993). *Dura Automotive* and *Loeffel Steel* made clear that Rule 703 was not an exception to the hearsay rule, and that one expert could not be the mouthpiece for another. If the latter had not been properly disclosed, he could not testify, and in that event the former's testimony would rest on air.

Thus, the underlying issue in this case is not whether Boyd had been timely disclosed as an expert, but whether Dr. McClave could reasonably rely on the Fertecon pricing data as permitted either by Rule 703 or some other rule of evidence. The defendants' argument that he could not is doubly deficient. First, it ignores Rule 803(17) of the Federal Rules of Evidence, which provides that "[m]arket quotations, tabulations, lists, directories or other published compilations, generally used and relied upon by the public or by persons in particular occupations" are not excluded by the hearsay rule even thought the declarant is available as a witness. As an exception to the hearsay rule, compilations that fall within the Rule, are, by definition, sufficiently reliable that they may be admitted into evidence without cross-examination.[4]

The Fertecon information falls within the plain and unambiguous text of the Rule, and the reasons that underlie the Rule apply here: the task of finding every person who reported price information to the newsletter would be manifestly impossible, and the evidence is undisputed that the weekly newsletter is widely used in the industry and by various agencies of government, and by the defendants themselves. *Cf.*, *United States v. Woods*, 321 F.3d 361, 363 (3rd Cir. 2003); *United States v. Cassiere*, 4 F.3d 1006,

---

[4] Thus, the concern defense counsel expressed at oral argument that cross examination would be all but impossible is not relevant if Rule 803(17) applies.

11

1018-19 (1ˢᵗ Cir. 1993); *Wantanabe Realty Corp. v. City of New York*, 2004 WL 188088 at *2 (S.D.N.Y. 2004); *Fournier v. Erickson*, 242 F.Supp.2d 318, 338 (S.D.N.Y. 2003). Since the Fertecon information falls within a hearsay exception, the vice found (and disapproved) in *Dura Automotive* and *Loeffel Steel* is absent here.

But even if recourse must be had to Rule 703, the defendants' argument fails. The defendants do not contend that statisticians and economists in antitrust cases cannot rely on pricing data. Nor do they seriously argue in their opening brief that the pricing information in the Fertecon/PentaSul newsletter is not the type of "facts or data" referred to in Rule 703. (*Defendants' Memorandum*, at 4-7). The argument, appearing in the reply brief, is that "it is impossible to determine if Dr. Boyd's price survey is valid and reliable without an understanding of the methodology he used to conduct his survey." (*Reply*, at 3). But contentions – especially undeveloped ones – first raised in a reply brief are waived. *Harper*, 433 F.3d at 528; *Coker*, 165 F.3d at 586. Apart from any question of waiver, the reliability of the Fertecon/PentaSul data and its availability under Rule 703 are not open to serious question.

The defendants' briefs would lead one to believe that they have no knowledge of Dr./Mr. Boyd, who is made to appear as almost an alchemist-like figure, whose price compilations are the result of some unfathomable sorcery. We may pass quickly over this claim, for we have it on the highest authority – the defendants themselves – that the price data are at least reasonably reliable. Indeed, Noranda executives have gone farther and, in internal corporate documents, have said that "Fertecon is the *most reliable* reporter of [sulfuric] acid pricing." (*Exhibits to Plaintiffs' Response*, Ex. 8)(Emphasis supplied). Indeed, so reliable (and apparently ubiquitous) is the newsletter that the Noranda defendants' attorneys earlier argued it should have put the plaintiffs on notice of the Noranda-DuPont joint venture when it was reported

