

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| In Re SULFURIC ACID ANTITRUST LITIGATION | ) ) ) ) ) ) ) |

MDL Docket No. 1536
Case No. 03 C 4576

Magistrate Judge Jeffrey Cole

## MEMORANDUM OPINION AND ORDER

### I.
### INTRODUCTION AND FACTUAL BACKGROUND

For a variety of psychological and perfectly sound institutional reasons, motions for reconsideration are viewed with a measure of skepticism. But, even though generally disfavored, *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191(7th Cir.1990); *Quaker Alloy Casting Co. v. Gulfco Industries, Inc.*, 123 F.R.D. 282, 288 (N.D.Ill. 1988)(Shadur, J.), motions for reconsideration can serve a valuable function by helping, under appropriate circumstances, to ensure judicial accuracy. Judges are not omniscient, and "in any given opinion, [a court] can misapprehend the facts. . .or even overlook important facts or controlling law." *Olympia Equipments v. Western Union*, 802 F.2d 217, 219 (7th Cir.1986).[1]

Since our adversarial system depends upon input from counsel,[2] the risk of mistake is enhanced where a court decides a case on a ground that was not submitted by one of the parties and

---

[1] *See also Tome v. United States*, 513 U.S. 150, 167 (1995)(Scalia, J., concurring in part and concurring in the judgment). *Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992); Robert Gettleman, *How to Tell a Judge He Screwed Up*, 32 LITIGATION 49, 51 (Summer 2006).

[2] Even Holmes thought so: "Shall I ask what a court would be, unaided? The law is made by the Bar, even more than by the Bench." Holmes, *The Law*, in Collected Speeches 16 (1931). *See also United States v. Cronic*, 466 U.S. 648, 655 (1984)( "'Truth' is best discovered by powerful statements on both sides of the question.'"); *Burdett v. Miller*, 957 F.2d 1375, 1380 (7th Cir. 1992).

of which they had no notice before the announcement of the decision. In that context, a motion for reconsideration not only serves an invaluable function, but a refusal even to consider the motion may constitute an abuse of discretion. *See De Jesus-Mangual v. Rodriguez*, 383 F.3d 1, 5-6 (1st Cir. 2004); *See also Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 822 (N.D.Ill. 2005)(inviting additional briefs to address grounds of decision not argued by either side in the briefs).[3]

On May 24, 2006, I issued an opinion denying the motion of defendants, Marsulex, ChemTrade, Koch, Intertrade Holdings, and PVS Chemicals (hereinafter, the "expert movants" or "Marsulex"), to bar the opinions of two of plaintiffs' expert witnesses, Drs. McClave and Tollison. The Opinion denied the Marsulex motion on various grounds, including Rules 703 and 803(17), Federal Rules of Evidence. The Noranda defendants (i.e., Noranda, Inc. Falconbridge, Ltd., Norfalco LLC), DuPont, and GAC Chemical Corp. (hereinafter, the "reconsideration movants"), have asked that the May 24th Opinion be withdrawn or reconsidered in light of the recently filed motions to bar testimony based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The motion contends that the May 24th Opinion went "beyond the narrow focus of Rule 26," "on the untimely disclosure of expert witnesses under Rule 26(a)(2)(A) and (C)," and consequently, the grounds of the decision could not have been anticipated. (*Objections and Request for Clarification*, at 1). The reconsideration movants did not join in the original motion because, they now say, "neither the original motion nor the response focused on the issue of whether the Tampa 'prices'

---

[3] *Compare Caritativo* v. California, 357 U.S. 549, 558 (1958)(Frankfurter, J., dissenting)("*Audi alteram partem* – hear the other side!– a demand made insistently through the centuries, is now a command, spoken with the voice of the Due Process Clause of the Fourteenth Amendment, against state governments, and every branch of them--executive, legislative, and judicial. . . .").

2

published in the *Fertecon/Penta Sul* newsletter were the kind of data that may be relied upon by an expert in the manner that Dr. McClave did in his damages study." (*Objections and Request for Clarification or Reconsideration* at 1 n.2). As will be seen, this explanation is singularly unconvincing. Curiously, the original movants, Marsulex, *et al.*, have not asked for reconsideration and have made no claim that their original motion was misunderstood in the May 24[th] Opinion.[4]

The premise of the motion to reconsider subordinates the substance of the motion to bar to its title, which specified Rule 26(a)(2) as its basis. But in the federal courts, pleadings, motions, and supporting memoranda are measured by their content, not their title. *Cf. Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992); *Shannon v. Shannon*, 965 F.2d 542, 552-52 (7th Cir. 1992). Simply phrased, the substance of a party's submission takes precedence over its form, "no matter what title [a party] plasters on the cover." *Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006).[5]

## A.
## The Motion To Bar And The Supporting Memorandum

The expert movants filed their motion to bar on January 13, 2006. The first sentence of the supporting memorandum relied explicitly on *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002) to "bar the opinions of Drs. McClave and Tollison." In so doing, Marsulex

---

[4] The following discussion is premised on the assumption that the reconsideration movants have standing to seek reconsideration of a motion in which they chose not to join.

