**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In Re SULFURIC ACID ANTITRUST LITIGATION | ) ) ) | MDL Docket No. 1536 Master File No. 03 C 4576 |
| This Document Relates To: | ) ) ) | Judge David H. Coar |
| ALL ACTIONS | ) ) ) | Magistrate Judge Jeffrey Cole |

**PVS'S  REPLY MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

To avoid summary judgment, Plaintiffs must present "evidence that tends to exclude the possibility that the alleged conspirators acted independently." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Market Force Inc. v. Wauwatosa Realty Co., 906 F.2d 1167 (7th Cir. 1990), held that an antitrust "defendant is entitled to summary judgment when it 'provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy.'" Id. at 1174. Moreover, to survive summary judgment, Plaintiffs "must demonstrate that [PVS behaved] in a way that is inconsistent with unilateral decision-making," which requires Plaintiffs to show "that [PVS] acted in a way that, but for a hypothesis of joint action, would not be in its own interest." Illinois Corporate Travel, Inc.v. American Airlines, Inc., 806 F.2d 722, 726 (7th Cir. 1986).

Under this standard, PVS is entitled to summary judgment.

I.    There is No Genuine Issue of Material Fact That
       PVS Independently Decided to Close Its Copley Plant.

Plaintiffs' Response to PVS's Motion for Summary Judgment concedes much more than it contests. With respect to the closure of the PVS Copley Plant, Plaintiffs do not dispute (1) that PVS did its make-or-buy analysis in 1987 (Plaintiffs' Response to Defendant PVS's Statement of Undisputed Material Facts ("Plfs. Res. to SMF") ¶ 20), (2) that "in 1987, PVS was 'going through a decision-making mode'" about whether to continue making sulfuric acid at the Copley Plant, or shutting it down and buying its needs from another source (Plfs. Res. to SMF ¶ 21), (3) that PVS's August 1987 make-or-buy analysis "was made based on [PVS's] need to do something better for [the] company and [it] entered into the make-or-buy analysis based on that thought process" (Plfs. Res. to SMF ¶ 22), (4) that PVS evaluated many economic factors in its make-or- buy analysis (Plfs. Res. to SMF ¶ 23), including the $200,000.00 annual maintenance expenditure needed to keep the Copley Plant running (Plfs. Res. to SMF ¶ 24), (5) that in 1987,

PVS considered buying its sulfuric acid needs from several involuntary acid producers other than Noranda, such as Phelps Dodge, Kennocott, Monaca, and Asarco when PVS did its make-or-buy analysis (Plfs. Res. to SMF ¶ 25), (6) that PVS observed that "[i]f Noranda can supply acid at the same time it is available from Southwest, at competitive economics, they are the more logical supplier" (Plfs. Res. to SMF ¶ 27), (7) that PVS's "Copley Sulfuric Shutdown Action Plan" was set out in an August 30, 1987 memorandum which constituted PVS's "game plan for Copley Sulfuric" (Plfs. Res. to SMF ¶ 28), (8) that PVS initiated the discussions with Noranda regarding supply of acid to PVS's Copley Plant (Plfs. Res. to SMF ¶ 32), and (9) that during those negotiations Noranda was aware that PVS was considering buying sulfuric acid from various other suppliers (Plfs. Res. to SMF ¶ 34).

In the face of these factual concessions, Plaintiffs attempt to avoid summary judgment by asserting (1) that the Copley Plant was not uneconomical because in 1988 (the year after PVS conducted its make-or-buy analysis and decided to purchase acid instead of making it) it earned a profit, and (2) that PVS's "final" decision to close the Copley Plant was not made until March 2, 1988 when a vote was taken to proceed with Noranda's unit train proposal and supply agreement. Neither assertion raises a genuine issue of material fact sufficient to avoid summary judgment.

The sole basis upon which Plaintiffs assert that PVS did not decide to close the Copley Plant until March 2, 1988 is a March 7, 1988 Sosnoski memorandum which Plaintiffs wrongly characterize as "indicating PVS did not make a final decision to close the Copley plant until March 2, 1988 when a vote was taken among the PVS officers and employees involved in the evaluation" (Plfs. Res. to SMF ¶ 26). That memorandum says no such thing, and is contrary to the undisputed testimony concerning it. The March 2 meeting, and subsequent vote, involved

not PVS's decision to shutdown the Copley Plant (which had already been made as of August 30, 1987), but instead involved whether PVS would proceed with Noranda's unit train proposal and supply agreement. The memorandum header says "Subject: Meeting Notes – Review of Noranda Unit Train Proposal." The purpose of the meeting and subsequent vote was identified in the memorandum as follows:

> On Wednesday, March 2, 1988, the above parties meet **to review the proposed terms and conditions of an agreement with Noranda Sales Corporation Limited** pursuant to which PVS Chemicals, Inc. (Ohio) would purchase approximately 60,000 tons per year of sulfuric acid.

