**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In Re SULFURIC ACID ANTITRUST LITIGATION | ) ) ) | MDL Docket No. 1536 Case No. 03 C 4576 |
| This Document Relates to: | ) ) | |
| ALL RELATED ACTIONS | ) | HONORABLE DAVID H. COAR |

## MEMORANDUM OPINION AND ORDER

Plaintiffs have filed suit on behalf of a class of sulfuric acid consumers against several producers of the commodity (collectively "Defendants") for violations of § 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs allege that Defendants engaged in anticompetitive behavior by conspiring to reduce the output and fix the price of sulfuric acid in Canada and the United States. In furtherance of the conspiracy, American Defendants GAC Chemical Corporation ("GAC"),[1] Boliden Intertrade Holdings, Inc. ("Boliden"), Pressure Vessel Services, Inc. ("PVS"),[2] Koch Industries Inc. ("Koch"), E.I. du Pont de Nemours and Company ("DuPont"), Marsulex, Inc., ("Marsulex"), and Chemtrade Logistics, Inc. ("Chemtrade") allegedly shut down or curtailed production in their respective facilities in favor of purchasing acid from Canadian Defendants Noranda, Inc. ("Noranda") or Falconbridge Ltd. ("Falconbridge"). Plaintiffs also allege that Defendants Noranda, Falconbridge, and DuPont operated an illegal price fixing and output restriction agreement under the label of Noranda DuPont, LLC (now "Norfalco"), a joint venture.

---

[1] Defendant GAC brought a motion to dismiss [339] that has since been rendered moot by its motion for summary judgment. Therefore, Defendant GAC's motion to dismiss is DENIED as MOOT.

[2] PVS Nolwood Chemicals, Inc. and PVS Chemicals, Inc. Ohio are also parties to this action. For purposes of this motion the three PVS-related companies will be referred to collectively as "PVS."

Plaintiffs' cases were consolidated and transferred to this Court by the Multidistrict Litigation Panel on July 1, 2003. The Court certified Plaintiffs' class on March 21, 2007.

Before this Court are motions for summary judgment brought by Defendants GAC [413], Noranda [418], Boliden [422], Falconbridge [426], PVS [430], Norfalco [433], and Koch [439]. All Defendants join in each other's motions. For the reasons stated below, the motions of Defendants Noranda, Boliden, PVS, Norfalco, and Koch are DENIED. Defendant Falconbridge's motion is DENIED in part and GRANTED in part. The Court GRANTS Defendant GAC's motion for summary judgment.

## FACTS[3]

The instant action centers on allegedly anticompetitive behavior that took place in the sulfuric acid market in Canada and the United States from 1988 through 2001.

A. Parties

1.  The named Plaintiffs are Ohio Chemical Services, inc., Independent Chemical Corporation, National Alum Corporation, Producers Chemical Company, Old Bridge Chemicals, Inc., and AG RX. Each claims to have purchased sulfuric acid directly from one or more of the Defendants or their alleged co-conspirators.

2.  The Defendants are Norfalco, Noranda, Falconbridge, PVS, GAC, and Koch. Defendants Noranda and Falconbridge, both located in Canada, were at all relevant times in the mining business, and were involuntary producers of sulfuric acid as a consequence of their metal smelting activities. The other Defendants were at various times in the business of manufacturing, marketing, selling, or distributing sulfuric acid in the United States.

3.  Defendants who have already reached settlement with Plaintiffs include DuPont, Marsulex, and Chemtrade.

---

[3] Several parties have chosen to disregard this Court's standing order and Rule 56's purpose of increasing the efficiency of these proceedings by providing argument, disputed facts, and inaccurate/insufficient citation in their statements of facts. Plaintiffs' statement of fact especially suffers from such conduct. As stated in its standing order, the Court shall not consider inappropriate arguments presented in the parties' Rule 56.1 statements.

## B. Jurisdiction

4.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

5.   Plaintiffs also allege that personal jurisdiction over the defendants comports with the United States Constitution. Plaintiffs allege that venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. § 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d) based upon their allegations that Defendants resided, transacted business, were found or had agents in this District and because of their allegations that a substantial part of the events giving rise to their claims occurred, and a substantial portion of the allegedly affected interstate trade and commerce was carried out, in this District.

## C. Procedural History

6.   Sulfuric acid consumers filed a variety of suits in United States federal courts, many of which were consolidated and transferred to this court by the Multidistrict Litigation Panel on July 1, 2003.  On motion of the Plaintiffs, this Court certified a class on March 21, 2007, made up of:

> All persons (excluding federal, state, and local governmental entities and political subdivisions, the Defendants, and their respective parents, subsidiaries and affiliates) who purchased sulfuric acid in the United States directly from one or more of the Defendants or their parents, subsidiaries, affiliates, or joint ventures during the period January 1, 1988 through January 16, 2003.

7.   Plaintiffs allege they purchased sulfuric acid directly from one or more of the defendants in this case.

## D. Sulfuric Acid Industry Generally

8.   Sulfuric acid is an extremely corrosive chemical used in many industrial processes.  The largest use of sulfuric acid in North America is to manufacture fertilizer, which is made by combining acid with phosphates.  Sulfuric acid is also an input in numerous industrial products and manufacturing processes.  For example, it is used in kraft pulp bleaching to make chlorine dioxide, a bleaching agent, and to make titanium dioxide.  (Falconbridge Rule 56.1 Statement of Facts ("SOF") ¶¶ 4, 13, 14 )

9.   Sulfuric acid is generally produced in one of two ways: voluntarily, in a process of burning elemental sulfur, or involuntarily, as a by-product from the smelting of ores into metals such as copper and zinc.  (Noranda SOF ¶ 4.)

10.     The marginal cost to a voluntary producer of sulfuric acid is generally the cost of the sulfur and the cost of operating the plant, net of a credit for any by-product energy generated during the manufacturing process.  (Noranda SOF ¶ 7.)

11.     The process of smelting ores into metals generates sulfur-containing gases, which environmental laws require to be recaptured, resulting in the "involuntary" production of sulfuric acid.  There is a dispute as to how to characterize the marginal cost to smelters of producing involuntary sulfuric acid.  (Pl. Response, Noranda SOF ¶ 8.)

12.     Because there are no commercially viable methods for disposing of or storing sulfuric acid, smelting operations producing acid have no reasonable alternative to selling it.  A smelter runs the risk of a forced shut down of its smelting operations if it is unable to sell enough sulfuric acid to avoid exceeding its storage capacity.  (Falconbridge SOF ¶¶ 7, 8, 10.)

13.     The costs of shutting down a smelter are quite high.  (Falconbridge SOF ¶ 11.)

14.     The cost of transporting sulfuric acid is large compared to its value.  (Falconbridge SOF ¶ 12.)

15.     The demand for sulfuric acid is driven for the most part by the demand for the products in which it is used as an input.  There are frequently no close substitutes for acid in these products.  (Falconbridge SOF ¶¶ 15, 16.)

16.     However, the demand for acid is not always responsive to the price of acid.  Also, the value of sulfuric acid in relation to the value of the product in which it serves as an input is small.  (Falconbridge SOF ¶¶ 16, 17.)

17.      In the 1980s, environmental legislation designed to prevent acid rain forced smelting companies to capture an increased amount of sulfuric acid as a result of their smelting processes. (GAC SOF ¶ 21.)

18.     Acid pricing eroded in the early 1990s due to the abundance of smelter acid in the market. (GAC SOF ¶ 46.)


E.  Noranda's Sulfuric Acid

19.     Noranda's core smelting operations produce base metals, such as nickel, copper, or zinc.  Sulfuric acid is not part of Noranda's core business.  (Noranda SOF ¶ 9, 18, 20.)

20.     During the 1980s, Noranda had to deal with an increased amount of sulfuric acid from its smelting processes, due in part to stricter environmental regulations for the prevention of acid rain.  Regulations required the recapture of sulfur-containing gases from the smelting process, which were converted to sulfuric acid.  (Falconbridge SOF ¶ 18.)

21. In the mid-1980s, Noranda made plans for a new sulfuric acid plant at its Horne smelter, designed to produce hundreds of thousands of additional tons of sulfuric acid per year. (Noranda SOF ¶ 16.)

22. The supply of acid in Eastern Canada, where Noranda's smelters were located, was greater than the local demand. (Falconbridge SOF ¶ 19.)

23. Noranda retained an outside consultant to investigate the market opportunities for the new sulfuric acid recovery system to be built at its Horne smelter. The result was a June 1985 report by Manderson Associates, Inc., entitled *Sulphur & Sulphuric Acid: Long Range Outlook for World and Regional Supply, Demand, Costs, and Prices with Emphasis on the Market Opportunities for By-Product Sulphuric Acid that May be Produced at Noranda's Smelter at Noranda, Quebec.* (Noranda Ex. 6 ("Manderson Report").)

24. The Manderson Report noted that, because of freight costs, the netback price from the sale of sulfuric acid from Noranda's new Horne sulfuric acid recovery plant to the U.S. market would be lower than the netbacks of "most (and possibly all) other locations that produce and market smelter acid in the U.S." (Manderson Report at 182.)

25. As used in the industry, the term "netback" or "Net Back" refers to the return on a sale net of freight costs.

26. The Report also stated that the likelihood of low net-backs from sales to the United States "suggests that Noranda would, at best, be only temporarily successful by cutting prices to gain market entry, especially against other producers of non-discretionary sulphuric acid. Moreover, there is the added danger that predatory pricing of Canadian acid would cause U.S. producers to lodge a complaint of dumping, which (if sustained) could trigger the assessment of an import tariff or other restrictions on acid movements from Canada into the U.S." (*Id.* at 182-83.)

27. The Report concluded that "the most prudent marketing approach would be for Noranda to work with existing U.S. producers of discretionary (sulphur-based) acid who, because of declining margins or other reasons, are willing to shut or throttle down their existing acid production in exchange for purchasing smelter acid. DuPont recently followed this tactic in the Chicago market- - by closing its local plant in Chicago Heights and becoming a marketer of smelter acid from Arizona. Such a move helps to preserve the existing price structure, because the existing local marketer(s) would continue not only to maintain contact with the customer(s) but also to provide delivery and related services." (*Id.* at 183.)

28. In estimating the sales prospects in the United States for Noranda's new Horne sulfuric acid plant, the Manderson Report "assumed that Noranda would pursue a sales philosophy of working with local acid marketers-producers, who would supplement part or all of their acid requirements through outside purchase. Their

idled plants would therefore serve as standby, if disruptions in supply of smelter acid take place." *Id.* at 16. The Report noted the Midwest and North Central U.S. as potentially attractive areas for the sale of acid. (*Id.* at 183.)

29. On October 18, 1985, the Canadian federal government solicited a meeting with Noranda to discuss a variety of topics with Noranda and the author of the Manderson Report. The topics included Noranda's "marketing strategy" for sulfuric acid, and whether there were "producers-sellers" that were "likely candidates" for the arrangements discussed in the report. (Noranda SOF ¶ 30.)

## F. Noranda's entrance into US markets

30. U.S. trade laws sanction imports that compete with American products if the American producers can make a case that prices are too low, a condition called "dumping." (Noranda SOF ¶ 31.)

31. Noranda was concerned that selling its acid directly to end-user consumers in the United States would put it at risk of an anti-dumping action brought by voluntary producers of sulfuric acid. (Noranda SOF ¶ 31.)

32. Noranda knew that certain voluntary producers in the U.S. had old and inefficient production facilities. As of the mid-1980s, "[m]ost of the acid plant capacity outside of the southeastern U.S. [was] from units which [were] fifteen years or older." (Manderson Report at 12.)

33. Noranda Sales Corporation, Noranda's wholly-owned sales and marketing subsidiary, proposed a strategy called "displacement by agreement," whereby Noranda would sell sulfuric acid to voluntary producers at a price lower than the costs of manufacturing the acid. (Def. Response, Pl. SOF ¶ 12.)

34. There is significant dispute as to promises and understandings beyond the face of Defendants' sales contracts. The primary dispute among the parties is whether Noranda required producers to shut down or curtail acid production as a condition of entering these agreements, and whether the purpose of these agreements was to stabilize prices, control industry output, and prevent competition.

35. During the relevant time, Noranda also sold through resellers and to end-user customers in the United States. (Noranda SOF ¶ 41.)

## G. PVS Involvement

36. Plaintiffs allege that Noranda and PVS entered into agreements to shut down PVS's sulfuric acid production facilities in Copley, Ohio, and Bay City, Michigan, thereby reducing the total amount of acid in the marketplace by 100,000 metric tons annually. (Compl. ¶¶ 38, 44.)

37.   PVS operated a sulfur burner in Copley, Ohio, that had been built in the early 1970s.  (Pl. Response, PVS SOF ¶ 16.)

38.   In 1987, PVS conducted a make-or-buy analysis to determine whether to continue producing sulfuric acid at Copley or obtain its requirements from another source. (PVS SOF ¶ 20.) In addition to Noranda, PVS considered Phelps Dodge, Kennecott, Monaca, and Asarco as potential suppliers.  (PVS SOF ¶ 25.)

39.   PVS ultimately determined that it would shut down the Copley plant's sulfuric acid manufacturing process and purchase the sulfuric acid it needed to service its customers.  (PVS SOF ¶ 26.)

40.   PVS executive, Donald Sosnoski, wrote regarding the prospect of a distribution contract with Noranda:

   "As I understand the market circumstances in Ohio, our choices are not between running the plant or proceeding with the unit train proposal. Rather, they are apparently between proceeding with the unit train proposal or gradually shutting down the plant and getting out of the sulfuric acid market in Ohio. Apparently, the Noranda acid is destined for the Ohio market, and if we don't control it, someone else will. The latter would apparently result in depressed prices and make it uneconomical to operate the plant."  Noranda Ex. 36 (3/1/88 Sosnoski Mem.) at 3.

41.   PVS and Noranda entered into a contract whereby PVS agreed to purchase an estimated 60,000 tons of sulfuric acid annually from Noranda. (PVS SOF ¶ 40.)

42.   The agreement between Noranda and PVS-Copley includes a revenue sharing provision.  (PVS Ex. 31, Copley Contract at ¶ 13.)

43.   PVS acquired its Bay City, Michigan sulfuric acid plant on or around April 30, 1976, in order to supply one principal customer, Dow Chemical, in Midland, Michigan. The plant was built many years before then.  (PVS SOF ¶ 42.)

44.   After the loss of Dow Chemical as a customer, the Bay City sulfuric acid facility principally supplied PVS in Detroit, Michigan.  (PVS SOF ¶ 44.)

45.   The additional freight costs of transporting acid over more than 100 miles to Detroit, combined with the plant's old age and inefficiency, made the Bay City operations economically unsound.  (PVS SOF ¶¶ 44, 45.)

46.   At some point, PVS considered purchasing its sulfuric acid requirements from smelting companies, rather than continuing to manufacture acid at Bay City. (PVS SOF ¶ 47.)

47.   PVS assessed the possibility of purchasing acid from Phelps Dodge, Asarco, Kennecott, Inco, Noranda, or Falconbridge.  (PVS SOF ¶ 47.)

48. A formal analysis conducted in June 1990 favored purchasing acid from Noranda. (PVS SOF ¶¶ 47, 48.)

49. On August 1, 1990, PVS entered into a contract with Noranda for the sale and delivery of PVS's sulfuric acid requirements to its Detroit facility, in the amount of 40,000 tons of acid annually. (PVS SOF ¶ 54.)

50. The Bay City plant shut down in 1990. (PVS SOF ¶ 52.)


## H. GAC Involvement

51. Plaintiff alleges that Delta Chemicals, Inc. ("Delta") coordinated with Noranda to shut down its sulfuric acid plants. The shutdowns allegedly removed 60,000 to 70,000 tons of annual capacity from the sulfuric acid market. (Compl. ¶ 40.)

52. Delta operated two acid plants at its Searsport facility from which it manufactured acid for sale to customers. (GAC SOF ¶ 7.)

53. At some point in the 1980s, when sales of sulfuric acid began to outpace Delta's manufacturing ability, the company began purchasing acid from third parties like Noranda to satisfy customer demand (GAC SOF ¶ 9, 28.)

54. Delta had environmental problems at the Searsport sulfuric acid facility starting as early as 1977. (GAC SOF ¶¶ 10, 11.)

55. In light of the costs required for environmental compliance, Delta performed a make-or-buy analysis to determine whether it would be more economical to continue producing sulfuric acid at Searsport, or instead buy 100% of Delta's acid requirements from a third party. (GAC SOF ¶ 15.)

56. Negotiations began between Delta and Noranda over the purchase of Delta's acid requirements. (GAC SOF ¶ 12.) On October 6, 1989, the companies entered into a contract for the sale by Noranda to Delta of "the total requirement of sulphuric acid by internal consumption at and sales from [Delta's] Searsport facility." (GAC SOF ¶ 39, 40; GAC Ex. 23 at p. 2.)

57. The Delta Contract stated that purchases would begin "no later than November 1, 1989, and continue to December 31, 1996, and thereafter from year after year subject to the right of termination. . . ." (GAC Ex. 23 at p. 6.)

58. The "revenue sharing" provision between Noranda and Delta provides that "any increase or decrease in Gross Margin [on Delta's sales to its customers]. . . shall be shared equally" by Noranda and Delta.

59. By their terms, the revenue-sharing agreements relate only to the distribution of Noranda's product.

60. Delta shut down of the Searsport facility in 1988. (GAC SOF ¶ 42.)

61. On or about March 8, 1994, GAC purchased the assets of Delta for $8.02 million, subject to certain adjustments, pursuant to an Asset Purchase Agreement of that date. (GAC Ex. 26.)

62. Delta and GAC survived as separate entities. (GAC Ex. 26 ¶ 1.2, 1.3, 2.2, 11.1, 11.2.)

63. Paragraph 2.2 of the Asset Purchase Agreement provides that, except for certain specific "Assumed Liabilities," GAC "shall in no event assume or be responsible for any liabilities, liens, security interests, claims, obligations, or encumbrances of [Delta]." (GAC Ex. 26 ¶ 2.2.)

64. When GAC acquired Delta's assets, the Searsport facility was not valued in or considered as part of the acquisition. Delta's Searsport plants were inoperable and incapable of producing sulfuric acid. Many of its components had rusted or were missing. (GAC SOF ¶ 54, 55.)

65. On or about March 19, 1995, Noranda and GAC agreed to revise the pricing for the balance of their 1995 sales, as well as develop a long-term, post-1995 contract. (GAC SOF ¶ 59.)

66. On March 1, 1996, GAC entered into a new sulfuric acid supply contract with Noranda. (GAC SOF ¶ 60; GAC Ex. 28.)

67. The GAC Contract does not have any "revenue sharing" provisions, customer allocation provisions, or territorial restriction provisions. (GAC SOF ¶ 61; GAC Ex. 28.)

68. At some point, GAC later contracted with the Noranda DuPont Joint Venture for the supply of sulfuric acid. Pl. SOF ¶ 38.

I. Koch Involvement

69. Plaintiffs allege that, pursuant to agreements with Noranda, Koch Sulfur Products Company or Koch Sulfur Products Company, LLC (collectively "Koch") closed or scaled back production its sulfuric acid plants, thus removing supply from the market. (Compl. ¶ 41.)

70. Koch operated various sulfuric acid production facilities until 2002, when it completed its exit from the sulfuric acid business. Koch also marketed another company's sulfuric acid by-product and operated terminals for the receipt and storage of acid purchased for resale or produced internally. (Koch SOF ¶¶ 7, 8.)