in the newsletter in January of 1989. (*Response of the Noranda Defendants in Opposition to Plaintiffs'
Motion to Compel*, at 5). They called Fertecon's Sulphuric Acid Telefax a "widely-distributed trade
publication." They obviously subscribed and may still. (*Id.*, (*Certain Defendants' Appendix of Exhibits*,
Ex. J ("McClave Dep.") at 205 (discussing references to Fertecon/PentaSul reports throughout the
documents defendants produced in discovery)). In addition, they produced a collection of excerpts from
these Fertecon faxes and newsletters as part of the files of Dr. Lauren Stiroh, the class expert economist
retained by the defendants. *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351, 365 (N.D.Ill.
2005).[5] According to the plaintiffs, there were approximately 4,400 pages of Fertecon/PentaSul materials
in Dr. Stiroh's files. (*Plaintiffs' Response to Certain Defendants' Motion*, at 7 n.3). In addition, she
referred to the price reports and the Fertecon/PentaSul newsletters as authoritative throughout her expert
report of December 16, 2003. (*Exhibits to Plaintiffs' Response*, Ex. 9).[6]

Thus, the question is whether an economic expert may base his opinions in an antitrust case on a
source that the defendants, themselves, have acknowledged is the most reliable reporter of pricing data in
the market. The answer is obvious. Rule 703 permits experts to based their opinions on all manner of
underlying data that might otherwise not be admissible in evidence, including interviews, reports prepared
by third parties, clinical and other studies, and technical publications. *See* 4 Weinstein's Federal Evidence

---

[5] Marsulex, one of the moving defendants, is also clearly an avid reader of the Fertecon/PentaSul
newsletters, having produced dozens of issues from its files during discovery. (*Plaintiffs' Response to
Certain Defendants' Motion*, at 7).

[6] It is no answer to suggest that this reliance cannot be taken into consideration and that she was
forced to use the price reports because I had deferred ruling on the admissibility of Dr. McClave's report until
after all the reports were in and all the expert depositions taken. If Dr. McClave's opinions were subject to
criticism because they were based on dubious data from the Fertecon newsletter, Dr. Stiroh would have said
so. She would not have conceded their authoritativeness on any level or to any degree.

13

§703.04[3] (collecting cases). Given the defendants' evaluation of the reliability of the Fertecon price compilations, which would appear to qualify as a party admission under Rule 801(d)(2), it cannot be said that Dr. McClave's reliance on that data was unreasonable.[7]

It is not just Dr. McClave and Dr. Stiroh, however, who relied on the Fertecon materials. The Fertecon price compilations were found to be a permissible basis for the expert in *In re Mulberry Phosphates, Inc.*, 149 B.R. 702 (M.D.Fla. 1993), where the court explained:

> The expert presented . . . is a recognized expert in the phosphate industry, has been in business for 60 years and employs 100 professionals. . . . in preparing their report, relied on the reports prepared by Blue, Johnson & Associates (Blue, Johnson) and Fertecon Research Centre (Fertecon). It is undisputed that Blue, Johnson and Fertecon are leaders in the industry who regularly publish projections and market analyses. For instance, Blue, Johnson publishes monthly fertilizer industry reports summarizing U.S. and international fertilizer activity. Blue, Johnson also publishes industry forecasts annually. Fertecon also regularly publishes forecasts for the fertilizer industry as well as weekly newsletters on the sulfur sulfuric acid, ammonia and DAP sectors of the industry.

149 B.R. at 709.

The Fertecon data is employed in reports to the Secretary of Commerce, http://ia.ita.doc.gov/download/ukraine-nme-status/comments/adhoc/adhoc-cvrltr-and-cmt.pdf (Ad Hoc Committee of Domestic Nitrogen Producers), testimony before the House Committee on Energy and Commerce, http://energycommerce.house.gov/108/Hearings/06102003hearing944/Liuzzi1521.htm, and in United States International Trade Commission publications. http://hotdocs.usitc.gov/docs/pubs/701_731/pub3821.pdf. The publication is cited in corporate filings with the Securities Exchange Commission, as a search of the SECInfo website reveals.

---

[7] While not an admission of defendants other than the Noranda defendants, the evaluation of the reliability of the Fertecon data by Noranda is a part of the overall mix of evidence to be evaluated under Rule 104 in determining the reliability of the data and the reasonableness of Dr. McClave's reliance on it.

http://www.secinfo.com/d14D5a.1932.htm (Cargill, Inc.); http://www.secinfo.com/dsvRs.4fBx4.htm (Terra Industries). The International Fertilizer Industry Association lists Fertecon as a resource for questions on pricing, http://www.fertilizer.org/ifa/Form/pub_trad.asp, and uses its data at its conferences. http://www.fertilizer.org/ifa/publicat/PDF/1998_biblio_84.pdf.[8] It is simply beyond reasonable debate that Dr. McClave could reasonably rely on the Fertecon data.