[5] *Cf. Parmellee Transportation Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir.), *cert. denied*, 368 U.S. 944 (1961) ("We are not concerned with labels. Otherwise, an adroit antitrust lawyer might use his skill in the use of words to convert many unlawful acts into antitrust violations."). The principle is merely a specific application of the broader principle that what controls judgment is the underlying reality rather than the label. *W.B. Worthen Co. ex. rel. Board of Commissioners v. Kavanaugh*, 295 U.S. 56, 62 (1935)(Cardozo, J.).

wove into the fabric of the motion the issue of whether Rule 703 allowed the defendants' disclosed experts to have relied on data and information from Robert Boyd, whom the defendants labeled an undisclosed expert. *See In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. 646, 651 (N.D.Ill. 2006). In *Dura Automotive*, the question of the timeliness of disclosure was ancillary to and contingent upon resolution of the Rule 703 issue. That is, if it was permissible for the expert in *Dura Automotive* to have relied on data from a third party who was not disclosed as an expert, there could be no violation of Rule 26's requirement that all experts be disclosed in accordance with a court ordered schedule.

Although the Marsulex motion was titularly brought pursuant to Rule 26(a)(2), the supporting memorandum left no doubt that the applicability of Rule 703 was at the core of the motion. Beyond the fact that Rule 26(a)(2)(A) makes specific reference to Rules 702 and 703 of the Federal Rules of Evidence, the substance of the memorandum dealt with the permissibility of the reliance by disclosed experts on information provided by others, thereby necessarily triggering an analysis of the applicability of Rule 703 (or some other rule of evidence):

> "Courts in the Seventh Circuit have barred an expert's testimony when the expert *impermissibly* relied upon the opinions of undisclosed third-parties. *See Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794 (N.D. Ill. 2005); *Grant v. Chemrex, Inc.*, No. 93 C 0350, 1997 U.S. Dist. LEXIS 6058 (N.D.Ill. Apr. 28, 1997)."

(*Memorandum of Law in Support of Certain Defendants' Motion to Bar the Opinions of Dr. McClave and Dr. Tollison Pursuant to Federal Rules of Civil Procedure 26(a)(2)*, at 4)(Emphasis supplied).

The permissibility, *vel non*, of reliance on information from non-testifying third parties is a function of Rule 703, which provides that "the facts or data in the particular case upon which an

expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon* by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." (Emphasis supplied).

The answer to a Rule 703 analysis preordains the answer to the question of whether there has been a violation of Rule 26's disclosure requirements. Phrased differently, the claimed failure seasonably to have named Dr. Boyd as an expert was meaningless from a Rule 26 perspective unless Rule 703 prohibited Drs. McClave and Tollison's reliance on the Boyd data. If it was not, there was obviously no violation of Rule 26, for there was no additional expert to be disclosed.

As the three cases on which the memorandum relied made luminously clear, the permissibility of reliance on the data from the third party who will not be testifying is a question answered by the Federal Rules of Evidence, not by Rule 26. Each spoke at length to the principle that while Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended either to abolish the hearsay rule or to allow oblique evasions of it. In *Dura Automotive*, a hydrogeologist relied on groundwater models developed by geotechnicians simulating conditions that might have prevailed twenty years earlier. The issue was the permissibility of that reliance under Rule 703. Where the providers of the underlying data are merely "gofers or data gatherers," analysis is simple and Rule 703 allows the disclosed expert to rely on the data provided to him. Since the data is not offered for its truthfulness, the hearsay rule is not implicated.

"Analysis becomes more complicated if the assistants exercise professional judgment that is beyond the expert's ken. In that context, it must be determined whether the disclosed expert is genuinely formulating an opinion based in part on the underlying data or whether he is acting as the

5

'mouthpiece' for the non-testifying individual on whose data he is relying. If the latter, the hearsay rule prohibits the testimony unless the non-testifying individual also testifies." 285 F.3d at 613. *See also Matter of James Wilson Associates*, 965 F.2d 160, 172-73 (7th Cir. 1992); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993).[6] In that event, failure to have seasonably named the individual on whose data the disclosed expert relied would run afoul of the disclosure requirements of Rule 26.