It was for that purpose that "J.B. Nicholson asked for a vote on whether to proceed with the project," and "[a]ll in attendance voted to proceed." The March 7, 1988 Memorandum in no way reflected a vote to "make a final decision to close the Copley plant" on March 2, 1988 as Plaintiffs wrongly characterize it.[1]

That PVS decided on March 2, 1988 to proceed with Noranda's unit train proposal and supply agreement does not conflict with, and clearly does not create any genuine dispute over, the fact that PVS had already decided as of August 1987 to shut down the Copley Plant. Dean Larson of PVS testified that "[b]y August 30, 1987, based upon PVS's make or buy analysis, PVS determined that it would shut down the Copley Plant's sulfuric-acid manufacturing process and seek to purchase the sulfuric acid that it needed to service its customers" (Larson Aff. ¶ 8, SMF Ex. 15). Plaintiffs do not dispute that at that time, PVS was considering buying its acid from several suppliers other than Noranda (Plfs. Res. to SMF ¶25).

Plaintiffs cross-examined Mr. Larson on this very issue, and he unambiguously testified that the March 2, 1988 vote referred to in the March 7, 1988 Memorandum was a vote to proceed

---

[1] The <u>only</u> references to closing the Copley Plant in that memorandum were (1) the observation that "there was no economic justification for spending money to attempt to 'mothball' the plant"

with Noranda's unit train proposal and supply agreement, rather than a vote on the decision to close the Copley Plant, which decision had been made months before in August 1987. Mr. Larson testified:

> Q.   If you could read the sentence [in the March 7, 1988 memorandum]?
>
> * * *
>
> A.   "J. B. Nicholson asked for a vote on whether to proceed with the project. All in attendance voted to proceed. The following assignments were given."
>
> Q.   So it was at this point that PVS made the decision to go ahead with the project in obtaining the acid and shut down the plant?
>
> * * *
>
> A.   **No. The decision to shut down the plant had been made months before.** It was at this point in time [i.e., March 2, 1988] that PVS made the plan to go forth with Noranda.

(Larson Dep. at 129: 15-16, 19-24; 130: 1, 5-8 SMF Ex. 10) (emphasis added). Mr. Larson further testified:

> Q.   Now, you said the decision on the make – or – buy was made – I'm sorry, I didn't catch it , was it August of '87?
>
> A.   Yes.
>
> * * *
>
> Q.   If you recall, we discussed this earlier today, where it says, "Conclusion. JP [sic] Nicholson asked for a vote on whether to proceed with the project. All in attendance voted to proceed?
>
> What was that vote for?
>
> * * *
>
> A.   The vote was ultimately to enter into an agreement with another to supply us.
>
> Q.   And so that decision was made that this goes?

---

because "[o]nce shut down, it was not deemed practical to ever restart it"; and (2) the observation that "[t]here was no economic justification for … 'running the plant until it stopped running'."

A.      No, **the decision to shut down the plant was made previous to that**. The decision to move forward with the agreement that … was under negotiation was given final approval at this meeting.

Q.      Okay.  Sorry I didn't catch it, **what was the date that you said the make-or-buy decision was made**?  Did you give a specific date?

A.      I think it was August 30, 1987, Document 1. **August 30, 1987**.

Q.      And where do you get from this document that the decision was made on that date?

A.      It says, "the actions as to what to do going forward."  It basically says , "Sulfuric acid is generating modest margin not covering indirect costs, make versus buy analysis favors purchase of smelter acid."

Q.      Okay.  I just wanted to know what  your basis for saying that this document shows you the date that this decision was made?

A.      It's the date the action planned – **the title of the document is the Copley Sulfuric Shutdown Action Plan**.  **That's pretty self-evident**.

Mr. Bell:  Thank you.

(Larson Dep. at 276: 17-20; 277: 5-24; 278: 1-16; SMF Ex. 10) (emphasis added).

Plaintiffs' Response to PVS's Motion for Summary Judgment is devoid of any evidentiary basis for disputing that PVS decided to close down its Copley Plant in August 1987, or that it was not a "final" decision.  The testimony on that issue is undisputed.

Next, Plaintiffs attempt to dispute that the Copley Plant was economically unviable, apparently in an attempt to create a fact question about whether PVS's decision to close the Copley Plant was based upon economic need.  Plaintiffs rely upon Ex. 211, which is Hall's testimony that in <u>1988</u> the Copley Plant "earned an economic profit."  Even assuming *arguendo* that the Copley Plant "earned an economic profit" in 1988,[2] that does not create any dispute that

---

[2]      PVS shut the Copley Plant down in 1988 (Larson Dep. at 32: 10-11, SMF Ex. 10).  In doing so PVS saved $200,000.00 on annual maintenance costs (Larson Dep. at 69: 10-13, SMF Ex. 10). Moreover Larson testified that PVS's post-closure analysis showed that shutting the Copley Plant down was economically "the right decision" (Larson Dep. at 75: 13-23).  It is therefore not

the Copley Plant was, and had been, unprofitable and was losing money before and at the time PVS did its make-or-buy analysis and decided in August of 1987 that the Copley Plant should be shut down.