71.    Koch operated at a relatively small scale compared to the total amount of U.S. sales of sulfuric acid.  (Koch SOF ¶ 13.)  Its production of sulfuric acid fluctuated every year at each of its facilities. (Koch SOF ¶ 9.)

72.    From 1988 to 1990, Koch sought to expand its sulfuric acid trading business. It was able to do so by purchasing additional sulfuric acid from other sources (both voluntary producers and involuntary smelter producers, including those located in Europe) and reselling it in the marketplace. (Koch SOF ¶¶ 10, 23.)

73.    Koch closed two sulfuric acid plants during the 15-year putative class period. (Koch SOF ¶ 17.)

74.    Koch purchased the Acme, North Carolina plant in 1990 and closed it in 1991. (Koch SOF ¶ 18.)

75.    Koch leased the DeSoto, Kansas facility from the United States Army. The DeSoto plant ceased manufacturing sulfuric acid at in June 1999.  (Koch SOF ¶¶ 20, 21, 29.)

76.    At some point, Koch internally discussed and compared its cost of production to its cost of purchasing sulfuric acid from others, including Noranda.  (Koch SOF ¶ 24.)

77.    Discussions took place in 1998 and 1999 between Koch and the Noranda DuPont Joint Venture, in which Koch negotiated to buy sulfuric acid from the joint venture.  (Koch SOF ¶ 27.)

78.    The explicit terms of any of Koch's agreements with Noranda or Noranda DuPont never included revenue sharing provisions, territorial allocations, customer restrictions, conditions that Koch purchase all its requirements from the seller, or any restrictions on what Koch would charge in the event it resold the acid it purchased.  (Koch SOF ¶ 14.)


J.   Noranda/Falconbridge Ownership

79.    Falconbridge's core products were nickel and copper, not sulfuric acid.  (Noranda SOF ¶ 19.)

80.    Alex Balogh, previously of Noranda Copper, became President of Falconbridge in 1989.  (Falconbridge SOF ¶ 21.)

81.    From 1994 through 2001, Balogh served as both the Chairman of Falconbridge's Board of Directors and the Deputy Chairman of Noranda's Board of Directors. (Falconbridge SOF ¶ 25.)

82.    From 1989 through 2003, Noranda had more members on Falconbridge's Board of Directors than any other single entity. (Falconbridge SOF ¶ 24.)

83.     From 1989 until June 1994, Noranda owned 50% of Falconbridge. Trelleborg AG ("Trelleborg") owned the other half.  (Falconbridge SOF ¶ 43, Noranda SOF ¶ 3.)

84.     In 1994, Trelleborg sold a large percentage of its shares to the public.  Its holding in Falconbridge was reduced to 28%, leaving Noranda (with 46.4%) as Falconbridge's largest shareholder.  (Falconbridge SOF ¶ 22.)

85.     Between 1994 and 2000, Noranda owned between 46.3% to 54.9% of the company, though it only became a majority shareholder after July 19, 2000.  (Pl. Ex. 9, 268.)  During this period, the remaining shares of Falconbridge were publicly owned with no significant shareholder other than Noranda. (Falconbridge SOF ¶ 23.)

86.     Between 2000 and 2003, Noranda's ownership interest ranged from 54.9% and 59.5%, with no other shareholder owning a significant interest.  (Falconbridge SOF ¶ 26.)

87.     Since July 1, 1994, Falconbridge's financials have been fully consolidated in Noranda's consolidated financial statements.  (Falconbridge SOF ¶ 28.)

88.     In 2000, Noranda and Falconbridge began to integrate a number of departments and business units in order to achieve managerial and operational cost-efficiencies.  (Falconbridge SOF ¶ 29.)

89.     In June 2005, Noranda and Falconbridge merged and the former Noranda and Falconbridge now form one company, under the name of Falconbridge Limited. (Falconbridge SOF ¶ 30.)

90.     Noranda and Falconbridge were viewed by the market as one single entity. (Falconbridge SOF ¶ 31.)


K.  Noranda/Falconbridge Sales Relationship

91.     Due in part to stricter environmental regulations during the 1980s, Falconbridge also had to contend with increased amounts of sulfuric acid from its smelting operations. (Falconbridge SOF ¶ 18.)

92.     Falconbridge did not have experience in selling sulfuric acid to end users. (Falconbridge SOF ¶ 34.)

93.     Noranda had experience marketing its metals directly, as well as in marketing its sulfuric acid in the United States through a group of distributors.  Noranda conducted these marketing activities through Noranda Sales Corp., its wholly-owned sales and marketing subsidiary.  (Falconbridge SOF ¶ 35.)

94.     On March 1, 1990, Falconbridge appointed Noranda Sales to be its sales agent for the sale of zinc, copper, gold, silver, cadmium, and zinc and copper concentrates. (Falconbridge SOF ¶ 36.)

95.     In April 1991, Falconbridge appointed Noranda as its sole sales agent responsible for the sales, marketing and distribution of the sulfuric acid that Falconbridge produced as a consequence of its smelting activities. (Falconbridge SOF ¶ 37.)

96.     After the agency appointment, Noranda handled the sales and marketing of Falconbridge's sulfuric acid until the agency relationship for the sale of acid in the United States terminated in 1998 with the formation of the Noranda DuPont Joint Venture. (Falconbridge SOF ¶ 38.)

97.     This agency agreement streamlined the marketing and sale of sulfuric acid produced by the Noranda/Falconbridge system. It was also desirable because Falconbridge did not have a marketing organization for its own acid. (Falconbridge SOF ¶ 39.)

98.     In the agency arrangement between Noranda and Falconbridge, Falconbridge retained the title to and ownership of the acid, including the ultimate risk of non-sale of the acid. (Falconbridge SOF ¶ 42.)

## L. Noranda DuPont Joint Venture

99.     In an effort to optimize the distribution of Noranda-Falconbridge sulfuric acid, the companies considered forming a joint venture with a distributor. The companies believed that the arrangement would eliminate third-party commissions and increase certainty that their by-product acid would be shipped and sold. (Norfalco SOF ¶¶ 10, 12, 13.)

100.    Noranda considered several existing distributors as potential joint venture candidates, assessing them for attention to safety, environmental standards, distribution expertise, infrastructure, and access to markets. (Norfalco SOF ¶ 14.)

101.    Concerned about antidumping actions by American acid producers, Noranda also considered whether the potential joint venture partner could offer protection from an antidumping action. (Norfalco SOF ¶ 15.)

102.    DuPont was the candidate that received the highest overall ranking in Noranda's evaluation of the strength of potential joint venture partners. (Norfalco SOF ¶ 16.)

103.    DuPont saw a joint venture with Noranda as an opportunity to grow its business, by gaining access to substantially higher volumes of product than DuPont could achieve on its own. (Norfalco SOF ¶ 17.)

104. Noranda and Falconbridge hoped to achieve numerous efficiencies through a joint venture with DuPont, including an opportunity to generate savings on freight costs and to supply customers from plants in multiple locations. (Norfalco SOF ¶¶ 19, 20.)

105. A "white paper" drafted by DuPont projected that DuPont would contribute leased transportation equipment, terminal agreements, market access, and technical and business expertise to the Joint Venture, while Noranda would contribute transportation equipment and technical and business expertise. Both partners would contribute their output of non-fuming sulfuric acid. (Norfalco SOF ¶ 18, 2/6/98 DuPont White Paper, Ex. 15.)

106. In the fall of 1997, Noranda and DuPont hired the independent accounting firm Deloitte & Touche to assist in evaluating the potential economic benefits of a joint venture. The firm was hired so that each party's competitively sensitive information would be kept from the other party. (Norfalco SOF ¶ 24.)

107. Noranda and DuPont asked Deloitte & Touche to estimate the value gained by forming a direct sales joint venture instead of paying intermediaries (i.e., resellers) to distribute sulfuric acid. Deloitte & Touche foresaw "an average gross [profit] margin of US $9.49 per short ton for direct shipments and US $5.95 per short ton for shipments through terminals." (Norfalco SOF ¶ 25, 12/1/97 D&T Letter, Ex. 19.)

108. On April 13, 1998, Noranda and DuPont executed a Letter of Understanding regarding the formation of the joint venture, to be named Noranda DuPont LLC ("Noranda DuPont" or "Joint Venture"). Therein, Noranda and DuPont proposed to "assign certain agreements to [the] LLC, including but not limited to reseller agreements, railcar leases, terminal agreements, vessel charter parties, barge leases and truck destination agreements, and to transfer certain other assets to" the Joint Venture. (Norfalco SOF ¶ 26, 4/13/98 Letter of Understanding, Ex. 21. at ND00087881.)

109. On April 15, 1998, the Joint Venture's Certificate of Formation as a limited liability company was filed in the office of the Secretary of the State of Delaware. (Norfalco SOF ¶ 27.)

110. On June 22, 1998, Noranda and DuPont entered into a short-form Limited Liability Company Agreement. Shortly thereafter, Noranda and DuPont entered into an Amended and Restated Limited Liability Company Agreement, under which Noranda and DuPont each received a fifty-percent interest in the joint venture in exchange for their respective contributions to the Joint Venture of certain assets and cash in the amount of $5,000. (Norfalco SOF ¶ 28.)

111. The LLC Agreement states that "[t]he sole purpose of the Company is to engage in the business of purchasing, transporting, distributing, marketing and selling Acid produced in the United States and Canada, and to engage in any and all

lawful activities necessary or advisable in connection therewith or incidental thereto." (Norfalco SOF ¶ 30, 7/1/98 Amended LLC Agreement, § 3.1 Ex. 24.)

112. The Agreement provides that the Joint Venture "shall do all things necessary to maintain its limited liability company existence separate and apart from each Member and any Affiliate of any Member, including holding regular meetings of the Members and maintaining its books and records on a current basis separate from that of any Affiliate of the Company or any other Person." (Norfalco SOF ¶ 31, 7/1/98 Amended LLC Agreement at § 3.3, Ex. 24.)

113. The Agreement provides that Noranda DuPont LLC shall not commingle its funds with the participants or maintain joint bank accounts that could be independently accessed by its participants. (Norfalco SOF ¶ 31, 7/1/98 Amended LLC Agreement at § 3.3, Ex. 24.)

114. Noranda and DuPont each agreed to advance the Joint Venture up to $2 million to cover cash deficits. (Norfalco SOF ¶ 29.)

115. The Joint Venture's profits were split between Noranda and DuPont. The Joint Venture was also set up so that Noranda and DuPont would share in any losses resulting from the operation of the joint venture. (Norfalco SOF ¶ 34.)

116. Noranda and DuPont received a percentage of the estimated margin made by Noranda's resellers prior to the formation of the Joint Venture based upon the volume of acid that the Joint Venture was able to sell. (Norfalco SOF ¶ 35.)

117. Falconbridge was a non-voting member of the Joint Venture, but participated on the Board and functioned as a full member. (Norfalco SOF ¶ 32.)

118. It was agreed that Falconbridge would participate in Noranda's share of any distributions from, or contributions to, the Joint Venture on the basis of Falconbridge's pro-rata supply of sulfuric acid relative to that of Noranda. (Norfalco SOF ¶ 36.)

119. The Joint Venture's Board, or "Members' Committee" included representatives from Noranda and DuPont, as well as a non-voting member from Falconbridge. The Committee met on a regular basis and the management of the joint venture would submit reports on their progress. (Norfalco SOF ¶ 51.)

120. The Joint Venture had a variety of leases assigned to it by involved parties. (Norfalco SOF ¶ 39.) For example, DuPont assigned to the Joint Venture its leases for railcars, barges and tank trucks used to transport sulfuric acid to the joint venture. (Norfalco SOF ¶ 38.)

121. The Joint Venture contracted with DuPont for the services of its sales force and the use of DuPont's technological support, customer support infrastructure, rail cars, customer contacts and sales experience, and overall logistic and distributional experience. Contracted services included (a) accounting and

invoicing, tax, treasury, credit and collection; (b) information systems and network services; (c) risk management; (d) sales; (e) customer service; (f) safety; (g) human resources; and (h) logistics services, such as maintenance of equipment, transportation rate negotiations, freight services, tracking services, leasing of transportation services, contracts with carriers. The Joint Venture compensated DuPont for these services and had financial responsibility for the cost of DuPont's sales force. (Norfalco SOF ¶¶ 46, 47.)

122. The Joint Venture contracted with Noranda for certain logistics and transportation-related services, including rate negotiations with rail and truck carriers. The Joint Venture compensated Noranda for these services. (Norfalco SOF ¶ 48.)

123. Noranda, Falconbridge, and DuPont contributed man-power to the Joint Venture by "seconding" employees to operate the new company. This method allowed the employees to preserve their benefits and pension status they were paid by the respective principals. The companies invoiced the Joint Venture for the salaries and benefits of the seconded employees. It was the job of the seconded employees first and foremost to look out for the best interest of the joint venture. (Norfalco SOF ¶ 43.)

124. Noranda and Falconbridge contributed personnel to the Joint Venture with experience in acid sales and transportation logistics and management. Seconded personnel included Kim Ross, formerly the head of Noranda's sulfuric acid business; Geoff Cowell, formerly marketing manager of Noranda's sulfuric acid department; Paul Shaw, brought in to improve business relationships; Tom Kim, who had sales experience; and Joseph Plut. Ross served as president of the Joint Venture from 1998-2000, after which Shaw took over. Falconbridge seconded John Pellegrini, who was involved in supply chain and inventory management for the Joint Venture. (Norfalco SOF ¶ 44.)

125. DuPont employees seconded to the Joint Venture included John Hammond, formerly vice president of marketing and operations for DuPont's sulfuric acid business; James Pawloski, who had prior experience at DuPont with business development; and Mark Myers, who served as a business analyst for DuPont. Pawloski was involved in marketing for the Joint Venture and Myers served as a product manager, Myers had price authority for acid sales and worked with the sales force for to identify new customers and maintain existing ones. (Norfalco SOF ¶ 45.)

126. Noranda, DuPont and Falconbridge each entered into separate sulfuric acid supply agreements with the Joint Venture. Noranda and Falconbridge each agreed to sell 100% of their respective acid productions to the Joint Venture. For its part, DuPont agreed to sell all of the acid it manufactured it its plants with certain specified exceptions for acid produced for internal DuPont consumption. (Norfalco SOF ¶ 49.)

127. Under their respective supply agreements with the Joint Venture, Noranda, DuPont, and Falconbridge each retained the right to increase or decrease the amount of sulfuric acid available for delivery to the Joint Venture at any or all of their plants, and to acquire or construct additional sulfuric acid production facilities. (Norfalco SOF ¶ 50.)

128. The Joint Venture began operations on January 1, 1999. Though it had been in existence since July 1998, servicing the pre-existing distribution contracts assigned to it, the bulk of the pre-existing contracts ended and the new ones began at the beginning of 1999. (Norfalco SOF ¶ 52.)

129. The Joint Venture had its own office in Chadds Ford, Pennsylvania, which was leased by the Joint Venture and not owned by any of the participants. The Joint Venture also had an office in Missassauga, Ontario. (Norfalco SOF ¶ 53.)

130. The Joint Venture entered into contracts under its own name. (Norfalco SOF ¶ 54.)

131. The Joint Venture was responsible for setting the resale price of the sulfuric acid it purchased from Noranda, DuPont, and Falconbridge. (Norfalco SOF ¶ 55.)

132. On average, sulfuric acid contract and transaction prices fell after the formation of the Joint Venture. (Norfalco SOF ¶¶ 66, 71.) The cause of the decline is disputed.

133. The Joint Venture was able to negotiate favorable rail and transportation contracts, and was successful in lowering transportation costs. (Norfalco SOF ¶ 60.)

134. The Joint Venture relied on DuPont's national sales force, which handled a variety of chemical products. The Joint Venture argues that its sulfuric acid customers benefitted from the "one stop shopping" it was able to provide. (Norfalco SOF ¶¶ 57, 59, 61.)

135. The Joint Venture also contends that their supply of acid was less susceptible to events like strikes and maintenance shut downs. DuPont's capabilities as a voluntary producer of sulfuric acid gave the Joint Venture "backup capability" if the supply of by-product acid was held up. (Norfalco SOF ¶ 58.)

136. As a new entrant, the Joint Venture competed with other distributors of sulfuric acid for business that previously had not been the subject of competition. (Norfalco SOF ¶ 65.)

137. Documents in the files of other companies engaged in the marketing and distribution of sulfuric acid reflect a perception that the Joint Venture was lowering prices. (Norfalco SOF ¶ 67.)

138.     Koch's Samuel Murray wrote in a February 1999 memorandum that PVS had "indicated that the JV is lowering pricing by $8-10/ton." (Norfalco SOF ¶ 68, 2/99 Murray Memo, Ex. 46.)

139.     At some facilities, Plaintiff National Alum purchased sulfuric acid from the Joint Venture at a price that was $5 less per ton than the price for which it had purchased sulfuric acid from its previous supplier.  (Norfalco SOF ¶ 69.)

140.     Plaintiff Old Bridge purchased sulfuric acid from the Joint Venture at a price that was lower than the price for which it had purchased sulfuric acid from its previous supplier.  (Norfalco SOF ¶ 70.)

141.     In the early months of 1999, the Joint Venture experienced a short term inventory bubble.  Several factors contributed to the short term inventory bubble, including the following: (1) the Joint Venture's attempts to initiate its acid delivery operations and integrate the assets contributed by Noranda, Falconbridge and DuPont; (2) severe winter weather conditions preventing the shipment of acid from Canada and the return of rail cars that were needed to ship acid from the smelters; (3) vigorous competition and an effort to lock up customers by other sellers of acid in response to the announcement of the formation of the Joint Venture; and (4) an oversupply of acid in the marketplace, particularly from overseas.  (Norfalco SOF ¶ 72.)

142.     The Joint Venture took several steps to control this inventory problem that were unrelated to affecting production, including: (1) making efforts to secure additional short term storage space and maximize existing storage facilities; (2) trying to unload and return railcars as expeditiously as possible; and (3) lowering prices to make additional sales.  (Norfalco SOF ¶ 73.)

143.     Rather than manufacturing acid that the Joint Venture could not sell or store, DuPont reduced production at one or, at most, two of its sulfuric acid plants.  (Norfalco SOF ¶ 75.)

144.     Accordingly, DuPont reduced its sulfuric acid production by a maximum of 20,000 to 25,000 tons over a two-month period.  (Norfalco SOF ¶ 76.)

145.     The Joint Venture decided that it would, on a temporary basis, ship acid that it had purchased from Noranda and Falconbridge to customers that had previously received acid procured from DuPont.  The Joint Venture consulted with DuPont regarding this decision.  (Norfalco SOF ¶ 74.)

146.     The Joint Venture was successful in its efforts to address the temporary inventory bubble.  (Norfalco SOF ¶ 77.)

147.     In May 2001, Noranda redeemed DuPont's interest in the Joint Venture.  DuPont withdrew due to dissatisfaction with the Joint Venture's financial results.  DuPont also had concerns about the large "environmental footprint" associated with the

Joint Venture's transportation of over 3 million tons of a hazardous product. (Norfalco SOF ¶ 79.)

148. Immediately after Noranda redeemed DuPont's interest in the Joint Venture, the operating entity continued in the form of NorFalco LLC, a company owned by Noranda and Falconbridge. (Norfalco SOF ¶ 80.)


## M. Boliden Involvement

149. From 1989 until 1994, Trelleborg owned 50% of Falconbridge. (Falconbridge SOF ¶ 43.)

150. Trelleborg also owned 100% of Boliden Intertrade, a world-wide marketer and trader of sulfuric acid. (Falconbridge SOF ¶ 44.)