Finally, although his conclusion is not outcome-determinative, Dr. McClave testified that the kind of price data involved in the Fertecon reports is relied on by experts in his field, and that he was satisfied that the pricing information was reliable. (McClave Dep. at 205). The expert retained by Marsulex and Chemtrade was not so sure, but Rule 703 does not require unanimity of expert opinion on this question. Nor could it, for the reality is "[a]n expert can be found to testify to the truth to almost any factual theory, no matter how frivolous." Weinstein, Improving Expert Testimony, 20 U.Rich.L.Rev. 473, 482 (1986).[9] The judge's role under Rule 104 of the Federal Rules of Evidence is to make an independent evaluation of reasonableness. That calculus is not dependent upon either expert's opinion, and the considerations that come into play cannot be captured in a formula. *See* McLaughlin, 4 Weinstein's Federal Evidence, §703.04[2] (2nd ed. 2005).[10]

---

[8] At oral argument it was suggested that an appropriate test of reliability is use by a government agency.

[9] *See also* Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Assurance of Trustworthiness* (1986) Ill.L.Rev. 43, 45 ("Today practicing lawyers can locate quickly and easily an expert witness to advocate nearly anything the lawyers desire."); ("A Ph.D. can be found to swear to almost any 'expert' proposition no matter how false or foolish.") Huber, *Safety and the Second Best: The Hazards of Public Risk Management in the Courts*, 85 Colum.L.Rev. 277, 333 (1985); *Loeffel Steel Products v. Delta Brands*, 372 F.Supp.2d 1104, 1106 (N.D.Ill. 2005)(collecting cases).

[10] Dr. Topel, the Marsulex and Chemtrade expert, while criticizing Dr. McClave's reliance on the
(continued...)

All that Rule 703 requires is that the facts or data upon which Dr. McClave based his opinion be of a type *reasonably* relied upon by experts in the particular field in forming opinions or inferences upon the subject. The Fertecon/PentaSul price data is the kind of data that case after case has found sufficient under the Rule. *See, e.g., Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d 1223, 1226 (5th Cir. 1977)(Bureau of labor statistics); *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001)(real estate investment trust index); *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 2004 WL 1899927 (N.D.Ill. 2004)(Consumer Price Index); *Lieberman v. American Dietetic Ass'n*, 1996 WL 521176, *5 (N.D.Ill. 1996)(Consumer Price Index); *In re Natural Gas Commodity Litigation*, 2005 WL 3036505 (S.D.N.Y. 2005)(prices reported in trade publications), *reversed in part on other grounds*, 2006 WL 1044224; *Williams v. Security Nat. Bank of Sioux City, Iowa*, 358 F.Supp.2d 782, 805-06 (N.D.Iowa 2005)(S&P index); *Devonshire v. Johnston Group First Advisors*, 338 F.Supp.2d 823, 826 (N.D.Ohio 2004)(Dow Jones and S&P indices).

Although the defendants contend that the Fertecon/PentaSul pricing data are not comparable to other indices because their "underlying components and methodologies are publicly known and available," (*Reply*, at 2), there is nothing but this unadorned conclusion to support the claim. That is insufficient.

<hr>

[19](...continued)
Fertecon information, does not say that it was unreliable. He opines that there is no evidence that the Fertecon prices are drawn from sufficiently competitive market conditions to be useful in the damage analysis undertaken by Dr. McClave. (*Exhibits to Plaintiffs' Response*, Ex.15 ("Topel Rep."), at 4-5). He also takes Dr. McClave to task for only knowing that the price information is gathered through consumers, producers and traders, but does not suggest what more need be known. In addition, in support of his critique, he asserts that Dr. McClave indicated that the best he could say for the price information is that "customers of Fertecon use it for some purpose," citing to page 568 of Dr. McClave's deposition. (Topel Rep. at 9). Such a comment does not appear on that page, however, and the fact that it is used by people in the industry is what is significant for purposes of Rule 703.