The question in *Dura Automotive* was the same as that raised by the Marsulex motion to bar. This is how the motion phrased it:

> "Based on the reports and deposition testimony, it appears that plaintiffs are offering two experts each of whom relies on the other to support his opinions. Dr. McClave is a statistician who is unable to verify the economic underpinnings of his damage model, while Dr. Tollison is an economist (who admits he is not a statistician) who does not have an understanding of the specifics of the economic model that he attempts to vouch for. Accordingly, neither expert is able to stand on his own without support from the other. To complicate matters further, each expert relies on the opinions and data of undisclosed third-party experts to provide essential support for his opinions. (Memorandum at 3).[7]

This formulation mirrored Judge Posner's discussion in *Dura Automotive*:

---

[6] Both cases were cited in *Dura Automotive*.

[7] In addition to the excerpt quoted above, there were these statements in the memorandum:

> Dr. Boyd was not identified as an expert in this case. Dr. McClave's opinions nonetheless *relied* upon, *inter alia*, information, studies and data prepared by Dr. Boyd. (*Memorandum of Law in Support of Certain Defendants' Motion to Bar*, at 5 (emphasis supplied));

> Dr. McClave's damage model necessarily *depends* on the *accuracy* of Dr. Boyd's survey. (*Id.* at 6(emphasis supplied);

> Dr. McClave made no effort to independently corroborate Dr. Boyd's work or data. (*Id.* at 7).

> The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science. A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer. If it were apparent that the study was not cut and dried, the author would have to testify; he could not hide behind the theoretician.

285 F.3d at 614.[8]

The memorandum in support of the motion to bar also relied upon *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794 (N.D.Ill. 2005). There, a damages expert with no understanding of how a complex steel-cutting machine worked sought to base his economic opinion on highly specialized information about the machine provided him by employees of the defendant. The economic expert was incapable of assessing the reliability of that information – which was provided during the litigation. Even though the accuracy of the information was essential to the expert's damage calculations, the defendant's employees were not deposed or designated as experts. The opinion held that *Dura Automotive* required that the economic expert's testimony be barred and that he was merely the mouthpiece for the defendant's employees. *Cf. Hot Wax, Inc. v. Warsaw Chemical Co.*, 45 F.Supp.2d 635, 639 (N.D.Ill. 1999)("Thus, Rufner's 'expert testimony' is, in reality, hearsay statements from Witco's employees dressed up to look like expert testimony.").

It is a contradiction in terms to say that a motion that was specifically based on *Dura*

---

[8] The Memorandum also said: "Dr. McClave has absolutely no knowledge of whether Dr. Boyd's price survey is *valid and reliable* and if allowed to offer his opinions (which *rely* on the survey) Dr. McClave would be, in effect, vouching for the *accuracy and reliability* of the survey." (*Id.* at 6)(Parenthesis in original)(Emphasis supplied). It is difficult to conceive of an argument more directly mimicking what Judge Posner said in *Dura Automotive*.

7

*Automotive* and *Loeffel Steel* and that questioned the *permissibility* of reliance on a purportedly undisclosed expert did not involve Rule 703 or require an analysis of the reliability of the Boyd price reports.

## B.
## The January 19, 2006 Hearing

A week after the motion to bar was filed, the parties appeared in court to discuss the motion. Although the reconsideration movants had not joined in the motion, their counsel was present and, indeed, interjected when he felt it was important to do so. (Transcript of 1/19/06, at 3). At that time, plaintiffs' counsel strongly suggested that "all the motions related to expert testimony and issues be done . . . at one time." (*Id.* at 4). But counsel for the expert movants insisted that the motion to bar ought to be resolved immediately so that the defendants, if they were successful, could avoid the expense of hiring their own experts. He stressed that the defendants were entitled to the relief they sought "under the cases cited in the Seventh Circuit that we've cited." (*Id.* at 4-6).

When counsel for the expert movants submitted that there were "two undisclosed experts... that [plaintiffs] should have disclosed under *Dura*" (*id.* at 7), I noted that those were the kinds of issues that were generally dealt with at the end of expert discovery, not "*seriatim.*" (*Id.*). I said that, therefore, I was disinclined to address those issues now, but felt they should be deferred until later when they could be resolved as a whole, rather than "in bits and pieces." (*Id.* at 8).[9] At that point, plaintiff's counsel noted that the motion challenged the "data gathering" of Dr. Boyd and that the expert movants felt that it was an underlying opinion. (*Id.* at 8). She explained that certain defense experts had also relied on Dr. Boyd. Presciently, she suggested that these issues could be better

---

[9] In colloquy with counsel, I noted that in cases like *Dura Automotive* the challenges came after the close of expert discovery. In *Dura Automotive,* this issue arose in the context of summary judgment.

resolved after all deposition testimony had been concluded. (*Id.* at 9). Unfortunately, Dr. Boyd – whose deposition testimony provides the basis for the motion for reconsideration – had not been deposed, and no one said that he would be.