Whether the Copley Plant realized a profit in 1988 – after PVS decided to buy rather than make based upon poor economics as of August of 1987 and after PVS entered into the supply agreement with Noranda – is not a material fact because it does not, and could not possibly, undermine the undisputed fact that before and at the time PVS decided to close the Copley Plant, PVS based that decision on its determination that the Copley Plant was, and continued to be, unprofitable. In short, Plaintiffs do not, and cannot, dispute the fact that when PVS did its make-or-buy analysis in 1987, it was uneconomical to continue making acid at the Copley Plant and supported PVS's decision to purchase its sulfuric acid needs, instead of continuing to make it. Whether or not it earned a profit after PVS made that decision and entered into the contract in 1988 is immaterial.[3]

The evidence establishing that the Copley Plant was uneconomical and PVS's make-or-buy decision in August of 1987 favored closing the Plant was abundant and uncontroverted. Mr. Larson testified that "[b]y the mid-1980's, the sulfuric acid manufacturing process at the Copley Plant was old, unprofitable and not competitive in the marketplace" (Larson Aff. ¶ 6; SMF Ex. 15). Mr. Larson testified on cross-examination by Plaintiffs as follows:

Q.   In the 1987 time period, how long was Copley operating unprofitably, as you say?

A.   Copley had been operating marginally profitably or unprofitably probably for two – and – a – half, three years. Since we bought the plant [in February 1983] it never really turned a profit, if you will. ... I knew we

---

[3]   surprising that in 1988 there would be a profit, but whether there was a profit in 1988 has no bearing upon whether PVS's make-or-buy analysis in August 1987 was correct.
In fact, that it may have realized a profit after PVS's make-or-buy decision was implemented shows that PVS's decision to buy instead of making acid was proper and economically justified.

were losing on a real basis a few dollars per ton on every ton we sold. We were not covering our overhead.

(Larson Dep. at 43: 9-15, 21, 24; SMF Ex. 10).

Mr. Larson further testified that when PVS did its 1987 make–or–buy analysis, it was because the Copley Plant was not profitable:

A.      ... [I]t was PVS's intention to earn a profit. Period. We're a for–profit corporation, and we were not earning a profit, so we needed to look at alternatives to what we were currently doing, which wasn't working.

(Larson Dep. at 56: 24, 57: 1-4; SMF Ex. 10). He further testified:

[The Copley Plant's] biggest problem was that it did not make eight or ten different products as my other plants did, it made only 66 degree sulfuric acid. The plant had been struggling for a long period of time because our raw material costs to produce sulfuric acid were very high and the plant was a money–losing plant.

(Larson Dep. at 17: 6, 12; SMF Ex. 10).

PVS's August 30, 1987 "Copley Sulfuric Shut Down Action Plan," which PVS identified as its "game plan for Copley Sulfuric," noted that "sulfuric [acid] is generating a modest margin, but [is] not covering indirect costs," and that the "[m]ake vs buy analysis favors purchase of smelter acid." (Larson Aff. Ex. A, SMF Ex. 15).

That Hall stated that the Copley Plant earned a profit in <u>1988</u> clearly does not create a factual dispute about whether it was unprofitable, unviable or uncompetitive up to the time PVS did its make-or-buy analysis in August 1987 and decide to buy acid instead of making it.

Plaintiffs also make the anemic assertion that the Copley Plant was somehow not unprofitable based upon statements from Mr. Larson in which he observed that when Noranda acid began coming into the Ohio market, the economics of the Copley Plant would suffer. <u>See</u> Plfs. Res. to SMF ¶ 17. From those comments, Plaintiffs leap to the unwarranted inverse inference that the Copley Plant presumably was economical, profitable and competitive before

that time. Hardly. Mr. Larson's cross-examined testimony established unambiguously -- and undisputedly -- that the Copley Plant operated marginally at best, and lost money at worst, from the time PVS acquired it in 1983 until it did its make-or-buy analysis in 1987. Mr. Larson's comments that the economics of the Copley Plant would suffer with additional Noranda acid in the market does not dispute the unambiguous and unequivocal testimony that the Copley Plant was uneconomical, uncompetitive and a marginal operation before that time.

Lastly, Plaintiffs rely upon a November 2, 1987 letter from Skurnac of Noranda to Frank Bierman of PVS reflecting that, in preliminary discussions regarding a possible long-term supply contract, PVS estimated a "potential 'cost savings' of $8–12 US/ST acid to operate the plant versus shutting it down." When asked "do you know what this refers to," Mr. Larson explained in his deposition that "I believe that would be called a negotiating ploy" (Larson Dep. at 87: 9-11) (Exhibit 1). Even Noranda observed in the November 2, 1987 letter that "this cost seems excessive." In any event, a statement that PVS estimated a "potential cost saving" in the context of negotiating a supply contract hardly creates a genuine fact issue that the Copley Plant was in fact unprofitable as of 1987, and that the economics favored shutting it down as of August 1987.