151. In 1990, Boliden purchased Tennessee Chemicals Company ("TCC"), a manufacturer and marketer of sulfuric acid. (Falconbridge SOF ¶ 44.)

152. TCC had a sulfur-burning acid plant located in Copperhill, Tennessee, and Boliden had considerable infrastructure and expertise in marketing sulfuric acid in the southeastern United States. (Falconbridge SOF ¶ 45.)

153. In 1992, Noranda Sales entered into an agreement with Boliden by which Boliden distributed Falconbridge acid to customers in the United States. (Falconbridge SOF ¶ 47.)

154. Under the agreement, Falconbridge paid Boliden a commission on sales of Falconbridge acid to Boliden customers. Falconbridge received whatever price the customer paid for the acid less Boliden's commission. Falconbridge also paid for the freight costs to deliver the acid to the customer. (Falconbridge SOF ¶ 48.)

155. Boliden was insulated from price changes in the marketplace because it received its commission per ton regardless of the price to the consumer. (Falconbridge SOF ¶ 49.)

156. In March, 1992, Boliden installed a new sulfur burner at Copperhill, Copperhill's nameplate production capacity for sulfuric acid production with this new sulfur burner increased to approximately 900,000 tons of sulfuric acid per year. (Falconbridge SOF ¶ 52.)

157. In early 1995, Boliden told Noranda and Falconbridge that it may increase its production at its Copperhill facility to actually achieve its stated nameplate capacity of 900,000 tons of acid per year. (Falconbridge SOF ¶ 53.)

158. In May 1995 Boliden reached its production capacity at its Copperhill facility achieved its stated nameplate capacity of 900,000 tons of acid per year.

(Falconbridge SOF ¶ 54.)

## N. Zone Contracts

159. Falconbridge traditionally relied on Boliden and Marsulex to sell its output of sulfuric acid. (Falconbridge SOF ¶ 57.) However, Noranda grew dissatisfied and concerned about Marsulex's performance. (Falconbridge SOF ¶¶ 58, 59.)

160. In or around 1995, Noranda, as Falconbridge's agent for the sale of sulfuric acid, restructured Falconbridge's method of distribution in the United States. (Falconbridge SOF ¶ 56.)

161. Noranda divided the northeastern half of the U.S. into 16 geographic zones, and invited certain prequalified resellers to offer to sell Falconbridge acid delivered within those zones. (Falconbridge SOF ¶ 60.)

162. Noranda offered the opportunity to bid on the zone contracts to distributors that Noranda believed "had efficiencies and goodwill for marketing acid in different geographic areas or infrastructure different areas [sic]." (Falconbridge SOF ¶ 62, Ross Dep. at 171:1-12, Ex. 17.)

163. Noranda established a number of criteria in determining which distributors would be prequalified to bid. The criteria "included things like a reseller's safety history, their infrastructure that they had in place that would be used to resell Noranda-Falconbridge sulfuric acid, their sales experience, [and] their knowledge of [Noranda and Falconbridge's] products." (Falconbridge SOF ¶ 60, Thomas Dep. at 131:19-132:10, Ex. 11.)

164. The zone contracts did not prevent the resellers from selling sulfuric acid in any geographic location that the reseller wished. (Falconbridge SOF ¶ 66.)

165. The zone contracts contained no restrictions whatsoever with regard to sales of sulfuric acid manufactured by companies other than Noranda or Falconbridge. (Falconbridge SOF ¶ 67.)

166. Marsulex, PVS, Boliden, and DuPont worked with Noranda under zone contracts. (Falconbridge SOF ¶¶ 64, 69.)

167. Plaintiffs allege that negotiations surrounding the zone contracts amount to collusive conduct aimed at allocation of customers so as to avoid competition. (Compl. ¶¶ 46, 47.)

## O. Timeline

168. Fertecon is a widely-distributed trade publication that dates to the 1980s is widely read by participants in the sulfuric acid industry. (Boliden SOF ¶ 4.)

169.   Representatives of many of the Plaintiffs would read publications such as *Chemical Marketing Reporter*, *Chemical Week*, and *Purchasing Magazine* to stay knowledgeable about the sulfuric acid industry.  (Boliden SOF ¶¶ 5-9.)

170.   Noranda and PVS entered into a contract regarding facilities in Copley, Ohio that became effective on March 11, 1988.  The March 11, 1988 contract between Noranda and PVS regarding facilities in Copley, Ohio was terminated by December 31, 1998.  (Boliden SOF ¶ 11.)

171.   Noranda and Delta entered into a contract regarding facilities in Searsport, Maine that became effective on October 6, 1989.  The October 1989 contract between Noranda and Delta was no longer in effect as of March 1, 1996, when Noranda entered into a separate contract with GAC, which had bought Delta's assets on March 9, 1994.  (Boliden SOF ¶ 12.)

172.   On August 1, 1990, Noranda and PVS-Nolwood Chemicals, Inc. ("PVS Nolwood") entered into a contract regarding facilities in Bay City, Michigan. (Boliden SOF ¶ 13.)

173.   Noranda and Koch entered into a purchase contract on June 27, 1990. (Boliden SOF ¶ 14.)

174.   Noranda and Boliden entered into a contract that was effective on January 1. 1992.  The January 1, 1992 contract between Noranda and Boliden was terminated by December 31, 1998. (Boliden SOF ¶ 15.)

175.   Noranda and DuPont entered into a contract regarding facilities in Grasselli, New Jersey that became effective on or about April 1, 1992.  The April 1992 contract between Noranda and DuPont was terminated by December 31, 1998. (Boliden SOF ¶ 16.)

176.   From 1986 through 1999, it was widely acknowledged and understood throughout the sulfuric acid industry and its publications that large volumes of smelter sulfuric acid were entering the American market from Canada.  It was also acknowledged and understood that Noranda was actively involved in developing relationships with companies involved in the American sulfuric acid regarding this development. (Boliden SOF ¶¶ 17-77.)

177.   In January 2003, the first Canadian media reports appeared regarding an investigation by the U.S. Department of Justice into anticompetitive activities involving sulfuric acid.   The articles arose after the Royal Canadian Mounted Police and Competition Bureau raided Noranda and Falconbridge offices, seizing thousands of documents. (Pl. SOF ¶¶ 171-173.)

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003)*; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

## ANALYSIS

Plaintiffs claim that Defendants violated the Sherman Act by engaging in collusive and anticompetitive behavior between 1988 and 2001. According to Plaintiffs, Noranda and Falconbridge negotiated agreements in which co-Defendants could access cheaper Noranda-Falconbridge acid if they shut down or curtailed their own voluntary production of sulfuric acid.

Profit-sharing arrangements allegedly served to distribute the proceeds of this collusion. Dominant producers Noranda, Falconbridge, and DuPont later formed a joint venture that virtually controlled the merchant market supply of sulfuric acid. DuPont allegedly restricted its production at the Joint Venture's direction. Overall, Plaintiffs allege that these arrangements enabled Defendants to control and reduce the industry-wide supply of sulfuric acid; stabilize, raise, or otherwise fix prices; and allocate market share, customers, and profits among themselves to eliminate competition.

Defendants contend that closing sulfuric acid production facilities was not, as Plaintiffs argue, a condition of any agreements to purchase Noranda-Falconbridge acid. Defendants generally argue that older facilities were shut down because the capital costs of maintaining them or complying with environmental regulations made continued voluntary production economically unfeasible. Noranda and Falconbridge further argue that DuPont's production was only temporarily reduced to deal with a short-term inventory bubble.

## I.    Choice of Law

As an initial matter, the Court must identify the governing law in this case. 28 U.S.C. § 1407 authorizes the Judicial Panel on Multidistrict Litigation to consolidate, by transfer of venue to a single district, civil actions pending in different federal courts. When cases are based on diversity of citizenship, the transferee court must apply the state laws that the transferor forums would have, according to that forums' choice-of-law rules. *See In re Data General Corp. Antitrust Litigation*, 510 F. Supp. 1220, 1227-28 (J.P.M.L. 1979) (quoting *In re Air Crash Disaster at John F. Kennedy International Airport on June 24*, 1975, 407 F. Supp. 244, 246-47 (J.P.M.L. 1976); *In re Air Crash Disaster near Chicago*, 644 F.2d 594, 610 (7th Cir. 1981). This

practice parallels the principle set forth in *Van Dusen v. Barrack*, which teaches that, under 28 U.S.C. § 1404(a), the law of the transferor forum accompanies a transfer. Just as *Erie R.R. v. Tompkins* aimed to prevent forum-shopping by compelling federal courts to apply the law of the state in which they sit, the Supreme Court in *Van Dusen* sought to "ensure that the 'accident' of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the courts of the State where the action was filed." 376 U.S. 612, 638 (1964); *see also Ferens v. John Deere Co.*, 494 U.S. 516, 1280 (1990).

With cases based on federal question jurisdiction, however, adopting the law of multiple transferor circuits poses problems. As the D.C. Circuit observed in *In re Korean Air Lines Disaster*, "because there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretations simultaneously is inherently self-contradictory." 829 F.2d 1171, 1175 (D.C. Cir. 1987). For this reason, circuits considering the issue since *Korean Air* have held that, in federal question cases consolidated under § 1407, the law of the transferor court warrants "close consideration" but does not bind the transferee court. *Id.* at 1176; *see also, e.g.*, *Menowitz v. Brown*, 991 F.2d 36, 41 (2d Cir. 1993); *In re Temporomandibular Joint Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996).[4]

Although the Seventh Circuit has yet to decide which law governs federal claims in cases transferred under 28 U.S.C. § 1407, it has adopted the rationale of *Korean Air* when resolving the question under 28 U.S.C. § 1404(a), which authorizes district courts to transfer cases for reasons of convenience. *See McMasters v. U.S.*, 260 F.3d 814, 819 (7th Cir. 2001); *Eckstein v.*

---

[4] Prior to *Korean Air*, the Judicial Panel on Multidistrict Litigation and some district courts assumed that *Van Dusen* applied to federal claims. *See, e.g.*, *In re Plumbing Fixtures Litigation*, 342 F. Supp. 756, 758 (J.P.M.L. 1972) (in an antitrust case, "[i]t is clear that the substantive law of the transferor forum will apply after transfer"); *In re Dow Co. Sarabond Products Liability Litigation*, 666 F.Supp. 1466, 1468 (D. Colo. 1987) (citing district court cases). Since *Korean Air* issued in 1987, courts seem to have abandoned this position.

*Balcor Film Investors*, 8 F.3d 1121, 1126 (7th Cir. 1993), *cert. denied*, 114 S. Ct. 883 (1994).[5]

Under § 1404(a), a transferee court in the Seventh Circuit is "free to decide [federal claims] in

the manner it views as correct without deferring to the interpretation of the transferor circuit."

*McMasters v. U.S.*, 260 F.3d at 819 (quoting *Korean Air*, 829 F.2d at 1174). This is because, in

contrast to the multifarious and localized nature of state laws, "[a] single federal law implies a

national interpretation . . . . [E]ach court of appeals considers the [federal] question

independently . . . without regard to the geographic location of the events giving rise to the

litigation." *Eckstein*, 8 F.3d at 1126. The law of the transferor forum is only applied when the

federal law in question is intended to be geographically non-uniform. *Id.* at 1127. Because the

Sherman Act is intended to apply uniformly throughout the territorial United States, it does not

trigger this exception. Taking its cue from the foregoing cases, this Court holds that Seventh

Circuit law applies to the present multidistrict litigation.


## II.    Statute of Limitations

Before proceeding to the merits of Defendants' motions, the Court must address their

assertion that all Sherman Act claims fail due to the expiration of the statute of limitations.

Antitrust claims are subject to a four-year statute of limitations period. 15 U.S.C. § 15b.

Generally, an antitrust claim "accrues and the statue begins to run when a defendant commits an

act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S.

321, 338 (1971). However, the Seventh Circuit has held that, "in the absence of a contrary

directive from Congress," antitrust actions are subject to the "discovery rule, which 'postpones

---

[5] Other circuits have adopted the same position. *See Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994)
("[W]hen reviewing federal claims, a transferee court in this circuit is bound only by our circuit's precedent.)
*Bradley v. United States*, 161 F.3d 777, 782 (4th Cir. 1998)(" [T]his court cannot and does not apply the law of
another circuit simply because the case was transferred from the other circuit.").

the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured.' " *In re Copper Antitrust Litigation*, 436 F.3d 782, 789 (7th Cir. 2006) (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990)). In other words, a plaintiff's claim accrues not when the conduct or injury occurs, but when the plaintiff, through the exercise of due diligence, "discovers that he has been *injured* and who has *caused* the injury." *Id.* (internal citations and quotation marks omitted) (emphasis in original).

Defendants assert that the Seventh Circuit's interpretation is contrary to Supreme Court precedent, and that the proper standard for accrual of the statute of limitations in antitrust suits is the incident of injury, rather than the discovery of the harm. Under Defendants' approach, most of Plaintiffs' claims are time-barred because all but one of the challenged contracts expired more than four years before Plaintiffs acted. Defendants' reading of Supreme Court jurisprudence cannot change the fact that, as discussed above, Seventh Circuit precedent governs this multidistrict litigation. It is for the Seventh Circuit or the Supreme Court to overturn that precedent, not this Court. Therefore, Defendants' initial argument fails.

Assuming for the sake of argument that the discovery rule does not apply to antitrust claims, genuine issues of material fact would remain as to whether Plaintiffs' accrual dates should be tolled on the grounds of fraudulent concealment. In an antitrust case, the doctrine of fraudulent concealment "presupposes that the plaintiff . . . should have discovered[] that the defendant injured him, and denotes efforts by the defendant . . . to prevent the plaintiff from suing in time." *Copper Antitrust*, 436 F.3d at 791 (quoting *Cada*, 920 F.2d at 451). The doctrine requires Defendants to take affirmative steps after the original wrongdoing to divert attention, mislead, or prevent discovery. *See Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir. 1975); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 815 F.2d 452, 456 n. 4 (7th Cir. 1987). Failure to

actively disclose illegal conduct, or mere denial of wrongdoing, does not qualify as an affirmative act of concealment. *Clow Corp. v. Witco Chemical Corp.*, No. 82 C 1287, 1984 WL 876, at *5 (N.D. Ill. June 20, 1984); *see also Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978); *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1155 (10th Cir. 1981). However, "hiding" the misconduct, "throwing up a smokescreen" or "misrepresentation" of facts comprising the cause of action can toll the limitations period. *Trecker v. Scag*, 679 F.2d 703, 708 (7th Cir. 1982).

As grounds for tolling under fraudulent concealment, Plaintiffs point to announcements made by Defendants throughout the 1990s that go beyond mere failures to disclose or denials of wrongdoing. *See* Pl. Ex. 30; Pl. Ex. 75; Pl. Ex. 154; Pl. Ex. 155; Pl. Ex. 157. These statements go so far as to offer alternative, and allegedly false, explanations for Defendants' decisions to shut down facilities or raise prices. While Defendants contend that their announcements are honest disclosures supported by market data, the Court must draw all reasonable inferences in Plaintiffs' favor where matters are disputed. Defendants' public statements create triable issues of fact as to whether Defendants, through misleading public statements, affirmatively concealed agreements to reduce industry-wide output or fix prices. *See Copper Antitrust*, 436 F.3d at 792 (evidence that defendant publicly offered "innocent alternative explanations to explain away events related to the price-fixing conspiracy, knowing that they were misleading," among other deceptive acts, was enough to show a dispute of material fact as to defendant's fraudulent concealment); *United Nat. Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 36 (D.C. Ill. 1984) (evidence that defendant publicly released "alternative explanations" for parallel price increases created genuine issues of fact as to whether defendants affirmatively concealed price-fixing arrangement). Determinations of fact are therefore necessary to ascertain whether Plaintiffs may

benefit from equitable tolling, and if so, when a diligent inquiry would have revealed evidence supporting the present cause of action.

Fraudulent concealment aside, Defendants contend that this action remains time-barred because a reasonably diligent plaintiff should have been aware of all relevant aspects of the alleged anticompetitive behavior early on. *See Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 717 (7th Cir. 1994) (under the discovery rule, a court determines when a plaintiff should have discovered its injury according to an objective standard). Throughout the late 1980's and early 1990's, Defendants' resale contracts, zone contracts, and the Noranda DuPont Joint Venture had all received publicity in various trade publications. Defendants thus maintain that Plaintiffs had constructive notice of Defendants' injurious acts several years prior to the earliest permissible accrual date.[6]

*In re Copper Antitrust Litigation* ("*Copper Antitrust*") guides the Court's ensuing analysis. 436 F.3d at 790. In that case, major newspapers had reported that the defendant bank had financed another company's illegal transactions, hedged deals in the copper market, and was one of several banks under federal investigation. However, because news articles stopped short of indicating that the bank had engaged in anything unlawful, and because the bank was never charged with violating any laws, the Seventh Circuit held that a dispute of material fact existed as to when a diligent inquiry would have revealed the defendant's illicit activity. *See id.*

As in *Copper Antitrust*, the publications cited by Defendants fail to make any mention of collusive behavior that could potentially give rise to liability under the Sherman Act. The reports merely expound upon common knowledge: namely, that mass quantities of nondiscretionary acid

---

[6] Because Plaintiffs filed their suits in 2003, the statute of limitations could not have accrued any earlier than 1999, if Plaintiffs acted in a timely manner. Boliden does not argue that Plaintiffs ever gained actual notice of anticompetitive activities.

were entering the American market, leading to the displacement of virgin acid, the voluntary shutdown of plants, and the forging of business deals between Noranda and others. At most, these reports reveal varying levels of commercial interaction and collaboration between the parties. Thus, even if Plaintiffs had harbored suspicions early on, it remains unclear whether a reasonable investigation would have revealed incriminating evidence sufficient to support an antitrust claim against Defendants. *See Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 444 (7th Cir. 2005) ("[T]he statute of limitations is tolled until such time as the plaintiff . . . in the exercise of reasonable diligence should have known[] that she was injured, the cause of her injury, and that there was some indication of wrongdoing.").[7] In short, generalized reports in trade publications do not constitute indisputable evidence of inquiry notice that Defendants engaged in illegal practices.

What can be established with certainty is that, in January of 2003, the Canadian Government raided Noranda and Falconbridge offices for a U.S. federal investigation into possible anticompetitive activity. The Canadian news media immediately pounced on the event, producing ample coverage of the potentially illegal nature of Defendants' agreements. From that point on, Plaintiffs had undeniable access to the facts required to support an antitrust suit against Defendants. If the limitations period began accruing at that time, Plaintiffs would have had until January 2007 to file their complaints. Plaintiffs' cases, all filed before September 16, 2003, were brought well within the applicable four-year statute of limitations.

---

[7] Plaintiffs contend that the explicit and implicit terms of Defendants' agreements, submitted in the instant case as evidence of anticompetitive behavior, remained confidential and inaccessible. The Court notes that internal documents used by some Plaintiffs to craft their claims came to light when a Canadian court unsealed them in mid-2003. That litigation was required to produce these records further discourages the Court from concluding that, as a matter of law, a reasonably diligent plaintiff could have uncovered Defendants' alleged misconduct absent legal action. *See Glazer Steel Corp. v. Toyomenka, Inc.*, 392 F. Supp. 500, 503 (S.D.N.Y. 1974) (defendants' continual refusal to answer interrogatories during discovery made it "unlikely that greater diligence on the part of the plaintiff would have uncovered the cause of action any sooner").