*Campania Mgmt. Co. v. Rooks, Pitts, & Poust*, 290 F.3d 843, 853 (7th Cir. 2002). Moreover, the cases uniformly recognize that trade and industry publications and compilations can be appropriate sources of facts and data upon which an expert can reasonably rely. *See, e.g., In re Potash Antitrust Litigation*, 159 F.R.D. 682, 696-98 (D.Minn. 1995)(plaintiff's expert based his opinion on a variety of publicly available information relating to the potash industry, including industry summaries of monthly potash prices); *Midwestern Machinery v. Northwest Airlines, Inc.*, 211 F.R.D. 562, 566 (D.Minn. 2001)(fare information from *both* private and governmental reports relating to the airline business); *RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2000 WL 310352, *3 (S.D.N.Y. March 24, 2000)(press releases, newspaper reports, and industry publications); *In re Natural Gas Commodities Litigation*, 231 F.R.D. 171, 182 (S.D.N.Y. 2005)(price listings in industry publications as opposed to actual spot prices). The defendants' contrary contention is unsupported and unamplified, and thus need not be considered. *FTC v. World Media Brokers*, 415 F.3d 758, 766 (7th Cir. 2005); *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir.2005).

The only objection regarding Dr. McClave's use of the Fertecon/PentaSul price reports that the defendants attempt to support is that "Dr. McClave has absolutely no knowledge of whether Dr. Boyd's price survey is valid and reliable" and if allowed to offer his opinions, Dr. McClave would be, in effect, vouching for the accuracy and reliability of the information. (*Defendants' Memorandum*, at 4-7). The conclusion, which begs the ultimate question under Rule 703 and does not follow from its premises, is based on the following brief exchange at Dr. McClave's deposition:

> Defendants' Counsel: Do you have an understanding of how [Dr.] Boyd conducted these surveys I believe you mentioned?

17

Dr. McClave: Well, I think I asked something along those lines, and his answer was, "Well, that's sort of proprietary information, but what I do is – I know the marketplace and I know people in the marketplace, and I talk to a lot of people."

(*Defendants' Memorandum*, at 6-7). The exchange proves rather more than the defendants acknowledge, and tacitly assumes that Boyd's methodology is governed by principles relating to "surveys."

Dr./Mr. Boyd is unquestionably knowledgeable about the sulfuric acid market and prices over time. In his role as the gatherer of information essential to the publication of a widely used and highly respected industry journal, he was not just a kibitzer – to borrow one of Judge Posner's *bons mots*. *Jessup v. Luther*, 277 F.3d 926, 929 (7th Cir. 2002). Rather, he appeared to be a systematic gatherer of price and other data that he obtained through his discussions with, as he put it, a lot of people. A number of cases have concluded that interviews (far less focused and systematic than what occurred over time here) can be a reliable source of data upon which to base expert opinion. *See* 4 Weinstein's Federal Evidence, *supra* §703.04[3]. Boyd's "interviews" – if they can be called that – were not episodic, but were regular and continuous activities that enabled him to publish for more than two decades a newsletter that had become common currency in the industry and that was sufficiently reliable that at least some of the defendants (i.e., Noranda and DuPont) used the information in their business affairs.

In a supplemental brief, Marsulex repeats the *assumption* in the opening brief that what is involved here are surveys by Boyd and argues that survey results must be presented through expert testimony and since they are not, Dr. McClave is relying on unreliable data and his testimony must be barred. Citation to two trademark cases, *Sears, Roebuck and Co. v. Menard, Inc.*, No. 01-9843, 2003 WL 168642, *1 (N.D.Ill. Jan. 24, 2003); *Simon Property Group L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1038 (S.D.Ind. 2000), is the sum of the argument. There is no attempt to show that the principles relating to

18

consumer confusion surveys in trademark cases, 5 McCarthy on Trademarks §§ 32:170-178 (4th ed.2002), are relevant to and control the Fertecon/PentaSul compilation of sulfuric acid prices.