Expert movants' counsel insisted on expedition: "we have everything we need right now to settle – to decide on this motion." (*Id.* at 9). While reconsideration movants' counsel spoke on other issues that were raised at the hearing (*Id.* at 11-14, 19-20), he did not object to the motion being decided immediately, nor did he suggest that the parties were even considering deposing Dr. Boyd, let alone that it was essential that he be deposed before the motion to bar could be decided.[10] In the end, I set a briefing schedule for the motion.

## C.
## The Balance Of The Briefing On The Motion To Bar

In their response to the motion to bar, the plaintiffs, as it turned out, quite accurately recognized the scope of the motion:

> At the initial argument on the motion on January 19, 2006, plaintiffs argued that the motion should be deferred, to be briefed and considered along with any other *Daubert* challenges these or other defendants might make at the conclusion of all expert discovery. Moving defendants argued to the contrary, claiming their motion was limited to one subject only: supposed non-compliance with F.R.Civ.P. 26(a)(2)(B), i.e., a failure of expert disclosure, enforced by a preclusion remedy under F.R.Civ.P. 37(c)(1). . . . As the balance of this memorandum will show, defendants were not accurate on January 19th, because that is not the thrust of their motion. Rather, they rely upon cases and arguments that for the most part do not address Rule 26(a)(2) at all, and force this Court to consider prematurely and piecemeal various challenges to Dr. McClave and Dr. Tollison.

(Plaintiffs' Response at 1)

---

[10] Now, the reconsideration movants indicate that they "*continue* to take the position that such complex issues [such as Rule 703] are best considered in conjunction with the *Daubert* motions." (Emphasis supplied). They do not, however, indicate where they first took that position, and they certainly did not take this position at the hearing on January 19th.

9

The plaintiffs went on to describe Dr. Boyd's price reports and argued that they were relied upon throughout the industry. In fact, the plaintiffs submitted that the defendants and their experts relied upon them. The plaintiffs accurately stressed that neither *Dura Automotive* nor *Loeffel Steel* were dependent upon an analysis of Rule 26. (*Id.* at 6-10). In their reply brief, the expert movants continued their challenges to the reliability of Dr. Boyd's price reports and thus, the impermissibility of the reliance of Drs. Tollison and McClave on his data:

> Plaintiffs do not dispute that Dr. McClave *relied* on Dr. Boyd's work as the central element of his damage model. (*Moving Defendant's Reply in Support of Their Motion to Bar*, at 1) (emphasis supplied);
>
> . . . the reliability of Dr. McClave's damage model substantially depends on the *accuracy and reliability* of the information obtained from Dr. Boyd. (*Id.*, at 2) (emphasis supplied);
>
> . . . it is impossible to determine if Dr. Boyd's price survey is valid and *reliable* without an understanding of the methodology . . . (*Id.*, at 3) (emphasis supplied);
>
> . . . if Dr. McClave was going to rely on Dr. Boyd's survey, plaintiffs were required to designate Dr. Boyd as an expert and set forth his expert opinions concerning the validity and reliability of his methodology in a report . . . (*Id.*, at 3) (Emphasis supplied).

Finally, referring to *Dura Automotive, Loeffel Steel,* and *Chemrex*, the motion argued that "these cases all concerned situations in which an expert *improperly relied* on the opinions of an undisclosed third party. (*Id.* at 4) (Emphasis supplied).

In light of the arguments in the briefs, it was beyond debate that the permissibility of Dr. McClave and Dr. Tollison's reliance on the Boyd price data was the salient issue in the motion to bar. But that question necessarily entailed the applicability of Rule 703.

## D.
## The February 28, 2006 Oral Argument

If it was still not apparent from the briefing that the scope of the motion to bar went beyond a simple timing issue under Rule 26, and necessarily required analysis of Rule 703, the oral argument on the motion on February 28th silenced all doubt. With counsel for *all* defendants present, counsel for Marsulex (speaking on behalf of all of the movants) opened the proceedings with a discussion *of Rule 703* and raised questions about the reliability of Dr. Boyd's price reports. (*Id.* at 6-8). *He* expressed concern that Dr. McClave's reliance on Dr. Boyd's price reports implicated "three or four different levels of *hearsay.*" (*Id.* at 10) (Emphasis supplied).

By the close of the oral argument, even a stranger to the proceedings could have been under no illusions as to what the motion was about. Yet curiously, counsel for the Noranda defendants claimed that the Rule 703 issue had been injected by the *plaintiff's counsel*, and that the issue "really wasn't part of what [he] saw in the motion as it was drafted or in the responses." (Tr., at 135-136). He asked whether, in ruling on the motion to bar, I would be getting into reasonable reliance under Rule 703. (*Id.* at 136). I answered that I certainly would because it was "the heart of the issue." (*Id.*).