Plaintiffs simply cannot identify any evidentiary basis to dispute that PVS decided to close the Copley Plant in August 1987 based upon PVS's own independent make-or-buy analysis, and then entered into the supply contract with Noranda only after having independently made the decision to close the Copley Plant.[4]

---

[4]      Nor does Plaintiffs' reference to a 1998 statement made in a presentation to the Noranda DuPont joint venture that "PVS Chemicals shutdown two Sulfuric Acid production facilities in favor of Noranda production (Copley, Ohio and Bay City, Michigan)" (Plaintiffs' Response Brief at 72) create any fact question about whether PVS closed those plants based upon its own independent analysis and decision. PVS did close those plants down in favor of Noranda production when it decided that that the economics of those plants favored stopping acid production and buying its acid needs from Noranda. The statement Plaintiffs cite which recounts that historical fact does not create a fact dispute that PVS made an independent decision to close those plants. Moreover,

II.    There is no genuine Issue of Material Fact That
       PVS Independently Decided to Close Its Bay City Plant.

As with PVS's Copley Plant, with respect to the closure of PVS's Bay City Plant Plaintiffs' Response concedes much more than it contests. Plaintiffs do not dispute (1) that PVS bought the plant in 1976 to supply one principal customer, Dow Chemical (Plfs. Res. to SMF ¶ 42), (2) that PVS lost Dow as a customer, and PVS in Detroit became the Bay City Plant's principal customer (Plfs. Res. to SMF 43-44), and the 100 mile distance between Bay City and Detroit made transporting acid "economically unsound" (id.), (3) that before the end of 1989, PVS concluded that in addition to losing Dow as a customer, the Bay City Plant's operation "was made even more economically unviable by the plant's old age and inefficiency" (Plfs. Res. to SMF ¶ 45), (4) that PVS was aware before 1990, based upon its experience with its Copley Plant, that Canadian smelters would increase involuntary acid into the market and "PVS's cost of producing sulfuric acid would, in all likelihood exceed the prices for which PVS could purchase replacement acid from the smelters" (Plfs. Res. to SMF ¶ 46, (5) that a May 18, 1990 PVS analysis proposed closing the Bay City Plant and the "possibility of purchasing sulfuric acid from several involuntary acid producers, including Phelps Dodge, Asarco, Kennecott, Inco, Noranda and Falcon Bridge" (Plfs. Res. to SMF ¶ 47), (6) that in June 1990 PVS did a formal make-or-buy analysis which "favored the option of shutting the Bay City sulfuric acid manufacturing facility and purchasing acid from Noranda" (Plfs. Res. to SMF ¶ 48), (7) that PVS

---

Plaintiffs' reference to PVS shutting down a production unit in Chicago in favor of Noranda creates no fact question because it is undisputed that PVS never reduced production to take Noranda acid. (Larson Dep. at 70: 18-24; 71: 1-3, SMF Ex. 10). More importantly, the statement that production was allegedly decreased "in favor of Noranda production" simply reflects that PVS sought to purchase acid from Noranda, and in no way establishes an agreement to restrict output.

decided to close the Bay City Plant in June 1990 and to buy acid to resell to its customers, because that "decision was determined to be in the best financial interests of PVS" (Plfs. Res. to SMF ¶ 50), and (8) that a July 6, 1990 PVS memorandum stated that the "decision [to close the Bay City Plant] was the result of several years of struggling with the economics" of the plant, and that the "economics have clearly supported this move for sometime" (Plfs. Res. to SMF ¶ 51). It is also undisputed that a PVS document called "Sulfuric Acid, Manufactured vs. Purchased Acid Presentation" concluded that purchasing acid for resale to its customers was more economical than manufacturing acid at the Bay City plant for sale to those same customers (Plfs. Res. to SMF ¶ 49). That document was generated in June 1990.[5]

Plaintiffs attempt to dispute very few issues, and even those attempts are not supported by any evidence. First, Plaintiffs attempt to dispute PVS's contention that the "decision to close the Bay City Plant was not part of any agreement with Noranda," by pointing to documents which Plaintiffs characterize as indicating that PVS was considering closing the Bay City Plant in 1989 (Plfs. Res. to SMF ¶ 50). Those documents reflect that "PVS is prepared to consider the closure of their Bay City, Michigan Plant during 1989," that Noranda hoped to speak with PVS about "the closure of their Bay City, MI Plant," and that "PVS would like to take the plant down during the third quarter of 1989" (Id.). Not surprisingly, Plaintiffs can point to absolutely no evidence to establish that any such discussions in fact occurred, or that PVS's interest in closing