The record does not indisputably show that, prior to 2003, information detectable upon diligent inquiry would have put Plaintiffs on notice of the alleged conduct forming the basis of this case. The point at which a reasonable person would have appreciated the need for diligent inquiry, or whether a resulting investigation would have produced useful results, are ultimately questions of fact for a juror to decide. *See Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) ("[A]s a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims is not an appropriate question for summary judgment."). This precludes the entry of summary judgment on the issue of timeliness.

## III.    The Sherman Act

The Court now addresses the merits of Defendants' motions for summary judgment on Plaintiff's Sherman Act claims.

### A.    Elements of a Claim under § 1

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To prevail on a claim under § 1, a plaintiff must therefore prove three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury. *Menasha Corp. v. News America Marketing In-Store, Inc.,* 238 F.Supp.2d 1024, 1032 (7th Cir. 2003) (citing *Denny's Marina, Inc. v. Renfro Productions, Inc.,* 8 F.3d 1217, 1220 (7th Cir. 1993)). The existence of genuine issues of material fact as to all three elements of proof compels the Court to deny most aspects of Defendants Noranda, Falconbridge, PVS, Koch, and Boliden's motions for summary

judgment. However, because Plaintiffs are unable to carry their burden of proving Defendant

GAC's involvement in the alleged conspiracy, GAC's motion is granted.


### 1.  Contract, Combination, or Conspiracy

While courts at summary judgment construe all reasonable inferences in the light most

favorable to the nonmovant, an exception is made for lawsuits alleging conspiracies to violate §

1 of the Sherman Act. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S.

574, 588 (1986). Due to the costly risk of chilling procompetitive conduct, antitrust law limits

the range of inferences a factfinder can draw from ambiguous evidence of conspiracy in a § 1

case. *See id.* Ultimately, conduct that is "as consistent with permissible competition as with

illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at

593-94 (citing *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764 (1984)). In order to

survive summary judgment, a plaintiff must present evidence " 'that tends to exclude the

possibility' that the alleged conspirators acted independently." *Id.* at 588 (citing *Monsanto,* 465

U.S. at 764). Put differently, the inference of conspiracy must be reasonable even when

considered against competing inferences of independent action or concerted, harmless action.

*See id.* (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 280 (1968)).

Courts in the Seventh Circuit divide this inquiry into two parts. A court first asks if the

plaintiff's evidence of conspiracy is ambiguous, that is, if it is as consistent with the defendants'

permissible independent interests as with an illegal conspiracy. If so, the court looks for any

evidence that tends to exclude the possibility that the defendants were pursuing these

independent interests. *Market Force Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1171 (7th

Cir. 1990). Plaintiffs can satisfy the second prong with direct or circumstantial evidence that

"reasonably tends to prove that [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto* 465 U.S. at 764.

### a. Defendants Noranda, Falconbridge, PVS, Koch, and Boliden

While Defendants assert that the facts cannot reasonably be construed as proof of collusion, evidence pointing to cooperation among Noranda, Falconbridge, PVS, Koch, and Boliden[8] does not conclusively favor either side. Defendants' evidence admittedly generates questions of fact on the matter. As they see it, Noranda and Falconbridge simply outsourced the distribution of a by-product to voluntary producers who, faced with the declining profitability of aging facilities, independently opted to shut down plants and resell cheaper smelter acid pursuant to objective cost-benefit analyses. This kind of proper business behavior does not run afoul of antitrust laws. *See University Life Ins. Co. of America v. Unimarc Ltd.,* 699 F.2d 846, 852 (7th Cir. 1983) ("Firms constantly face "make-or-buy" decisions – that is, decisions whether to purchase a good or service in the market or to produce it internally – and ordinarily the decision, whichever way it goes, raises no antitrust question."). Nevertheless, Plaintiffs' evidence is consistent with allegations that, in anticipation of a looming tide of Canadian smelter acid and attendant price erosion, Defendants clandestinely conspired to preserve a market in which supply met demand by scaling back production or shutting down facilities. Such collusion would undeniably constitute a *per se* violation of § 1 of the Sherman Act. *See, e.g.*, *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 190-91 (1940) (horizontal agreement to remove surplus gasoline

---

[8] Evidence that reasonably tends to prove a conspiracy among Noranda, Falconbridge, and DuPont under the umbrella of the Noranda DuPont Joint Venture is discussed in Section III.B.5 of this opinion.

from the market to stabilize prices artificially was illegal *per se*).  Because much of Plaintiffs' evidence can be interpreted to support either side, it can be described as ambiguous.[9]

The inquiry does not end there, though.  Plaintiffs have further submitted evidence tending to exclude the possibility of independent action on the part of Defendants.  The most damaging piece of evidence is Noranda's "Sulphuric Acid 1989 Plan," in which the company articulates its continuing strategy to "approach[] sulphur burning acid producers to purchase acid from Noranda and thereby shutdown sulphur burning acid plants.  It is a strategy of displacement by agreement. *This strategy is being followed so as not to force an oversupply into a balanced market with predictable price disruption* and to minimize the risk of inviting trade action by U.S. authorities." Pl. Ex. 13 ¶ 12 (emphasis added).  Evidence pointing to compliance with this plan on the part of Defendants Koch, Boliden, PVS, and Falconbridge only strengthens the inference of collusive activity.  *See, e.g.*, Pl. Ex. 54 at KSP00062754 (Koch memo) ("Koch could displace acid currently in the market with Noranda acid, so as to maintain industry structure."); Pl. Ex. 42 (Boliden internal letter) ("Noranda will undoubtedly continue to press the Copperhill shut-down issue with Boliden."); Pl. Ex. 39 at 2 (Falconbridge memo) ("Boliden have just recently conceded they will cut back Copperhill by 112,500 MT and move only 50% (112,500 MT) of our tonnage to Florida."); Pl. Ex. 40 at 2; Pl. Ex. 41 at 8 (Falconbridge memo) ("Boliden will reduce their sulphur burning acid production to purchase acid from KCM/FL."); Pl. Ex. 14 at 8 (Noranda Report) ("Agreement has been reached whereby PVS will close this facility and receive all their acid requirements from Noranda."); Pl. Ex. 27 at 166784 (PVS/Noranda

---

[9] The revenue sharing provisions in some of Defendants' contracts is an example.  Plaintiffs do not claim that contractual revenue sharing *per se* violates antitrust laws.  Rather, they rely on the provisions as evidence pointing to collusive activity, for their capacity to act as mechanisms through which Defendants allegedly reaped the profits of their conspiracy.  While revenue sharing can be consistent with such usage, and may provide Defendants with added motive to cooperate with each other in make-buy decisions, it does not, standing alone, tend to show anticompetitive collusion.

Contract) ("PVS agrees to arrange to have its affiliate discontinue production of sulphuric acid at its Bay City, Michigan acid plant no later than October 15, 1990."); Pl. Ex. 13 at 13 (Noranda Report) ("Confirmed contracts with PVS in Copley, Ohio . . . involving closure of sulphur burning acid plants, have provided working models for future acid supply agreements).

Defendants constantly fault Plaintiffs for failing to produce direct evidence revealing anything more than arms-length negotiations and independent make-buy decisions. As shown above, Plaintiffs have submitted circumstantial evidence tending to show that Defendants' negotiations went beyond commerce in acid to produce a cleverly disguised conspiracy. Plaintiffs are not limited to proving their claims through direct evidence. The Court must deny summary judgment if the evidence, whether directly or indirectly indicating guilt, tends to exclude the possibility of independent action. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (Ambiguous statements "are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial."). The fact remains that the extra-contractual nature of Defendants' conduct is significantly disputed. [10] That none of Defendants entered into express agreements to engage in an antitrust conspiracy does not insulate them from liability under the Sherman Act. So long as the parties, in a meeting of the minds, coordinated horizontal behavior with the purpose of

---

[10] Defendant Koch complains at length that none of Koch's contracts explicitly involved the shutdown of facilities or the reduction of production, nor is there evidence that Koch ever attended any meetings at which the overarching conspiracy was discussed. Yet, Plaintiffs' circumstantial evidence tends to show that negotiations beyond the scope of the written agreements informed Koch of the purpose and methods of the alleged conspiracy, and that Koch acted accordingly. *See, e.g.* Pl. Ex. 14 at 11 (1988 Noranda report) ("Koch has expressed an interest in partial closure of both plants with particular emphasis on the Wilmington facility); Pl. Ex. 52 (1988 Koch memo) ("As a company, management wants production to either cease or be scaled back for Noranda's acid to enter the market."); Pl. Ex. 54 at KSP00062754 (1990 Koch memo) ("Koch could displace acid currently in the market with Noranda acid, so as to maintain industry structure."); Pl. Ex. 56 at 7 (Koch Answers to Interrogatories) (showing a reduction in production by 25,000 tons in 1990 at the Wilmington Plant); Pl. Ex. 242 at KSP00119407 (2005 notes by Koch employee) ("[Noranda] wondered about Wilmington facility. He felt there could be a good fit once the new acid plant comes on stream. I mentioned that we have considered the option and can talk in the near future.").

committing a *per se* violation, they remain exposed. *See United States v. General Motors Corp.*, 384 U.S. 127, 142-43 (1966) ("[E]xplicit agreement is not a necessary part of a Sherman Act conspiracy - certainly not where . . . joint and collaborative action was pervasive in the initiation, execution, and fulfillment of the plan.").[11]

As Defendants accurately state, none of the evidence *necessarily* excludes the possibility that Defendants arrived at make-buy decisions on their own. However, all that is necessary to avoid summary judgment is evidence that reasonably *tends* to exclude that possibility. Plaintiffs' evidence cumulatively accomplishes this. *See High Fructose*, 295 F.3d at 661 ("[N]o single piece of the evidence that we're about to summarize is sufficient in itself to prove a price-fixing conspiracy. . . . The question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment."). At least with regard to Defendants Noranda, Falconbridge, PVS, Koch, and Boliden,[12] the submitted documents are "relevant and persuasive as to a meeting of minds." *Monsanto*, 465 U.S. at 765.

---

[11] Citing *In re High Fructose Corn Syrup Antitrust Litigation*, Defendants seem to argue that Plaintiffs must produce a written contract in order to survive summary judgment. *See* Koch Reply Br. at 2 (citing *High Fructose*, 295 F.3d 651, 661 (7th Cir. 2002) ("[T]his evidence is consistent with the hypothesis that [defendants] had a merely tacit agreement, which at least for purposes of this appeal the plaintiffs concede is not actionable . . . . The question then becomes whether there is enough evidence for a reasonable jury to find that there was an explicit agreement, not merely a tacit one.")). But the Seventh Circuit's definition of an "explicit agreement" in the context of *High Fructose* is "an actual, manifest agreement not to compete," which could be, and was, made orally. *See id.* at 661-62 (reversing grant of summary judgment due to evidence of an explicit agreement in the form of incriminating comments made by defendants, rather than a written contract).

[12] In the alternative, Defendant Boliden claims that it "withdrew" from any conspiracy by May 1995, when it was reported to be running the Copperhill plant at full capacity. Firstly, Plaintiffs dispute that Boliden began running at capacity at that time. *See* Noranda Ex. 27 at 37 (showing that Copperhill's annual output fell short of its capacity between 1993 and 1998). Secondly, even if Copperhill was producing at maximum levels, doing so for some period of time is not inconsistent with the overall conspiracy alleged by Plaintiffs. To wit, Defendants allegedly conspired to reduce output whenever supply overshadowed demand, so as to maintain a balanced market. Whenever supply dipped below demand, Defendants could increase production while still remaining true to the goals of the conspiracy. Thirdly, producing at full capacity is insufficient to alone constitute a withdrawal from a conspiracy. Withdrawal requires an affirmative act on the part of the conspirator; he must either make a full confession to the authorities, or communicate to each of his coconspirators that he has abandoned the conspiracy and its goals. *See United States v. Sax*, 39 F.3d 1380, 1386 (7th Cir. 1994). Defendants offer no evidence that Boliden acted accordingly.

Defendants further assert that evidence of separate agreements between Noranda and American producers is insufficient to support the inference that they agreed to a single and common scheme. For their argument, Defendants overstate the holding of *Spectators' Communication Network Inc. v. Colonial Country Club*, which holds that hub-and-spoke conspiracies wherein a core conspirator (at the hub) stands in a vertical relationship with co-conspirators (the spokes) cannot qualify as a horizontal combination in violation of § 1 without evidence that the competing co-conspirators agreed among themselves. 253 F.3d 215, 224-25 (5th Cir. 2001) (citing cases). As discussed in Section III.B.1.a of this opinion, a triable issue of fact exists as to whether Noranda and Falconbridge horizontally compete with the American Defendants. Should a jury find that all Defendants were in competition, PVS, Koch, and Boliden could remain liable for separate horizontal conspiracies with Noranda and Falconbridge, regardless of whether the evidence connected all Defendants in a single conspiracy.

In any event, Plaintiffs' evidence can reasonably be read to indicate a single conspiracy among Defendants. A classic hub-and-spoke conspiracy involves a "rim" connecting the spokes, such that the spokes "must have been aware of each other and must do something in furtherance of some single, illegal enterprise." *U.S. v. Haynes*, 582 F.3d 686, 699 (7th Cir. 2009) (citing *United States v. Bustamante,* 493 F.3d 879, 885 (7th Cir. 2007). The parties have produced evidence indicating that the American Defendants' highly publicized shutdowns and concurrent collaborations with Noranda and Falconbridge were generally known among them,[13] that Defendants each took steps to reduce production in furtherance of a common scheme, and that all Defendants generally desired to preserve the integrity of the balanced market by preventing an

---

[13] *See* Boliden Br. App. A-H (sample media reports of decisions by producers to close acid plants and resell Canadian smelter acid). In addition to extensive media coverage, there is evidence indicating an awareness among American Defendants of co-Defendants' specific dealings with Noranda. *See, e.g.*, Pl. Ex. 51 (Koch notes regarding shutdown of PVS plant).

oversupply of acid, thus giving rise to a reasonable inference that all Defendants acted with a unity of purpose.[14]

None of Defendants' remaining case law supports a grant of summary judgment on this record. The cases only confirm that antitrust law's heightened standard of proof serves to weed out factually or economically implausible claims. In *Matsushita*, the Supreme Court approved summary judgment on a claim alleging a conspiracy to charge higher-than-competitive prices because the alleged restraint "simply [made] no economic sense" and defendants lacked "any rational motive to conspire." *See* 475 U.S. at 587, 597. Further, something more than evidence of parallel prices, or even conscious parallelism, is required to establish a price-fixing conspiracy. *See Monsanto* 465 U.S. at 763-64; *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032 (8th Cir. 2000); *Barry v. Blue Cross of California*, 805 F.2d 866, 869 (9th Cir. 1986); *Amer. Floral Services, Inc. v. Florists' Transworld Delivery Assoc.*, 633 F. Supp. 201 (N.D. Ill. 1986); *see also See Market Force*, 906 F.2d at 1174 (fact that two companies were mutually aware of each other's policies, combined with hostile comments made about a plaintiff, was insufficient to avoid summary judgment on price fixing claim).

Defendants' attempt to characterize the alleged conspiracy as "economically implausible" fails. Plaintiffs allege and produce evidence to support the existence of a garden-variety output limitation scheme. *See, infra,* Section III.B.1.b. The actual and probable anticompetitive effects of such conspiracies are well established. Moreover, unlike the above cases, Plaintiffs in the

---

[14] *See, e.g.*, Pl. Ex. 215 at PVS107692 (PVS internal letter) ("Noranda acid is destined for the Ohio market and if we do not control it, someone else will. The latter would apparently result in depressed prices and make it uneconomical to operate the plant."); Pl. Ex. 54 at KSP00062754 (Koch memo) ("Koch could displace acid currently in the market with Noranda acid, so as to maintain industry structure."); Pl. Ex. 45 at 1-2 (Boliden-Noranda letter) ("Noranda and Boliden are in concurrence in that . . . 'sharing the pain' is essential. . . . It is our objective . . . to pursue other opportunities such as . . . shut down agreements . . . in order to maximize the realizations on this tonnage."); Pl. Ex. 28 at 2 (1991 Noranda memo) ("All parties fully support Boliden's strategic desire to reduce Marsulex's volume by that quantity . . . of acid anticipated (some time ago) to be displaced from Falconbridge's traditional Canadian sales.").

instant case do not solely rely on nebulous accusations of cooperation. Plaintiffs have submitted tangible evidence against each Defendant[15] tending to exclude the possibility of unilateral action, whether in the form of external correspondence or internal memoranda. [16] It is undisputed that Noranda and Falconbridge, under their "displacement by agreement" strategy, approached and interacted with co-Defendants, and that co-Defendants thereafter reduced production. (Response to Pl. SOF ¶ 12; Pl. Ex. 13 at 14.) The question is whether co-Defendants simply made an independent make-buy analysis, or whether the communication between the parties involved a wider discussion of mutual interests directed at the stabilization of the sulfuric acid market. Summary judgment is unwarranted on this point because Plaintiffs' evidence, while not conclusive by any means, tends to prove the existence of a conspiracy to act on these motives.

### b. Defendant GAC

Defendant GAC, the purchaser of Delta Inc.'s assets, paints a much more compelling portrait of its lack of collusive behavior. On October 6, 1989, Delta and Noranda entered into a contract for the sale of smelter acid satisfying the total requirements of Delta's Searsport, Maine facility until 1996. GAC Ex. 23 at 2, 6 (Delta-Noranda contract). Delta shut down the Searsport facility in 1988. GAC purchased most of Delta's assets on March 8, 1994, after which Delta

---

[15] *See, e.g.*, Pl. Ex. 13 ¶ 12 (implicating Noranda); Pl. Ex. 54 at KSP00062754 (implicating Koch and Noranda); Pl. Ex. 52 (implicating Koch); Pl. Ex. 39 at 2 (implicating Boliden and Falconbridge); Pl. Ex. 41 at 8 (implicating Boliden and Falconbridge); Pl. Ex. 14 at 8, 10 (implicating PVS and Noranda); Pl. Ex. 13 at 13 (implicating PVS and Noranda); Pl. Ex. 27 at 166784 (implicating PVS and Noranda).

[16] Citing *General Leaseways*, Defendants urge the Court to disregard internal company documents because the reliability of their content is questionable. In deciding whether a plaintiff had raised a substantial question on the merits so as to warrant a preliminary injunction, the *General Leaseways* court "attach[ed] rather little weight to internal company documents used to show anticompetitive intent, because, though they sometimes dazzle a jury, they cast only a dim light on what ought to be the central question in an antitrust case: actual or probable anticompetitive effect." 744 F.2d at 595. Courts do not weigh evidence at summary judgment as they do on a motion for a preliminary injunction. At this stage, assigning weight to different pieces of evidence is a task reserved for factfinders.

survived as a separate entity. At the time of the acquisition, the Searsport facility was inoperable, with many parts either rusted or missing. Searsport was therefore not valued in or considered as part of GAC's acquisition. GAC did retain Delta management in the sulfuric acid business, and assumed the Delta-Noranda contract for the remainder of its term. *See* Pl. Ex. 26 at NFD106333 (GAC-Delta contract). On March 1, 1996, GAC entered into a new supply contract with Noranda. GAC later contracted with the Noranda DuPont Joint Venture for the supply of sulfuric acid.