It is not for a court to do the work the lawyers have chosen not to do, *Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir.2005); *United States v. Lanzotti*, 199 F.3d 954, 960 (7th Cir. 1999), and tendentiously and uncritically calling what Boyd did a "survey" does not make the constraining principles applicable to consumer confusion surveys in trademark cases. *Cf. King v. Federal Bureau of Prisons*, 415 F3d 634, 636 (7th Cir. 2005) (Posner, J.); *Tomic v. Catholic Dioceses of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006). The question here, as always, is one of underlying reality rather than forms or labels. *See Bowen v. Gilliard*, 483 U.S. 587, 605 (1987); *W.B. Worthen Co. ex. rel. Board of Commissioners v. Kavanaugh*, 295 U.S. 56, 62 (1935)(Cardozo, J.).

This case cannot be equated to *Loeffel Steel II*. There, the expert did not bring to bear his own expertise on underlying data. Rather, he was essentially repeating the expert opinions of others, who could not testify because they had not been disclosed as experts. This was precisely the situation that troubled the court in *Dura Automotive*. To allow the disclosed experts in *Dura Automotive* and in *Loeffel Steel* to testify would have made them the "mouthpiece" for the non-testifying expert in violation of the hearsay rule. *Dura Automotive*, 285 F.3d at 612, 614; *Loeffel Steel II*, 387 F.Supp.2d at 807-09. *See also TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 734 (10th Cir. 1993).[11] The only way *Loeffel Steel II* or *Dura Automotive* would apply here is if Boyd had instructed Dr. McClave on what to do with the

---

[11] In *Loeffel Steel II*, the non-testifying experts had provided to the disclosed (valuation) expert the very methodology he utilized and about which he knew nothing beyond what he was told. He brought to bear absolutely no expertise. In *Dura Automotive*, the testifying expert based his opinions on certain models that involved a succession of expert opinions and judgments none of which the testifying expert was conversant with. And, the modeling techniques employed were not "cut and dried;" they were, in fact, "controversial."

19

underlying price data, and Dr. McClave followed those instructions without understanding them or bringing any independent expertise to bear. But that is not what occurred.[12]

The few lines of testimony the defendants cite from Dr. McClave's two-day deposition do not accurately depict his understanding of the price reports. Elsewhere in his deposition, when asked whether he undertook an independent investigation of whether the Tampa prices reported in the Fertecon/PentaSul newsletter reflected the various complex supply and demand factors at work in the sulfuric acid market, Dr. McClave responded:

> Well, certainly in the sense that I read most, if not all, of the issues of the publication which reports the results of this [price] survey, and noted to my own level of interest that – and satisfaction that in most of these – in many of these publications these factors which affect supply and demand are discussed at some length.
>
> \*      \*      \*
>
> ... I also saw a number of references in defendants' documents – well, that's probably where I saw most of them – to this survey price, which indicated some dependence, some reliance is maybe a better word, on that price from time to time in the defendants' documents.

(McClave Dep., at 205). Later on, Dr. McClave related that the "data had been collected in a relatively consistent way over time" and that because traders and producers were all parts of the process, "that enhanced the reliability aspect" to Dr. McClave as a statistician. (McClave Dep. at 568). He also indicated that it was a series utilized and relied upon in the industry over a long period of time. (*Id*.). So he is a bit more familiar with the type of information that goes into the price reports – and the acceptance of those reports in the industry – than the defendants' motion concedes.

In conclusion, there was no need for the plaintiffs to have disclosed Boyd as an expert witness

---

[12] *Chemrex* is similarly inapplicable. There, a physician relied upon the test results and accompanying opinion of an industrial hygienist regarding the chemical composition of a sealant compound, and the level of exposure to those chemicals to which a user would be subjected. 1997 WL 223071, \*6, 8.

under Rule 26(a)(2).