Counsel for the Noranda defendants requested the opportunity to brief those issues, since their resolution would affect his clients (and the others who had not joined in the motion). (*Id.* at 136-37, 141). He specifically expressed concern that a ruling might be "based on an incomplete record." (*Id.* at 141). I allowed additional briefing on the reliability of Dr. Boyd's price reports in terms of Rule 703, and said that while the price reports might be the type of data that an expert could reasonably rely upon under Rule 703 – an issue to be decided – it was another matter whether Dr.

11

McClave employed that data properly. That was an expert methodology question to be considered under *Daubert.* (*Id.* at 142-145).

Despite the invitation to the very parties who are now claiming that they were caught by surprise by the May 24th Opinion to file a supplemental brief, neither the Noranda defendants, DuPont, nor GAC filed anything. It is difficult to imagine a more obvious waiver than this. *United States v. Wesley*, 422 F.3d 509, 520 (7th Cir. 2005)("'A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law.'"). The only additional brief came from Marsulex, on March 7, 2006. Not surprisingly, the brief focused on Rule 703 concerns and the reliability of Dr. Boyd's price reports. The plaintiffs responded on March 17, 2006.

## E.
## The Motion For Clarification Or Reconsideration

Although the Noranda defendants knew by March 22, 2006, that Dr. Boyd would be deposed on April 11, 2006 – and obviously there was discussion about the deposition before that [11] – neither the Noranda defendants, DuPont nor GAC informed me that Dr. Boyd was going to be deposed and obviously did not ask me to defer ruling on the motion to bar pending that deposition.

The parties appeared in court on May 25th – the day after the May 24th Opinion issued – regarding a briefing schedule for the *Daubert* motions they had filed. At that time, counsel for the reconsideration movants expressed concern regarding the scope of the May 24th Opinion. He informed me that Dr. Boyd had been deposed and that, in the defendants' opinions, his testimony

---

[11] The date was provided by counsel for the Noranda defendants pursuant to a request made in a conference call with him and counsel for the plaintiffs.

undermined the reliability of his price data – and thus, the permissibility of reliance on that data by Drs. Tollison and McClave. I asked Noranda's counsel why, given his position on the significance of the Boyd testimony, the defendants had not brought to my attention even the fact of his deposition. Counsel for the reconsideration movants conceded that they were late in doing so, but offered the following explanation:

> We should have brought it to your attention earlier. We did . . . we thought it was procedural issues were being; could be addressed without getting to the merits of the [price reports], but I understand having read your decision, that's the essence of your decision.

(5/25/06–10:04:09).[12]

Counsel for Noranda indicated that he would like to file a motion for reconsideration of the May 24th Opinion, and I allowed him three weeks in which to do so. The motion has two bases: (1) that the May 24th Order dealt with issues not presented in the motion to bar, thereby catching the reconsideration movants off guard; and (2) Dr. Boyd's April 11th deposition testimony. According to the motion, the deposition testimony establishes that Dr. McClave's reliance on the price reports was inappropriate under Rule 703, and that the price reports are not admissible under Rule 803(17).[13]

## II.

---

[12] The only way this excuse could have even marginal plausibility is if counsel for the reconsideration movants ignored the content of the memorandum in support of the motion to bar, the cases on which the memorandum relied, the discussion in court on January 19th, the oral argument on February 28th, and my response to the question asked by Noranda's counsel at the close of that argument. That obviously did not occur, and the very implausibility of the excuse precludes its acceptance. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *Rogers v. Barnhart*, 2006 WL 2246868 at *16 (N.D.Ill. 2006)(collecting cases).

[13] The motion argues that Dr. Boyd testified about the manner in which he compiled sulfuric acid price information: whom he interviews, how often, what markets are involved, and to what degree he used his judgment in reporting prices. The defendants – all of them, this time – made the deposition testimony a significant part of the *Daubert* motions they filed on May 22nd and May 24th, which again challenged Drs. McClave and Tollison.

13

## ANALYSIS

### A.

Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). Such a motion cannot be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the previous motion. *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005); *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004). To support a motion for reconsideration based on newly discovered evidence, the moving party must show not only that this evidence was newly discovered or unknown to it, but also that it could not with reasonable diligence have discovered and produced such evidence during the pendency of the motion. *Caisse Nationale*, 90 F.3d at 1270.

The instant motion for reconsideration, to the extent it does not merely reargue what was previously argued, is based on Dr. Boyd's testimony. But that testimony is not newly discovered evidence. By March 22, the defendants knew the evidence would be forthcoming yet did nothing to alert me. By April 12th, they knew what Dr. Boyd had said and still did nothing.[14] That is reason enough to deny the motion. *Caisse Nationale*, 90 F.3d at 1270 (admission that new evidence could have been adduced earlier forecloses motion for reconsideration); *Feliberty v. Kemper Corp.*, 98 F.3d 274, 279 n.1 (7th Cir. 1996)(evidence supporting the motion for reconsideration that could have been introduced during the pendency of the previous motion but was not, is properly excluded).