---

[5]     Although Plaintiffs "dispute PVS' assertion that the referenced document was dated June 1990 as unsupported" because the "document is undated" (Plfs. Res. to SMF ¶ 49), Mr. Peacock testified that it was generated in June 1990 (Peacock Dep. at 45:17-24; 46: 1-8) (Exhibit 2)). After PVS filed it Motion for Summary Judgment and Statement of Undisputed Material Facts on July 31, 2006, Plaintiffs sought and were granted leave to depose Mr. Peacock, which occurred September 7, 2006. Tellingly, Plaintiffs' Response is devoid of any mention or reference to Mr. Peacock's testimony.

the Bay City Plant derived from discussions with Noranda, as opposed to PVS's own evaluation of the poor economics of continuing to make acid at the Bay City Plant.

Moreover, it is undisputed that PVS was aware that the Bay City Plant was unprofitable from 1988 on. Richard Peacock of PVS testified that when he "got here in 1988," the Bay City Plant "was a very unprofitable component of PVS and it was not able to compete in the market place (Peacock Dep. at 12: 17, 22-23, 13: 4-5) (Exhibit 2). Plaintiffs admit that PVS's July 6, 1990 memo from Mr. Peacock similarly reflects that the decision to close the Bay City Plant in 1990 was "the result of several years of struggling with the economics" and that the "economics have clearly supported this move for some time." (Plfs. Res. to SMF ¶ 51). PVS had considered the idea of closing the Bay City Plant since at least 1988 (Peacock Dep. at 14: 5-14) (Exhibit 2). Before PVS decided in June 1990 to close the Bay City Plant, "Noranda was already a supplier of the sulfuric acid to our facility in Copley so certainly there had been much discussion with Noranda about supplying sulfuric acid to the firm" (Peacock Dep. at 18: 10-11, 13-16) (Exhibit 2).

Plaintiffs next attempt to dispute that the reason PVS shut down the Bay City Plant was because it was not profitable, citing Hall's testimony that in 1990 the Bay City Plant earned a profit (Plfs. Res. to SMF ¶ 52). As with its argument regarding the Copley Plant, Plaintiffs at most assert that the facility realized a profit only _after_ PVS did its make-or-buy analysis and stopped manufacturing sulfuric acid. Mr. Peacock testified that closing the Bay City Plant and entering into the supply contract "certainly improved the profitability of my sulfuric acid business" (Peacock Dep. at 38: 7-8) (Exhibit 2). Plaintiffs admit that PVS's decision to close the Bay City Plant was in its best financial interest (Plfs. Res. to SMF ¶50), that closing the Bay City Plant was supported for some time (Plfs. Res. to SMF ¶ 51), and that PVS's make-or-buy

analysis "favored the option of shutting down the Bay City Sulfuric Acid manufacturing facility and purchasing acid from Noranda" (Plfs. Res. to SMF ¶ 48). At most, Plaintiffs can establish that the Bay City Plant earned a profit in 1990, the year PVS closed it and bought its acid requirements. That does not create any genuine issue of material fact regarding whether PVS's decision to close the Bay City Plant was the result of its own independent economic analysis and determination that the analysis favored closing the Plant and buying acid, rather than continuing to manufacture it.

> III.   Acknowledgement In the Contracts that PVS Would
> Close Its Copley and Bay City Plants Does Not
> Evidence That PVS's Decision To Do So Was Not
> the Result of Independent Analysis and Action

Both the March 11, 1988 Agreement (dealing with the Copley Plant, which PVS decided in August 1987 to close) and the August 1, 1990 Agreement (dealing with the Bay City Plant, which PVS decided in June 1990 to close) acknowledge that PVS will close those facilities. The March 11, 1988 Agreement recites that "WHEREAS, PVS Chemicals will discontinue production of sulfuric acid at its acid plant at Copley, Ohio" (SMF ¶38, Ex. 21) and the August 1, 1990 Agreement recites that "WHEREAS, PVS's affiliate intends to discontinue production of sulfuric acid at its acid plant at Bay City" (SMF ¶54, Ex. 27). Plaintiffs argue that "[n]either Noranda or PVS has a credible explanation for why shut down provisions would be included in a purchase and sale agreement between horizontal competitors" (Plaintiffs' Response Brief at 72). That those provisions were included does not represent a contractual obligation on behalf of PVS, but instead simply reflects a decision that PVS made -- independently and prior to deciding to contract with Noranda -- to close each of those facilities. Reciting those facts in the contract in no way establishes that closing the Copley and Bay City Plants was a *quid pro quo* for

Noranda's agreement to supply PVS, and it certainly does not dispute that fact that PVS decided to close those plants based upon its own prior, independent analysis.

As argued in Noranda's main brief, even if PVS's independent decision to close its Copley and Bay City Plants could be deemed "shut down" agreements, that conduct would be judged under a rule of reason. For the reasons set out in Noranda's briefs, which PVS incorporates herein, Plaintiffs lack evidence to establish liability under a rule of reason analysis.