In Plaintiffs' brief in opposition to GAC's motion to dismiss, they promised to establish through discovery that GAC acquired Delta with knowledge of the Delta-Noranda conspiracy and with the intent to benefit from that illegal agreement. As Plaintiffs observed, "[i]t is well recognized that a co-conspirator who joins a conspiracy may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 554 (7th Cir. 1980). Thus far, Plaintiffs have supplied no evidence indicating, even tangentially, that GAC was aware of the allegedly illegal nature of Delta's agreement with Noranda. Nor does the record contain anything pointing to GAC's intent to benefit from any prior anticompetitive conduct.

Plaintiffs further argued that GAC may have assumed liability for Delta's past actions under exceptions to the common law rule against successor liability. In most American jurisdictions, a purchaser of assets does not assume the seller's liabilities "even if all the assets are transferred by the sale so that in effect the entire business has been sold, and the purchaser intends to continue it as a going concern." *E.E.O.C. v. G-K-G, Inc.,* 39 F.3d 740, 747 (7th Cir. 1994); *see also Leannis v. Cincinnati, Inc.,* 565 F.2d 437, 439 (7th Cir. 1977). Some states, under the *de facto* merger or continuity of enterprise doctrines, observe exceptions to this

common law rule.  *See, e.g.*, *In re Master Key Antitrust Litig.*, 1976 WL 1377, at *1 (D. Conn. Sept. 28, 1976).  However, to date, Plaintiffs have not attempted to produce evidence in support of these doctrines.  At any rate, Maine, under whose law the GAC-Delta contract is expressly governed, does not recognize exceptions to the rule against successor liability.  *See Saco River Tel. & Tel. Co. v. Shooshan & Jackson, Inc.*, 826 F. Supp. 580, 583 (D. Me. 1993) (citing *Director of Bureau of Labor Standards v. Diamond Brands, Inc.*, 588 A.2d 734, 736 (Me. 1991)).  Indeed, Maine law holds that "absent a contrary agreement by the parties, or an explicit statutory provision in derogation of the established common law rule, a corporation that purchases the assets of another corporation in a *bona fide* arm's-length transaction is not liable for the debts or liabilities of the transferor corporation." *Diamond Brands, Inc.*, 588 A.2d at 736.

The GAC-Delta Asset Purchase Agreement undisputedly provides that, except for certain specific "Assumed Liabilities," GAC  "shall in no event assume or be responsible for any liabilities, liens, security interests, claims, obligations, or encumbrances of [Delta]."  GAC SOF ¶ 51, GAC Ex. 26 ¶ 2.2.  As per the explicit language of the contract, GAC did not assume liability for antitrust infringements.  Plaintiffs have produced nothing to refute the validity of the Asset Purchase Agreement.  Delta's complicity in the alleged conspiracy – to which Plaintiffs devote the bulk of their argument – is therefore irrelevant to the question of whether summary judgment is appropriate on GAC's motion.

At summary judgment, Plaintiffs have apparently shifted the theory of their case. Plaintiffs now contend that the following factors combine to produce a reasonable inference that GAC consciously joined the conspiracy allegedly entered by Delta: (1) GAC "stepped into Delta's shoes" by knowingly and intentionally assuming the Delta-Noranda Agreement with the knowledge and consent of Noranda, and operating under it until at least March 1996; (2) Delta

personnel continued with GAC's acid business; and (3) GAC never rendered the Searsport facility operational and never produced sulfuric acid.

Plaintiffs cite no authority for their position that an asset purchaser knowingly joins in a seller's antitrust conspiracy as a matter of law by assuming an existing contract, maintaining the seller's personnel, and deciding against restarting production at inoperable plants. The conspiracy alleged by Plaintiffs was to reduce output to stabilize prices.[17] There is no evidence indicating that GAC ever made a decision to limit output, as it is undisputed that GAC never produced acid. As for the price fixing claim, Plaintiffs cite a GAC-Noranda communication to show that GAC was upset at being underpriced and outbid by Marsulex, another reseller of Noranda-Falconbridge acid. *See* Marsulex Ex. 16; Def. Reply Ex. C, Poure Dep. At 52:14-55:9. To the extent that this implies coordination among GAC, Noranda, and Marsulex regarding the pricing of Noranda-Falconbridge acid, such cooperation constitutes a vertical price restraint on intrabrand competition; GAC functioned as a reseller of Noranda acid and never as a competing producer. As discussed at length in Sections III.B.1.a and III.B.4 of this opinion, antitrust law is concerned with interbrand competition among horizontally aligned competitors. It does not condemn vertical cooperation between suppliers and distributors as illegal *per se*. Vertical price restraints are properly analyzed under the rule of reason. For reasons stated later in this opinion, challenges to such restraints cannot survive summary judgment because Plaintiffs have waived the right to defend their claims as anything other than *per se* violations of § 1.

In sum, Plaintiffs have produced neither direct nor circumstantial evidence that reasonably tends to prove that GAC was aware of, much less made a conscious commitment to

---

[17] Plaintiffs' allegations of a horizontal conspiracy to allocate customers lack sufficient evidentiary support and thus cannot survive summary judgment. *See, infra,* Section III.B.4. Such a claim would fail against GAC at any rate, because it did not compete with Noranda or Falconbridge in the production of sulfuric acid.

enter into, an illegal conspiracy with co-Defendants. *See Monsanto*, 465 U.S. at 763. None of the documents relied on by Plaintiffs excludes the possibility that GAC was acting independently when it purchased Delta's assets, assumed Delta's contract, and later entered into contracts for the resale of Noranda acid. *See Matsushita*, 475 U.S. at 588; *Market Force*, 906 F.2d at 1171. Plaintiffs have failed to carry their burden of proving that GAC knew of or entered a conspiracy violating § 1 of the Sherman Act. For the foregoing reasons, GAC's motion for summary judgment is granted.

    2. **Unreasonable Restraint of Trade**

Depending on the nature of an alleged restraint, the reasonableness of a restraint of trade is judged according to one of two standards. *Denny's Marina*, 8 F.3d at 1220. Activities such as horizontal price fixing, market allocation, group boycotts, or tying arrangements are so inherently anticompetitive, they are considered illegal *per se*. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5-6 (1958); *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.* ("*BMI*"), 441 U.S. 1, 19-20 (1979). Because these actions are conclusively presumed to be unreasonable, no inquiry into the harm actually caused is required. *Copperweld*, 467 U.S. at 768; *Northern Pacific*, 441 U.S. at 5. In contrast, such combinations as mergers, joint ventures, and various vertical agreements may enable a firm to compete more effectively. Such activities are therefore commonly judged under the "rule of reason," which considers the actual effects of these commercial efforts. *Copperweld*, 467 U.S. at 768. A challenged action is unreasonable if – in light of facts particular to the industry, its condition before and after the imposition of the restraint, and the restraint's nature, history, and effects – it suppresses rather than promotes

competition.  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *National Soc. Of Professional Engineers v. U.S.*, 435 U.S. 679, 691-92 (1978); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238 (1918).

Claims under § 1 of the Sherman Act are generally evaluated under the rule of reason, unless the challenged action falls into the narrow category of *per se* violations.  *Wilk v. American Medical Ass'n*, 895 F.2d 352, 359 (7th Cir. 1990).  However, Plaintiffs adamantly insist that the rule of reason should not be applied in the instant case.  Instead, Plaintiffs dedicate their briefs to showing that Defendants' activities were illegal *per se*.  Consistent with this position, Plaintiffs offer no arguments or evidence pertaining to critical elements of rule of reason analysis.  They do not, for instance, discuss the anticompetitive effects of the challenged practices, or whether Defendants possessed the market power to substantially restrain competition.[18]  *See General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 596 (7th Cir.1984); *Copperweld*, 467 U.S. 752, 768 (1984).

Since Plaintiffs have waived the argument, the Court need not consider whether a factual dispute exists as to the prevailing parties under the rule of reason.  *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (arguments not presented to the district court in response to summary judgment motions are waived).  Accordingly, Plaintiffs can survive summary judgment only if a genuine issue of material fact exists as to whether Defendants committed a restraint that is *per se* unreasonable.

The Supreme Court has cautioned against the over-zealous application of the *per se* label. *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Ass'n, Inc.*, 672 F.2d

---

[18] Plaintiffs briefly make an attempt to address the issue of market power by equating the concept with Dr. Tolliver's assessment of market share. Yet, they do not dispute that Dr. Tolliver did not determine the geographic markets or markets at issue in this case.  *See* Noranda SOF ¶ 52.

1280, 1284 (7th Cir. 1982) (citing *BMI*, 441 U.S. 1 (1979); *Continental T.V., Inc. v. GTE*

*Sylvania Inc.*, 433 U.S. 36 (1977)). The Seventh Circuit has concluded that "[a] particular course

of conduct will not be termed a *per se* violation of the Sherman Antitrust Act until the courts

have had considerable experience with that type of conduct and application of the rule of reason

has inevitably resulted in a finding of anticompetitive effects." *Bunker Ramo Corp. v. United*

*Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983); *see also United States v. Topco*

*Associates, Inc.*, 405 U.S. 596, 607-608 (1972) ("It is only after considerable experience with

certain business relationships that courts classify [certain agreements or practices] as per se

violations of the Sherman Act."); *BMI*, 441 U.S. at 19-20 (a *per se* violation is a practice that

"facially appears to be one that would almost or almost always tend to restrict competition and

decrease output"). Plaintiffs may thus proceed to trial on a *per se* theory if a reasonable juror

could find, from the undisputed facts, that Defendants' conduct is of the type that is either

typically treated as a *per se* violation, or has been found invariably anticompetitive after multiple

applications of the rule of reason by courts.

Because the parties disagree on virtually every aspect of the multi-step analysis required

to determine the appropriateness of the *per se* rule, the Court addresses these arguments

separately in Section III.B of this opinion. As the Court's reasoning will show, outstanding

factual disputes preclude a decision at this point on the applicable legal rule in this case.[19]

---

[19] An intermediate "quick look" doctrine also exists for cases that do not fall in *per se* illegal categories, yet do not
require elaborate industry analysis to determine their overall anticompetitive effect. Such conduct can be
condemned short of full rule of reason analysis if "an observer with even a rudimentary understanding of economics
could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."
*Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Further discussion of the quick look doctrine is unnecessary
where, as here, the *per se* rule may yet apply after the resolution of outstanding factual disputes.

### 3. Accompanying Injury

Seeing as multiple Defendants have raised the issue, the Court shall first touch on the accompanying injury element. To survive summary judgment, Plaintiffs must also show that they suffered a cognizable injury resulting from Defendants' alleged conspiracy. *See Matsushita,* 475 U.S. at 585-86 (citing *Cities Service,* 391 U.S. at 288-289). However, the Seventh Circuit has clearly stated that "antitrust remedies may be available without a showing of market injury if an individual competitor can show that the defendant's anticompetitive actions were per se illegal under Section 1." *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1032 (7th Cir. 2006); *see also Copperweld*, 467 U.S. at 768 ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused.") (citing *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5 (1958)). Thus, if Plaintiffs are successful in convincing a factfinder that Defendants engaged in *per se* violations of the Sherman Act, a failure to show particularized injury is not fatal.

Calculating damages presents a separate challenge. A plaintiff seeking damages must prove that his financial loss was caused by the unlawful acts of the defendant. *MCI Communications Corp. v. American Tel. and Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("[T]he courts have been consistent in requiring plaintiffs to prove in a reasonable manner the link between the injury suffered and the *illegal* practices of the defendant."). Injury to individual plaintiffs may not be assumed simply because a case is being treated as a *per se* antitrust violation; Plaintiffs must show that they were the type of plaintiff to be affected by the anticompetitive conduct. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-45

(1990) (finding that competitor dealer was not of the type to be impacted by the anticompetitive effects of vertical arrangement in question).

Although Defendants argue that this litigation may not proceed because Plaintiffs cannot prove antitrust injury, the substance of Defendants' arguments targets Plaintiffs' damages calculations. Defendants assert that Plaintiffs' causation expert and statistician rely on faulty analytical methods or mere guesswork. But the arguable inaccuracy of Plaintiffs' damages calculations is not grounds for granting summary judgment. The credibility and persuasiveness of Plaintiffs' expert witnesses are issues best left to a factfinder. For the purposes of the instant motions, what matters is that Plaintiffs' satisfaction of the accompanying injury requirement hinges on the success of their *per se* case. Until a factfinder is given an opportunity to assess the disputed facts underlying Plaintiffs' *per se* theory, the issue of antitrust injury is not ripe for summary judgment.

**B.**     ***Per Se* Treatment vs. Rule of Reason**

Defendants generally argue that the unique nature of the sulfuric acid industry, the complexity of Defendants' relationships, and the procompetitive effects of their actions prevent the Court from holding that their actions "would always or almost always tend to restrict competition and decrease output," so as to warrant *per se* treatment. *BMI*, 441 U.S. at 19-20; *see also Bunker Ramo*, 713 F.2d at 1284 (citing *Topco*, 405 U.S. at 607-08). Defendants offer volumes of evidentiary support, including economic data, expert testimony, and industry publications, to show that their methods were not only ancillary to a plainly lawful purpose, but also necessary for the benefit of the consumer. These justifications, Defendants reason,

contradict a finding that their conduct was "manifestly anticompetitive." *GTE Sylvania*, 433 U.S. at 50.

The cumulative weight of Defendants' evidence may certainly bear fruit at trial, when a factfinder must decide whether Plaintiffs have satisfied their burden of proof. At the summary judgment stage, however, Defendants' efforts are misdirected. At this stage of the proceedings, is not this Court's task to determine whether Defendants' conduct would be subjected to the rule of reason if the facts are as they claim. Indeed, Defendants' rule of reason arguments assume many facts that are central to the dispute and decidedly contested in the record. At summary judgment, the Court must view the evidence in the light most favorable to Plaintiffs, drawing all reasonable inferences in their favor. *See Schuster*, 327 F.3d at 573. If, after weighing the facts in this manner, the record contains enough evidence to convince a reasonable juror that a *per se* violation has occurred, summary judgment must be denied. *See Anderson*, 477 U.S. at 248.

### 1. Horizontal Price Fixing as a *Per Se* Violation

*Per se* analysis calls for a distinction between horizontal and vertical arrangements. Only a small class of "manifestly competitive" horizontal agreements among competitors falls under the *per se* rule. All other horizontal agreements, and all vertical ones, have been deemed potentially procompetitive and are thus judged under the rule of reason. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007); *GTE Sylvania*, 433 U.S. at 58.

Horizontal price-fixing is one of the clearest *per se* violations of the Sherman Act. *See Texaco v. Dagher*, 547 U.S. 1, 5 (2006) ("Price-fixing agreements between two or more competitors . . . fall into the category of arrangements that are *per se* unlawful."). An agreement among competitors to restrict the production of a certain good equates to a price-fixing

agreement, because conspiracies to limit output are designed to raise, stabilize, or otherwise fix

the price of goods.  *See Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226 (7th Cir.

1978) (equating an output limitation agreement with a price fixing arrangement because "[p]rice

fixing is a characterization which extends to all conspiracies designed to manipulate the price of

goods.") (citing *Socony-Vacuum*, 310 U.S. 150) (internal quotation marks omitted); *General*

*Leaseways*, 744 F.2d at 594-95 ("If firms . . . restrict output directly, price will . . . rise in order

to limit demand to the reduced supply.  Thus, . . . raising price, reducing output, and dividing

markets have the same anticompetitive effects.").

### a. Horizontal vs. Vertical Relationships

"An arrangement is said to be 'horizontal' when its participants are (1) either actual or

potential rivals at the time the agreement is made; and (2) the agreement eliminates some avenue

of rivalry among them."  11 H. Hovenkamp, Antitrust Law ¶ 1901b, p. 203 (2d ed. 2005).

Defendants claim that, because Noranda and Falconbridge were neither actual nor potential

competitors of the American co-Defendants, their relationships were vertical rather than

horizontal in nature, and thus subject to the rule of reason.

Noranda and Falconbridge depict themselves as suppliers in desperate need of

distributors, rather than producers in competition with other producers.  Noranda, the exclusive

sales agent for Falconbridge, claims that it lacked the capacity to compete against American co-

Defendants because it had no distribution infrastructure with which to disseminate sulfuric acid.

Plaintiffs not only dispute that Noranda lacked the capacity to compete with co-Defendants, but

they also assert that Noranda actually competed against them.  *See* Pl. Ex. 5 at 1, 3, 4 (Noranda

marketing video) (advertising "dedicated information and transportation networks for total

customer service" and "Noranda's single car fleet of 200 line railcars to the 40-car unit trains dedicated to a large volume of sulfuric acid customers."); Pl. Ex. 88 at NFD 291799 (Noranda memo) ("Noranda and DuPont currently compete in the sale of sulphuric acid."); Pl. Ex. 135 (Noranda memo) (joint venture "avoids the chaos, risk, and embarrassment of reverting to competing against one another").  The record shows that Noranda had enough infrastructure to supply 52% of its acid directly to end users in the United States.  *See* Pl. Ex. 8, Hall Dep. 267:13-269:7.  Noranda contests that these shipments were direct sales by Noranda, characterizing them instead as "drop-shipments" through a reseller.  It also argues that the distributional and sales capability trumpeted in its promotional video was gained through relationships with American co-Defendants.  Summary judgment on this point is inappropriate because whether Defendants' justifications are true is a question of fact.

Alternatively, Defendants argue that their arrangement belongs to the class of horizontal-vertical hybrids subject to the rule of reason.  In support of this position, they cite cases applying the rule of reason whenever the general lack of experience with hybrid vertical/horizontal arrangements, like dual-distributorships, counseled against *per se* treatment.  *See, e.g.*, *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982) (applying rule of reason to dual distributorship, in which an operator licenses independent area franchisers to manufacture branded ice cream, but also operates as an area franchiser itself); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986) (applying rule of reason to a "hybrid arrangement" comprised of both a dual distributorship and horizontal relationship).  While there is some evidence that Defendants established a dual distributorship-like arrangement, the argument seems somewhat premature, as enough evidence exists to place Defendants within traditional horizontal relationships, as well.

According to Noranda's own briefs, it approached American acid producers as a matter of necessity, seeking to offload large quantities of the commodity without bearing the risk of antidumping actions associated with direct sales. As such, whether or not Noranda had the capacity for direct sales at the time, it arguably could have developed that capacity, as their ultimate purpose was the sale of acid to end users. *See* Pl. Ex. 97 at NFD206607 (Noranda DuPont presentation) ("If Noranda and DuPont are unable to conclude agreement on joint venture then Noranda will withdraw & will set up its own US company to sell directly to customers"). Noranda's strategy was motivated by concerns about antidumping actions and low prices – there is no indication that distribution, transportation, or related problems were foremost in the company's mind. Ultimately, the evidence can be reasonably read to infer that Noranda and Falconbridge, upon realizing that the market would not accommodate their product at the price levels of the time, placed themselves in a vertical relationship with co-Defendants as a matter of necessity, negotiating with the American producers to become distributors when they might not have otherwise done so. The Canadian acid producers essentially went through a series of communications to adjust the market to their good. While the resulting conspiracy, as alleged, incorporates vertical elements as a vehicle for restraining trade, it substantively amounts to the concerted action of actual or potential competitors eliminating some avenue of rivalry among them.

All this is to say whether Noranda and Falconbridge stood in a horizontal, vertical, or hybrid relationship with co-Defendants remains a triable issue of fact. Defendants cannot prevail on the position that their agreements were solely vertical and thus necessarily governed by the rule of reason.