## C.
## The Plaintiffs Did Not Improperly Fail To Disclose Ms. Erler As An Expert Witness

Dr. Tollison relied on data and information prepared by Elise Erler, who was hired by the plaintiffs' counsel to provide sulfuric acid market data for Dr. Tollison. Ms. Erler works for the state of Utah, and was formerly in charge of selling sulfuric acid for Kennecott, a large copper smelter. Dr. Tollison had requested data on sulfuric acid sales east of the Mississippi River in order to ascertain the defendants' sales in the eastern United States. (*Certain Defendants' Appendix of Exhibits*, Ex. K ("Tollison Dep.") at 39). He spent about an hour on the phone with Ms. Erler, instructing her on the type of information to be gathered. (Tollison Dep. at 40-41).

Ms. Erler's work is submitted in exhibits 12 and 13 to the plaintiffs' response to the defendants' motion. Exhibit 12 is a table several pages in length that sets forth data regarding sulfuric acid production for dozens of plants throughout the United States and Canada. For each plant, the table lists data such as source of sulfur, plant capacity in 2005, estimated production in 1996, intended use for sulfuric acid produced – such as fertilizer or metal leaching – type of demand, and sales location. Finally, the table indicates the sources of the information were found in defendants' own documents, most often Fertecon publications or documents from the defendants' expert, Dr. Stiroh. Exhibit 13 breaks the information down by region, and indicates the share of the market for non-fertilizer sulfuric acid the defendants enjoyed in Northeast, Southeast and Midwest regions of the United States.

Dr. Tollison employed the data gathered by Ms. Erler in formulating his expert opinion. Although the defendants object to his reliance on this information, the argument is barely one page (*Defendants'*

21

*Memorandum*, at 7-8) and treads dangerously close to, if it does not actually cross, the line where skeletal arguments are not considered. *Huck Store Fixture Co. v. N.L.R.B.*, 327 F.3d 528, 537 (7th Cir. 2003)(single-page argument deemed waived); *United States v. Spiller*, 261 F.3d 683, 692 n. 9 (7th Cir. 2001)(skeletal arguments deemed waived). Defendants assert, without supporting case law, that Dr. Tollison erred in his reliance on Ms. Erler's data because he failed to determine his own market definition and was not sufficiently familiar with hers. (*Defendants' Memorandum*, at 8). Defendants do not expound on either theory, however, so it is difficult to assess their position.

Under the liberalizing thrust of Rule 703, experts are entitled to use assistance in formulating expert opinion, and the aiders need not themselves testify. The opposing party can depose them to ensure that their information gathering tasks were performed competently. Cross-examination will reveal whether there was adequate supervision and whether relying on such assistance was standard practice in the field. If the requisite assurances are there, the assistant's work need not be introduced into evidence. Judge Posner has called such assistants "gofers or data gatherers." *Dura Automotive*, 285 F.3d at 613. *See also NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 790 (7th Cir. 2000)(no requirement that an expert "personally perceive the subject of his analysis"); *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1119 (N.D.Ill. 2005)(*Loeffel Steel I*)(expert's opinion based on data gathered and supplied by others).

In *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 (7th Cir. 2000), for example, a certified public accountant calculated the discounted present value of the lost future earnings that plaintiff would have had, had it not been terminated as a franchisee. This calculation was based on financial information furnished by the plaintiff and assumptions given to him by plaintiff's counsel as to the

22

effect of the termination on plaintiff's sales. *Id.*, at 591. Similarly, in *Loeffel Steel I*, the plaintiff's expert relied upon data gathered by plaintiff's employees. 372 F.Supp.2d at 1119. Dr. Tollison's use of Ms. Erler as a data gatherer is unobjectionable, especially since the data employed was taken not from the plaintiffs, but from documents from the defendants' own files. (*Exhibits to Plaintiffs' Response*, Ex. 12; Tollison Dep. at 41).

The defendants' objection to Ms. Erler's having divided the eastern United States into regional markets consists of an unsupported, undeveloped, single-sentence assertion in their opening brief. Their reply brief is no more developed. It calls this division an improper, "subjective and undisclosed decision about how markets should be defined." No cases are cited to support the contention. Perfunctory and undeveloped arguments are generally considered waived. *Perry v. Sullivan*, 207 F.3d 379, 383 (7th Cir. 2000) (single-sentence argument unsupported by citation to authority deemed waived). Beyond that, the defendants appear to be raising issues that are not yet ripe for resolution.