Issues of delay have been prominent in this case, and have resulted in consequences that

---

[14] Neither did the plaintiffs, but they had no obligation to assist their opponent in establishing their claims. *F.E.L. Publications v. Catholic Bishop of Chicago*, 1989 WL 100006 *3 (N.D.Ill. Aug. 22, 1989); *Korman v. Shull*, 184 F.Supp. 928, 936 (W.D.Mich. 1960).

were not favorable for the delaying party. *See In re Sulfuric Acid Antitrust Litigation*, 230 F.R.D. 527, 533 (N.D.Ill. 2005); *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 337 (N.D.Ill. 2005); *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320, 325 (N.D.Ill. 2005). The kind of conscious quiescence exhibited by the reconsideration movants is, under the circumstances presented here, not excusable. The suggestion that misperception of the motion to bar is accounted for the defendants' inaction is not an attractive argument in light of all that had occurred. A more realistic explanation is the defendants decided to sit back and see if the Marsulex motion were successful. If it were, there would be no need to deal with the Boyd testimony. Indeed, from their perspective, there was value in inaction. Doing nothing eliminated the risk that the Boyd testimony might be viewed as sufficiently supportive of his price data under Rule 703. If the motion were denied, there would be time enough to trot out the argument now advanced that Dr. Boyd's collection methods made his data unreliable.

Not to have brought either the fact of Dr. Boyd's deposition or the claims now being made about his testimony to my attention until the day after the ruling on the motion could scarcely have been more irresponsible or more inimical to the proper functioning of the adversary system or to its efficient operation. *Cf. supra*, n. 2; *Albrechtsen v. Regents of University of Wisconsin System*, 309 F.3d 433, 436 (7th Cir. 2002). Judges have limited time to devote to any given case, and when that time is expended unnecessarily all other cases that compete for that scarcest of judicial resources are adversely and unfairly affected. *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077 (7th Cir. 1987). *See also Channell v. Citicorp Nat. Services, Inc.*, 89 F.3d 379, 386 (7th Cir. 1996); *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 230 (7th Cir. 1992).

Given the level of experience and sophistication of the lawyers for the Noranda defendants,

15

DuPont and GAC, it is idle to suggest that (at least after February 28th) they were under some misapprehension about the necessary implications of the Marsulex motion, and that they were unaware that the threshold issue was whether it was permissible for Drs. Tollison and McClave to have relied on the Boyd price data – an issue that was governed not by Rule 26, but by the appropriate federal rules of evidence. The reconsideration movants had every opportunity to present their arguments well before the May 24th Opinion, thereby relieving the court of what they now claim was a premature exercise. Instead, they delayed, inexcusably, to see how things would go.

This "heads I win, tails you lose approach. . .is no more acceptable in a court than in a casino." *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 341 (N.D.Ill. 2005). It is an approach that in all contexts has been rejected. *Cf. Bateman, Eichler, Hill, Richards, Inc. v. Berner*, 472 U.S. 299, 318 (1985); *Kaskel v. Northern Trust Co.*, 328 F.3d 358, 360 (7th Cir. 2003)(Posner, J); *American International Specialty Insurance Co. v. Electronic Data Systems Corp.*, 347 F.3d 665, 667 (7th Cir. 2003); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998)("sandbagging" leads to inefficient use of judicial resources, and "divert[s] time from litigants in other cases patiently waiting in the queue for the limited time of federal judges.").

## B.

The motion to reconsider argues that Dr. Boyd's price reports are not admissible under Rule 803(17), which excepts from the hearsay rule "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular positions." The motion to reconsider fails to cite a case in support of the conclusion that because Dr. Boyd did something more than simply record prices, Rule 803(17) is necessarily inapplicable. *(Objections and Request for Clarification*, at 2-4). Perhaps. But the defendants' present perfunctory

16

motion is unconvincing.

In addition, while the reconsideration movants argue that Dr. Boyd's use of his "judgment" disqualifies his data under Rule 803(17), the argument is a repetition of the initial argument in the motion to bar that the method used by Dr. Boyd to gather price information is not sufficiently scientific to qualify as a "survey." (*Objections*, at 4). Beyond its mere statement, the argument is undeveloped and unsupported. In any event, the question is not whether the Fertecon data could qualify as a survey in the narrow and limited sense discussed in the *survey cases*, but whether what Dr. Boyd said he did in connection with the pricing data removes it from the scope of 803(17). The motion to reconsider simply assumes that it does. That is not enough.