Lastly, Plaintiffs weakly assert that PVS entered into a "zone contract" which they claim is an illegal market division agreement (Plaintiffs' Response Brief at 72). It is undisputed that PVS was always free to sell outside of its "zone." Mr. Larson testified:

> Q. After the zone bidding was accomplished and various zones were awarded, was there anything that prevented PVS from making acid sales outside the zones that did cover it?
>
> A. No, we were free to sell acid wherever we wanted.
>
> Q. Were you free to sell acid outside the zones that you were assigned under those zone contracts?
>
> A. Yes.

(Larson Dep. at 274: 20-24; 275: 1-5; SMF Ex. 10).

### IV.    Conclusion

Plaintiffs present no evidence to dispute that PVS closed its Copley and Bay City Plants based upon its own economic interests and as the result of its own independent make-or-buy analysis. PVS therefore is entitled to summary judgment on Plaintiffs' claims. Additionally, PVS is entitled to summary judgment for the reasons set out in co-defendant Intertrade's motion for summary judgment regarding the statute of limitations, Noranda's motion regarding the rule of reason and revenue sharing agreements, and Falconbridge's motion regarding zone contracts.

Respectfully submitted,


By: /s K. Scott Hamilton_____
One Of The Attorneys On Behalf Of PVS
K. Scott Hamilton (P44095)
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
Phone: 313-223-3500

*Attorneys for Defendant*
*Pressure Vessel Services, Inc.*



Dated: December 12, 2006

## CERTIFICATE OF SERVICE

K. Scott Hamilton certifies that on_____, 2006, he served PVS's Motion for Summary Judgment and Proof of Service upon counsel of record by Electronic Filing, Facsimile, Federal Express, and/or First Class Mail as follows:

Mary Jane Edelstein Fait
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
656 W. Randolph Street, Suite 500W
Chicago, IL 60661
*Plaintiffs' Co Lead Counsel*

*Via E-filing, Facsimile and Federal Express*

Joseph C. Kohn
Robert J. LaRocca
**KOHN SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
*Plaintiffs' Co Lead Counsel*

*Via E-filing, Facsimile and Federal Express*

Thomas Fina
Todd McLawhorn
**HOWERY SIMON ARNOLD & WHITE**
1299 Pennsylvania Avenue, N.W.
Washington, DC. 20004
*Counsel for Koch Industries, Inc.*

*Via E-Filing and First Class Mail*

Edward L. Foote
R. Mark McCareins
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601
*Counsel for Chemtrade Logistics (U.S., Inc. and Marsulex, Inc.*

*Via E-Filing and First Class Mail*

Edward M. Ordonex
Hugo Chaviano
**SANCHEZ & DANIELS**
333 West Wacker Drive, Suite 500
Chicago, IL 60606
*Council for E.I. DuPont de Nemours & Co., Inc. and Norfalco, LLC*

*Via E-Filing and First Class Mail*

Steven O. Sidener
Joseph M. Barton
**GOLD BENNETT CERA & SIDENER LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105
*Plaintiffs' Co Lead Counsel*

*Via E-Filing, Facsimile and Federal Express*

Steven A. Asher
**WEINSTEIN KITCHENOFF & ASHER**
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
*Plaintiffs' Co Lead Counsel*

*Via E-filing, Facsimile and Federal Express*

Jaime Kilbreth
**VERRILL & DANA, LLP**
One Portland Square
Portland, ME 04112-0586
*Counsel for GAC Chemical Corp.*

*Via E-Filing and First Class Mail*

16

David C. Gustman
**FREEBORN & PETERS**
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
*Counsel for Noranda, Inc., Falconbridge Ltd.,*
*and Norfalco LLC*

*Via E-Filing and First Class Mail*

Stephen J. Kastenberg
**BALLARD SPAHR ANDREWS & INGERSOLL,**
**LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
*Counsel for E.I. DuPont de Nemours and Co.,*
*Inc.*

*Via E-filing and First Class Mail*

William Edward Snyder
Michael Patrick Connelly
**CONNELLY, ROBERTS & MCGIVNEY LLC**
One North Franklin, Suite 1200
Chicago, IL 60606
*Counsel for Intertrade Holdings, Inc.*

*Via E-Filing and First Class Mail*

DETROIT 46831-1 968190v1

**INDEX OF EXHIBITS TO
PVS'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

<u>**EXHIBIT**</u>                 <u>**DESCRIPTION**</u>

1                          Page 87 of the Deposition of Dean Larson held on
                           June 23, 2005

2                          Pages 12, 13, 14, 18, 38, 45, 46 of the Deposition of
                           Richard Peacock held on September 7, 2006

DETROIT 46831-1 968604v1

# EXHIBIT 1

**(Page 87 of the Deposition of Dean Larson
held on June 23, 2005)**

1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

4

5    IN RE SULFURIC ACID         )

6    ANTITRUST LITIGATION        )MDL DOCKET NO. 1536

7    ------------------------------)CASE NO. 03 C 4576

8    THIS DOCUMENT RELATES TO:     )

9    ALL RELATED ACTIONS         )

10

11         The deposition of DEAN LARSON, called

12   for examination, taken pursuant to the Federal

13   Rules of Civil Procedure of the United States

14   District Courts pertaining to the taking of

15   depositions, taken before ELLEN DUSZA, CSR No.