### b. Characterization of Defendants' Conduct

Defendants observe on numerous occasions that a given business practice does not earn *per se* illegality until courts have had considerable experience with it. *See Topco*, 405 U.S. at 607-08. Yet, despite Defendants' attempts to portray their agreements as the product of a hybrid or dual distributorship, there is nothing new about the alleged restraint at issue. While perhaps a little unique in its arrangement, the alleged conspiracy is at heart a classic instance of price fixing and output restriction. Courts have had considerable exposure to such conspiracies, and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects.

Defendants thus overreach when accusing Plaintiffs of formalistic literalism in their use of the terms "price fixing" and "output restrictions" to Defendants' conduct. In *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.* ("*BMI*"), the Supreme Court contrasted the use of "price fixing" in the literal sense – as when two partners set a common price for their goods and services – against "price fixing" as a descriptive term for anticompetitive practices commonly considered *per se* illegal. *BMI*, 441 U.S. at 9. While the literal application of antitrust terminology is "overly simplistic and often overbroad," the *per se* rule is rightly applied to price fixing that substantively resembles the category of behavior found manifestly anticompetitive in collective judicial experience. *Id.*

Plaintiffs have alleged conduct characteristic of price fixing in the substantive, rather than literal sense. Conspiring to reduce industry output as a means of stabilizing or raising prices is prototypical of conduct that has time and again been condemned by courts as *per se* illegal. *See, e.g.*, *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 190-91 (1940) (*per se* illegal horizontal agreement to remove surplus gasoline from the market, despite continuing competition among defendants, artificially raised prices in violation of the Sherman Act); *Westinghouse,* 588 F.2d at

226 ("[A]n agreement to restrict the production of uranium unquestionably is a price fixing arrangement. . . . In fact, all serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output.").

Defendants continually confuse their version of the facts, which does not involve archetypal price fixing behavior, with the factual story generated when all reasonable inferences are drawn in Plaintiffs' favor. While this tactic pervades all arguments in Defendants' briefs, it fails in each instance. In particular, a recurring theme in Defendants briefs intones that *per se* treatment is inappropriate because the undisputed facts remain consistent with Defendants' claims. Defendants fail to acknowledge that neither are the undisputed facts inconsistent with Plaintiffs' interpretations, which additionally benefit from favorable inferences.

For example, consider Defendants' repeated assertions that the terminated plants were among the least profitable operated by Defendants, that Noranda's acid was relatively cheap, and that make-buy analyses favored displacement. *See* PVS Br. at 11; Koch Br. at 5; Falconbridge Br. at 7; Noranda Br. at 5. The undisputed nature of these facts does not preclude the possibility that facilities were shut down pursuant to a collusive agreement to limit production. Firstly, as noted by Plaintiffs, "competitors would be most amenable to closing less profitable plants, not their most profitable ones. There is no requirement under the antitrust laws that plaintiffs prove only the most profitable capacity be eliminated." Pl. Br. at 12. Secondly, American producers may have benefited in multiple ways from an output limitation agreement with Noranda or Falconbridge. They faced a market in which cheaper smelter acid threatened to precipitate a plunge in prices across North America, potentially putting discretionary producers out of

business.[20]  Voluntary producers could have colluded to reduce output and stabilize acid prices precisely to salvage profit – indeed, stay in business – in a dire economic climate.[21]

While Defendants frequently refer to their financial constraints as an element in their defense, an unforgiving market offers no excuse for violating antitrust laws.  In writing the Sherman Act, Congress did "not permit[] the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies."  *Socony*, 310 U.S. at 221.  As the Supreme Court noted, "[r]uinous competition, financial disaster, evils of price cutting and the like appear throughout our history as ostensible justifications for price-fixing."  *Id.*  If courts had to account for these factors, "the reasonableness of prices would necessarily become an issue in every price-fixing case.  In that event the Sherman Act would soon be emasculated; . . . it would not be the charter of freedom which its framers intended."  *Id.*

The facts of *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. at 190-91, are on point.  In the 1930s, a flood of cheap and illegal "hot oil" led to a precipitous decline in oil and gasoline prices.  To stabilize prices, defendant companies bought up surplus gasoline to remove it from the market.  At trial, defendants claimed that these measures did not raise prices, but rather maintained a fair market price, because competitive forces were still in effect.  Essentially, the challenged conduct arguably eliminated the illegitimate inflating effect introduced by "hot gasoline."  The Supreme Court responded,

---

[20] Defendants paint a picture of an "economic reality that acid produced as a by-product from smelting metals and acid produced from burning sulfur would not both continue to be produced in a 'balanced' market where supply already equaled demand. . . . A rational voluntary producer of acid would not continue producing under these conditions."  Noranda Reply Br. at 7-8.  Plaintiffs dispute the continued profitability of Defendants' plants, however.  *See* Pl. Ex. 8, Hall Dep. 204:22-205:23.

[21] Defendants argue that the agreements produced efficiencies for Defendants' business. It is undisputed, for instance, that Delta's sales increased.  GAC SOF ¶ 45.  But whether these efficiencies came at the cost of the consumer is the key question of fact in this case.

The whole scheme was carefully planned and executed to the end that distress gasoline would not overhang the markets and depress them at any time. And as a result of the payment of fair going market prices a floor was placed and kept under the spot markets. . . . a floor which served the function of increasing the stability and firmness of market prices. That was repeatedly characterized in this case as stabilization. But in terms of market operations stabilization is but one form of manipulation. And market manipulation in its various manifestations is . . . a factor which prevents the determination of . . . prices by free competition alone." *Socony-Vacuum*, 310 U.S. at 220-23. [22]

Thus, regardless of the motives driving an unlawful conspiracy, "[a]ny combination which tampers with price structures is engaged in an unlawful activity." *Id.* at 221.

Moving on, Defendants rightly note that, due to environmental regulations and the nature of the material, Noranda indisputably lacked a viable alternative to selling its acid, other than shutting down smelting operations. But Plaintiffs do not condemn the sale of the acid, merely the unlawful conspiracy that allegedly accompanied those sales. Plaintiffs allege that Noranda could have sold the acid in a legitimate manner, but opted not to. As an example, Plaintiffs point to the Noranda/Delta agreement, claiming that Noranda could have won Delta's largest customer, Georgia Pulp and Paper, by underbidding Delta. However, as explained in Noranda's "Sulfuric Acid 1989 Plan," the competition would have "force[d] an oversupply into a balanced market with predictable price disruption." Pl. Ex. 13 at 14. Noranda allegedly chose the more lucrative and illegal route, colluding with Delta to shut down its plant, take tons out of production, and continue contracts with existing customers with Noranda smelter acid. Plaintiffs further suggest that the Florida fertilizer market was a viable alternative destination for Noranda's smelter acid. *See* Pl. Ex. 11, 12.

---

[22] Koch's argument that it could not have conspired to decrease production because it increased overall output by importing acid from Europe, as well as Noranda's defense that its smelter acid may have ultimately increased or maintained the total output of acid in the marketplace, thus fails under *Socony-Vacuum*. *See* Koch Reply Br. at 9; Noranda Br. at 9. Whether the overall level of sulfuric acid increased over time is irrelevant; it matters only whether the overall level increased at a slower rate than it would have without "market manipulation." *See Socony-Vacuum*, 310 U.S. at 223.

Noranda's argument that they avoided end consumers to prevent antidumping actions, while potentially true, does not avoid antitrust liability. Defendants offer no authority for the position that a company is immune from antitrust actions simply because it engaged in anticompetitive behavior as a means of diminishing the probability of other types of lawsuits. Even if well-intended, Defendants' state of mind is not a determinative factor in the Court's analysis. *See Professional Engineers*, 435 U.S. at 693 (finding illegal a rule forbidding competitive bidding within professional organization, apparently made on the good faith belief that competitive bidding would result in deficient engineering work and defective products).

Defendants' general argument that the undisputed facts can be read in their favor does not alter the Court's analysis. It is undisputed that had defendants engaged in arms-length negotiations, the ensuing conduct would not have invoked antitrust liability. Unfortunately for Defendants, a person resolving all factual disputes in Plaintiffs' favor could find that Defendants did not act independently or legitimately. *See, supra,* Section III.A.1 (summarizing evidence tending to exclude the possibility of independent action).

### 2. The Ancillary Restraints Doctrine

An "ancillary" restraint "contribute[s] to the success of a cooperative venture that promises greater productivity and output," whereas a "naked" restraint restricts competition without the benefit of a redeeming procompetitive virtue. *Polk Bros., Inc. v. Forest City Enters., Inc.,* 776 F.2d 185, 188-89 (7th Cir. 1985). Where an ancillary restraint is *per se* illegal standing alone, it nevertheless benefits from rule of reason analysis because, in the context of the greater venture, it holds the potential to "increase economic efficiency and render markets more, rather

than less, competitive." *BMI*, 441 U.S. at 20.[23]  On the other hand, naked restraints remain subject to *per se* treatment because they have no other purpose than to stifle competition.  *Id.*

The Seventh Circuit articulates the requisite inquiry in *Polk Brothers*.  It instructs, "[a] court must ask whether an agreement promoted enterprise and productivity at the time it was adopted.  If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment."  *Id.*  By contrast, if an agreement "is formed with the objectively intended purpose or likely effect of increasing price or decreasing marketwide output in the short run," it may be condemned as a naked restraint on competition.  11 H. Hovenkamp, Antitrust Law ¶ 1906a, p. 235 (2d ed. 2005).  Summary judgment is therefore warranted if the shutdown agreements undisputedly promoted a cooperative venture with plausible prospects for increasing output or creating more desirable products.

Defendants posit that the output reduction agreements, as alleged, necessarily contributed to the success of a larger and lawful cooperative venture.  They reiterate that the economic realities of the time were such that voluntary producers had to decide whether to continue producing sulfuric acid in an environment that made it difficult for them to compete.  By entering into a distribution relationship with Noranda in lieu of producing all their acid, co-Defendants continued using their existing tangible and intangible distribution assets, rather than idling them.  Defendants submit that shutting down production promoted and enabled the success of Defendants' relationship by ensuring Noranda a "home" for its acid.  Arguably, consumers stood to benefit from an increased supply of lower cost acid made available through an expanded distributional network.

Defendants' position is problematic in a number of regards.  To begin, under established

---

[23] Generally, a finding of ancillarity works to "remove the *per se* label from restraints otherwise falling within that category."  R. Bork, *Ancillary Restraints and the Sherman Act,* 15 ANTITRUST L.J. 211, 212 (1959).

precedent, a restraint is only ancillary if it necessary to achieve otherwise unattainable procompetitive benefits. *See BMI*, 441 U.S. at 21-22 (blanket license promised greater productivity at lower costs to consumers, but could not have been rationally administered without price fixing); *Polk Bros.*, 776 F.2d at 189-90 (restrictive covenant between retailers who had constructed and occupied a joint facility was ancillary, because allocating items between them made possible the overall cooperative venture to increase output); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) ("[S]ome agreements [that] restrain competition may be valid if they are subordinate and collateral to another legitimate transaction and necessary to make that transaction effective.") (quoting R. Bork, *The Rule of Reason,* at 797-98); 11 H. Hovenkamp, Antitrust Law ¶ 1906d, p. 242 (2d ed. 2005) ("[T]he fixing of prices is presumptively a naked restraint unless there is clear evidence of joint productive activity with the potential for increasing output, and the price fixing was essential to facilitating this output increase."); *National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 601 (11th Cir. 1986) (certain arrangements are ancillary because they are "counterbalanced by otherwise unattainable procompetitive benefits") (citing *Arizona v. Maricopa County Medical Soc.,* 457 U.S. 332, 365 (1982) (Powell, J., dissenting)).

Defendants claim that the alleged shutdown agreements made possible an otherwise unobtainable "new and unique product" in the form of "cheap by-product smelter acid" delivered through the distribution infrastructure of American producers. Noranda Reply Br. at 6. The implication is that the distribution capacity of American Defendants would have been lost at the cost of consumer welfare, presumably because voluntary producers would have gone out of business, had output not been reduced to provide space in the market for Noranda-Falconbridge acid. Defendants' liberal use of terminology aside (delivering a commodity to a wider customer

base does not instantly make it a new or unique product), their proposition exercises questionable logic. As evidence of the procompetitiveness of their actions, Defendants cite statistics revealing that voluntary sulfuric acid production grew at an annual rate of 1.5% per year from 1985 until 1997, while non-voluntary production grew at a rate of 3.7-4.6% per year. Noranda SOF ¶ 43. Such figures indicate that not only could the market accommodate the influx of Noranda-Falconbridge smelter acid, but it also was able to assume increased output on the part of discretionary producers. It stands to reason, then, that cheap smelter acid could be efficiently sold and distributed throughout the United States without agreements to reduce industry output. At the very least, it is disputed whether the shutdowns were necessary to achieve Defendants' proposed market efficiencies. *See* Pl. Ex. 8, Hall Dep. 204:22-205:23 (describing continuing profit margins of $6-12 a ton at plants terminated by Defendants).

In any event, Defendants' argument relies on an interpretation of the record in which the shutdowns buttressed some efficiency-enhancing integration among the parties. *See BMI*, 441 U.S. at 20. It goes without saying that the facts underlying that assumption – indeed, the very nature of Defendants' agreements – remain hotly disputed. Given the parties' lack of economic integration, *see, e.g., Polk Bros.*, 776 F.2d at 189-90 (joint facility), or the absence of a new and unique product, *see, e.g., BMI*, 441 U.S. at 21-22 (blanket license), a factfinder resolving all disputes in Plaintiffs favor could conclude that the alleged shutdown agreements did not support some higher goal, but rather served the naked and objectively intended purpose of reducing output to buoy declining market prices.[24] Under those circumstances, Defendants' agreements

---

[24] Noranda argues that the Manderson Report represents "prior executive . . . branch involvement," which serves as a "unique indicator that the challenged practice may have redeeming competitive virtues and that the search for those values is not almost sure to be in vain." *BMI*, 441 U.S. 1, 13 (1979). The Manderson Report recommended that Noranda distribute its by-product acid through existing U.S. producers of discretionary acid. It was written by an outside consultant, retained by Noranda and the Quebec Government to make a preliminary investigation of the market opportunities for the proposed Horne Smelter. *See* Noranda Ex. 6 at 1 (Manderson Report). However, Defendants offer no evidence to support the notion that the Province of Quebec approved of or supported the

could not be considered ancillary to a lawful, productivity-enhancing cooperative venture. Since a reasonable juror might find no redeemable, overarching purpose to Defendants' arrangements, a dispute remains as to whether the shutdowns were ancillary, and thus whether Defendants' alleged violations should receive *per se* treatment or rule of reason analysis.

### 3. The Sulfuric Acid Industry

Defendants argue that the unique nature of the sulfuric acid industry differentiates it from other price-fixing and output-reduction cases, such that the Court cannot say with confidence that Defendants' restraints "would always or almost always tend to restrict competition and decrease output." *BMI*, 441 U.S. at 19-20.

In *Board of Regents v. National Collegiate Athletic Association* ("*NCAA*"), the Supreme Court held that the collegiate athletic industry was such that "horizontal restraints on competition are essential if the product is to be available at all." 468 U.S. 85, 101 (1984). Since the products being marketed were contests between competing institutions, an athletic industry could not function if competitors were not permitted to agree on the rules defining that competition. *See id*. In other words, a certain degree of cooperation is necessary for the survival of the industry. *Id*. In such industries, restraints that might typically receive *per se* treatment have to be analyzed under the rule of reason. *See id.; American Needle*, 130 S.Ct. 2201, 2216 (2010) (applying rationale of *NCAA* to the National Football League)

---

recommendations made by the third-party report. Defendants fail to produce documents or depositions of any provincial authorities to that effect. The record does contain testimony of a Canadian federal government official, who has denied making any recommendations to Noranda about the sale of its sulfuric acid. *See* Pl. Ex. 269, Bourassa Dep. at 22:11-26:8. Even if the Province of Quebec approved of Defendants' sale strategy to market to producers, Defendants conflate the lawful and arms-length commercial transactions recommended by the Manderson Report with the allegedly collusive activity at issue here. If at all, provincial authorities would likely have approved of acid sales that did not involve illegal and anticompetitive output restriction terms. Defendants' alleged conspiracy is not afforded procompetitive effects by virtue of the Manderson Report.

Hoping to similarly distinguish this case from the typical *per se* fact pattern, Defendants point out that "U.S. Courts have yet to consider the competitive effects accompanying the displacement of voluntary acid with essentially costless by-product acid." Noranda Br. at 10.[25] The sulfuric acid industry, while idiosyncratic, is not so markedly different from other industries in which the *per se* rule has been applied that the Court is prevented from applying the rule here. In the sulfuric acid industry, the commodity can be produced at a much cheaper price by some competitors than others and it must be offloaded through sale. These factors are common in many industries. Moreover, "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid 'the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable – an inquiry so often wholly fruitless when undertaken." *Maricopa*, 457 U.S. at 350-51; *see also Socony*, 310 U.S. at 222 ("Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."); *NCAA*, 468 U.S. at 99 ("[T]he likelihood that horizontal price

---

[25] To illustrate the uniqueness of the sulfuric acid industry, Defendants cite a Canadian case holding that voluntary producer's decision to shut down facilities in favor of an exclusive resale contract with a smelter did not violate Canadian antitrust laws. *See R. v. Allied Chem. Canada Ltd.*, 6 W.W.R. 481 [1975]. While legal analysis under Canadian law is irrelevant, it bears noting that the British Columbia Supreme Court's holding was not premised on the uniqueness of the sulfuric acid industry. The court actually based its decision on findings of fact that this Court is prevented from making at summary judgment. The Canadian court observed, "[c]ertainly there are cases where control and diminution of supply may be a weapon to control price. . . . But here the problem was to dispose of an excess of acid, not to dry the source of supply. . . . There was no suggestion that the plan was to shut down [the plant] so [the smelter] could control the price of acid, nor is there any evidence that any overt acts to that end did result." *Id.* at ¶ 125-26. The court ultimately found that "[t]here was no initial illegal agreement to limit all facilities in the western British Columbia area to those at [the smelter], and there was no ongoing policy to do so, nor any overt action directed to carrying out such a policy." *Id.* at ¶ 137. By contrast, it remains disputed whether the instant case involves illegal agreements comprising an ongoing conspiracy to reduce output as a means of influencing prices.

and output restrictions are anti-competitive is generally sufficient to justify application of the *per se* rule without inquiry into the special characteristics of a particular industry.")

This is not a case, as Defendants argue, where reluctance to adopt a *per se* rule should be observed "in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Khan*, 522 U.S. at 10. That oft-quoted phrase advises courts to be careful when assessing arrangements substantively different from a typical *per se* illegal restraint, not industries with rare appearances on the antitrust stage. *See, e.g.*, *F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 458 (1986) (policy of federation of dentists with respect to its members' dealings with third-party insurers constituting a concerted refusal to deal on particular terms with patients covered by group dental insurance, similar but not identical to practices that had been labeled "group boycotts"); *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co*., 472 U.S. 284, 298 (1985) (system in which nonmember retailers can purchase supplies from nonprofit cooperative buying association at the same price as members, resulting in effectively lower prices to members due to annual distribution of profits to members in the form of a percentage rebate). The restraint at issue is not distinguishable from the sort normally considered under the *per se* rule simply because it occurs in the context of the sulfuric acid industry. Defendants' argument to that effect is unavailing.