The burden is on the plaintiffs to establish the relevant geographic market. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000)(*citing United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377(1956). And the issue of relevant geographic market is a question for the jury. *Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 33 (7th Cir. 1976); *Coastal Fuels of Puerto Rico, Inc. v. Carribean Petroleum Corp.*, 79 F.3d 182, 197 (1st Cir. 1996); *Thurman Industries, Inc. v. Pay 'n' Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). Obviously, it is far too early – this is, after all, what defendants call a Rule 26(a)(2) motion – to reach any conclusions about the relevant geographic market or plaintiffs' proof regarding that issue. The plaintiffs will, of course, have to provide a factual basis sufficient to justify its delineation of the relevant market. *Baxley-DeLamar Monuments,*

*Inc. v. American Cemetery Ass'n*, 938 F.2d 846, 851 (8th Cir. 1991); *Menasha Corp. v. News America Marketing In-Store, Inc.*, 238 F.Supp.2d 1024, 1034 (N.D.Ill. 2003). Their expert's opinion must be supported by sufficient facts to validate it. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1983). But these are issues for a later time.

## D.
## Neither Dr. Boyd Nor Dr. Tollison
## May Testify As To Undisclosed Opinions At Trial

Finally, the defendants argue that both Dr. Boyd and Dr. Tollison "routinely attempted to give new opinions that were not contained in their reports nor properly disclosed pursuant to Rule 26(a)(2)." (Defendants Memorandum at 9). Of course, the court may exclude the party's expert from testifying at trial on the matters the party was required to disclose, but did not. Rule 37(c)(1); *NutraSweet Co.*, 227 F.3d at 785. But this far from trial – a trial date has not even been set – there is nothing to indicate that the plaintiffs' experts will attempt to testify to matters not disclosed in their reports. About the best that can be provided the defendants is "a prophylactic ruling that plaintiff is to comply with the established rules of civil procedure." *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, No. 94 C 50392. 1998 WL 299300, *2 (N.D.Ill. June 3, 1998); *Brennan v. Paul Revere Life Insurance. Co.*, No. 00 C 0725, 2002 WL 1284385, *5 (N.D.Ill. June 10, 2002)(unable to determine contours of ruling limiting expert testimony "until we hear the questions that will be asked ...at trial...."); *Richman*, 415 F.Supp.2d at 950-51 (noting that certain issues regarding expert testimony can only be addressed as testimony unfolds at trial).

What is permissible trial testimony may also hinge on what occurred at the expert depositions. Questions elicited at that time that go beyond the reports may well have a bearing on the permissible scope of testimony at trial. For example, at the deposition of Dr. McClave, the following exchange occurred:

24

Defendants' Counsel: Let me ask you, do you have any opinions on liability?

Dr. McClave: None other than the fact that the results of the damage modeling are consistent with, in my opinion, the allegations of – of anti-competitive behavior.

(McClave Dep. at 63; *Defendants' Memorandum*, at 9). This kind of responsive testimony is not the kind of ambush with an undisclosed opinion that the disclosure rules were designed to prevent. *Ortiz-Lopez*, 248 F.3d at 35. As one commentator has cautioned:

> If you decide to take an expert deposition, you must be careful what you ask. You may open the door to testimony that would otherwise be precluded under Rule 37(c)(1). There is, to be specific, considerable downside in asking common deposition questions designed to ensure that no unexplored opinions exit – like the traditional catch-all question, "Do you have any other opinions as to this case that we haven't discussed?" You generally don't want to know the answer to that question. If you don't ask it and the opinions are not provided either in the report, in the deposition, or otherwise "in writing" (under Rule 26(e)(1), the undisclosed opinions are presumptively excluded under Rule 37(c)(1).