## C.

The discussion of Dr. Boyd's deposition in Argument III of the motion to reconsider (pp. 5-8) does not require that the May 24th Opinion be changed. The argument that the newsletter contained, in addition to sulfuric acid prices, industry news and other information unrelated to sulfuric acid – thereby precluding Dr. McClave's use of the price data – calls to mind Judge Easterbrook's comments in *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995): "So What?...Who cares?...True, but irrelevant." The contention – and it is no more than that – is tantamount to saying that one could not conclude that readers of the New York Times looked to stock prices because each edition had information relating to cooking, travel, news, books, and a virtually endless array of other materials and information.

It is well to recall that "[t]here is a real world as well as a theoretical one." *Lee v. Illinois*, 476 U.S. 530, 548 (1986)(Blackmun, J., dissenting). The defendants' argument that one cannot be certain given the composition of the newsletter that anyone relied on the acid price data – as opposed

17

to the tidbits of non-sulfuric acid information – despite the success of the newsletter for more than two decades implicitly demands a level of certainty of proof that is fundamentally at odds with the standard of reasonableness in Rule 703 and with the liberalizing thrust of the Federal Rules of Evidence. Indeed, the requirement of certainty that is implicit in the defendants' argument would itself be "unreasonable," as the Supreme Court stressed in *Daubert*, 509 U.S. at 590.

A further problem with the defendants' argument that since the Fertecon newsletter was more than a compilation of price data and therefore one does not know whether there was reliance on that information or merely interest in the balance of the newsletter is that "hypothesis is not proof," *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005)(Posner, J.), and speculation is never an appropriate substitute for evidence. *See United States v. Holland*, 445 F.2d 701, 793 (D.C.Cir. 1971); *United States v. Landry*, 257 F.2d 425, 431 (7th Cir. 1958). In light of the available evidence, it is a far more plausible conclusion that industry insiders and outsiders alike looked to the Fertecon price data in their daily affairs.

It simply will not do in a motion for reconsideration by parties who chose not to participate in the original motion to bar – or to file their own brief when invited to do so – to belatedly insist that their interpretation of the evidence must be preferred over other more plausible interpretations. *Daubert* reserves these sorts of contentions for cross-examination and for the jury's ultimate determination.

Equally unpersuasive for purposes of the present motion is the concern expressed over the reliability of the Fertecon data from mid-2001. This case involves an alleged conspiracy spanning at least 15 years, and issues about a small component of that time frame would not invalidate the utility of the Fertecon data for other periods. The fact that the Boyd data may have a temporally

limited flaw does not preclude any reliance on any aspect of that data under Rule 703. The failure to take into account a critical factor may weaken the value of testimony without requiring exclusion of it. *See Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1153 (10th Cir. 1990). *Cf. Bazemore v. Friday*, 478 U.S. 385, 400 (1986)(failure of regression analysis to include other variables normally affects the analysis's probativeness not its admissibility).

It should be noted that all of the facts relating to the composition of the newsletter, the identity of the defendants' employees who touted the accuracy of the sulfuric acid prices as reported in the Fertecon newsletter, and other matters that form much of the motion for reconsideration were known to all the defendants at the time Marsulex filed its motion to bar. In fact, at least some of the arguments now being advanced were made in the initial round of briefing on that motion. They need not be reconsidered.

### D.

There can be no doubt that an economic expert can base his opinions on price data. And Rule 703 allows him to do so even if the underlying data is not admissible so long as experts in the field reasonably rely on it, and the underlying data itself is reasonably reliable. *United States v. Gardner*, 211 F.3d 1049, 1053 (7th Cir. 2000); *Faries v. Atlas Truck Body Mfg. Co.*, 797 F.2d 619, 624 (8th Cir. 1986). Often, the reasonableness of the reliability on third party data is shown through the testimony of experts themselves, although their conclusions are not necessarily outcome-determinative, and a court can look to any other factors that inform the answer to the question of the reasonableness of reliance and of the reliability of the underlying data. *See In re Paoli Railroad Yard PCB Litigation v. Southeaster Pennsylvania Transportation Authority*, 35 F.3d 717, 748 (3rd Cir. 1994). There are no hard and fast definitions of what constitutes reasonable reliance. *DeKalb Pike Real Estate*

19

*Associates, LP v. The Allstate Corp.*, 2004 WL 2905245 at *2 (E.D.Pa. 2004).