16   84-3386, a Notary Public within and for the County

17   of Cook, State of Illinois, and a Certified

18   Shorthand Reporter of said state, at Suite 1111,

19   55 West Monroe Street, Chicago, Illinois, on the

20   23rd day of June, A.D. 2005, at 9:34 a.m.

21

22

23

24

down."

        Do you know what that refers to, reading that today?

A.    I do not.  I mean I can translate US short ton, and it refers that we can save 8 to $12 by running the plant.

Q.    Versus shutting it down?

A.    Right.

Q.    And do you know what that refers to?

A.    I believe that would be called a negotiating ploy.

Q.    It follows -- at least Mr. Skurnac continues to say, "Although this cost seems excessive compared to the cost of constructing a unit train facility, Noranda would like to retain the option of supplying acid to Copley or operating the plant at our expense until the Horne Acid Plant comes on stream."

        Reading that today and looking at that time frame, do you know what that was referring to?

A.    I honestly don't understand the paragraph in its entirety.

Q.    Do you have any idea of what that's referring to?

# EXHIBIT 2

**(Pages 12, 13, 14, 18, 38, 45, 46 of the
Deposition of Richard Peacock held on September 7, 2006)**

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4                                              COPY

5   In re SULFURIC ACID ANTITRUST

6   LITIGATION,                        Master File

7                                      No. 03-CV-4576

8   THIS DOCUMENT RELATES TO           MDL No. 1536

9   All Related Actions,               Judge David H. Coar

10                                      Magistrate Judge

11                                      Jeffrey Cole

12                        /

13  DEPONENT:  RICHARD PEACOCK

14  DATE:      Thursday, September 7, 2006

15  TIME:      2:00 p.m.

16  LOCATION:  10900 Harper Avenue

17             Detroit, Michigan

18  REPORTER:  Laura E. Rochow, CSR-3162

19             Certified Shorthand Reporter

20

21

22

23

24

25

1   A.   Nothing of significance to Dow.  If we did, I don't

2         recall it.

3   Q.   Moving on, in Paragraph 7 you say that following the

4         loss -- quote, Following the loss of Dow as a

5         customer, the Bay City plant's principal customer

6         became PVS in Detroit.

7                 Is that -- end quote.  Is that the parent

8         company you're referring to?

9   A.   That's the parent company.

10   Q.   The paragraph goes on to state, quote, Given the

11         100-mile distance between Bay City and Detroit,

12         however, the additional freight costs transporting the

13         acid from Bay City to Detroit made the Bay City

14         operations economically unsound.  Do you see that?

15   A.   I do.

16   Q.   What did you mean by, "economically unsound"?

17   A.   When I got here in 1988, in my mind it sometimes comes

18         up as '89 but it was 1988 when I arrived here, the

19         chemical distribution business that I came to look

20         after and continue to look after sold sulfuric acid,

21         most of which, if not all of which, was produced in

22         the Bay City plant.  It was a very unprofitable

23         component of PVS Nolwood Chemical's business when I

24         arrived here.

25   Q.   Was PVS Nolwood actually losing money on its sulfuric

1       acid business when you came?

2   A.   I don't recall if we were losing money in total but

3       certainly there were some accounts where we were

4       selling at or below cost.  We were not able to compete

5       in the marketplace with prices that were being offered

6       by others.

7   Q.   In your next paragraph, which I believe your comments

8       segue into, you state, quote, Before the end of 1989,

9       PVS management had determined that, beyond losing Dow

10      Chemical as a customer, the Bay City plant's continued

11      operation was made even more economically unviable by

12      the plant's old age and inefficiency, end quote.

13            Were you involved in making that

14      determination?

15  A.   I was saddled with selling sulfuric acid at prices

16      that were terribly unattractive to the business.

17  Q.   So you came in, if I can just paraphrase, you came in

18      when the company was financially not doing very well

19      with its sulfuric acid due to the loss of a big

20      customer and an inefficient plant?

21  A.   Yes.

22  Q.   What if any action did you take to try to overcome

23      those problems?