### 4. Zone Contracts

Plaintiffs challenge Defendants' zone contracts as an attempt at horizontal market allocation and thus a *per se* violation of § 1. One of the classic examples of a *per se* violation is an agreement between competitors to allocate territories in order to minimize competition. *See Topco,* 405 U.S. at 608 ; *United States v. Heffernan*, 43 F.3d 1144, 1145-46 (7th Cir. 1994);

*Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49 (1990). Such horizontal market allocation

agreements can be contrasted against vertical combinations of entities at different levels, such as

suppliers and distributors, designed to control the marketing of a certain brand of product. *See*

*Topco*, 405 U.S. at 608; *GTE Sylvania,* 433 U.S. at 57-59; *Business Electronics Corp. v. Sharp*

*Electronics Corp.*, 485 U.S. 717, 727-28 (1988). In *Continental T.V. v. GTE Sylvania, Inc.*, the

Supreme Court considered a challenge to a manufacturer's exclusive territorial and marketing

agreements, which limited the number of franchises granted for any given area and required each

franchisee to sell manufacturer's products only from the location(s) at which it was franchised.

*See* 433 U.S. at 38. The Court held that the agreement could not be condemned as *per se* illegal,

observing that the reduction of intrabrand competition through vertical territorial restrictions

allowed suppliers to achieve certain efficiencies in the distribution of their products, thereby

stimulating interbrand competition. *See id.* at 54-56, 58; *see also Leegin*, 554 U.S. at 890.[26]

Because territorial restrictions on distributors have the possibility of producing procompetitive as

well as anticompetitive effects, they are properly judged under the rule of reason. *See Leegin*,

551 U.S. at 903 (citations omitted); *see also*, *Copy-Data Sys., Inc. v. Toshiba Am., Inc.,* 663 F.2d

405, 411 (2d Cir. 1981), *cert. denied,* 474 U.S. 825 (1985). Moreover, it is well established that

antitrust law is primarily concerned with interbrand, rather than intrabrand, competition. *GTE*

*Sylvania, Inc.,* 433 U.S. at 52 n. 19; *Leegin*, 551 U.S. at 895.

　　　　Plaintiffs conflation of the zone contracts with horizontal market allocation agreements

falls flat. It is undisputed that the zone contracts were implemented by Noranda, Falconbridge's

---

[26] Intrabrand vertical restraints threaten interbrand competition only if the supplier has monopoly power in the relevant market. *See O.S.C. Corp. v. Apple Computer, Inc.,* 601 F. Supp. 1274, 1291 n. 8 (C.D. Cal. 1985), *aff'd,* 792 F.2d 1464 (9th Cir.1986). For this reason, the rule of reason is required to assess their legality. Given that vertical restraints can produce market efficiencies, it cannot be stated with any degree of confidence they "always or almost always tend to restrict competition and decrease output," *Business Electronics,* 472 U.S. at 723. In other words, the possibility of procompetitive effects precludes *per se* treatment.

exclusive sales agent, to reduce intrabrand competition among distributors selling Falconbridge sulfuric acid. *See* Falconbridge SOF ¶ 65. While Noranda stands as a horizontal competitor with Defendants during illegal agreements to limit industry output, it stands in vertical relationships with them insofar as the sale of its own acid is concerned, whether from Noranda or Falconbridge sources. If the zone contracts had restricted competing producers from selling their own sulfuric acid in certain territorial locations, that would undoubtedly be a *per se* violation. But the zoning policy had no power over how producers handled their own acid; they only divided the U.S. into territories in which a limited number of prequalified resellers were permitted to bid for Falconbridge acid sales contracts. *See* Falconbridge SOF ¶ 60. Even then, the zone contracts did not prevent the resellers from marketing Falconbridge sulfuric acid in any geographic location that the reseller wished. *See* Falconbridge SOF ¶ 66. [27]

The zoning policy was essentially a non-restrictive system relied upon by Noranda Sales to geographically diversify buyers of Falconbridge acid.[28] Such systems are regularly upheld by courts as legal. *See Cranfill v. Scott & Fetzer Co.*, 773 F. Supp. 943, 951 (E.D. Tex. 1991) ("The practice of assigning areas of primary responsibility to distributors has been regularly upheld, especially when, as here, nothing prohibits the distributors from selling outside their areas.")

---

[27] Although Plaintiffs do not dispute this in their response to Falconbridge's statement of facts, they cursorily suggest in their brief that the contracts restricted the areas in which Falconbridge acid could be resold. In support of this position, Plaintiffs cite without explanation an internal Noranda email. *See* Pl. Ex. 78. The email describes a request for sulfuric acid from a potential Wisconsin customer. The Noranda employee taking the order writes that "[t]he acid must come from the Horne [Noranda's smelter] because only Marsulex can sell Falconbridge in this zone and Marsulex is not my customer." Pl. Ex. 189; *see also* Pl. Ex. 77 at NFD197665 (map indicating that Wisconsin was in Marsulex's "zone"). When viewed in the light most favorable to Plaintiffs, this email at most establishes that the zone contracts granted Falconbridge acid distributors an exclusive right to purchase and sell Falconbridge acid in their given zone, while Noranda acid (i.e. from the Horne smelter) could be freely sold to customers outside that pool. The effect of the distinction is minimal. Such a vertical restraint on Falconbridge acid sales would remain subject to the rule of reason under *GTE Sylvania*, 433 U.S. at 38, 58.

[28] In contrast to the evidence reasonably tending to prove Defendants' participation in an output limitation conspiracy, Plaintiffs' have failed to submit comparable evidence suggesting the existence of a horizontal market allocation conspiracy. *See Monsanto* 465 U.S. at 764; *Matsushita*, 475 U.S. at 588. At best, Plaintiffs' evidence suggests a vertical market allocation arrangement.

(citing cases). Generally, a supplier may select the distributors to whom it sells its own product without risking *per se* condemnation. *See Leegin*, 551 U.S. at 902 (citing *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919) (holding that a manufacturer can suggest resale prices and refuse to deal with distributors who do not follow them)). What is at heart an internal system for organizing bids or managing intrabrand competition cannot be characterized as a restraint that "would always or almost always tend to restrict competition and decrease output." *BMI.*, 441 U.S. 1, 19-20 (1979). No reasonable juror could find otherwise. If Plaintiffs wish to challenge Defendants' zone contracts, they must do so under the rule of reason. Since Plaintiffs have eschewed rule of reason analysis, summary judgment on this issue, addressed in Defendant Falconbridge's motion, must be granted.


### 5. The Noranda DuPont Joint Venture

Joint ventures are typically judged under the rule of reason because they require extensive cooperation by nature and "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Copperweld,* 467 U.S. at 768; *Polk Bros.*, 776 F.2d at 188. Restraints imposed by a joint venture may nevertheless come under the *per se* rule in two situations. In the first, a joint venture may receive *per se* treatment if it amounts to a sham lacking any reasonable prospect of efficiency-enhancing benefit to society. *See Topco*, 405 U.S. at 608-09 (holding that district court erred in applying rule of reason to a joint venture's market division agreement for developing, producing, and selling a common brand); *United States v. Sealy, Inc.,* 388 U.S. 350, 353 (1967) (in finding that challenged enterprise was not a "separate entity, but . . . an instrumentality of the individual manufacturers" subject to *per se* treatment, the Court was moved by "identity of the persons who act, rather than the label of their hats");

*Timken Roller Bearing Co. v. U.S.*, 341 U.S. 593, 595, 598 (1951) (failing to "find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.' Perhaps every agreement and combination to restrain trade could be so labeled."), *overruled on other grounds by Copperweld,* 467 U.S. at 764-65 (ending application of intra-enterprise doctrine in antitrust lawsuits, but noting that *Timken* court's reliance on the doctrine was not necessary to the result).[29]  In the second situation, a challenged restraint may be condemned as a *per se* violation if it is a naked restraint against competition, that is, it is not ancillary or reasonably necessary to achieve a legitimate joint venture's efficiency-enhancing benefits.  *See Polk Bros.,* 776 F.2d at 188-89. The ancillary restraints doctrine cannot be applied to a joint venture's "core activity," though.  *See Dagher,* 547 U.S. at 1280-81 ("[The] doctrine governs the validity of restrictions imposed by a . . .  joint venture, on *nonventure* activities.") (emphasis added).

The *per se* rule thus remains available to Plaintiffs if: (1) the record permits a reasonable juror to conclude that the joint venture was merely a sham label attached to *per se* illegal conduct, or (2) the challenged practice is collateral to the "core activity" of the joint venture and a naked restraint on competition.  Plaintiffs allege that, under the guise of a sham joint venture, Noranda, Falconbridge, and DuPont conspired to set common prices and reduce output as means of balancing supply and demand in the sulfuric acid market. They further compare DuPont's

---

[29] The Supreme Court frequently looks beyond labels to condemn underlying collusion among competitors as violations of the Sherman Act.  *See American Needle*, 130 S.Ct. at 2209 ("[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity."); *accord United States v. American Tobacco Co.*, 221 U.S. 106, 187 (1911) (where the trust or holding company device brought together previously independent firms to lessen competition and achieve monopoly power, "the combination was in and of itself" is a restraint of trade); *see also* Federal Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 9 (2000) ("[L]abeling an arrangement 'joint venture' will not protect what is merely a device to raise price or restrict output . . . .").

output reductions to naked restraints. Defendants counter that Noranda and Falconbridge entered into the direct sales joint venture with DuPont to eliminate Noranda's need to sell through multiple intermediaries and achieve numerous market efficiencies, including the opportunity to generate savings on freight costs that could be passed on to consumers, and offering a more dependable supply of sulfuric acid to an expanded network of end users. Defendants assert that controlling the output of the joint venturers was ancillary to the achievement of these efficiencies.

Defendants argue that *Texaco v. Dagher* controls this case. In *Dagher*, two oil companies formed a production and marketing joint venture under the name of Equilon Enterprises. The Supreme Court held that Equilon's decision to sell separately-branded gasoline at the same price was not *per se* illegal price fixing because the constituent oil companies were, for antitrust purposes, no longer horizontal competitors. The Court reasoned, "[w]hen persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm competing with other sellers in the market." *Id.* at 6 (internal quotation marks and citation omitted). In reaching its conclusion, the *Dagher* Court "presume[d] for purposes of these cases that Equilon is a lawful joint venture. Its formation has been approved by federal and state regulators, and there is no contention here that it is a sham." *Id.* at 6 n. 1.[30]

---

[30] In dicta, the Supreme Court speculated that "[h]ad respondents challenged Equilon itself, they would have been required to show that its creation was anticompetitive under the rule of reason." *Id.* This line cannot be read to mean that whether a joint venture amounts to a sham must be analyzed under the rule of reason. Such an interpretation does not square with existing Supreme Court precedent. *See* P. Areeda & H. Hovenkamp, Antitrust Law ¶ 2132, p. 387 (Supp. 2010) ("[W]e would not read too much into the decision's dicta.").

The indicia of legitimacy and integration so compelling in *Dagher* are not to be found in the instant case.[31] Specifically, the formation of Equilon was approved by consent decree by the Federal Trade Commission ("FTC"). 547 U.S. at 4. While mandating certain divestments and other modifications to the joint venture, the FTC imposed no restrictions on the pricing of Equilon's products. *Id.* It was also undisputed that Equilon controlled extensive oil refining and marketing assets, in the form of "numerous refineries, lubricant plants, research laboratories, terminals, thousands of service stations, miles of pipeline, and employees." *Id.* at 7. In the end, the *Dagher* plaintiffs could produce no evidence that Defendants sought to conceal or achieve an ulterior anticompetitive purpose or that Equilon was patently anticompetitive. *See Dagher v. Saudi Refining, Inc.*, 2002 WL 34099815, at *11 (C.D. Cal. Aug. 13, 2002). In contrast, the Noranda DuPont arrangement was not approved by federal or state regulators, and Plaintiffs in this case have questioned whether there is any legitimate purpose or independent structure to the joint venture.

Certainly, Plaintiffs' chances of prevailing on their "sham" claim diminish with the accumulation of evidence pointing to real integration between the joint venturers. *See Maricopa*, 457 U.S. at 356 (applying *per se* rule to consortium of competing doctors because the collaboration was "not analogous to . . . joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities

---

[31] Given Equilon's legal pedigree and high level of integration, subsequent applications of the "single entity" principle indicate that *Dagher* should be interpreted narrowly. *See, e.g.*, *American Needle, Inc. v. National Football League*, 130 S.Ct. 2201, 2215 (2010) (despite operating under separate management, corporation established by the NFL to exclusively license the teams' trademarks was not a "single entity" for antitrust purposes, since the constituent teams did not function like components of a single firm maximizing the firm's profits); *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 326 (2d Cir. 2010) (holding that *Dagher* does not apply in a case where plaintiffs challenged joint venture as a sham and the joint venture was not explicitly approved by state or federal regulators); P. Areeda & H. Hovenkamp, Antitrust Law ¶ 2132, p. 387 (Supp. 2010) ("[O]ne should not overread the opinion. . . . This particular joint venture came very close to being a full merger of the two firms . . . Other ventures integrate far less.").

for profit."); *Topco*, 405 U.S., at 609 (applying *per se* rule to joint venture because "[e]ach of the member chains operates independently; there is no pooling of earnings, profits, capital, management, or advertising resources. . . . The association does not itself own any manufacturing, processing, or warehousing facilities . . . ."); *Dagher*, 547 U.S. at 7 ("The significant integration of assets itself suggests that Defendants intended Equilon and Motiva to function as true joint ventures, rather than covers for price fixing.").  But while evidence that assets or personnel have been contributed to a jointly-owned entity goes far to support a claim of genuine integration, it does not necessarily settle the issue.  In *Citizen Publishing Company v. United States*, 394 U.S. 131, 134 (1969), Arizona's only two daily newspapers had pooled distribution and production operations into a jointly-owned entity, through which they collectively set subscription and advertising prices and divvied up profits. *Id*. at 133-134. Despite the fact that the combination of the "circulation, advertising, and production departments has resulted in substantial cost savings," the joint venture was found liable for *per se* violations of § 1, including price fixing, horizontal market allocation, and profit pooling at an inflexible ratio.  *Id.* at 135-36.[32]

The existence of "plausible arguments that [the joint venture was] intended to enhance overall efficiency and make markets more competitive" also militates against application of the *per se* rule.  *Northwest Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294 (1985); *see also* Gregory J. Werden, *Antitrust Analysis of Joint Ventures: An Overview*, 66 Antitrust L.J. 701, 713 (1998) ("Any genuine economic integration that plausibly could confer nontrivial social benefits suffices to take a joint venture outside the purview of the *per se*

---

[32] The Supreme Court did not elaborate on the basis for its holding. Most likely, the Court condemned the joint venture as a *per se* violation because, from the start, it held no reasonable prospect of delivering efficiency-enhancing benefits to society.  The Court found that "[t]he purpose of the agreement was to end any business or commercial competition between the two papers," and that defendants lacked a viable defense for their actions.  In effect, despite the integration of assets, the joint venture was a sham. *Citizen Publishing*, 394 U.S. at 134, 136-37.

rules applied to cartel activity."). Yet, the nature and intended purpose of Defendants' collaboration, and the degree to which the Noranda DuPont Joint Venture integrated the participants' operations, remain issues of disputed fact. To be sure, Defendants have produced ample evidence indicating that, at least on paper, the joint venture aimed to legitimately pair up the complementary strengths of constituent firms in a single entity. Plaintiffs' evidence, on the other hand, is relatively slim. Still, the Court cannot conclusively say that the evidence is insufficient to shake a reasonable juror's faith in Defendants' representations. A factual determination is required to resolve whether the Joint Venture's formal documentation belies the true nature of the relationships among Noranda, DuPont, and Falconbridge. [33]

Prior to the formation of the Joint Venture, the record indicates that Noranda pressured DuPont to curtail its virgin acid production, and that DuPont may have complied. In a 1996 communication to Noranda's Vice President regarding resale contract negotiations, DuPont's Product Manager warned, "[w]e believe that [Noranda's] pricing at these levels encourages suppliers with sulfur burners to increase production . . . . We can burn sulfur and deliver acid . . . at significantly lower prices than you are asking us to pay. In other words, the proposed pricing encourages us to burn sulfur while Noranda has been steadily inquiring about ways to encourage us NOT to burn sulfur at our plants. We both know this is not in the long term best interest of both parties." Pl. Ex. 82. This sentiment arguably builds on a history of prior collusion. *See* Pl. Ex. 28 at 2 (Noranda memo) (referencing "our confidential discussions with DuPont relative to the eventual . . . closing of the Grasselli sulphur burner and hence the elimination of this 200,000 mt of acid production from the market."); Pl. Ex. 14 at 2, 8 (Noranda report) ("Successful

---

[33] Defendants suggest that any *possibly* legitimate venture encompassing the alleged anticompetitive behavior requires that the rule of reason test be applied. However, as this Court interprets the law, it is only *plausible* connections to legitimate business motivations that urge against applying *per se* analysis to what would otherwise be clearly anticompetitive behavior. And whether or not Noranda, DuPont, and Falconbridge's collaboration plausibly promoted competition or market efficiency is exactly what is at issue here

negotiations with . . . DuPont . . . have demonstrated the feasibility of replacing sulphur burned acid with smelted acid") ("[Du Pont h]as expressed a much stronger interest in scaling down production at [the Grasselli] facility by as much as 50-100,000 STPY."); Pl. Ex. 27 at 1 (Noranda memo) ("Grasselli Terms: DuPont shall permanently cease production of acid and oleum at Grasselli prior to commencement of shipments by Noranda.").

Such evidence tends to exclude the possibility that Noranda and DuPont consistently acted in an independent and legitimate manner. *See Matsushita*, 475 U.S. at 588. Plaintiffs essentially argue that the Joint Venture was an extension of an existing conspiracy among Defendants.[34] They contend that, due to DuPont's tremendous production capacity, the Joint Venture merely simplified Noranda's industry-wide price fixing scheme by reducing the number of conspirators required to achieve the desired result. Plaintiffs fortify their argument with evidence that the joint venturers were motivated by a desire to avoid a price war and a "ruinous battle for market share." *See* Pl. Ex. 116 at 116901 (Noranda DuPont presentation); Pl. Ex. 32 at 1 (Noranda notes); Pl. Ex. 135 (Noranda memo). As Defendants point out, there is nothing inherently illegal about wanting to avoid a detrimental price war with a competitor. But a reasonable factfinder could nevertheless infer from these references that the Joint Venture may have been established to suppress horizontal competition and stabilize acid prices.

The Joint Venture's chief financial officer stated that the "primary goal" of the joint venture was "to make sure we never shut a smelter down." Pl. Ex. 89, Kopko Dep. 139:21-140:7. In early 1999, the Joint Venture suffered a short-term inventory bubble due to an oversupply of

---

[34] Overall, Defendants tend to analyze separately evidence in support of anticompetitive deals made with Noranda prior to 1998 and those made with Noranda DuPont, LLC thereafter. The Court declines to decide how long, if at all, the alleged conspiracy lasted, and which specific plant shutdowns it entailed. If the Noranda DuPont joint venture is found to be an extension of existing concerted action, the temporal distinction posed by Defendants may be rendered moot. It is up to a factfinder to determine whether the dealings of Defendants Koch, PVS, and Boliden with Noranda DuPont LLC form part of a conspiracy that existed prior to the formation of the Joint Venture.

acid in the marketplace, among other factors. Norfalco SOF ¶ 72. To avoid smelter shutdowns at Noranda, DuPont scaled back production and burned sulfur at minimum levels for two months. Pl. Ex. 119. at 2 (DuPont email); Pl. Ex. 120 at 2 (DuPont email); Pl. Ex. 121 at ND94778 (Noranda DuPont presentation); Pl. Ex. 122 at 2 (Noranda DuPont fax); Pl. Ex. 123 at ND118186 (Noranda DuPont presentation).[35] Again, there are perfectly legal explanations for this decision. Still, the undisputed facts remain consistent with Plaintiffs' contention that the Joint Venture sought to maintain a balanced market by reducing output to accommodate Noranda's smelter acid.