Joseph, Gregory P., "Expert Approaches", 28 LITIGATION 20, 21 (Summer 2002).[13]

Defendants also find fault with portions of Dr. McClave's deposition testimony where he stated that "the results of the econometric model certainly support the allegation that there was [sic] supply limitation agreements not to compete in the sense that the damage model reveals supracompetitive pricing" and that his findings were consistent with the theory that reduction in output will have some impact on price (McClave Dep. 18, 32; *Defendants' Memorandum*, at 9). But, this too was in response to defense counsel's questioning on Dr. McClave's damage models, questions designed to elicit testimony that in creating a damages model, it was necessary to assume liability. (McClave Dep. at 16-17). A damages

---

[13] Indeed, the very fact that the defendants elicited such testimony at the deposition has been found, in other instances, to amount to all the disclosure necessary under Rules 26(a)(2) and 37(c)(1). *Wheeler v. Chrysler Corp.*, No. 98 C 3875, 2000 WL 263887, *6 (N.D.Ill. Mar. 1, 2000)(defendant deposed expert at length about his causation opinion and was, therefore, not prejudiced by lack of disclosure of that opinion in expert's report).

model would, of course, be necessarily consistent with liability, or necessarily assume liability. *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1045 (9th 2005)(properly relied upon the fundamental assumption that defendant maintained artificially high costs in the market); *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed.Appx. 479, 487 (6th Cir. Sept. 3, 2002)(damages model relied assumed central questions of liability in the case, which were properly presented to the jury); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 485-86 (3rd Cir. 1998); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1524 (10th Cir. 1984)(admission of testimony by plaintiff's expert on damages was not an abuse of discretion, notwithstanding that there may have been considerable evidence contradicting expert's assumptions); *JamSports and Entertainment, LLC v. Paradama Productions, Inc.*, No. 02 C 2298, 2004 WL 2966947, *3 (N.D.Ill. Nov. 24, 2004)(damages model relied upon numerous disputed issues). That is how Dr. McClave, not surprisingly, testified. It is certainly not cause for barring his testimony at trial.

There is also the claim that Dr. Tollison improperly testified that the "behavior of the defendants over the course of time, 1988 to July 2001, is consistent with a conspiracy to reduce output and raise prices of sulfuric acid." (Tollison Dep. at 9; *Defendants' Memorandum*, at 10). The argument that this opinion is not to be found in Dr. Tollison's expert report overlooks paragraph 13 of his report, which stated that Noranda and Falconbridge "joined together to dispose of their sulfuric acid . . . and entered into an alliance to pool their acid and sell it jointly." They did so, according to Dr. Tollison, "with the objective . . . to dispose of their sulfuric acid without entering into price competition or depressing the price of acid." (*Appendix to Memorandum of Law in Support of Certain Defendants' Motion*, at 4-5). Dr. Tollison then went on to describe the Noranda-Falconbridge strategy of "displacement by agreement," whereby

26

smelting plants would shut down or reduce their capacity in favor of selling Noranda-Falconbridge waste acid. (*Id.*, at 5-6). He also discussed efforts he felt were directed at controlling prices. (*Id.*, at 7-8).

The argument that there is a difference between Dr. Tollison's conclusion at his deposition that the defendants conspired with each other and his report that they entered into an alliance to avoid market competition is based on an attitude that treats words as ends and not as vehicles to convey meaning. *Pope v. Atlantic Coastline RR*, 345 U.S. 379, 390 (1953)(Frankfurter, J., dissenting). Dr. Tollison's views are merely alternative phrasings of his conclusion that the defendants agreed to commit an unlawful act, which is the definition of conspiracy. *United States v. Recio*, 537 U.S. 270, 274 (2003). Justice Holmes' timeless admonition provides the answer to the defendants' semantic argument: "We must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889). *Compare NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 348 (1953)("We prefer to deal with... realities and to avoid entering into the bog of logomachy, as we are invited to....").

## CONCLUSION

For the foregoing reasons, the Motion of Certain Defendants To Bar The Testimony of Dr. McClave and Dr. Tollison [# 277] is DENIED.

ENTERED:

UNITED STATES MAGISTRATE JUDGE

DATE: 5/24/06

27