Here, in addition to the testimony of the disclosed experts, proof of the underlying reliability of the Fertecon price data comes through the testimony of certain of the defendants' officers, the reliance placed on it by the defendants and governmental agencies, the longevity of the newsletter itself, and the other factors discussed in the May 24th Opinion. *See In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. at 653-658. Whether Dr. Boyd's testimony demonstrates unreliability of sulfuric acid price data, notwithstanding 20 years of experience by those sophisticated industry insiders and governmental authorities certainly cannot be ascertained on the basis of a sketchy and one-sided presentation of what occurred at the deposition.[15]

Nor can it be ascertained whether a determination of the reliability of the underlying price data need or can take account of the basic principle that in antitrust cases damages need only be proven to a reasonable degree of certainty, and that there is broad latitude in establishing antitrust damages. Any other rule, the Supreme Court has said, would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); *Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 745 F.2d 441, 448 (7th Cir. 1984), *cert. denied* 471 U.S. 1125 (1995); *Triebwasser & Katz v. AT&T*, 535 F.2d 1356, 1359 (2nd Cir. 1976)(same).

The Court's willingness to accept a degree of uncertainty in these cases rests in part on the

---

[15] The plaintiffs have not filed a brief in response to the motion.

difficulty of ascertaining business damages and on the principle "that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." J. Truett Payne Co., Inc.,, 451 at 566. *See also DeLong Equipment Co. v. Washington Mills Electro Minerals Corp.*, 990 F.2d 1186, 1201 (11th Cir. 1993); *National Farmers' Organization, Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1303 n.33 (8th Cir. 1988)(affirming damage computation even though there were no actual figures available for certain periods included in the computation); *Merritt, Vickers, Inc. v. SEC*, 353 F.2d 293, 296 (2nd Cir. 1965)(market prices sufficiently proven by use of sheet quotations even though they did not constitute unconditional offers to buy or sell at the indicated price and failed to reflect changes in the market).

The fact that some of those with whom Dr. Boyd spoke may not have accurately reported price data does not disqualify the Fertecon materials under rule 703, any more than the possibility that a party may have misreported his physical condition to a doctor. Matters of accuracy and truthfulness are generally left for trial. *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020-1021 (7th Cir. 2000). Vigorous cross examination, presentation of contrary evidence and careful jury instructions, the Court in *Daubert* said, are the traditional and appropriate means of attacking shaky but admissible evidence. 509 U.S. at 596; *Richman v. Sheahan*, 415 F.Supp.2d 929, 933 (N.D.Ill. 2006)(collecting cases). The regime established by *Daubert* and confirmed by *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999) was not intended to supplant the tools and techniques of the adversary system.

**E.**

In light of the imminency of the completion of the briefing on the defendants' *Daubert*

21

motions, it is perhaps appropriate to clarify the boundaries of the May 24th Opinion. Properly read, the Opinion does not foreclose a challenge to the manner in which plaintiffs' experts employed Dr. Boyd's price reports or a challenge to the reliability of their methodology. I indicated as much at the close of the oral argument on February 28th when I differentiated between the issue of the reasonableness of an expert relying on the Boyd data and the issue of whether an expert used that data appropriately. (*Tr.*, at 142-43,146).

The motion to reconsider argues that Fertecon may "provide the 'most reliable' data available without being particularly reliable for use in a scientific study as a benchmark comparing the Tampa 'market' to other markets in the United States." (*Objection*, at 7). The difficulty with the proposition is that it would not appear that use of the Fertecon data constitutes a "scientific" study as the Court used that term in *Daubert*, and the conclusion is anything but self-evident.[16]  The motion to reconsider makes not the slightest attempt to support the conclusion through principled argument or case analysis. Consequently, as presented and in the context presented, I am not prepared to agree with it.[17]

---

[16] *Kumho Tire Co. Ltd.*, while making the *Daubert* analysis applicable to "technical," and other specialized knowledge, stressed that there are many different kinds of experts and many different kinds of expertise. Since the gatekeeping inquiry must be tied to the facts of the particular case, the Court held that a trial court may – but is not required to – consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability. But, the Court stressed, those factors, which were meant to be helpful, not definitive, neither necessarily nor exclusively apply to all experts or in every case. 526 U.S. at 142. Their applicability will depend on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Id.* at 150. Ultimately, the particular procedure employed will depend largely on the "particular circumstances of the particular case at issue." *Id.* at 150, 152. *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1110 (N.D.Ill. 2005).

[17] It is not the task of the court to research and formulate and support legal arguments for the parties. *See Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir.2005); *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir.1995); *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir.1997).

22

As things now stand, there is more than ample evidence that the underlying Fertecon price data is sufficiently reliable that it may reasonably be relied on by experts in the field. Dr. Boyd's deposition may call into question the use the plaintiff's experts made of the information and the conclusions they drew from it. Then again, it may not. Obviously, the present posture of the case and the defendant's one-sided and terse briefing are not sufficiently informative to resolve that question.

## CONCLUSION

For the foregoing reasons, the defendants' motion for reconsideration [# 376] is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 8/29/06