24  A.   Well, I challenged my sales force to help us find

25      products that we could manufacture at Bay City where

```
 1        we could upgrade the value of the product we were

 2        producing there and possibly build a business that

 3        could consume the product on site and be in a more

 4        profitable position.

 5   Q.   Did -- when did the possibility of actually closing

 6        the Bay City plant come up as an option?

 7   A.   I couldn't know that precisely but shortly after I

 8        joined the company in '88 we closed our plant in

 9        Copley, Illinois and because we were able to buy

10        product considerably cheaper than we could manufacture

11        at Copley, and we've been doing that for some time.

12        Certainly something that I would have encouraged the

13        company to do so that I could have sulfuric acid that

14        was competitive to sell in this marketplace.

15   Q.   So Copley was closed about the same time you came on

16        here?

17   A.   Shortly after.

18              MR. NORDAHL:  Just to clarify, I think you

19        said Copley, Illinois.

20              THE WITNESS:  I'm sorry, Copley, Ohio.

21   Thank you.

22 BY MR. BARTON:

23   Q.   There a few Copleys out there?

24   A.   No other Copley that I know of other than the one

25        outside of Cleveland, Ohio.
```

1   A.   That's correct.

2   Q.   Yeah, and then Paragraph 13 says, "in June 1990," so

3        sometime after the presentation and the economic

4        analysis --

5   A.   -- thank you.

6   Q.   Your declaration says that the company and the PVS

7        parent decided to close the Bay City plant?

8   A.   That's correct.  The decision to close the plant was

9        based on the economic evaluation.

10  Q.   Now, had you talked to Noranda prior to making that

11       decision in June 1990 about selling their acid?

12  A.   I wasn't involved in any discussions with Noranda but

13       Noranda was already a supplier of the sulfuric acid to

14       our facility in Copley so certainly there had been

15       much discussion with Noranda about supplying sulfuric

16       acid to the firm.

17  Q.   Again, just to clarify, you were not personally

18       involved in any discussions with Noranda prior to

19       June 1990 about supplying acid?

20  A.   No.  No.  I didn't participate in the negotiations to

21       procure acid at all.  I participated in sales meetings

22       where I believe Noranda may have been present.  I

23       recall being in meeting with Noranda but certainly I

24       was not involved in any negotiation to buy acid.

25  Q.   Do you recall being in any meetings where the subject

1      and we are a resale company.  We're a chemical

2      distribution business and we don't really manufacture

3      anything.  We buy low and sell high.  So it was my job

4      to try to sell sulfuric acid for more than I paid for

5      it and pay as little as I can and sell it for as much

6      as I can.

7              This contract certainly improved the

8      profitability of my sulfuric acid business.

9   Q.   I'm done with Number 8.  We'll mark Number 9.

10              (Deposition Exhibit 9 was marked for

11              identification.)

12  BY MR. BARTON:

13  Q.   This document is Bates Numbered NFD 163329 to 163330.

14       Have you ever seen this document before?

15  A.   Not that I recall.

16  Q.   Were you ever involved in negotiating for sight

17       rehabilitation costs associated with the Bay City

18       plant?

19  A.   No, I was not involved in that at all.

20  Q.   Again, just to clarify, you weren't involved in any of

21       the negotiations of the terms between Noranda and PVS?

22  A.   I was not.

23              MR. BARTON:  Why don't we -- can we take

24       five or ten minutes?  I'll just go through my notes

25       here.

1        MR. HAMILTON:  Mr. Peacock, I just have a

2    couple hopefully very quick questions.

3                    E X A M I N A T I O N

4    BY MR. HAMILTON:

5    Q.    With respect to Exhibit 2, your affidavit, there are

6        three exhibits, A, B and C.  If called upon to testify

7        at the time of trial, would you be able to testify to

8        the matters -- the substance of the matters set out in

9        those three documents?

10   A.    Certainly.

11                    MR. HAMILTON:  I don't have any additional

12       questions.

13                    MR. NORDAHL:  I just have a really quick

14       question, if I might.

15                    E X A M I N A T I O N

16   BY MR. NORDAHL:

17   Q.    Turning to that same exhibit.  I think there was some

18       question earlier in the deposition about the date of

19       the document.  If you could turn to page PVS 109468.

20   A.    Okay.

21   Q.    Do you see the first column entitled YTD actual

22       5-31-90?

23   A.    I do.

24   Q.    Does that refresh your recollection as to the time

25       frame when this study may have been conducted?

```
 1   A.    Yes.  I believe during the questioning there was a

 2         question about an early June document and I was trying

 3         to confirm the dates and about the same time I

 4         realized that this sales data was through the end of

 5         May the question was -- might seemed to have been

 6         answered clearing up the dates on the part of

 7         Mr. Barton's comments.  So I didn't point out that

 8         it's obvious that this was data as of the end of May.

 9               MR. NORDAHL:  That's the only question I

10         have.  Thank you.

11               MR. BARTON:  I have no questions.

12               MR. HAMILTON:  Bill, anything from your

13         end?

14               MR. O'NEIL:  I have no questions.

15               (The deposition was concluded at 3:35 p.m.)

16                        - - -

17

18

19

20

21

22

23

24

25
```