Finally, the Court is unable to conclusively determine the level at which Noranda, DuPont, and Falconbridge integrated under the Joint Venture. To Defendants' credit, Plaintiffs' fixation on the Joint Venture's lack of manufacturing assets is largely misdirected. While "there were no capitalizable assets on the books of the joint venture . . . there was accounts receivable, inventory, and assigned leases." (Pl. Ex. 104, Hamma Dep. 152:17-153:11.) Noranda and DuPont further contributed cash and seconded personnel to the Joint Venture. Norfalco SOF ¶ 29, 38, 43-45.[36] The existence of jointly-owned assets lends credibility to Defendants' claims of legitimacy. Nevertheless, a 1998 Falconbridge report detracts somewhat from the import of these assets. When discussing the assignment of transportation contracts to the Joint Venture, the report states that "Noranda wants to assign these agreements to the JV as quickly as possible .

---

[35] DuPont claims that its decision to scale back production was unilateral, but the issue is disputed. Plaintiffs have produced evidence implying that DuPont acted at the direction of the Joint Venture. *See* Pl. Ex. 122, at ND00087153.

[36] The undisputed record also establishes that profits of the Joint Venture were split evenly between Noranda and DuPont, and that both companies shared the Joint Venture's losses. Norfalco SOF ¶ 34. Given the questionable history between the joint venturers in this case, the Court hesitates to read too much into the sharing of profits and risks. "If the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel 'could evade the antitrust law simply by creating a 'joint venture' to serve as the exclusive seller of their competing products.'" *See American Needle*, 130 S.Ct. at 2215 (quoting *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 335 (2d Cir. 2008) (Sotomayor, J., concurring)).

. . in order to have assets in the JV so it is perceived as a real as opposed to a shell company." Pl. Ex. 140 at 179709. While this language may have been an innocuous warning from a vigilant legal department, a factfinder could also reasonably infer from it that a genuine level of integration may not have been required or initially desired by the parties to accomplish their true aims. Joint assets aside, the record leaves open the possibility that the Joint Venture only integrated operations to a superficial degree, and that Noranda, DuPont, and Falconbridge continued to function more or less as independent and competing firms entering into an exclusive resale contract as a means of limiting their collective output. *See* Pl. Ex. 97 (Noranda DuPont Presentation) ("Investment required is just working capital and setup costs"); Pl. Ex. 100 at NFD156050 (Proposed Venture . . . Minimal initial investment – manufacturing remains with partners").

In the end, dispute over the central nature and purpose of the Noranda DuPont Joint Venture clouds inquiry into whether, at the time of its inception, it plausibly enhanced competition and efficiency in the sulfuric acid market. Certainly, the market efficiencies praised by Defendants might arise if the Joint Venture was as legitimate and integrated as claimed. Moreover, as Defendants also argue, it may well be that Plaintiffs have vastly overstated the evidence, which is comprised primarily of emails, notes, and slideshow presentations. But the weight of the evidence is for a juror, not the Court, to decide. When viewing the record in the light most favorable to Plaintiffs, a reasonable juror might conclude that, underneath the elaborate trappings of a joint venture, Noranda and DuPont maintained a relatively unintegrated sales relationship that enabled them to limit market output whenever supply threatened to overshadow demand. The joint activity described in the latter scenario has no prospects for procompetitive effects and would therefore remain vulnerable to *per se* condemnation.

Defending the Joint Venture's actions as ancillary to a legitimate business purpose does not produce a different result. In *Dagher*, the Supreme Court expressly forbade the application of the ancillary restraints doctrine to the pricing of goods sold by a joint venture, because price setting was a function of that joint venture's "core activity." *See Dagher*, 547 U.S. at 1281. Similarly, the pricing of Noranda DuPont's jointly distributed sulfuric acid is a function of its purported core activity. It bears noting, however, that Noranda DuPont was only responsible for transporting and selling sulfuric acid, not producing it. Thus, restricting the output of contributing companies arguably lies outside the "core activity" of the Joint Venture. Yet, whether DuPont's output reductions were necessary to support a legitimate, productivity-enhancing venture is precisely what is at issue here. The Court cannot embark on ancillary restraints analysis without first making a fact determination as to the nature of Defendants' greater collaborative activity.

In light of the lack of clarity on this issue, this Court cannot find that the Joint Venture was so clearly of a legitimate nature as to negate evidence justifying *per se* treatment, or make all anticompetitive effects merely ancillary to the business venture. The standard governing the legality of the challenged restraints depends on whether the Joint Venture conferred nontrivial economic benefits upon society, or merely served as a "formalistic shell for ongoing concerted action." *American Needle*, 130 S.Ct. 2201, 2215 (2010) (citing *Topco,* 405 U.S., at 609; *Sealy,* 388 U.S., at 352-354). Plaintiffs have submitted evidence that reasonably tends to prove that Noranda, Falconbridge, and DuPont consciously entered an output limitation conspiracy under the artful guise of a joint venture. *Accord Monsanto* 465 U.S. at 764; *Matsushita*, 475 U.S. at 588. Because a factfinder is required to decide the Joint Venture's legitimacy, summary

judgment must be denied.

### 6. Falconbridge, Noranda, and Boliden as a Single Entity

Defendants Falconbridge, Noranda, and Boliden argue that they are incapable of conspiring with each other in violation of § 1 because they essentially form a single entity. The Sherman Act makes a "basic distinction between concerted and independent action." *Copperweld*, 467 U.S. at 767. While Section 1 can only be violated by concerted action undertaken by horizontal competitors, the anticompetitive decisions of single firms are governed by § 2 of the Sherman Act. *Id.* at 767.

In *Copperweld Corporation v. Independence Tube Corporation*, the Supreme Court held that the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a "single enterprise" for purposes of section 1 of the Sherman Act. The Court based its holding on the rationale that "a parent and its wholly owned subsidiary have a complete unity of interest. . . . [T]heir general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." 467 U.S. at 753. In contrast, in *American Needle, Inc. v. National Football League* ("NFL"), the Supreme Court held that neither the NFL, nor a corporation established by the NFL to exclusively license the teams' trademarks, were "single entities" for antitrust purposes. The Court explained:

> We generally treat agreements within a single firm as independent action on the presumption that the components of the firm will act to maximize the firm's profits. But in rare cases, that presumption does not hold. Agreements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intrafirm agreements may simply be a formalistic shell for ongoing concerted action. 130 S.Ct. 2201, 2215 (2010) (citing *Topco Associates, Inc.,* 405 U.S., at 609; *Sealy,* 388 U.S., at 352-354).

The NFL was not considered a "single entity" because the league's independently-operating teams retained competitive interests and did not resemble components of a single firm seeking to maximize the firm's profits. *Id.* In other words, if an agreement joins together "independent centers of decisionmaking," it qualifies as concerted action under the purview of § 1. *See id.* at 2212 (quoting *Copperweld,* 467 U.S. at 769).

It is undisputed that Trelleborg owned 100% of Boliden Intertrade. From 1989 until June 1994, Trelleborg also owned 50% of Falconbridge, while Noranda owned the other half. In 1994, Trelleborg sold a large percentage of its Falconbridge shares to the public, reducing its holdings to 28%, and leaving Noranda as the largest shareholder with 46.4%. Since then, Falconbridge's financials have been fully consolidated in Noranda's consolidated financial statements. Noranda became a majority shareholder in Falconbridge after July 19, 2000, with no other shareholder owning a significant interest from that point on. That year, Noranda and Falconbridge began to integrate a number of departments and business units. The companies eventually merged in 2005, two years after the instant cases were filed.

All parties agree that, under *Copperweld*, any agreements between Trelleborg and its wholly owned subsidiary, Boliden, cannot be considered concerted action in violation of § 1 of the Sherman Act. However, *Copperweld's* guidance ends there. *See Copperweld*, 467 U.S. at 767 (limiting inquiry to "whether a parent and its wholly owned subsidiary are capable of conspiring in violation of §1 of the Sherman Act"). *Copperweld* has no bearing on agreements between wholly owned subsidiaries (e.g. Boliden) and a company of which its parent is a joint owner (e.g. Falconbridge), or agreements between a joint or majority corporate owner (e.g. Noranda) and its subsidiary (e.g. Falconbridge). Surprisingly, Defendants only devote two sentences and an inapposite citation to the dispositive issue of whether *per se* treatment remains

available in cases involving coordinated action between joint or majority corporate shareholders, partially-owned subsidiaries, and sister subsidiaries who are not wholly owned. *See* Falconbridge Br. at 14 (citing *U.S. v. Citizens & S. Nat'l Bank*, 422 U.S. 86 (1975) (holding that a national bank's agreements with banks in which it held 5% stock did not violate the Sherman Act because the 5% banks fell within the terms of the grandfather provision in the Bank Holding Company Act)). Plaintiffs do not address the matter at all. The Court therefore undertakes this analysis on its own initiative.

Although the Supreme Court has not addressed the aforementioned issue, lower courts have found that similarly related entities can conspire with each other. *See, e.g.*, *Sonitrol of Fresno, Inc. v. AT&T*, 1986 WL 953 (D. D.C. April 30, 1986) (holding that AT&T can conspire with corporations in which it holds a 32.6% and 23.9% interest and exerts *de facto* control). The reasoning behind *Copperweld*, elaborated on by *American Needle*, supports that conclusion. Under *American Needle*, the formal or legal assignation of parties to an agreement is not determinative of the "single entity" question. 130 S.Ct. at 2212. So long as a conspiracy joins together "separate economic actors pursuing separate economic interests," it constitutes concerted action covered by § 1 of the Sherman Act. *Id.* (quoting *Copperweld*, 467 U.S. at 768). Defendants point to the shares of Falconbridge under Noranda control, the presence of Noranda members on the Falconbridge Board of Directors, the consolidation of both company's financial statements, and the eventual integration of business units, to argue that Noranda and Falconbridge form essentially the same "corporate consciousness." Defendants thus depict the relationship between Noranda and Falconbridge as comparable to that of a parent company and its wholly owned subsidiary.

The degree to which Noranda exerted *de facto* control over Falconbridge is disputed, however. Plaintiffs present evidence contradicting the perception of a "complete unity of interest" between Noranda and Falconbridge. *Copperweld*, 467 U.S. at 753; *see, e.g.*, Pl. Ex. 110 (Noranda memo) ("Falconbridge has indicated its desire on several occasions to forego synergies with Noranda and to pursue its own interests even at the expense of Noranda, in an effort to preserve and protect its public shareholders."); Pl. Ex. 109 (Noranda memo) ("[A] similar problem will arise again unless Noranda insists that Falconbridge managers stop focusing on levering more from Noranda and begin to cooperate actively . . . ."); Pl. Ex. 93 at 2 (Noranda memo) ("[I]t makes sense for Falconbridge and Noranda acid to be sold jointly so as to avoid mutually damaging competition, but [Falconbridge] now see themselves as suffering as much damage as if that were taking place."); *see also* Pl. Ex. 39 at NFD 180494 (Falconbridge memo refuting unity of interest with Boliden) ("Boliden appear to be taking the view that FL has no alternative but to place the surplus with them on their terms. Something has gone awry win these negotiations . . . FL needs better deal out of Boliden."). Moreover, while Noranda appointed the President of Falconbridge, and Defendants' witnesses have testified that Noranda generally controlled the board, none of Defendants' evidence specifies a year in which Noranda held a controlling bloc, if any. Meanwhile, Falconbridge's annual reports covering 1994 to 1998 and 2000 indicate that Noranda never had more than four members on a board of ten or eleven directors. *See* Pl. Ex. 190 at NF/EX 014067, 014159, 014271, 014333, 014490, 014665 (Falconbridge annual reports); *see also Sonitrol of Fresno, Inc. v. AT&T*, 1986 WL 953, at *5 (D. D.C. April 30, 1986) (in spite of AT&T's *de facto* control of partially-owned subsidiaries, "[a]s long as [the subsidiaries' boards of directors] had the legal ability to determine the course of business activity for their corporation independently of AT&T, they were capable of conspiring

with AT&T in violation of § 1 of the Sherman Act."). Varieties of share ownership notwithstanding, whether Noranda and Falconbridge were so unified as to benefit from the "single entity" doctrine remains a triable issue of fact. Accordingly, a *per se* illegal conspiracy may yet be found to have existed among them, depending on how a factfinder favors the evidence.

Noranda and Falconbridge further argue that they cannot conspire to engage in concerted action under § 1 because they share an agency relationship. In April 1991, Falconbridge appointed Noranda as its sole sales agent responsible for the sales, marketing and distribution of its sulfuric acid. Noranda handled the sales and marketing of Falconbridge's sulfuric acid until the agency relationship for the sale of acid in the United States terminated in 1998 with the formation of the Noranda DuPont Joint Venture.[37]

Defendants inaccurately cite *Day v. Taylor*, 400 F.3d 1272 (2005) for the broad proposition that companies in an agency relationship cannot conspire to commit violations of § 1 of the Sherman Act. *Day* merely teaches that " 'genuine contracts of agency' do not constitute resale price maintenance because the 'owner of an article' is permitted to 'fix [] the price by which his agents transfer the title from him directly to the consumer.' " 400 F.3d at 1276 (quoting *United States v. General Electric Co.,* 272 U.S. 476, 488 (1926)). *Day* would be relevant if Plaintiffs had challenged Noranda's pricing of Falconbridge's acid as a violation of the Sherman Act in and of itself. However, Plaintiffs do not question Noranda and Falconbridge's agency relationship as an illegal price fixing agreement. Rather, Plaintiffs charge Falconbridge with engaging in conduct outside the parameters of their agency relationship, i.e.,

---

[37] Although Noranda acted as Falconbridge's exclusive sales agent for seven years, it appears that, within this relationship, the companies retained competing interests. *See* Pl. Ex. 272 at NFD172546 ("Falconbridge pointed out that it felt it had a disproportionate allocation of 'distant' customers relative to Noranda during the preceding 3 years, and that if Noranda had been pooling with Falconbridge its average freight cost would be lower. . . .").

conspiring with voluntary sulfuric acid producers to reduce their output as a means of stabilizing industry prices. *See* Pl. Ex. 39 at 2 (Falconbridge report) ("Boliden have just recently conceded they will cut back Copperhill by 112,500 MT and move only 50% (112,500 MT) of our tonnage to Florida."); Pl. Ex. 41 at 8 (Falconbridge memo) ("Boliden will reduce their sulphur burning acid production to purchase acid from KCM/FL."); Ex. 14 at 8 (Noranda report) (Sayreville plaint "is extremely expensive to operate and CIL may consider closing it provided it can secure a satisfactory supply agreement from another producer."); Pl. Ex. 64 (contract between CIL and Falconbridge); Pl. Ex. 28 at 1-2 (Noranda memo) (indicating that Noranda, as "sales agent" and "joint owners" of Falconbridge, responds to proposals "strongly request[ed]" or "urge[d]" by Falconbridge).

According to Plaintiffs' allegations, Noranda's role as sales agent merely streamlined the process by which the two Canadian companies delivered smelter acid to co-conspirators. In that case, the agency relationship does not insulate Noranda and Falconbridge from liability under the Sherman Act. In any event, Falconbridge may still be liable for *per se* violations of the Sherman Act if its agent Noranda acted with actual or apparent authority to commit the illegal acts at issue. *See American Soc. Of Mechanical Engineers, Inc., v. Hydrolevel Corp.*, 456 U.S. 556, 565 (1982). Falconbridge is also charged with the alleged collusive activity underlying the Noranda DuPont Joint Venture, which occurred after the termination of the agency relationship. *See* Falconbridge SOF ¶ 38.

The Court finally addresses Defendants' contention that Boliden, Noranda, and Falconbridge should collectively enjoy "single entity" status because Falconbridge was purportedly a joint venture between the two others. As an initial matter, the Court rejects the suggestion that Falconbridge was a joint venture between Boliden and Noranda. More

accurately, Falconbridge was a joint venture between Trelleborg and Noranda. The fact that a wholly owned subsidiary and its parent company are considered a single entity for purposes of § 1 liability does not mean that the two are interchangeable in all regards. At any rate, Defendants cite no authority for the proposition that two companies engaging in a joint venture cannot violate antitrust laws by entering in an anticompetitive conspiracy separate and apart from that joint venture.

Defendants' argument that Noranda and Boliden must be considered a single entity in all aspects simply because Falconbridge is unified draws language from case law wherein joint ventures or their actions are themselves challenged as infringements of the Sherman Act. *See, e.g., Dagher*, 574 U.S. at 3; *Chicago Professional Sports Ltd. Partnership v. National Basketball Assoc.*, 95 F.3d 593, 595 (7th Cir. 1996). Such precedent is inapposite to the case at hand. Plaintiffs do not challenge the legitimacy of Falconbridge as they do the Noranda DuPont Joint Venture. They readily concede that Falconbridge's decisions amount to the unilateral decisions of a single entity. They simply accuse that single entity of conspiring with other firms in violation of the Sherman Act. Even if the Court were to treat Falconbridge as a joint venture, the *per se* rule could still apply to its actions; Falconbridge's alleged efforts to limit industry output, for which sufficient evidence exists to persuade a factfinder, could constitute a naked, collateral, and thereby *per se* illegal restraint on competition. *See, e.g.*, Pl. Ex. 39 at 2 (Falconbridge report); Pl. Ex. 40 at 2; Pl. Ex. 41 at 8 (Falconbridge memo); Pl. Ex. 64 (contract between CIL and Falconbridge). In sum, Noranda, Boliden, and Falconbridge do not enjoy "single entity" status for all conduct separately undertaken by the companies, simply because Falconbridge was, for a time, the legitimate joint venture of Noranda and Trelleborg. Noranda, Falconbridge, and Boliden qualify as separate entities capable of conspiring under § 1 of the Sherman Act.

## CONCLUSION

At this point, Plaintiffs have raised enough issues of contested material fact to preclude both summary judgment on the merits and determination of the appropriate legal standard for this case. Plaintiffs claim that Defendants were in a competitive situation, were confronted by a jarring change to the market, and coordinated their production and distribution to stabilize that market. There is, of course, a lack of clarity as to whether Defendants in fact acted as Plaintiffs allege, but there is complete clarity that, if they did, it would amount to a *per se* violation of the Sherman Act and carry with it anticompetitive effects.

Defendant GAC stands apart from co-Defendants due to a lack of evidence tending to exclude the possibility of independent action on its part. Plaintiffs' horizontal market allocation claims based on Defendants' zone contracts are likewise unavailing, as vertical nonprice restraints are properly judged under the rule of reason. Having eschewed rule of reason analysis, Plaintiffs have failed to raise a triable issue of fact as to Defendants' liability under the *per se* doctrine for the anticompetitive nature of the zone contracts.

For the foregoing reasons, the Court GRANTS Defendant GAC's motion for summary judgment. The Court DENIES the motions submitted by Defendants Noranda, Boliden, PVS, Norfalco, and Koch. Defendant Falconbridge's motion is DENIED in part. Falconbridge's request for summary judgment on the issue of Defendants' zone contracts is GRANTED.

Enter:

/s/ David H. Coar
_____

David H. Coar
United States District Judge

Dated: **September 24, 2010**